COOLEY LLP
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
MARK F. LAMBERT (197410) (mlambert@cooley.com)
RITESH K. SRIVASTAVA (246477) (rsrivastava@cooley.com)
AMANDA A. MAIN (260814) (amain@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Defendant
VOLCANO CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FORMER SHAREHOLDERS OF CARDIOSPECTRA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>VOLCANO CORPORATION, a Delaware corporation; and DOES 1-10,<br><br>Defendants. | Case No. CV12-01535 (WHO)<br><br>**DEFENDANT VOLCANO CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION OF PLAINTIFFS' CLAIMS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: March 19, 2014<br>Time: 2:00 p.m.<br>Judge: Honorable William H. Orrick<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS


Page

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 2

I. INTRODUCTION ..... 2

II. STATEMENT OF FACTS ..... 3

- A. Volcano's Acquisition of CardioSpectra ..... 3
- B. The Merger Agreement and its Milestone Provisions ..... 4
- C. Plaintiff Banas' Tenure as the Head of Volcano's OCT Division and Volcano's Development of CardioSpectra's Prototype System ..... 6
- D. Plaintiffs' Claim for Breach of Contract ..... 9

III. LEGAL STANDARD ..... 11

IV. PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT FAILS AS A MATTER OF LAW ..... 12

- A. As A Matter of Law, No Payments are Due Under the Sales Milestones ..... 12
  - 1. Axsun's laser components are not "OCT Products" under the Merger Agreement ..... 12
    - a. Plaintiffs' Interpretation Conflicts with the Plain Language of the Merger Agreement ..... 13
    - b. Plaintiffs' Interpretation Frustrates the Scheme of the Merger Agreement ..... 15
    - c. Plaintiffs' Interpretation Nullifies Other Provisions in the Merger Agreement ..... 17
  - 2. Plaintiffs cannot present admissible extrinsic evidence to support their interpretation that Axsun's laser components are "OCT Products." ..... 19
  - 3. Plaintiffs cannot state facts showing that Volcano has met the definitional elements of the Sales Milestones ..... 20
- B. Plaintiffs' Anticipatory Breach Claim Fails As A Matter of Law ..... 21
- C. Plaintiffs Cannot Prove that Volcano Failed to Use Commercially Reasonable Efforts to Achieve Milestone 2 ..... 22

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Airborne Health, Inc. v. Squid Soap, LP*
984 A.2d 126 (Del. Ch. 2009) ........ 16

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........ 11, 23

*Artesian Water Co. v. Dep't of Highways & Transp.*
330 A.2d 441 (Del. 1974) ........ 19

*Bank of N.Y. Mellon v. Commerzbank*
65 A.3d 539 (Del. 2013) ........ 13, 18

*Celotex Corp. v. Catrett*
427 U.S. 317 (1986) ........ 11, 21, 22

*Chrylser Corp. v. Quimby*
14 A.2d 123 (Del. 1958) ........ 22

*Clark Motor Co. v. Mfrs. & Traders Trust Co.*
360 Fed. App'x 340 (3d Cir. 2010) ........ 25

*DV Realty Advisors, LLC v. Policemen's Annuity & Ben. Fund of Chi.*
75 A.3d 101 (Del. 2013) ........ 22, 23

*E.I. du Pont de Nemours v. Shell Oil Co.*
498 A.2d 1108 (Del. 1985) (en banc) ........ 15, 17

*Eagle Indus. v. DeVilbiss Health Care*
702 A.2d 1228 (Del. 1997) ........ 13, 19, 20

*Fu-Kong Tzung v. State Farm Fire & Cas. Co.*
873 F.2d 1338 (9th Cir. 1989) ........ 12

*Gilbert v. MPM Enters.*
709 A.2d 663 (Del. Ch. 1997) ........ 16

*GRT, Inc. v. Marathon GTF Tech., Ltd.*
2012 Del. Ch. LEXIS 134 (Del. Ch. June 21, 2012) ........ 13, 22

*H-M Wexford LLC v. Encorp, Inc.*
832 A.2d 129 (Del. Ch. 2003) ........ 23

*In re Hayes Lemmerz Int'l Inc.*
640 B.R. 461 (Bankr. D. Del. 2006) ........ 14

*Interim Healthcare v. Spherion Corp.*
884 A.2d 513 (Del. Super. Ct. 2005) ........ 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*James Cable, LLC v. Millenium Digital Media Sys., L.L.C. (In re Broadstripe, LLC)*
435 B.R. 245 (Bankr. D. Del. 2010) ........ 21

*JANA Master Fund Ltd. v. CNET Networks, Inc.*
954 A.2d 335 (Del. Ch. 2008) ........ 12

*Morente v. Morente*
2000 WL 264329 (Del. Ch. Feb. 29, 2000) ........ 25

*Nisqually Indian Tribe v. Gregoire*
623 F.3d 923 (9th Cir. 2010) ........ 11

*O'Brien v. Progressive N. Ins. Co.*
785 A.2d 281 (Del. 2001) ........ 18

*Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*
616 A.2d 1192 (Del. 1992) ........ 13

*San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*
132 F.3d 1303 (9th Cir. 1997) ........ 19

*SIGA Techs., Inc. v. PharmAthene, Inc.*
67 A.3d 330 (Del. 2013) ........ 23

**OTHER AUTHORITIES**

Am. Heritage Coll. Dictionary (3d ed. 1997) ........ 14, 15, 16

Black's Law Dictionary (9th ed. 2009) ........ 16

Brian JM Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127 (2012) ........ 16

Federal Rule of Civil Procedure 56 ........ 1, 11

H. Ramsey Fowler & Jane E. Aaron, The Little, Brown Handbook (4th ed. 1989) ........ 15

Maryann A. Waryjas, *Structuring and Negotiating Earn–Outs,* Acquiring or Selling the Privately Held Company 2007 (PLI Corporate Law & Practice, Course Handbook Series) ........ 16

The New York Public Library Writer's Guide To Style & Usage (1st ed. 1994) ........ 15

The Oxford Dictionary Of English Grammar (1994) ........ 15

Webster's II New Coll. Dictionary (1999) ........ 14

# LIST OF DECLARATION EXHIBITS

**EXHIBITS ATTACHED TO THE DECLARATION OF SCOTT HUENNEKENS** in Support of Defendant Volcano Corporation's Motion for Summary Judgment or, Alternatively, Summary Adjudication of Plaintiffs' Claims ("Huennekens Decl."):

- **EXHIBIT A**: Agreement and Plan of Merger among Volcano Corporation ("Volcano"), Corazon Acquisition, Inc., CardioSpectra, Inc., and Christopher E. Banas and Paul Castella, as Shareholders' Representatives, dated December 7, 2007 (the "Merger Agreement").
- **EXHIBIT B**: Letter from Volcano to Christopher E. Banas and Paul Castella ("Plaintiffs"), dated November 15, 2013.
- **EXHIBIT C**: Letter from Plaintiffs to Volcano, dated January 25, 2012.

**EXHIBITS ATTACHED TO THE DECLARATION OF AMANDA A. MAIN** in Support of Defendant Volcano Corporation's Motion for Summary Judgment or, Alternatively, Summary Adjudication of Plaintiffs' Claims ("Main Decl."):

- **EXHIBIT D**: Plaintiffs' Second Amended Complaint for Breach of Written Contract, dated August 20, 2012.
- **EXHIBIT E**: Plaintiffs' Notice of Videotaped Deposition of Defendant Volcano Corporation Pursuant to Fed. R. Civ. P. 30(b)(6), dated June 14, 2013.
- **EXHIBIT F**: Defendant Volcano Corporation's Responses and Objections to Plaintiffs' Notice of Videotaped Deposition of Defendant Volcano Corporation Pursuant to Federal Rule of Civil Procedure 30(b)(6), dated July 9, 2013.
- **EXHIBIT G**: Excerpted deposition transcript of Nathaniel J. Kemp ("Kemp Depo").
- **EXHIBIT H**: Excerpted deposition transcript of Tim Glynn ("Glynn Depo.").
- **EXHIBIT I**: Excerpted deposition transcript of John T. Dahldorf ("Dahldorf Depo.").
- **EXHIBIT J**: Exhibit 164 to Dahldorf Depo.
- **EXHIBIT K**: Excerpted deposition transcript of Daniel Sims ("Sims Depo.").
- **EXHIBIT L**: Exhibit 351 to Sims Depo.

- **EXHIBIT M**: Excerpted deposition transcript of Scott Huennekens ("Huennekens Depo.").
- **EXHIBIT N**: Excerpted deposition transcript of Paul Castella ("Castella Depo").
- **EXHIBIT O**: Exhibit 821 to Castella Depo.
- **EXHIBIT P**: Excerpted deposition transcript of Christopher E. Banas ("Banas Depo.").
- **EXHIBIT Q**: Exhibit 861 to Banas Depo.
- **EXHIBIT R**: Exhibit 863 to Banas Depo.
- **EXHIBIT S**: Exhibit 873 to Banas Depo.
- **EXHIBIT T**: Defendant Volcano Corporation's Second Set of Interrogatories to Plaintiffs Former Shareholders of CardioSpectra, Inc., dated June 28, 2013.
- **EXHIBIT U**: Order Regarding Parties' Discovery Dispute at Docket Number 52, dated October 4, 2013.
- **EXHIBIT V**: Supplemental Objections and Responses to Defendant Volcano Corporation's Second Set of Interrogatories to Plaintiffs Former Shareholders of CardioSpectra, Inc., dated November 4, 2013.
- **EXHIBIT W**: Letter from Amanda A. Main to Marc R. Stanley re: Plaintiffs' Supplemental Objections and Responses to Defendant Volcano Corporation's Second Set of Interrogatories, dated November 25, 2013.
- **EXHIBIT X**: Selected supplemental authority cited herein: The Am. Heritage Coll. Dictionary 297, 687, 992 (3d ed. 1997); Webster's II New Coll. Dictionary 798 (1999); The New York Public Library Writer's Guide To Style & Usage 280-81 (1st ed. 1994); Sylvia Chalker & Edmund Weiner, The Oxford Dictionary Of English Grammar 280 (1994); H. Ramsey Fowler & Jane E. Aaron, The Little, Brown Handbook 428 (4th ed. 1989); and Maryann A. Waryjas, *Structuring and Negotiating Earn–Outs,* Acquiring or Selling the Privately Held Company 2007, at 759, 761 (PLI Corporate Law & Practice, Course Handbook Series 2007).

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on March 19, 2014, at 2:00 p.m., or as soon thereafter as this motion may be heard by the above-captioned Court, Defendant Volcano Corporation ("Volcano") will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), for summary judgment or, alternatively, summary adjudication of each claim for relief in the Second Amended Complaint (the "Complaint") filed by Plaintiffs' Christopher E. Banas and Paul Castella, in their capacities as Shareholders' Representatives of the Former CardioSpectra Shareholders ("Plaintiffs"). Volcano bases this Motion on the accompanying Memorandum of Points and Authorities, the Declarations of Scott Huennekens and Amanda A. Main and the exhibits attached thereto, which are filed concurrently herewith, all pleadings and papers on file in this action, and such other matters and arguments presented to the Court at the hearing on this Motion.

**STATEMENT OF RELIEF SOUGHT**

Pursuant to Rule 56, Volcano seeks an order granting summary judgment or, alternatively, summary adjudication of each claim for relief in the Complaint.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether Volcano is entitled to an order granting summary judgment or, alternatively, summary adjudication of each allegation of breach of contract in the Complaint, because Plaintiffs cannot present admissible evidence to support a jury verdict in their favor that:

(1) Plaintiffs are entitled to payment under Sections 2.5(a)(iii) and (iv) (the "Sales Milestones") of the Agreement and Plan of Merger among Volcano Corporation, Corazon Acquisition, Inc., CardioSpectra, Inc., and Christopher E. Banas and Paul Castella, as Shareholders' Representatives, dated December 7, 2007 (the "Merger Agreement");

(2) Volcano anticipatorily breached its obligation to use "commercially reasonable efforts" to cause the achievement of the Sales Milestones; and

(3) Volcano failed to act in good faith and use "commercially reasonable efforts" to cause the achievement of the second Milestone in Section 2.5(a)(ii) of the Merger Agreement.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In December 2007, Defendant Volcano acquired CardioSpectra, Inc. ("CardioSpectra"), the developer of a prototype Optical Coherence Tomography ("OCT") imaging system for imaging coronary arteries, known as the "CorVue System." This medical device required approvals from the Food & Drug Administration (the "FDA") before it could be tested in humans or marketed or sold in the U.S. CardioSpectra had not tested its CorVue System in a single human and had not obtained any form of regulatory approval. In fact, at the time, no company in the world had obtained U.S. regulatory approval for a cardiovascular OCT system. Ex. P (Banas Depo. at 216:23-25). Given the tremendous uncertainty associated with successfully developing and commercializing the acquired technology, CardioSpectra agreed to an acquisition price of $25.2 million and the possibility of additional, deferred compensation contingent on whether Volcano realized value from the acquired assets, as measured by four agreed-upon milestones relating to regulatory approvals of OCT systems and sales of "OCT Products." As part of the merger, CardioSpectra's employees formed Volcano's new OCT division, including its CEO and the lead Plaintiff, who served as the head of Volcano's OCT division and was admittedly responsible for the "strategy and implementation plan to develop and commercialize the OCT program." (*Id.* at 267:14-268:14).

To date, Volcano has paid $36.2 million to CardioSpectra's Former Shareholders and has invested another $31.3 million on research and development ("R&D") alone. Volcano has not generated any revenue from its investment, and it never will, as it has recently terminated its cardiovascular OCT program, which it determined to be a "Commercial Failure." Plaintiffs nevertheless demand another $27 million for the unmet milestones despite the $67.5 million Volcano already invested in its fruitless cardiovascular OCT program. Plaintiffs criticize Volcano's efforts, but their hindsight second guessing cannot support a verdict in their favor because it is legally irrelevant and unsupported by fact. Even more, the law precludes Plaintiffs from suing Volcano based on conduct in which they participated and acquiesced. Finally, the Merger Agreement's plain terms defeat Plaintiffs' contrived theory that they are entitled to

compensation based on the sale of OCT components developed and commercialized entirely by a third-party company that Volcano purchased over a year after acquiring CardioSpectra.

## II. STATEMENT OF FACTS

Volcano is a publicly-traded medical device company that was founded in 2000. Huennekens Decl. at ¶ 2. Volcano designs, develops, manufactures, and commercializes a broad suite of precision guided therapy tools, including intravascular ultrasound ("IVUS"), to diagnose and treat vascular heart disease. *Id.* Volcano markets its products to physicians, nurses, and technicians who perform procedures in hospitals and to other personnel who make purchasing decisions on behalf of hospitals. *Id.* Volcano's products consist of consoles that give the user access to multiple imaging technologies on a single system (i.e., multi-modality consoles) that are marketed as stand-alone units or as customized units. *Id.*

CardioSpectra was a start-up medical device company founded in San Antonio, Texas in April 2005, which had developed a prototype OCT imaging system for coronary arteries, known as the "CorVue System." Ex. D (SAC at ¶¶ 2, 15, 18, 21); Ex. N (Castella Depo. at 90:10-21). The system consisted of three primary parts: a console, a patient interface module and pull-back device (a "PIM"), and a catheter. Ex. N (Castella Depo. at 90:19-93:24); Ex. P (Banas Depo. at 220:15-221:6); Ex. Q (Banas Ex. 861 (p. 26)). The system incorporated components purchased from original equipment manufacturers ("OEM"), including an off-the-shelf OCT laser housed in the counsel that was purchased from third-party manufacturer Santec. Ex. N (Castella Depo. at 90:10-23, 92:10-93:19); Ex. P (Banas Depo. at 179:10-14). The console also included various OEM hardware components, such as monitors, computer processors, power supplies, data storage devices, and a printer. Ex. P (Banas Depo. at 204:17-205:17). CardioSpectra's OCT system required FDA's approval of a 510(k) application before it could be marketed or sold in the U.S. (*Id.* at 133:21-134:9, 300:9-21). Additionally, if human clinical data were needed to support the 510(k) application, the FDA must approve an Investigational Device Exemption ("IDE") application before the OCT system could be tested in humans in the U.S. *Id.*

### A. Volcano's Acquisition of CardioSpectra

On August 9, 2007, CardioSpectra met with Volcano and presented an overview of the

company, the CorVue System, product development status, and intellectual property portfolio. Ex. P (Banas Depo. at 97:8-101:16); Ex. Q (Banas Ex. 861). Following due diligence, Volcano acquired CardioSpectra on December 7, 2007 for approximately $25.2 million pursuant to the Merger Agreement. Ex. D (SAC at ¶ 21); Ex. A (Merger Agmt.). Plaintiffs are parties to the Merger Agreement in their capacities as Shareholder Representatives of the Former Shareholders of CardioSpectra. Ex. A (Merger Agmt.).

### B. The Merger Agreement and its Milestone Provisions

The Merger Agreement contains four "Milestone" (or "earn-out") provisions, which contemplate the possibility of additional merger consideration payments if Volcano were to achieve certain, agreed-upon goals following the acquisition. Ex. A (Merger Agmt. at § 2.5(a)). The first two Milestones relate to regulatory approvals of specifically-defined OCT systems (collectively, the "Regulatory Milestones"), while the last two Milestones are triggered by defined sales of "OCT Products" (collectively, the "Sales Milestones"). *Id.* Exhibit A to the Merger Agreement contains "Certain Definitions," including key terms in the Milestone provisions. Ex. A (Ex. A to Merger Agmt.). The Milestones are as follows:

**Milestone 1:** $11 million upon regulatory approval from European *or* Japanese regulatory authorities, *or* from the FDA, of a "Generation 1 OCT System" by December 31, 2009. Ex. A (Merger Agmt. at § 2.5(a)(i)). A "Generation 1 OCT System" is defined as "an OCT System incorporating (a) an imaging and display console substantially similar to the OCT System in use today, (b) rudimentary medical grade verified and validated application software and a pull-back rotating sled . . . , and (c) a single use OCT System catheter." *Id.* at A-9.

**Milestone 2:** $10 million upon FDA approval or premarket notification clearance (i.e., 510(k) clearance) of a "Generation 1a OCT System" by December 31, 2010. Ex. A (Merger Agmt. at § 2.5(a)(ii)). A "Generation 1a OCT System" is "a productized version of the Generation 1 OCT System incorporating (a) an imaging and display console substantially similar to the OCT System in use today but with the elimination of unnecessary components and circuit jumpers, (b) medical grade software and customary features . . . and a pull-back rotating sled with integrating actuation . . . , and (c) a single use OCT System catheter." *Id.* at A-9.

**Milestone 3:** $10 million if Volcano attains "Cumulative Cash Sales"[1] totaling $10 million from "Commercial Sales[2] of OCT Products" by December 31, 2013. *Id.* at § 2.5(a)(iii).

**Milestone 4:** $7 million if Volcano achieves "Cumulative Cash Sales" totaling $25 million from "Commercial Sales of OCT Products" by December 31, 2014. *Id.* at § 2.5(a)(iv).

Under the Sales Milestones, "'OCT Product' means consoles (including OCT laser light sources[,][3] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." [4] Ex. A (Merger Agmt. at A-13). To monitor the status of progress towards the Sales Milestones, Plaintiffs may request a report of "Cumulative Cash Sales of OCT Products" from Volcano twice a year. *Id.* at § 2.5(e)).

The Merger Agreement expressly disclaims any guarantee that Volcano will achieve any Milestone. Ex. A (Merger Agmt. at § 2.5(b) ("[the Agreement] shall not require that any Milestone be achieved on or before [the specified] dates ***or ever***") (emphasis added). In lieu of such a promise, Volcano must "act in good faith and use commercially reasonable efforts . . . to cause each of the Milestones to be achieved." *Id.* Volcano is never required to "use more than

---

[1] "'Cumulative Cash Sales' mean revenues calculated in accordance with GAAP for OCT Products . . . from Commercial Sales less the following amounts directly chargeable to such OCT Products . . . and stated separately on the applicable bill or invoice: (a) customary trade, quantity or cash discounts and rebates actually allowed and taken; (b) amounts repaid or credited to customers on account of rejections or returns; and (c) freight and other transportation costs, including insurances charges, and duties, tariffs, sales and excise taxes and other governmental charges based directly on sales, turnover or delivery of such OCT Products . . . and actually paid or allowed" by Volcano. Ex. A (Merger Agmt. at A-7).

[2] "Commercial Sale" means, in pertinent part, "(a) the sale by Parent or its Affiliates of an OCT Product . . . for end use or consumption of such product in a country, [or] (b) the sale by Parent or its Affiliates of an OCT Product . . . to a wholesaler or reseller of OCT Products . . . ." Ex. A (Merger Agmt. at A-4).

[3] The parties have agreed that a comma was mistakenly omitted between the words "sources" and "processors." Ex. N (Castella Depo. at 180:14-20).

[4] Plaintiffs do not contend that Volcano has sold any product "covered by the scope of any Valid Claim contained in any Licensed Patent," as referenced within the definition of "OCT Product." Ex. V (Pls.' Supp. Resp. Interrog. No. 13).

commercially reasonable efforts." *Id.*

The parties negotiated for a particular "commercially reasonable efforts" standard:

> the use of efforts, sales terms, expertise and resources normally used by [Volcano] for other products, which, as compared with the OCT Products, are of similar market potential at a similar stage in its development or product life, taking into account all reasonable relevant factors affecting the cost, risk and timing of development and the total potential of the applicable OCT Products, all as measured by the facts and circumstances at the time such efforts are due.

*Id.* Under this negotiated standard, Volcano may determine its investment of efforts and resources in pursuit of the Milestones in relation to its other products and initiatives, rather than being subject to after-the-fact, non-contractual standards such as "industry standards" or "best practices," or other externally-driven comparisons to other companies in the industry. *See id.* This tailored contractual standard also eschews hindsight second guessing by measuring the efforts "at the time such efforts are due." *See id.*

Volcano's obligation to use the specifically defined commercially reasonable efforts is "in all circumstances" further subject to its additional rights under Section 2.5(c) to, "at its sole discretion, terminate all or any part of its OCT cardiovascular program, including terminating the development and/or commercialization of all or some OCT Systems or OCT Products" upon its "reasonable determination" that "a Technical Failure or Commercial Failure has occurred." *Id.* at §§ 2.5(b), 2.5(c). Such a determination terminates Volcano's obligation to use commercially reasonable efforts to cause the achievement of the Milestones. *Id.*

### C. Plaintiff Banas' Tenure as the Head of Volcano's OCT Division and Volcano's Development of CardioSpectra's Prototype System

As part of the acquisition, nearly all of CardioSpectra's employees, most of whom were shareholders, joined Volcano to form its new OCT division. Ex. N (Castella Depo. at 18:20-19:2). This included Plaintiff Banas, CardioSpectra's former CEO, who became the head of Volcano's OCT division. Ex. P (Banas Depo. at 25:12-25). Mr. Banas, the person "responsible for the OCT division," was "ultimate[ly] responsib[le]" for obtaining regulatory approval of the OCT system, and created the "strategy and implementation plan to develop and commercialize the OCT program." (*Id.* at 264:22-265:20, 267:14-268:14).

As of the merger, the CorVue System had not been tested in a single human and had not received any form of regulatory approval. Ex. N (Castella Depo. at 49:14-17); Ex. P (Banas Depo. at 224:8-12). During the months following the acquisition, Volcano encountered unexpected and serious technical challenges associated with the acquired CorVue System. Ex. G (Kemp Depo. at 110:4-17); Ex. P (Banas Depo. at 284:15-288:8). For example, in animal and European human studies conducted during the first half of 2008, Volcano discovered significant impairment of the image quality, referred to as non-uniform rotational distortion, or "NURD," delaying forecasted R&D and regulatory timelines. Ex. G (Kemp Depo. at 110:4-17); Ex. K (Sims Depo. at 169:23-171:14); Ex. L (Sims Ex. 351 (p. 3)); Ex. P (Banas Depo. at 284:15-288:8). Indeed, in the summer of 2008, Plaintiff Banas acknowledged in his OCT status report that "all of [the program's strategic] decisions are based on whether the CorVue catheter can be made to have acceptable amounts of NURD." Ex. S (Banas Ex. 873 (p. 9)).

Under Plaintiff Banas' watch, Volcano also determined a strategic need to replace the expensive and bulky Santec laser housed in the CorVue console. Ex. M (Huennekens Depo. at 75:8-16). Around August of 2008, Volcano learned of an opportunity to acquire Axsun Technologies ("Axsun"), a manufacturer of, among other things, compact laser components that could be used in OCT imaging devices in various medical fields, including ophthalmology, dentistry, and cardiology. Ex. M (Huennekens Depo. at 17:9-18:14); Ex. P (Banas Depo. at 304:5-17). Plaintiff Banas, then acting as leader of Volcano's OCT division, vocally expressed his strong support in favor of the acquisition and envisioned substituting the Santec laser with an Axsun laser. Ex. P (Banas Depo. at 303:24-306:3). Volcano acquired Axsun in December 2008 for approximately $20 million, and Axsun operates as a separate, wholly-owned subsidiary of Volcano. Ex. M (Huennekens Depo. at 20:23-21:13); Ex. P (Banas Depo. at 348:24-349:2).

Under Plaintiff Banas' leadership, Volcano adopted a strategy of seeking 510(k) regulatory clearance from the FDA without first requesting a pre-submission meeting or conducting a clinical trial for testing in humans. Ex. P (Banas Depo. at 293:3-297:12, 297:23-300:8); Ex. S (Banas Ex. 873 (pp. 49-54)). Mr. Banas, the leader of the OCT division, recognized the risk that the FDA could require human clinical data to support 510(k) regulatory clearance of

the OCT devices but, after reviewing the options and weighing the pros and cons, agreed that this strategy would yield the quickest and most substantive FDA feedback. *Id.* Volcano submitted 510(k) applications for regulatory clearance of the OCT system and catheter in November 2008 and an IDE application in December 2008 for approval to conduct a clinical trial in the United States to collect data for a future regulatory submission in Japan. Ex. H (Glynn Depo. at 18:6-18), Ex. P (Banas Depo. at 319:1-320:2, 322:3-24). The FDA responded in early 2009, stating that Volcano needed human clinical data to support the 510(k) submissions and seeking additional information regarding the clinical trial. Ex. H (Glynn Depo. at 18:10-19:24, 77:21-78:09). The FDA's response to the 510(k) was one of the known risks of the strategy that Mr. Banas approved and supported. Ex. P (Banas Depo. at 293:3-297:12, 297:23-300:8). Plaintiff Banas thus participated and acquiesced in the developmental and regulatory strategy and decisions Volcano implemented from the time of the acquisition until approximately March 2009 when he transitioned out of his leadership position. Ex. P (Banas Depo. at 264:22-265:20, 267:14-268:14, 270:10-25, 285:25-288:8, 293:3-300:8, 314:15-317:1, 319:1-320:16, 322:3-24).

After receiving the FDA's feedback, Volcano determined that a successful clinical trial could not be conducted without further development and testing of the OCT system. Ex. G (Kemp Depo. at 80:11-81:21); Ex. H (Glynn Depo. at 121:23-123:7). Volcano thereafter achieved the first Regulatory Milestone by obtaining "CE Mark approval" from European regulatory authorities of a "Generation 1 OCT System" by the end of 2009, and thus paid an additional $11 million. Ex. N (Castella Depo. at 173:14-19); Ex. P (Banas Depo. at 142:5-8). Volcano continued its R&D and regulatory efforts up until approximately November 2013 when it decided to terminate its cardiovascular OCT program.[5] Huennekens Decl. at ¶¶ 4-5.

Despite its substantial investment in acquiring CardioSpectra and developing their OCT technology, Volcano has not earned any return on its investment. Beyond the $25.2 million

---

[5] In a letter dated November 15, 2013, Volcano notified Plaintiffs that it had made a reasonable determination that "a Commercial Failure has occurred with respect to its OCT cardiovascular program, such that it is not reasonable to further pursue development or commercialization of its OCT cardiovascular program" such that it was terminating the program in its entirety. Ex. B to Huennekens Decl.

Volcano paid to acquire CardioSpectra and the additional $11 million it paid upon achieving the first Regulatory Milestone, Volcano invested approximately $31.3 million on OCT R&D alone between 2008 and 2013, separate and apart from regulatory spending. Ex. J (Dahldorf Ex. 164); Huennekens Decl. at ¶ 4. By contrast, CardioSpectra had invested a total of approximately $5.3 million during its two and a half years of existence – a number that pales in comparison to Volcano's investment of approximately $67.5 million. Ex. N (Castella Depo. at 37:14-18).

**D. Plaintiffs' Claim for Breach of Contract**

On March 27, 2012, Plaintiffs and other Former CardioSpectra Shareholders filed suit against Volcano, asserting claims for breach of the Merger Agreement, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. *See* Dkt. No. 1. The Court dismissed all of Plaintiffs' claims. *See* Dkt. No. 31. Plaintiffs then filed a Second Amended Complaint (the "Complaint"), alleging that Volcano breached the Merger Agreement. *See* Dkt. No. 33.

Plaintiffs claim that Volcano breached the Merger Agreement by failing to act in good faith or "use commercially reasonable efforts to cause" the achievement of the second Regulatory Milestone through FDA approval of a "Generation 1a OCT System." Ex. D (SAC at ¶¶ 30, 35). Plaintiffs also claim that Volcano has breached the Merger Agreement by achieving the Sales Milestones and not paying the amounts due thereunder. Ex. D (SAC at ¶ 36). Plaintiffs alternatively assert that Volcano anticipatorily breached the Merger Agreement by "preventing the achievement" of the Sales Milestones. *Id.*

With respect to the second Regulatory Milestone, Plaintiffs allege that Volcano "openly expressed hostility" to developing the OCT system and feigned product development concerns "as a cover," and that Volcano's senior management was "secretly working against [Plaintiff Banas] and undercutting his role and authority." Ex. V (Pls.' Supp. Resp. to Interrog. No. 6). Plaintiffs also criticize Volcano's regulatory strategy, personnel, and leadership and mount personal attacks on various employees. Ex. V (Pls.' Supp. Resp. to Interrog. No. 4).

With respect to the Sales Milestones, Plaintiffs allege that Volcano has sold more than $25 million of "OCT Products," citing Axsun's alleged sale of "OCT laser light sources, associated development and support services, and/or other products that all fall within the definition of OCT

Products" under the Merger Agreement. Ex. D (SAC at ¶¶ 7, 31, 36). Plaintiffs contend that Axsun's laser components are "OCT laser light sources," and thus "OCT Products," and that Axsun's sales of its proprietary technology have triggered Volcano's obligation to pay $17 million to CardioSpectra's Former Shareholders under the Sales Milestones. *Id.*[6]

Plaintiff Banas participated in the Axsun due diligence and knew that Axsun supplied laser components to a Volcano competitor, LightLab Imaging, Inc. ("LightLab"), for integration into its OCT system. Ex. P (Banas Depo. at 180:8-181:9, 306:4-306:11). During the time leading up to the Axsun acquisition and even after, Plaintiff Banas admits that he never told anyone at Volcano that he believed Axsun's sale of its proprietary laser components would count towards the Sales Milestones, nor did he disclose that the acquisition would personally benefit him while effectively doubling Volcano's cost to acquire Axsun in the form of $17 million in milestone payments to CardioSpectra's Former Shareholders. Ex. P (Banas Depo. at 349:19-351:15). Plaintiffs also failed to mention this theory when they sought to negotiate a discounted payment for Milestones 2 through 4 in June 2010, or when they claimed that Volcano achieved the Sales Milestones in January 2012. *See* Exs. C, O. In fact, Plaintiffs first made Volcano aware of their theory around the time they filed this lawsuit in March 2012, more than three years after Volcano acquired Axsun. Notably, although Plaintiffs knew about Volcano's ownership of Axsun and Axsun's sales of laser components since December 2008, Plaintiffs never purported to invoke their right to request reports of Cumulative Cash Sales of OCT Products until January 2012, only two months before filing this lawsuit. Ex. A (Merger Agmt. at § 2.5(e)).

To discover the factual bases supporting Plaintiffs' assertions, Volcano propounded contention interrogatories. Ex. T. Plaintiffs' initial responses were factually deficient, and the

---

[6] Plaintiffs contend that the following Axsun components qualify as "OCT Products": (1) Axsun Swept Laser OEM Engine (1060 nm and 1310 nm); (2) Axsun Swept Laser Benchtop Engine (1060 nm and 1310 nm); (2) Axsun Camera Link Data Acquisition (DAQ) Board; and (4) Axsun Swept Laser with Integrated DAQ. Ex. V (Pls.' Resp. to Interrog. No. 7). Plaintiffs allege that "[w]ith respect to the medical industry, Volcano" manufactures and sells "OCT products for medical applications[,] such as ophthalmology, dental, research projects, and cardiovascular." (*Id.* at Supp. Resp. to Interrog. No. 7). Plaintiffs claim that "[t]he sales from these products, including OCT laser light sources, exceed $25,000,000." *Id.*

Court ordered them to supplement their responses and state all material facts supporting their contentions. Ex. U. Plaintiffs supplemented. Ex. V. To ensure that Plaintiffs were not withholding any facts that could support their claims, Volcano's counsel sent a letter to Plaintiffs' counsel, explaining that the supplemental responses still contain factually unsupported and legally irrelevant contentions and asking Plaintiffs to confirm that such responses disclose all material facts supporting their contentions. Ex. W (p. 4). Plaintiffs failed to do so and did not further supplement their responses. Main Decl. at ¶ 18. Accordingly, Plaintiffs' supplemental responses presumably state all material facts supporting their contentions, as ordered by the Court.

## III. Legal Standard

Federal Rule of Civil Procedure 56(a) requires the Court to grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Material facts are those which might affect the outcome of the case, and a dispute as to a material fact is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the opposing party bears the burden of proof at trial, the moving party need only show that "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 427 U.S. 317, 325 (1986). The non-moving party must then go beyond the pleadings and identify "specific facts showing that there is a genuine issue for trial." *Celotex*, 427 U.S. at 324. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a summary judgment motion. *Anderson*, 477 U.S. at 253. Instead, the plaintiff must present evidence on which a reasonable jury could rely to find by a preponderance of the evidence that the plaintiff is entitled to a verdict in its favor. *Id.*

Accordingly, summary judgment must be granted unless the Court concludes that a reasonable jury could return a verdict in favor of Plaintiffs based on the evidence presented. *Anderson*, 477 U.S. at 249-52 ("The judge's inquiry, therefore, unavoidably asks . . . 'whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'") (citation omitted); *see, e.g., Nisqually Indian Tribe v. Gregoire*, 623 F.3d 923, 932-33 (9th Cir. 2010) (affirming district court's grant of

summary judgment to defendant on plaintiff's breach of contract claim).

## IV. PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT FAILS AS A MATTER OF LAW.

Summary judgment in favor of Volcano is warranted because: (1) Plaintiffs cannot prove that Volcano has achieved the Sales Milestones and are thus entitled to payment; (2) Plaintiffs' alternative claim that Volcano anticipatorily breached the Sales Milestones is not supported by the law or triable facts; and (3) Plaintiffs cannot demonstrate that Volcano failed to act in good faith or use commercially reasonable efforts with respect to the second Regulatory Milestone.

### A. As A Matter of Law, No Payments are Due Under the Sales Milestones.

Plaintiffs cannot prove that Volcano has achieved the Sales Milestones. To demonstrate that Volcano achieved the Sales Milestones, thus triggering an obligation to pay an additional $17 million in "Milestone Merger Consideration," Plaintiffs must show that Volcano has attained "Cumulative Cash Sales" totaling $25 million "from Commercial Sales of OCT Products." Ex. A (Merger Agmt. at § 2.5(a)(iii)-(iv)). Plaintiffs contend that the Sales Milestones have been met through Axsun's sales of its proprietary laser components. Ex. D (SAC at ¶ 31); Ex. V (Pls.' Initial & Supp. Resp. to Interrog. Nos. 10, 12).

Plaintiffs' claim fails as a matter of law for two independent reasons. First, the Merger Agreement unambiguously establishes that Axsun's laser components are not "OCT Products." Even if this Court finds an ambiguity, Plaintiffs cannot present sufficient extrinsic evidence to resolve the ambiguity in their favor. Second, Plaintiffs cannot present admissible evidence to prove that revenue from Axsun's sales of its laser components has resulted in "Cumulative Cash Sales" totaling $25 million from "Commercial Sales," as defined in the Merger Agreement.

#### 1. Axsun's laser components are not "OCT Products" under the Merger Agreement.

The court decides the meaning of an unambiguous contract as a matter of law. *Fu-Kong Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1340-42 (9th Cir. 1989); *JANA Master Fund Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 338-39 (Del. Ch. 2008).[7] Where the contract is

[7] Delaware law applies. Ex. A (Merger Agmt. at § 13.9(a) (the agreement "shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware").

not reasonably or fairly susceptible to the non-moving party's interpretation, the moving party is entitled to summary judgment. *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 Del. Ch. LEXIS 134, at *4-5, 11 (Del. Ch. June 21, 2012). When determining the contract's meaning, the "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citation omitted). This reasonable person is "acquainted with all operative usages and know[s] all the circumstances prior to and contemporaneous with" the execution of the agreement. *Interim Healthcare v. Spherion Corp.*, 884 A.2d 513, 555 (Del. Super. Ct. 2005); *see also Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 n.7 (Del. 1997) (allowing for the consideration of "undisputed background facts to place the contractual provision in its historical setting").

Volcano is entitled to summary judgment, because the Merger Agreement is not reasonably or fairly susceptible to Plaintiffs' interpretation that Axsun's laser components are "OCT Products." As discussed below, such an interpretation conflicts with the plain language and meaning of the Merger Agreement, frustrates its manifest plan and scheme, and renders other provisions meaningless or superfluous.

**a. Plaintiffs' Interpretation Conflicts with the Plain Language of the Merger Agreement.**

An interpretation that Axsun's laser components are "OCT Products" is unreasonable because it conflicts with the plain language and meaning of that definition and the Merger Agreement as a whole. *Bank of N.Y. Mellon v. Commerzbank*, 65 A.3d 539, 555 (Del. 2013) ("An interpretation that conflicts with the plain language of a contract is not reasonable."). Under the Merger Agreement, "'OCT Product' means consoles (including OCT laser light sources[,] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." Ex. A (Merger Agmt. at A-13). It is undisputed that the parenthetical after "consoles" contains a list of components that one would expect to find in a console at the time of the merger. Ex. N (Castella Depo. at 188:17-20, 197:9-18).

Plaintiffs do not claim that Axsun's laser components are "consoles," "PIM[s]," "OCT catheters or wands," or "any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." Rather, Plaintiffs manufacture their claim around the phrase "OCT laser light sources" that appears within the parenthetical list following the word "console," arguing that all of the components listed in the parenthesis, including "OCT laser light sources," are by themselves and severally "OCT Product[s]." *See* Ex. V (Pls.' Supp. Resp. to Interrog. Nos. 7, 10, 12). This interpretation is fatally flawed for several reasons.

First, Plaintiffs' interpretation gives unreasonable breadth to the definition of "OCT Product." Because the terms within the parenthetical must be interpreted with reference to one another, if an "OCT laser light source" is an "OCT Product," then so is every other component listed therein. *See* Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961) (interpreting a term "by the company it keeps . . . to avoid [] unintended breadth"); *In re Hayes Lemmerz Int'l Inc.*, 640 B.R. 461, 483 (Bankr. D. Del. 2006) (interpreting "worn out" in conjunction with the other words listed, such as "lost, stolen, [and] destroyed," to mean damage beyond repair and not simply in need of repair). Following Plaintiffs' interpretation, generic off-the-shelf computer parts not unique to an OCT console (let alone proprietary to CardioSpectra), such as "data storage devices" and "printers," constitute "OCT Products" in addition to countless, unspecified "other related components." This interpretation improperly deprives the definition of "OCT Products" of any meaningful limit and creates a post-merger payment obligation tied to third-party components that do not in any way derive from the assets Volcano acquired from CardioSpectra.

Second, Plaintiffs' interpretation ignores the generic nature of the word "console" and the unmistakable purpose served by the parenthetical list of components. The word "console" is a generic term[8] and the parenthetical[9] serves to explain this term (and no other term) in the context

---

[8] The American Heritage College Dictionary attributes no less than seven definitions to the word "console." The Am. Heritage Coll. Dictionary 297 (3d ed. 1997) (defining console as "1.a. A cabinet, as for a television set, designed to stand on the floor. b. A small freestanding storage cabinet. 2. *Mus.* The desklike part of an organ that contains the keyboard, stops, and pedals. 3.a. A central control panel for a mechanical, electrical, or electronic system. b. An instrument panel. 4. The portion of a computer or peripheral that houses the apparatus used to operate the machine manually. 5. A small storage compartment mounted between bucket seats in an

of the Merger Agreement. This is apparent from the plain language and structure of the parenthetical, which begins with "including," a word commonly used to identify "part[s]" or "element[s]"[10] of a complete entity, and then lists specific parts followed by a broad reference to an unspecified class of "other related components." The listed parts along with the "other related components" are all merely "components" of a console. Plaintiffs' interpretation that each and every component inside the parenthetical necessarily constitutes an additional, stand-alone "OCT Product," as well as a "console" as a whole, improperly disregards the plain meaning of the parenthetical text. The parenthetical gives meaning to the generic term "consoles" and cannot be reasonably construed to create a list of components constituting "OCT Product[s]" on equal footing with "consoles," "PIM[s]," and "OCT catheters or wands." *See* The New York Public Library Writer's Guide To Style & Usage 280-81 (1st ed. 1994) (parentheses are used to deemphasize information and indicate that the enclosed words are not vital to the sentence's meaning); Sylvia Chalker & Edmund Weiner, The Oxford Dictionary Of English Grammar 280 (1994) (defining parenthesis as providing "an explanation or afterthought into a passage which is grammatically complete without it"); H. Ramsey Fowler & Jane E. Aaron, The Little, Brown Handbook 428 (4th ed. 1989) ("parenthetical expressions include explanations, facts, digressions, and examples that may be helpful or interesting but are not essential to meaning").

**b. Plaintiffs' Interpretation Frustrates the Scheme of the Merger Agreement.**

A "meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (en banc) (rejecting interpretation permitting the sublicense of a patent in a nonexclusive license agreement given that the ordinary scheme of such agreements is to convey personal rights not

---

automobile. 6. An often scroll-shaped bracket used for decoration or for supporting a projecting member. 7. A console table.").

[9] Webster's II New Coll. Dictionary 798 (1999); The Am. Heritage Coll. Dictionary 992 (3d ed. 1997) (both defining "parenthetical" as "qualifying or explanatory").

[10] The Am. Heritage Coll. Dictionary 687 (3d ed. 1997) (defining "include" and "including" as "to take in as a part, an element, or a member").

susceptible to sublicensing). Plaintiffs' interpretation contravenes this fundamental rule by impermissibly frustrating the plan and scheme of the Merger Agreement. As reflected by the parties' use of earn-out provisions and the plain language of the Merger Agreement, the Milestone provisions must be achieved through the development and commercialization of the CardioSpectra assets.

Black's Law Dictionary defines an "earnout agreement" as one "for the sale of a business whereby the buyer first pays an agreed amount up front, leaving the final purchase price to be determined by the business's future profits." Black's Law Dictionary (9th ed. 2009). Earn-out provisions provide for the possibility of future payments to the seller if and when the value of the transferred assets is realized, as measured by the agreed-upon criteria in the contract. *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 132 (Del. Ch. 2009) (stating that an earn-out provision "requir[es] the buyer to pay more only if the business proves that it is worth more"); *Gilbert v. MPM Enters.*, 709 A.2d 663, 670 (Del. Ch. 1997) (explaining that, with an earn-out agreement, the buyer has the advantage of "pay[ing] now for value he perceives now and pay[ing] later for additional value, but only if that additional value materializes").[11] Earn-out provisions therefore allocate "the risk of a negative outcome to the seller." Quinn, *Earnouts* at 130. Critically, a seller's right to the deferred compensation is directly dependent on, and tied to, the post-acquisition value realized by the buyer from the acquisition. *See Airborne Health*, 984 A.2d at 132; *Gilbert*, 709 A.2d at 670. Thus, the earn-out provisions in the Merger Agreement unquestionably reflect the parties' fundamental intent to compensate CardioSpectra's Former Shareholders ***if and when*** Volcano realizes value from the acquired assets, as measured by the goals specified in the Milestones.

[11] Maryann A. Waryjas, *Structuring and Negotiating Earn–Outs,* Acquiring or Selling the Privately Held Company 2007, at 759, 761 (PLI Corporate Law & Practice, Course Handbook Series 2007) ("An earnout provision makes a portion of the payment to the sellers contingent upon the target reaching specified milestones during a specified period after the closing."); Brian JM Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 133 (2012) [hereinafter Quinn, *Earnouts*] (stating that, through the use of earn-out provisions, the parties "defer the ultimate valuation question until a later point in time when the uncertainties with respect to valuation have been resolved").

The plain language of the Milestones also directly ties the Former CardioSpectra Shareholders' right to deferred compensation, if any, to the development, performance, and commercial success of the devices and technology acquired from CardioSpectra. Specifically, achievement of the Regulatory Milestones hinges on regulatory approval of Generation 1 and Generation 1a OCT Systems—each defined as "substantially similar" to the system acquired from CardioSpectra. Ex. A (Merger Agmt. at § 2.5(a)(i)-(ii), A-9).

Plaintiffs' contention that Axsun's OCT laser components are "OCT Products" under the Sales Milestones negates the scheme of the Merger Agreement by entitling CardioSpectra's Former Shareholders to windfall compensation based on value realized ***not from CardioSpectra's assets,*** but instead from OCT-related components developed and commercialized by a third party. Such an interpretation is neither reasonable nor fair. Accordingly, the Court must reject it.

#### c. Plaintiffs' Interpretation Nullifies Other Provisions in the Merger Agreement.

Plaintiffs' interpretation also improperly renders other provisions in the Merger Agreement null and without effect, including provisions relating to the Milestones. *E.I. du Pont*, 498 A.2d at 1113 (requiring the court to construe the contract "as a whole, giving effect to all provisions therein"). For instance, Section 2.5(c) of the Merger Agreement affords Volcano the right to "terminat[e] the development and/or commercialization of all or some OCT Systems or OCT Products" and extinguish its obligation to use "commercially reasonable efforts" to cause the achievement of the Milestones upon its reasonable determination that a Technical or Commercial Failure has occurred. Ex. A (Merger Agmt. at § 2.5(c)). Section 2.5(c), on its face, plainly contemplates that Volcano's rights relate to an OCT Product "develop[ed] and/or commercializ[ed]" by Volcano following the acquisition. *Id.* at § 2.5(c), A-4, A-16. Further, a "Commercial Failure" or "Technical Failure," by definition, can only occur with respect to an OCT Product developed or commercialized by Volcano.[12] *Id.* Because it is undisputed that Volcano did not develop or commercialize Axsun's laser components, Plaintiffs' interpretation

---

[12] Ex. A (Merger Agmt. at § 2.5(c), A-4 ("Commercial Failure" relates to Volcano's "further development or commercialization" of the OCT Product), A-16 ("Technical Failure" relates to Volcano's "development" or "commercialization" of the OCT Product)).

renders Volcano's contractual rights under Section 2.5(c) meaningless and illusory. *See* Ex. P (Banas Depo. at 180:8-181:9, 306:4-306:11); *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (rejecting interpretation that robbed other provision of any meaningful effect).[13]

The criteria for declaring a Technical Failure also contemplates that the OCT Product requires FDA approval. Ex. A (Merger Agmt. at § 2.5(c), A-16) (Volcano can declare a "Technical Failure" with respect to an OCT Product if it determines that "FDA marketing approval [is] not reasonably likely"). This provision is non-sensical under Plaintiffs' interpretation, because Axsun does not need FDA approval to sell its laser components. Ex. P (Banas Depo. at 194:20-198:3).

Not only rendering such provisions illusory, Plaintiffs' interpretation deprives Volcano of the benefit of its bargain, because Section 2.5(b) unequivocally provides that Volcano's obligation to cause the achievement of the Milestones "*shall in all circumstances be subject to*" Volcano's right to declare a Commercial or Technical Failure. Ex. A (Merger Agmt. at § 2.5(b) (emphasis added)).[14] *See Bank of N.Y. Mellon v. Commerzbank*, 65 A.3d 539, 556 (Del. 2013) (dismissing an interpretation that would "gut the protections afforded" by the contract).

Similarly, Section 2.5(b)—the very section defining Volcano's obligation with respect to the Milestones—defines "commercially reasonable efforts" only in terms of OCT Products that Volcano would develop (and not by a company that Volcano paid fair value to acquire a year later with Plaintiff Banas' enthusiastic support). More specifically, Section 2.5(b) states that Volcano will "use commercially reasonable efforts to cause each of the Milestones to be achieved" and tailors those efforts, in part, to the "cost, risk and timing of development" of the OCT Product. Ex. A (Merger Agmt. at § 2.5(b)). Where neither Volcano (nor the Surviving Company) develops

---

[13] Similarly, such an interpretation would have the absurd effect of prohibiting Axsun from discontinuing manufacture or development of an OCT-related component unless Volcano notified the CardioSpectra Shareholder Representatives of a Technical or Commercial Failure as to the Axsun component – an outcome that could not have been envisioned at the time of the CardioSpectra acquisition.

[14] Ex. A (Merger Agmt. at § 2.5(b) ("*provided, however,* that the obligation of [Volcano] to use commercially reasonable efforts . . . to achieve the Milestones . . . shall in all circumstances be subject to paragraph (c) below in the event of a Commercial Failure or Technical Failure")).

the purported "OCT Product" (as is the case here where Plaintiffs claim that the Axsun laser is the qualifying OCT Product) Volcano's obligation to use commercially reasonable efforts to cause the achievement of the Milestones is illusory. In other words, Plaintiffs contend that Volcano achieved the Sales Milestones not by complying with its obligation to use commercially reasonable efforts relative to the assets acquired from CardioSpectra, but by later acquiring Axsun for $20 million—a decision beyond the scope of Volcano's obligation to CardioSpectra's Former Shareholders, yet which would absurdly enrich them to the tune of $17 million.

For these reasons, the Merger Agreement is not reasonably or fairly susceptible to Plaintiffs' claim that Axsun's sales of its laser components triggered the Sales Milestones. Accordingly, the Court should grant summary judgment in favor of Volcano.

**2. Plaintiffs cannot present admissible extrinsic evidence to support their interpretation that Axsun's laser components are "OCT Products."**

The Merger Agreement is not reasonably or fairly susceptible to Plaintiffs' interpretation, but even if it were, summary judgment remains proper because Plaintiffs cannot come forward with admissible extrinsic evidence to support their proffered interpretation. *See San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) (affirming summary judgment where contract was ambiguous but the ambiguity could not be resolved consistently with the non-moving party's interpretation); *Eagle Indus.*, 702 A.2d at 1233. The strongest evidence reflecting the parties' understanding of the contract is often their course of performance under the agreement. *Artesian Water Co. v. Dep't of Highways & Transp.*, 330 A.2d 441, 443 (Del. 1974) (stating that the parties conduct in the performance of their contract is of "great weight in determining the meaning and applicability of the contract").

Plaintiff Banas' post-acquisition conduct belies any claim that the parties' shared an understanding that Axsun's sale of its laser components would count towards the Sales Milestones. Instead, his conduct suggests that he either actively concealed this interpretation from Volcano or that he later developed this theory. Plaintiff Banas, while President of Volcano's OCT division, was an adamant proponent of the Axsun acquisition and envisioned using an Axsun laser as a substitute for the Santec laser in the CorVue System. Ex. P (Banas

Depo. at 303:24-306:3). Plaintiff Banas knew that Axsun sold OCT laser components to Volcano's competitor, LightLab. (*Id.* at 180:8-181:9). Despite the fiduciary duties he owed to Volcano, Plaintiff Banas never mentioned to anyone at Volcano, either before or around the time that Volcano acquired Axsun, that he believed Axsun's sale of its proprietary laser components would count towards the Sales Milestones, or that the Axsun acquisition would effectively cost Volcano an additional $17 million (nearly doubling the cost to acquire Axsun) in the form of milestone payments to him and the other CardioSpectra's Former Shareholders. (*Id.* at 349:19-351:15). Tellingly, Plaintiffs first mentioned this theory just before they filed this lawsuit in March 2012, more than three years after Volcano acquired Axsun in December 2008. If Plaintiffs believed that Axsun was selling OCT Products, it is surprising that neither of them exercised their contractual right to request "a report of Cumulative Cash Sales of OCT Products" for more than three years, despite knowing that Axsun was actively selling its OCT laser components. Ex. A (Merger Agmt. at § 2.5(e)). Through their course of performance, Plaintiffs demonstrated the non-existence of any mutual understanding that Axsun sales could trigger the Sales Milestones.[15]

Because any claimed ambiguity cannot be resolved in favor of Plaintiffs' interpretation, Volcano is entitled to summary judgment.

**3. Plaintiffs cannot state facts showing that Volcano has met the definitional elements of the Sales Milestones.**

Summary judgment is also appropriate for the independent reason that Plaintiffs cannot come forward with evidence that the sales of Axsun components meet the exacting requirements of "Cumulative Cash Sales" from "Commercial Sales," as defined in the Merger Agreement. *See*

---

[15] The court may also consider extrinsic evidence concerning the communications between the parties before entering into the agreement. *Eagle Indus.*, 702 A.2d at 1232-33. Plaintiffs' claim that Axsun's laser component sales count towards the Sales Milestones is contradicted by the parties' pre-merger communications. During negotiations, Volcano and CardioSpectra developed a "model" estimating the timeline for achieving the Sales Milestones, which contemplated that Volcano would manufacture and sell whole consoles continuing to house Santec's off-the-shelf laser light source, a processor, and other related components. Ex. P (Banas Depo. at 145:7-149:6), Ex. R (Banas Ex. 863). This "model" only contemplated that Volcano would reach the Sales Milestones through the development and regulatory approval of the assets acquired from CardioSpectra (which makes perfect sense since no credible business person would oblige the company to pay CardioSpectra shareholders for future acquisitions not then contemplated or known). *Id.*

*Celotex*, 427 U.S. at 322-24 (mandating summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). The "Commercial Sales" definition requires that the OCT Products be either: (1) sold for "end use or consumption," as distinguished from a manufacturer that buys a component that is incorporated into a medical device and then sold for end use or consumption by a customer; (2) sold to wholesalers or resellers of OCT Products; or (3) leased or licensed. Ex. A (Merger Agmt. at A-4). Further, "Cumulative Cash Sales" are calculated by a formula requiring specific deductions from "revenue" and thus are not simply gross revenue attributable to Commercial Sales of OCT Products. *Id.* at A-7. Significantly, Volcano designated a corporate representative to testify as to Axsun's sales of its OCT laser components (Ex. F), but Plaintiffs failed to ask a single question regarding the required elements. Even after the Court ordered Plaintiffs to state all materials facts supporting their contention that Volcano achieved the Sales Milestones, Plaintiffs still state no facts from which a reasonable jury could conclude that the "Cumulative Cash Sales" and "Commercial Sales" elements have been met.

**B. Plaintiffs' Anticipatory Breach Claim Fails As A Matter of Law.**

Plaintiffs alternatively claim that Volcano was "preventing the achievement" of the Sales Milestones and therefore anticipatorily breached the Merger Agreement. Ex. D (SAC at ¶ 36). To prevail on a claim for anticipatory breach, Plaintiffs must prove that Volcano unequivocally informed Plaintiffs that it would not use "commercially reasonable efforts" to cause the achievement of the Sales Milestones. *James Cable, LLC v. Millenium Digital Media Sys., L.L.C. (In re Broadstripe, LLC)*, 435 B.R. 245, 261 (Bankr. D. Del. 2010) (explaining anticipatory breach as the repudiation of an obligation through a clear statement showing that a party "will not or cannot perform" or an act "rendering performance apparently or actually impossible").

Summary judgment is warranted because there is an "absence of evidence" supporting Plaintiffs' anticipatory breach claim. *See Celotex*, 427 U.S. at 325. Plaintiffs allege no facts in their Complaint showing that Volcano unequivocally informed them that it would not use commercially reasonable efforts to cause the achievement of the Sales Milestones or any facts

supporting their allegation that Volcano was "preventing the achievement" of the Sales Milestones. Likewise, Plaintiffs' court-ordered supplemental interrogatory responses identify no factual basis to support their claim. Ex. V (Pls.' Supp. Resp. to Interrog. No. 8).

Additionally, Plaintiffs' claim fails as a matter of law because Volcano properly discharged the obligation on which Plaintiffs rely to assert anticipatory breach. Under Delaware law, there can be no anticipatory breach of a contract term that is no longer operative. *Chrylser Corp. v. Quimby*, 14 A.2d 123, 133 (Del. 1958) ("There can obviously be no anticipatory breach on July 27 of a clause in a contract that had ceased to be operative on June 13."). Upon Volcano's declaration of a Commercial Failure of its cardiovascular OCT program under Section 2.5(c), Volcano extinguished its obligation to continue using commercially reasonable efforts to achieve the Sales Milestones. *See GRT*, 2012 Del. Ch. LEXIS 134 at *21 (where "a contract specifically contemplates that a party may take action, addresses the specific obligations the other party is owed when that happens, and then the party takes that action in full accordance with its attendant obligations, there is no proper basis to conclude that the party has breached the contract by doing what the objective terms of the contract authorize.").

**C. Plaintiffs Cannot Prove that Volcano Failed to Use Commercially Reasonable Efforts to Achieve Milestone 2.**

Plaintiffs claim that Volcano breached its obligation to act in good faith and use "commercially reasonable efforts" to cause the achievement of the second Regulatory Milestone (i.e., FDA approval of a "Generation 1a OCT System"). There is an "absence of evidence" supporting this claim as is apparent from Plaintiffs' supplemental responses to Volcano's contention interrogatories. *See Celotex*, 427 U.S. at 325.

First, Plaintiffs cannot advance a triable issue of fact that Volcano failed to act in good faith. The Merger Agreement's express good faith requirement is a subjective standard, requiring "honesty in fact." *See DV Realty Advisors, LLC v. Policemen's Annuity & Ben. Fund of Chi.*, 75 A.3d 101, 110 (Del. 2013) (interpreting contractual "good faith" as purely subjective, meaning "honesty in fact"). To show that Volcano's conduct lacked "good faith," Plaintiffs must come forward with evidence showing that Volcano acted in "bad faith." *See id.* Volcano's conduct will be considered "good faith" unless it "went so far beyond the bounds of reasonable judgment

that it seems essentially inexplicable on any ground other than bad faith." *See id.* (internal quotations omitted). Bad faith is "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *SIGA Techs., Inc. v. PharmAthene, Inc.,* 67 A.3d 330, 344 (Del. 2013).

Plaintiffs cannot show that Volcano intentionally acted with the purpose of avoiding payment of the Milestones. Despite the tens of millions invested by Volcano, Plaintiffs assert that Volcano "openly expressed hostility" to developing the OCT system and feigned product development concerns "as a cover," and that Volcano's senior management was "secretly working against [Plaintiff Banas] and undercutting his role and authority." Ex. V (Pls.' Supp. Resp. to Interrog. No. 6). Plaintiffs have no admissible evidence to support these assertions and, fatal to their claim, Plaintiffs admit that Volcano did not intentionally jeopardize the development, regulatory approval, or commercialization of the acquired OCT system. Ex. N (Castella Depo. at 297:23-298:17); Ex. P (Banas Depo. at 289:15-291:4, 322:3-324:9).

Plaintiffs also bear the burden of proving that Volcano breached its obligation to use "commercially reasonable efforts" to cause the achievement of the second Regulatory Milestone. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). The Merger Agreement defines "commercially reasonable efforts" as "the use of efforts, sales terms, expertise and resources normally used by [Volcano] for other products, which, as compared with the OCT Products, are of similar market potential at a similar stage in its development or product life, taking into account all reasonable relevant factors affecting the cost, risk and timing of development and the total potential of the applicable OCT Products, all as measured by the facts and circumstances at the time such efforts are due." Ex. A (Merger Agmt. at § 2.5(b)). Plaintiffs thus cannot defeat summary judgment unless they present "significantly probative" evidence: (1) identifying "other products" of "similar market potential" and at a "similar stage" in their development or product life, as compared to the OCT Products; (2) showing the specific efforts, expertise and resources Volcano "normally" used for these similarly-situated "other products"; and (3) demonstrating that the facts and circumstances at the time of the alleged breach required Volcano to apply the same efforts to its OCT Products. *Id.*; *see Anderson*, 477 U.S. at 249-50.

Plaintiffs' court-ordered discovery responses consist of assertions that are irrelevant to the contractually defined performance standard and cannot support a reasonable jury verdict that Volcano breached that standard. *See* Ex. V (Pls.' Supp. Resp. to Interrog. No. 4). For instance, Plaintiffs contend that Volcano's efforts fell below "accepted practices . . . for the medical device industry," but this factually unsupported contention is irrelevant, as the Merger Agreement requires efforts "normally" used by Volcano and does <u>not</u> impose an industry performance standard. *Id.*; Ex. A (Merger Agmt. at § 2.5(b)).

Plaintiffs' interrogatory response is also devoid of facts necessary to prove key elements of their claim. *See* Ex. V (Pls.' Supp. Resp. to Interrog. No. 4). Plaintiffs identify no "other products" for which Volcano "normally" used the efforts, expertise and resources that Plaintiffs now claim were required of Volcano. Plaintiffs also state no facts that could demonstrate that any such "other products" were of "similar market potential" and "at a similar stage" in their development or product life. Plaintiffs' vague references to Volcano's "accepted practices" and other regulatory submissions do not establish the efforts Volcano owed, or that an alleged failure to apply the same efforts to OCT Products, "as measured by the facts and circumstances at the time such efforts were due," was a breach of the Merger Agreement.

Disregarding the specified performance standard in the Merger Agreement, Plaintiffs instead voice hindsight criticisms regarding Volcano's regulatory strategy (including Volcano's decision not to meet with the FDA before submitting the applications and Volcano's submission of applications without clinical data), the quality of the submissions, the competence of Volcano's regulatory personnel, the quality of the assistance provided by members of other cross-functional teams (including the Marketing and Clinical Affairs Departments), the lack of leadership from Volcano's senior management, and decisions made with respect to product development. Even assuming such criticisms have any merit (which they do not), they are insufficient to show that Volcano failed to use the "commercially reasonable efforts" required by the Merger Agreement.

For example, Plaintiffs criticize the quality of the assistance received by the OCT division from Volcano's cross-functional divisions (i.e., divisions providing resources for all of Volcano's products), including the Regulatory Affairs Department. Plaintiffs even go so far as to attack the

competence, professionalism, and integrity of their former colleagues. They do not, however, state any facts indicating *how* Volcano's employment of these purportedly sub-par employees means that Volcano did not use the "efforts, expertise and resources [it] normally used" for similarly situated products, nor can they because those employees were the resources "normally" used by Volcano at that time.

For these same reasons, Plaintiffs also cannot rely on their expert to support their claim, because the expert's opinions and criticisms likewise fail to address the defined "commercially reasonable efforts." Moreover, Plaintiffs' claim is predicated on conduct in which they participated or acquiesced and of which they cannot now complain. *See, e.g., Clark Motor Co. v. Mfrs. & Traders Trust Co.*, 360 Fed. App'x 340 (3d Cir. 2010); *Morente v. Morente*, 2000 WL 264329, at *2 n.9 (Del. Ch. Feb. 29, 2000).

Accordingly, Plaintiffs cannot present evidence on which a reasonable jury could rely to find in their favor, and thus the Court should dispose of the factually unsupported claims by granting summary judgment in favor of Volcano.

## V. CONCLUSION

For the foregoing reasons, Volcano respectfully requests that the Court grant summary judgment or, alternatively summary adjudication, in its favor.

Dated: January 21, 2014

COOLEY LLP

*/s/Michael G. Rhodes*

Michael G. Rhodes (116127)

Attorneys for Defendant
VOLCANO CORPORATION

1200544/HN