such Company Employees have immediately prior to the Closing, *provided that* each Company Employee executes and delivers to Parent a Proprietary Information and Inventions Agreement, in the standard form of Parent (***"Continuing Employees"***).

(b) Subject to any eligibility requirements, Parent shall enroll all Continuing Employees in the Parent plans, programs, policies, practices, contracts, agreements or other arrangements providing for employment, compensation, retirement, deferred compensation, loans, severance, separation, termination pay, performance awards, bonus, incentive, stock option, stock purchase, stock bonus, phantom stock, stock appreciation right, supplemental retirement, fringe benefits, cafeteria benefits or other benefits, whether written or unwritten, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA (the "***Parent Employee Plans***"), to the extent applicable, which are provided to similarly situated employees of Parent based on levels of responsibility. Nothing in this Section 6.7 is intended to prevent Parent from terminating any Parent Employee Plan or Company Plan. The Continuing Employees shall receive credit for purposes of eligibility to participate and vesting under Parent Employee Plans (other than any parent equity-based awards) for years of service with the Company prior to the Effective Time. Parent will cause any and all pre-existing condition limitations, eligibility waiting periods and evidence of insurability requirements under any group health plans (but not any supplemental disability, life or other insurance plans in which individuals who choose to participate must qualify to be eligible to participate on an individual basis) of Parent in which such Continuing Employee and their eligible dependents will participate to be waived, unless such conditions were not covered under the comparable plans of the Company in which such Continuing Employee participated immediately prior to the Closing Date and will, upon receipt of proof from the Continuing Employee, provide credit for any coinsurance and deductibles prior to the Effective Time but in the plan year which includes the Effective Time for purposes of satisfying any applicable deductible, out-of-pocket or similar requirements under any such plans that may apply for such plan year after the Effective Time. The parties hereto acknowledge and agree that all provisions contained in this Section 6.7 with respect to Continuing Employees are included for the sole benefit of the respective parties hereto and shall not create any right in any other Person, including, without limitation, any Continuing Employees, former Continuing Employees, any participant in any Company Plan or Parent Employee Plan or any beneficiary thereof.

(c) As promptly as practicable after the Closing and subject to approval by Parent's board of directors, Parent shall grant appropriate Continuing Employees an option to acquire Parent Common Stock in an amount determined per Parent's current salary and option grid.

## 7. CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT AND MERGER SUB.

The obligations of Parent and Merger Sub to effect the Merger and otherwise consummate the transactions contemplated by this Agreement and the Related Agreements are subject to the satisfaction or written waiver by Parent, at or prior to the Closing, of each of the following conditions:

7.1 **Accuracy of Representations.** Each of the representations and warranties made by the Company in this Agreement in connection with the transactions contemplated by this

Agreement shall have been accurate in all material respects as of the date of this Agreement (without giving double effect to any materiality qualifications), and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date (without giving double effect to any materiality qualifications).

7.2 **Performance of Covenants.** All of the covenants and obligations that the Company is required to comply with or to perform at or prior to the Closing shall have been complied with and performed in all material respects.

7.3 **Shareholder Approval.** This Agreement and the Merger shall have been duly approved by the Required Company Shareholder Approval, and the Company Charter Amendment shall have been duly approved by the requisite shareholder vote. The number of shares of Company Capital Stock that approve this Agreement and the Merger shall constitute no less than 95% of the Company Capital Stock outstanding immediately prior to the Closing.

7.4 **Consents.** All material Consents required to be obtained by the Company in connection with the Merger and the other transactions contemplated by this Agreement (including the Consents identified in Part 3.21 of the Company Disclosure Schedule) from any Person or Governmental Body shall have been obtained, shall be in full force and effect and all relevant statutory, regulatory or other governmental waiting periods, if any, whether domestic, foreign or supranational shall have expired.

7.5 **Agreements and Documents.** Parent shall have received the following agreements and documents, each of which shall be in full force and effect:

(i) the Escrow Agreement in the form of **Exhibit G**, executed by the Escrow Agent and the Shareholders' Representative;

(ii) a General Release (including a related spousal consent) in the form of **Exhibit H** executed by each of the Key Shareholders and each of the Company's officers and directors (other than those that are Key Shareholders);

(iii) a Proprietary Rights Agreement in the form of **Exhibit I**, executed by each Continuing Employee;

(iv) a offer letter or consulting agreement in the standard form of Parent executed by each Key Employee set forth on **Exhibit B**;

(v) written resignations of all officers and directors of the Company, effective as of the Effective Time;

(vi) a certificate signed on behalf of the Company by the President and the Chief Financial Officer of the Company representing and warranting that the conditions set forth in Section 7.1, Section 7.2, and, with respect to the Company, Section 7.4 have been duly satisfied (the "***Company Compliance Certificate***"); *provided* that the certification by the Company's officers set forth in such Company Compliance Certificate shall be qualified by and subject to any notifications made pursuant to Section 5.3;

(vii) a legal opinion of Cox Smith Matthews Incorporated in the form of **Exhibit J**;

(viii) a certificate signed by the Chief Financial Officer of the Company certifying the accuracy in all respects of the Merger Consideration Spreadsheet;

(ix) a Noncompetition Agreement in the form of **Exhibit C**, executed by each Key Employee set forth on **Exhibit B**;

(x) a certificate, dated as of the Closing Date, signed by the Secretary of the Company (i) attaching true and correct copies of the articles of incorporation and bylaws, and any amendments thereto, of the Company, (ii) certifying that attached thereto are true and correct copies of actions by written consent or resolutions duly approved by the board of directors and shareholders of the Company which authorize and approve the execution, delivery and performance of this Agreement, the consummation of the transactions contemplated hereby, including the Merger, and the Company Charter Amendment (iv) certifying that there are no proceedings for the dissolution or liquidation of the Company, and (v) certifying the incumbency, signature and authority of the officers of the Company authorized to execute, deliver and perform this Agreement and all Related Agreements executed or to be executed by the Company;

(xi) Parent's reasonable satisfaction with the terms and conditions of the Warrant Cancellation Agreement;

(xii) evidence reasonably satisfactory to Parent of the termination of the First Amended and Restated Voting Agreement dated August 29, 2006, by and among the Company and certain of the Company Shareholders;

(xiii) amendments to the Company's exclusive patent license agreements with the Board of Regents of the University of Texas System and Thomas Milner, reasonably satisfactory to Parent;

(xiv) evidence reasonably satisfactory to Parent of the termination of the Company's Texas Emerging Technology Fund Grant Agreement and all obligations on the part of the Company thereunder in connection with the exercise or termination of the Company Warrant held by the State of Texas;

(xv) Parent's reasonable satisfaction with the arrangements providing for the pay-off and termination, including the release of any related security interests, of the Chase Line and the JPMorgan Note on or prior to Closing; and

(xvi) the inventor(s) named in each of the patent applications identified in Part 3.9 of the Company Disclosure Schedule shall have executed assignments with regard to the related Intellectual Property Rights reasonably acceptable to Parent and such executed assignments shall have been submitted for recording with the appropriate Governmental Body.

7.6 **No Material Adverse Effect.** There shall not have occurred any event, fact or circumstance which could reasonably be expected to result in a Material Adverse Effect on the Company.

7.7 **No Restraints.** No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the Merger shall have been issued by any Governmental Body and remain in effect, and there shall not be any Legal Requirement enacted or deemed applicable to the Merger that makes consummation of the Merger illegal.

7.8 **No Other Litigation.** There shall not be pending any Legal Proceeding by any Governmental Body (a) which could reasonably be expected to have a Material Adverse Effect on the Company; (b) challenging or seeking to restrain or prohibit the consummation of the Merger or any of the other transactions contemplated by this Agreement; (c) relating to the Merger and seeking to obtain from Parent or any Parent Subsidiary, or the Company, any damages or other relief that may be material to Parent; (d) seeking to prohibit or limit in any material respect Parent's ability to vote, receive dividends with respect to or otherwise exercise ownership rights with respect to the stock of the Company; or (e) which, if unfavorably adjudicated, would materially and adversely affect the right of Parent or the Surviving Corporation to own the assets or operate the business of the Company.

7.9 **Employee Matters.** The employees identified on Schedule 7.9 shall have provided reasonable assurance that they will continue employment (or enter into a consulting arrangement) with the Surviving Corporation or Parent, shall be available to commence work (or consulting) after the Closing and shall not have made any indication to Parent, the Company or any of their Representatives that such individual has a present intent to terminate the individual's employment, consulting or contractual relationship, as applicable.

7.10 **FIRPTA Compliance.** Parent shall have received the statement referred to in Section 6.5(a) and the Company shall have filed with the Internal Revenue Service the notification referred to in Section 6.5(b).

7.11 **Termination of Company Plans.** The Company shall have terminated each of the Company Plans (other than the CardioSpectra, Inc. 401(k) Profit Sharing Plan and Trust which shall remain in effect until merged with Parent's 401(k) plan and the participants in which shall become participants in Parent's 401(k) plan as of January 1, 2008) on terms reasonably satisfactory to Parent, shall have provided evidence reasonably satisfactory to Parent to ensure that no employee or former employee of the Company has any right under any such Company Plans and that all liabilities of the Company under any such Company Plans (including any liabilities relating to services performed prior to the Closing) are fully extinguished at no cost, and with no liability, to the Company, Parent or any Parent Subsidiary.

7.12 **Termination of All Company Options, Company Warrants and Other Company Capital Stock Purchase Rights.** The Company shall have terminated all Company Options, Company Warrants and any other rights to acquire Company Capital Stock outstanding immediately prior to the Effective Time to ensure that all Company Options, Company Warrants and any other rights to acquire Company Capital Stock no longer represent the right to purchase or otherwise acquire any Company Capital Stock, any other equity security or any other

consideration of the Company, the Merger Sub, Parent, Surviving Corporation or any other Person.

7.13 **280G Shareholder Approval.**

(a) Each Person who might receive any payments and/or benefits referred to in Section 5.5(c) hereof shall have executed and delivered to the Company a 280G Waiver in the form of **Exhibit K**, and such 280G Waiver shall be in full force and effect immediately prior to the Effective Time.

(b) With respect to any payments and/or benefits that Parent reasonably determines may constitute "parachute payments" under Section 280G of the Code with respect to any employees of the Company, the shareholders of the Company shall have (i) approved, pursuant to the method provided for in the regulations promulgated under Section 280G of the Code, any such "parachute payments" or (ii) shall have voted upon and disapproved such parachute payments.

7.14 **Company Indebtedness Schedule.** Parent and the Company shall have approved the Company Indebtedness Schedule.

7.15 **Accredited Investor Forms.** Parent shall have received validly completed, signed and submitted Accredited Investor Forms of the holders of at least seventy-five percent (75%) of the shares of the Company Capital Stock outstanding immediately prior to the Effective Time (including shares of Company Capital Stock issuable upon exercise of Company Options and Company Warrants).

8. CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY.

The obligations of the Company to effect the Merger and otherwise consummate the transactions contemplated by this Agreement and the Related Agreements are subject to the satisfaction or written waiver by the Company, at or prior to the Closing, of the following conditions:

8.1 **Accuracy of Representations.** Each of the representations and warranties made by Parent and Merger Sub in this Agreement shall have been accurate in all material respects as of the date of this Agreement (without giving double effect to any materiality qualifications), and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date (without giving double effect to any materiality qualifications).

8.2 **Performance of Covenants.** All of the covenants and obligations that Parent and Merger Sub are required to comply with or to perform at or prior to the Closing shall have been complied with and performed in all material respects.

8.3 **Documents.** The Company shall have received (a) a certificate signed on behalf of Parent by an executive officer of Parent representing and warranting that the conditions set forth in Section 8.1 and Section 8.2, and with respect to Parent and Merger Sub, Section 8.5 have been duly satisfied, *provided however,* that the certification by Parent's executive officer set forth in such certificate shall be qualified by and subject to any notifications made pursuant to

Section 5.3, and (b) the Escrow Agreement in the form of **Exhibit G**, executed by the Escrow Agent and Parent.

8.4 **Shareholder Approval.** This Agreement shall have heen duly approved by the Required Company Shareholder Approval.

8.5 **Consents.** All material Consents required to be obtained by the Parent and the Merger Sub in connection with the Merger and the other transactions contemplated by this Agreement from any Person or Governmental Body shall have been obtained, shall be in full force and effect and all relevant statutory, regulatory or other governmental waiting periods, if any, whether domestic, foreign or supranational shall have expired.

8.6 **Company Indebtedness Schedule.** The Company and the Parent shall have approved the Company Indebtedness Schedule.

8.7 **No Restraints.** No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the Merger shall have been issued by any Governmental Body and remain in effect, and there shall not be any Legal Requirement enacted or deemed applicable to the Merger that makes consummation of the Merger illegal.

8.8 **No Other Litigation.** There shall not be pending any Legal Proceeding by any Governmental Body (a) challenging or seeking to restrain or prohibit the consummation of the Merger or any of the other transactions contemplated by this Agreement; or (b) which, if unfavorably adjudicated, would materially and adversely affect the right of Parent or the Surviving Corporation to own the assets or operate the business of the Company, Parent or any of its Subsidiaries.

8.9 **Filing of Company Charter Amendment.** The Company Charter Amendment shall has been filed with and accepted by the Secretary of State of the State of Texas.

9. TERMINATION.

9.1 **Termination Events.** This Agreement may be terminated prior to the Closing:

(a) by mutual written consent of Parent and the Company;

(b) by either Parent or the Company, if any Order by any Governmental Body of competent jurisdiction preventing or prohibiting consummation of the Merger shall have become final and nonappealable; *provided, however,* that the party seeking to terminate this Agreement pursuant to this Section 9.1(b) must have used all reasonable efforts to remove any such Order;

(c) by Parent if, within ten business days of the date of execution of this Agreement the Required Company Shareholder Approval shall not have been obtained;

(d) by Parent if any of the Company's representations and warranties contained in this Agreement shall have been materially inaccurate as of the date of this Agreement or shall have become materially inaccurate as of any subsequent date (as if made on

such subsequent date), or if any of the Company's covenants contained in this Agreement shall have been breached in any material respect; *provided, however,* that Parent may not terminate this Agreement under this Section 9.1(d) on account of an inaccuracy in the Company's representations and warranties or on account of a breach of a covenant by the Company if such inaccuracy or breach is curable by the Company unless the Company fails to cure such inaccuracy or breach within 5 days after receiving written notice from Parent of such inaccuracy or breach;

(e) by the Company if any of Parent's or Merger Sub's representations and warranties contained in this Agreement shall have been materially inaccurate as of the date of this Agreement or shall have become materially inaccurate as of any subsequent date (as if made on such subsequent date), or if any of Parent's or Merger Sub's covenants contained in this Agreement shall have been breached in any material respect; *provided, however*, that the Company may not terminate this Agreement under this Section 9.1(e) on account of an inaccuracy in Parent's or Merger Sub's representations and warranties or on account of a breach of a covenant by Parent or Merger Sub if such inaccuracy or breach is curable unless Parent or Merger Sub fails to cure such inaccuracy or breach within 5 days after receiving written notice from the Company of such inaccuracy or breach; or

(f) by Parent or the Company if the Closing has not taken place on or before January 31, 2008 (the "***Termination Date***") (other than as a result of any failure on the part of the party attempting to terminate this Agreement (or, if Parent is attempting to terminate this Agreement, any failure on the part of Merger Sub) to comply with or perform any of its covenant or obligation set forth in this Agreement).

**9.2** Termination Procedures. If either party wishes to terminate this Agreement pursuant to Section 9.1, it shall deliver to the other party a written notice stating that it is terminating this Agreement and setting forth a brief description of the basis on which it is terminating this Agreement.

9.3 Effect of Termination. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement shall terminate; *provided, however*, that: (a) neither the Company nor Parent shall be relieved of any obligation or liability arising from any inaccuracy or prior breach by such party of any representation, warranty, covenant or other provision of this Agreement; (b) the parties shall, in all events, remain bound by and continue to be subject to the provisions set forth in Section 13; and (c) no party hereto shall be liable to the other for any consequential or punitive damages.

**10. Indemnification, Etc.**

**10.1 Survival of Representations, Etc.**

(a) The representations and warranties made by the Company in this Agreement (including the Company Disclosure Schedule), the Company Compliance Certificate or in the certificates provided pursuant to Section 7.5(viii) or 7.5(x) shall survive the Closing and expire at the termination of the Escrow Claim Period; *provided, however,* that (A) if, at any time prior to the end of the Escrow Claim Period, any Parent Indemnitee delivers to the Shareholders'

Representative a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Company for which the Escrow Claim Period has not expired (and setting forth in reasonable detail the basis for such Parent Indemnitee's belief that such an inaccuracy or breach may exist) and asserting a claim for recovery under Section 10.2 based on such alleged inaccuracy or breach, then the representation or warranty underlying the claim asserted in such notice shall survive the end of the Escrow Claim Period until such time as such claim is fully and finally resolved and for the sole purpose of remaining in effect in order to permit such claim to be fully and finally resolved; and (B) the representations and warranties in Section 3.3 (Capitalization) and Section 3.14 (Tax Matters) shall survive indefinitely. All representations and warranties made by Parent and Merger Sub shall survive the Closing and expire at the termination of the Escrow Claim Period; *provided however*, that the representations and warranties in Section 4.4 shall survive indefinitely. All of the covenants, agreements and obligations of the parties contained in this Agreement or any other document, certificate, schedule or instrument delivered or executed in connection herewith shall survive (i) until fully performed or fulfilled, unless non-compliance with such covenants, agreements or obligations is waived in writing by the party or parties entitled to such performance or (ii) if not fully performed or fulfilled, until the expiration of the relevant statute of limitations.

(b) The representations, warranties, covenants and obligations of the Company, and the rights and remedies that may be exercised by the Parent Indemnitees, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or knowledge of, any of the Parent Indemnitees or any of their Representatives. The parties recognize and agree that the representations and warranties also operate as bargained for promises and risk allocation devices and that, accordingly, any party's knowledge, and the waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, shall not affect the right to indemnification or payment of Damages pursuant to this Section 10, or other remedy based on such representations, warranties, covenants, and obligations.

(c) For purposes of this Section 10, each statement or other item of information set forth in the Company Disclosure Schedule or the Parent Disclosure Schedule shall be deemed to be a representation and warranty or a qualification to a representation or warranty, as the case may be, made by the Company or Parent in this Agreement.

10.2 Indemnification by Company.

(a) From and after the Closing Date (but subject to Section 10.1(a) and the limitations set forth in Section 10.3 below), each Parent Indemnitee shall be held harmless and shall be indemnified from and against, and shall be compensated, reimbursed and paid for, any Damages which are directly or indirectly suffered or incurred by any Parent Indemnitee or to which any Parent Indemnitee may otherwise become subject (regardless of whether or not such Damages relate to any third-party claim) and which arise from or as a result of, or are directly or indirectly connected with: (i) any inaccuracy in or breach or (in the case of a third-party claim that, if determined in favor of the applicable third party, would result in a breach) alleged breach of any representation or warranty of the Company set forth in this Agreement, in the Company Compliance Certificate, or in the certificates provided pursuant to Section 7.5(viii) or 7.5(x)

(without giving effect, in each case other than the Company Compliance Certificate, to any information provided by the Company pursuant to Section 5.3); (ii) any breach or (in the case of a third-party claim that, if determined in favor of the applicable third party, would result in a breach) alleged breach of any covenant or obligation of the Company set forth in this Agreement (including the covenants set forth in Sections 5 and 6) to be performed on or prior to Closing (without giving effect, in each case, to any information provided by the Company pursuant to Section 5.3); (iii) any Excess Indebtedness that was not considered in the calculation of the Closing Consideration; and (iv) any Legal Proceeding relating to any inaccuracy or breach of the type referred to in clauses (i) or (ii) or relating to clause (iii) above (including any Legal Proceeding commenced by any Parent Indemnitee for the purpose of enforcing any of its rights under this Section 10 if a Parent Indemnitee is the prevailing party therein).

(b) In the event the Surviving Corporation suffers, incurs or otherwise becomes subject to any Damages as a result of or in connection with any inaccuracy in or breach or (in the case of a third-party claim that, if determined in favor of the applicable third party, would result in a breach) alleged breach of any representation, warranty, covenant or obligation, then (without limiting any of the rights of the Surviving Corporation as a Parent Indemnitee) Parent shall also be deemed, by virtue of its ownership of the stock of the Surviving Corporation, to have incurred Damages as a result of and in connection with such inaccuracy or breach.

(c) In the event any Parent Indemnitee shall suffer any Damages for which such Parent Indemnitee is entitled to indemnification under this Section 10, such Parent Indemnitee shall be entitled to recover such Damages by, first, obtaining the amount of Escrow Funds equal in value to the aggregate amount of such Damages, and, second, once no Escrow Funds remain in the Escrow Fund, by setting off the amount of such Damages (or the remaining amount of such Damages, after giving effect to any amounts obtained for such Damages from the Escrow Fund) against the Milestone Merger Consideration remaining to be paid in accordance with Section 10.7, with such recovery to be made from the Escrow Funds (or set off against the Milestone Merger Consideration) on a basis proportional to the Escrow Funds contributed under the Escrow Agreement by or on behalf of each Company Shareholder and Terminating Warrantholder. A Parent Indemnitee's rights to indemnification under Section 10 with respect to the Company Shareholders and Terminating Warrantholders shall be limited to recovery against the Escrow Fund and the Milestone Merger Consideration, in each case to the extent not yet delivered to the Company Shareholders or Terminating Warrantholders; *provided, however,* that nothing in this Agreement shall restrict or limit the ability of any Parent Indemnitee to bring suit for Damages against any Company Shareholder or Terminating Warrantholder for any claim of actual fraud or intentional and willful misrepresentation by such Company Shareholder or Terminating Warrantholder.

10.3 Threshold/Limitations.

(a) Subject to Section 10.3(b), the Parent Indemnitees shall not be entitled to any indemnification payment pursuant to Section 10.2(a)(i) (and under Section 10.2(a)(iv) with respect to a Legal Proceeding relating to a claim under Section 10.2(a)(i)), until such time as the total amount of all Damages that have been directly or indirectly suffered or incurred by any one or more of the Parent Indemnitees, or to which any one or more of the Parent Indemnitees has or have otherwise become subject, exceeds $100,000 in the aggregate (the ***"Deductible"***). If the

total amount of such Damages exceeds the Deductible, then the Parent Indemnitees, shall be entitled to be indemnified against and compensated and reimbursed for only the amount of such Damages that exceed the Deductible.

(b) The limitations that are set forth in Section 10.3(a) shall not apply: (i) in the case of fraud or intentional and willful misrepresentation; or (ii) to any inaccuracies in any of the amounts set forth in the Merger Consideration Spreadsheet.

(c) Subject to Section 10.3(d), in the event the Shareholders' Representatives on behalf of the Company Shareholders or any of the Company Shareholders or their Affiliates, Representatives or successors and assigns directly or indirectly suffers or incurs or otherwise becomes subject to Damages arising from or as a result of, or directly or indirectly connected with, any inaccuracy in or breach or (in the case of a third-party claim that, if determined in favor of the applicable third party, would result in a breach) alleged breach of any representation or warranty of Parent set forth in this Agreement, or the certificate delivered by Parent pursuant to Section 8.3(a) (without giving effect, in each case other than the certificate of Parent delivered pursuant to Section 8.3, to any information provided by Parent pursuant to Section 5.3), or with respect to any Legal Proceeding relating thereto, Parent shall not be required to reimburse or otherwise pay any of such Persons for any of such Damages until such time as the total amount of all such Damages exceeds, in the aggregate, the Deductible. If the total amount of such Damages exceeds the Deductible, then, to the extent Parent is found liable, Parent shall reimburse or otherwise pay for only the amount of such Damages that exceed the Deductible.

(d) The limitations set forth in Section 10.3(c) shall not apply in the case of fraud or intentional and willful misrepresentation.

10.4 **No Contribution.** The Company Shareholders shall not have and shall not exercise or assert (or attempt to exercise or assert) any right of contribution, right of indemnity or other right or remedy against the Surviving Corporation in connection with any indemnification obligation or any other liability to which such Company Shareholders may become subject under or in connection with this Agreement or the Escrow Agreement.

10.5 **Defense of Third Party Claims.**

(a) In the event of the assertion or commencement by any Person of any claim or Legal Proceeding (whether against the Surviving Corporation, against Parent or against any other Person) with either respect to which any of the Parent Indemnitees may be entitled to indemnification pursuant to this Section 10, Parent shall promptly give the Shareholders' Representatives and the Escrow Agent written notice (a "*Claim Notice*") of such claim (a "*Claim*") or Legal Proceeding. If the contents and delivery of a Claim Notice satisfy the content and delivery requirements of an Indemnification Demand pursuant to Section 10.6, then such Claim Notice shall also be deemed to be an Indemnification Demand. The Claim Notice shall be accompanied by reasonable supporting documentation submitted by the third party making such Claim (to the extent then in the possession of Parent) and shall describe in reasonable detail (to the extent known by Parent) the facts constituting the basis for such Claim and the amount of the claimed Damages; *provided, however*, that no delay or failure on the part of Parent in delivering a Claim Notice shall relieve the Escrow Fund or the Milestone Merger Consideration or the

Company Shareholders or Terminating Warrantholders from any indemnification liability hereunder except to the extent such failure materially prejudices the defense of such Claim or Legal Proceeding.

(b) Within 30 days of delivery of the Claim Notice, the Shareholders' Representatives may elect (by written notice delivered to Parent) to take all necessary steps properly to contest any Claim or Legal Proceeding involving third parties or to prosecute such Claim or Legal Proceeding to conclusion or settlement; *provided, however*, the Shareholders' Representatives shall not be entitled to assume control of such defense (unless otherwise agreed to in writing by the Parent Indemnitee) if (i) the Claim relates to or arises in connection with any criminal or quasi criminal Legal Proceeding; (ii) the Parent Indemnitee reasonably believes an adverse determination with respect to the Proceeding or other claim giving rise to such Claim would be materially detrimental to or materially injure the Parent Indemnitee's reputation or future business prospects; (iii) the Claim seeks an injunction or equitable relief against the Parent Indemnitee; or (iv) the Parent Indemnitee has been advised by counsel that a reasonable likelihood exists of a conflict of interest between either Shareholders' Representative and the Parent Indemnitee. If the Shareholders' Representatives make the foregoing election and are entitled to assume control of such defense, the Shareholders' Representatives shall be entitled to recover all reasonable expenses relating to the defense of such Claim or Legal Proceeding by obtaining the amount of Escrow Funds equal in value to the aggregate amount of such expenses and Parent shall instruct the Escrow Agent to deliver such funds from the Escrow Fund to the Shareholders' Representatives. Such recovery shall be made from the Escrow Funds on a basis proportional to the Escrow Funds contributed under the Escrow Agreement by or on behalf of each Company Shareholder and Terminating Warrantholder. Parent Indemnitee will have the right to participate at its own expense in all proceedings. If the Shareholders' Representatives do not make such election within such period or fail to diligently contest such Claim or Legal Proceeding after such election, or the Parent Indemnitee is entitled to and does assume the defense of such Claim or Legal Proceeding as set forth above, then the Parent Indemnitee shall be free to handle the prosecution or defense of any such Claim or Legal Proceeding, and will take all necessary steps to contest the Claim or Legal Proceeding involving third parties or to prosecute such Claim or Legal Proceeding to conclusion or settlement, and will notify the Shareholders' Representatives of the progress of any such Claim or Legal Proceeding, will permit the Shareholders' Representatives, at the sole cost of the Shareholders' Representatives, to participate in such prosecution or defense and will provide the Shareholders' Representatives with reasonable access to all relevant information and documentation relating to the Claim or Legal Proceeding and the prosecution or defense thereof. If Parent proceeds with the defense of any such Claim or Legal Proceeding as the Parent Indemnitee in these circumstances, all Parent's reasonable expenses relating to the defense of such Claim or Legal Proceeding shall be recovered by obtaining an amount of Escrow Funds equal in value to the aggregate amount of such expenses and the Shareholders' Representatives shall instruct the Escrow Agent to deliver such funds from the Escrow Fund to Parent. Such recovery shall be made from the Escrow Funds on a basis proportional to the Escrow Funds contributed under the Escrow Agreement by or on behalf of each Company Shareholder and Terminating Warrantholder. In the event that the Escrow Funds remaining in the Escrow Fund are insufficient to permit recovery by Parent of all such expenses, Parent shall be entitled to set off the amount of such deficiency against the Milestone Merger Consideration in accordance with Section 10.7, with any such set-off to be allocated among the Company Shareholders and Terminating Warrantholders on a basis

proportional to the Escrow Funds contributed under the Escrow Agreement by or on behalf of each Company Shareholder and Terminating Warrantholder.

(c) Neither party will compromise or settle any such Claim or Legal Proceeding without the written consent of either Parent (if the Shareholders' Representatives defend the Claim or Legal Proceeding) or either Shareholders' Representative (if Parent or other Parent Indemnitees defend the Claim or Legal Proceeding), such consent not to be unreasonably withheld. In any case, the party not in control of the Claim or Legal Proceeding will cooperate with the other party in the conduct of the prosecution or defense of such Claim or Legal Proceeding. In the event Parent delivers a Claim Notice in connection with a claim for indemnification with respect to third party claims for which the procedures set forth in Section 10.5(a), (b) and (c) have been followed, Parent shall comply with the procedures set forth in Section 10.6(a), (b), (c) and (d) hereof and in the Escrow Agreement. Any such procedures shall be in addition to and not in lieu of the indemnification procedures set forth in Section 10.5(a), (b) and (c).

10.6 Indemnification Claims.

(a) In order for any Parent Indemnitee to seek indemnification under this Section 10, Parent shall deliver, in good faith, a written demand (an *"Indemnification Demand"*) to the Shareholders' Representatives and the Escrow Agent which contains (i) a description and the amount (the *"Asserted Damages Amount"*) of any Damages incurred or reasonably expected to be incurred by the Parent Indemnitee, (ii) a statement that the Parent Indemnitee is entitled to indemnification under this Section 10 for such Damages and a reasonable explanation of the basis therefor, and (iii) a demand for payment in the amount of such Damages.

(b) Within 20 days after delivery of an Indemnification Demand to the Shareholders' Representatives, the Shareholders' Representatives shall deliver to Parent a written response (the *"Response"*) in which the Shareholders' Representatives shall: (i) agree that the Parent Indemnitee is entitled to receive all of the Asserted Damages Amount, and the Shareholders' Representatives and Parent shall deliver to the Escrow Agent, within three days following the delivery of the Response, a written notice executed by both such parties instructing the Escrow Agent to disburse the full Asserted Damages Amount to the extent of the remaining Escrow Funds to Parent; (ii) agree that the Parent Indemnitee is entitled to receive part, but not all, of the Asserted Damages Amount (such portion, the *"Agreed Portion"*), and the Shareholders' Representatives and Parent shall deliver to the Escrow Agent, within three days following the delivery of the Response, a written notice executed by both such parties instructing the Escrow Agent to disburse the Agreed Portion to the extent of the remaining Escrow Funds to Parent; or (iii) dispute that the Parent Indemnitee is entitled to receive any of the Asserted Damages Amount.

(c) In the event that the Shareholders' Representatives shall (i) dispute that the Parent Indemnitee is entitled to receive any of the Asserted Damages Amount, or (ii) agree that the Parent Indemnitee is entitled to only the Agreed Portion of the Asserted Damages Amount, the Shareholders' Representatives and Parent shall attempt in good faith to agree upon the rights of the respective parties with respect to each of the indemnification claims that

comprise the Asserted Damages Amount (or the portion of the Asserted Damages Amount not comprising the Agreed Portion). If the Shareholders' Representatives and Parent should so agree, a memorandum setting forth such agreement shall be prepared and signed by both such parties and shall be furnished to the Escrow Agent. If no such agreement can be reached after good faith negotiation within sixty days after delivery of a Response, either Parent or the Shareholders' Representatives may demand arbitration of any matter set forth in the applicable Indemnification Demand.

(d) If no agreement is reached, the matter shall be settled by arbitration conducted by one arbitrator mutually agreeable to Parent and the Shareholders' Representatives. In the event that, within 30 days after submission of any dispute to arbitration, Parent and the Shareholders' Representatives cannot mutually agree on one arbitrator, then the parties shall arrange for the American Arbitration Association to designate a single arbitrator in accordance with the rules of the American Arbitration Association. Any such arbitration shall be held in Santa Clara County, California, under the rules and procedures then in effect of the American Arbitration Association. The arbitrator shall determine how all expenses relating to the arbitration shall be paid, including the respective expenses of each party, the fees of the arbitrator and the administrative fee of the American Arbitration Association. The arbitrator shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing Parent and the Shareholders' Representatives an opportunity, adequate in the sole judgment of the arbitrator to discover relevant information from the opposing parties about the subject matter of the dispute. The arbitrator shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a competent court of law or equity, should the arbitrator determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification. The decision of the arbitrator as to the validity and amount of any indemnification claim in such Indemnification Demand shall be subject to the limitations set forth in this Agreement (including that the arbitrator shall have no authority to award, other than in the case of actual fraud or intentional and willful misrepresentation, consequential, special, punitive or statutory multiples of damages, except to the extent payable to a third party, and the arbitrator's determination of damages shall otherwise comply with the definition of Damages in this Agreement) and final, binding and conclusive upon the parties. Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator. All payments required by the arbitrator shall be made within 30 days after the decision of the arbitrator is rendered. Judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction.

10.7 **Setoff Rights.** Parent may withhold and set off against any amounts due the Company Shareholders and Terminating Warrantholders with respect to the Milestone Merger Consideration, any amount as to which any Parent Indemnitee is entitled to indemnification pursuant to Section 10.2, subject to the limitations in Section 10.3. Parent and the Shareholders' Representatives shall follow the procedures set forth in Sections 10.5 and 10.6 for handling indemnification claims (both based on third-party suits and directly) between the parties in the event Parent seeks to set off any amounts against Milestone Merger Consideration under this Section 10.7, subject to appropriate adjustment to reflect that neither the Escrow Agent nor the Escrow Fund will be involved in the resolution of such indemnification claims. Any claim by a Parent Indemnitee hereunder must be satisfied first from the Escrow Fund in accordance with the

procedures set forth in Section 10 and thereafter as a set-off against any amounts of the Milestone Merger Consideration due the Company Shareholders and Terminating Warrantholders. If it is subsequently determined by the final judgment of a court of competent jurisdiction, an arbitrator or by mutual written agreement among Parent and the Shareholders Representatives' that a Parent Indemnitee was not entitled to indemnification for any amount withheld by Parent pursuant to this Section 10.7, with respect to any such amount wrongfully withheld by Parent, simple interest shall accrue on such obligation and be payable therewith from the due date of such payment to the day preceding the date of payment at the annual rate equal to ten percent (10%).

10.8 **Exercise of Remedies by Parent Indemnitees Other Than Parent.** No Parent Indemnitee (other than Parent or any successor thereto or assign thereof) shall be permitted to assert any indemnification claim or exercise any other remedy under this Agreement unless Parent (or any successor thereto or assign thereof) shall have consented to the assertion of such indemnification claim or the exercise of such other remedy.

10.9 **Exclusive Remedy.** From and after the Closing Date and except as expressly provided in Section 13.11, the parties hereto acknowledge and agree that the indemnification provisions of this Section 10 shall be the sole and exclusive remedy of the Parent Indemnitees with respect to any and all claims that a Parent Indemnitee may have against the Company Shareholders and the Terminating Warrantholders, or any of them, based upon, arising out of, or otherwise in respect of this Agreement (whether such claims arise at law or in equity, in contract or tort, or arising under or based upon any federal, state, local or foreign statute, law, rule, regulation or otherwise), except (i) with respect to claims against a Company Shareholder or Terminating Warrantholder for actual fraud or intentional and willful misrepresentation and (ii) if such Company Shareholder or Terminating Warrantholder is party to a Related Agreement with the Parent or the Surviving Corporation, claims against such Company Shareholder or Terminating Warrantholder arising out of such Related Agreement. Subject to the previous sentence, the parties hereto acknowledge and agree that, from and after the Closing Date, no Company Shareholder shall have any liability of any nature to Parent or the Surviving Corporation with respect to the breach by the Company of any representation, warranty, covenant or agreement contained in this Agreement or any other matter relating to the Merger or the other transactions contemplated by this Agreement (except to the extent that any such Company Shareholder is party to a Related Agreement with the Parent or the Surviving Corporation, and then to the extent of the liabilities arising from such Related Agreement).

10.10 **No Implied Representations.** The parties acknowledge and agree that (a) except as expressly provided in Sections 3 and 4 or in any other Related Agreement, no party hereto, and none of the Representatives of any party hereto, has made or is making any representations or warranties whatsoever, implied or otherwise, and (b) they did not rely on any representations or warranties other than those expressly provided in Sections 3 and 4 or in any other Related Agreement in connection with determining to enter into this Agreement.

11. REGISTRATION RIGHTS.

11.1 Registration Rights.

(a) Within sixty (60) days after the first date on which Parent issues any shares of Parent Common Stock as payment for any Milestone Merger Consideration, Parent shall file (the date of such filing, the "***Filing Date***") with the SEC a registration statement on any appropriate form under the Securities Act (including any amendment, supplement or new registration statement contemplated herein, the "***Registration Statement***") with respect to the offering and sale or other disposition of the number of shares of Parent Common Stock that may be issued upon the achievement of the applicable Milestone and a good faith estimate of the number of shares of Parent Common Stock that may be issued upon the achievement of each Milestone remaining to be attained thereafter. Parent agrees to use commercially reasonable efforts to cause the Registration Statement and each registration statement filed pursuant to the next sentence to become effective as soon as practicable after the Filing Date or date specified in the next sentence, as applicable (it being acknowledged and agreed among the parties that satisfaction of Parent's obligations pursuant to this sentence shall not require Parent to accelerate its planned timing for filing of any Form 10-K or proxy for its annual shareholders' meeting or require Parent to include in any 10-K information that it would otherwise incorporate by reference in such 10-K from the proxy for its annual shareholders' meeting). If the actual number of shares issued in respect of the Milestone Merger Consideration exceeds the number of shares registered under the Registration Statement, Parent shall use its commercially reasonable efforts to file, within sixty (60) days after Parent has notice that the shares to be issued in respect of the Milestone Merger Consideration exceeds the number of shares registered under the Registration Statement, an amendment to the Registration Statement or file a new registration statement on any appropriate form under the Securities Act covering the resale to the public by the Company Shareholders and Terminating Warrantholders of all such excess shares. The Company Shareholders and Terminating Warrantholders agree to cooperate with and provide assistance to Parent, as Parent may reasonably request, in connection with any registration and sale of the shares of Parent Common Stock. Parent shall pay the expenses incurred by it in complying with its obligations under this Section 11, including, without limitation, all preparation, registration, filing fees, costs and expenses, all exchange listing fees, all fees, costs and expenses of counsel for Parent, accountant for Parent and other advisors or Persons retained by Parent in connection with the filing.

(b) Parent agrees that it will (i) prepare and file with the SEC, any amendments or supplements to the Registration Statement or prospectus which may be necessary to keep the Registration Statement effective and to comply with the provisions of the Securities Act with respect to the offer of the shares of Parent Common Stock covered by the Registration Statement until the sale of the shares registered thereby or until all such shares may be continuously sold by each selling shareholder named therein within a ninety (90) day period under Rule 144; (ii) prepare and promptly file with the SEC and promptly notify the holders of registered shares of the filing of such amendment or supplement to the Registration Statement or prospectus as may be necessary to correct any statement therein or omission therefrom if, at any time when a prospectus relating to the shares of Parent Common Stock is required to be delivered under the Securities Act, any event with respect to Parent shall have occurred as a result of which any prospectus would include an untrue statement of material fact or omit to state

any material fact necessary to make the statements therein not misleading; (iii) in case the holders of registered shares are required to deliver a prospectus, prepare promptly such amendment or amendments to the Registration Statement and such prospectus or prospectuses as may be necessary to permit compliance with the requirements of Section 10(a)(3) of the Securities Act; and (iv) advise the holders of registered shares promptly after Parent shall receive notice or obtain knowledge of the issuance of any stop order by the SEC suspending the effectiveness of the Registration Statement or amendment thereto or of the initiation or threatening of any proceedings for that purpose.

(c) The holders of registered shares agree that, upon receipt of any notice from Parent of the happening of any event of the kind described in paragraph (b)(ii) of this Section 11.1 (a "*Blackout Notice*"), they will forthwith discontinue the disposition of the shares of Parent Common Stock until they have received copies of the supplemented or amended prospectus contemplated by paragraph (b)(ii), or until such holders are advised in writing by Parent that the use of the prospectus may be resumed, and have received copies of any additional or supplemental filings that are incorporated by reference in the prospectus, and, if so directed by Parent, such holders will deliver to Parent all copies then in such holders' possession of the prospectus covering the shares of Parent Common Stock current at the time of receipt of such notice.

(d) Each of the holders of registered shares shall furnish information to Parent concerning their holdings of securities of Parent and the proposed method of sale or other disposition of the shares of Parent Common Stock and such other information and undertakings as shall be required in connection with the preparation and filing of the Registration Statement and any amendments thereto covering all or part of the shares of Parent Common Stock in order to assist Parent in complying with the Securities Act and the Exchange Act, and it shall be a condition precedent of Parent's obligations under this Section 11.1 that each holder of Parent Common Stock included in the Registration Statement furnish to Parent such information. Each such holder shall further agree to enter into such undertakings and take such other action relating to the conduct of the proposed offering which Parent may reasonably request as being necessary to assist Parent in complying with the federal and state securities laws and the rules or other requirements of the National Association of Securities Dealers, Inc. ("*NASD*") or otherwise to effectuate the offering.

12. INDEMNIFICATION AND INSURANCE.

(a) Subject to the limitations set forth below, from and after the Closing Date and for a period of six years thereafter, Parent shall indemnify and hold harmless, to the fullest extent permitted under the TBCA, the individuals who on or prior to the Closing Date were directors or officers of the Company and who are listed on Exhibit L (collectively, the "*Corporate Indemnitees*") with respect to all acts or omissions by them in their capacities as such or taken at the request of the Company at any time prior to the Closing Date to the extent required or permitted under the indemnification provisions included in the current Company Constituent Documents.

(b) On or prior to the expiration of the Company's current Directors' and Officers' Legal Liability Policy with Ace Westchester Fire Insurance Company, Parent will

purchase a six-year tail endorsement for that policy from Ace Insurance with terms and coverage amounts no less favorable than the insurance coverage currently in effect.

(c) The provisions of this Section 12 are intended to be for the benefit of, and shall be enforceable by, each Corporate Indemnitee and his or her heirs. The parties acknowledge and agree that the Corporate Indemnitees to whom this Section 12 applies shall be third party beneficiaries of this Section 12.

13. MISCELLANEOUS PROVISIONS.

**13.1 Shareholders' Representatives.** The shareholders of the Company, by approving this Agreement and the transactions contemplated hereby, and the Terminating Warrantholders, by executing the Warrant Cancellation Agreement, hereby irrevocably appoint Christopher E. Banas and Paul Castella as Shareholders' Representatives, including to act as their agents and attorneys-in-fact for purposes of Section 2.9 and Section 10 and the Escrow Agreement, and consent to the taking by the Shareholders' Representatives of any and all actions and the making of any decisions required or permitted to be taken by either of them under this Agreement and the Escrow Agreement (including the exercise of the power to authorize delivery to Parent of the Escrow Funds in satisfaction of claims by Parent or otherwise, agree to, negotiate, enter into settlements and compromises of and demand arbitration, and comply with orders of courts and awards of arbitrators with respect to such claims or otherwise, resolve any claims made pursuant to Section 2.9 and Section 10 and the Escrow Agreement, and to take all actions necessary in the judgment of the Shareholders' Representatives for the accomplishment of the foregoing). By their execution of the Escrow Agreement, each of Christopher E. Banas and Paul Castella hereby accepts his appointment as a Shareholders' Representative for purposes of Section 2.9 and Section 10 and the Escrow Agreement. Parent shall be entitled to deal exclusively with the Shareholders' Representatives on all matters relating to Section 2.9 and Section 10 and the Escrow Agreement, and shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Company Shareholder or Terminating Warrantholder by either Shareholders' Representative (with the consent of the other Shareholders' Representative), and on any other action taken or purported to be taken on behalf of any Company Shareholder or Terminating Warrantholder by either Shareholders' Representative (with the consent of the other Shareholders' Representative), as fully binding upon such Company Shareholder or Terminating Warrantholder. The rights and obligations of the Shareholders' Representatives shall be as set forth in the Escrow Agreement. If either Shareholders' Representative shall die, become disabled, resign or otherwise be unable to fulfill his responsibilities as agent of the Company Shareholders and the Terminating Warrantholders, then the Company Shareholders and the Terminating Warrantholders who hold a majority of the voting Company Capital Stock immediately prior to the Merger (assuming, for this purpose, that all Terminated Warrant Shares attributable to the Terminating Warrantholders were outstanding at such time) (the "***Requisite Former Company Shareholders***") are authorized and shall, within 10 days after such death or disability, appoint a successor agent and, promptly thereafter, shall notify Parent of the identity of such successor. Any such successor shall become a "Shareholders' Representative" for purposes of Section 2.9, Section 10, this Section 13.1 and the Escrow Agreement. If for any reason there are no Shareholders' Representatives at any time, all references herein to the

Shareholders' Representatives shall be deemed to refer to the Requisite Former Company Shareholders.

Each Shareholders' Representative shall have no liability to any Company Shareholder or Terminating Warrantholder with respect to the execution of his duties and responsibilities, except with respect to gross negligence or willful misconduct. Furthermore, the Company Shareholders and the Terminating Warrantholders shall indemnify and hold harmless the Shareholders' Representatives for any Damages (including Damages arising out of the negligence of the Shareholders' Representative) arising out of the acceptance or administration of their duties hereunder and reasonable fees and expenses incurred in the fulfillment of their duties and responsibilities. The Company Shareholders and the Terminating Warrantholders shall, jointly and severally, indemnify the Shareholders' Representatives and hold them harmless against any loss, liability or expense incurred without gross negligence or bad faith on the part of the Shareholders' Representatives and arising out of or in connection with the acceptance or administration of their duties hereunder. Any indemnification obligations owed to the Shareholders' Representatives by the Company Shareholders and the Terminating Warrantholders under this Section 13 shall be paid (a) at the end of the Escrow Claim Period or thereafter out of Escrow Funds that would otherwise be released to the Company Shareholders and Terminating Warrantholders at such time pursuant to Section 2.9 and the Escrow Agreement or (b) out of Milestone Merger Consideration otherwise payable to the Company Shareholders and Terminating Warrantholders, after giving effect to Section 10.7, at the times such Milestone Merger Consideration is payable under this Agreement, in each case with such amounts to be determined on a pro rata basis for each Company Shareholder and Terminating Warrantholder based on the Escrow Funds contributed under the Escrow Agreement by or on behalf of each Company Shareholder and Terminating Warrantholder.

(a) A Company Shareholder, by his, her or its approval of this Agreement and approval of the Merger, and a Terminating Warrantholder, by his, her or its execution of the Warrant Cancellation Agreement agrees, in addition to the foregoing, that:

(i) Parent shall be entitled to rely conclusively on the instructions and decisions given or made by, or believed in good faith by Parent to be given or made by, the Shareholders' Representatives as to the settlement of any claims for indemnification by Parent or the Surviving Corporation pursuant to Section 10 hereof, or any other actions required or permitted to be taken by the Shareholders' Representatives hereunder, and no party shall have any cause of action against Parent for any action taken by Parent in reliance upon any such instructions or decisions;

(ii) all actions, decisions and instructions of the Shareholders' Representatives shall be conclusive and binding upon all of the shareholders of the Company and the Terminating Warrantholders and no Company Shareholder or Terminating Warrantholder shall have any cause of action against either Shareholders' Representative for any action taken, decision made or instruction given by such Shareholders' Representative under this Agreement, except for actual fraud or willful and intentional breach of this Agreement by such Shareholders' Representative;

(iii) the provisions of this Section 13.1 are independent and severable, are irrevocable and coupled with an interest and shall be enforceable notwithstanding any rights or remedies that any Company Shareholder or Terminating Warrantholder may have in connection with the transactions contemplated by this Agreement; and

(iv) remedies available at law for any breach of the provisions of this Section 13.1 are inadequate; therefore, Parent and the Surviving Corporation shall be entitled to temporary and permanent injunctive relief without the necessity of proving damages if Parent or the Surviving Corporation or any of them brings an action to enforce the provisions of this Section 13.1.

The provisions of this Section 13.1 shall be binding upon the executors, heirs, legal representatives, personal representatives, successor trustees and successors of each Company Shareholder and Terminating Warrantholder.

Except as otherwise set forth herein, all actions of the Shareholders' Representatives authorized hereunder shall require the consent or approval of both Shareholders' Representatives; *provided, however*, if there is only one Shareholders' Representative (and a replacement Shareholders' Representative has not been appointed to fill the vacant position), then the remaining Shareholders' Representative shall have the sole authority to take all actions authorized hereunder.

13.2 **Further Assurances.** Each party hereto shall execute and cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

13.3 **Fees and Expenses.** Subject to the terms of this Agreement, each party to this Agreement shall bear and pay all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by such party in connection with the transactions contemplated by this Agreement, including all fees, costs and expenses incurred by such party in connection with or by virtue of (a) the investigation and review conducted by Parent and its Representatives with respect to the Company's business (and the furnishing of information to Parent and its Representatives in connection with such investigation and review), (b) the negotiation, preparation and review of this Agreement (including the Company Disclosure Schedule and the Parent Disclosure Schedule) and all agreements, certificates, opinions and other instruments and documents delivered or to be delivered in connection with the transactions contemplated by this Agreement, (c) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any Consent required to be obtained in connection with any of such transactions, and (d) the consummation of the Merger. Notwithstanding the foregoing, at Closing, Parent shall pay, on behalf of the Company, the Bonus Payments, the Closing Company Merger Costs and amounts outstanding under the JPMorgan Note.

13.4 **Attorneys' Fees.** If any action or proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the

prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

13.5 Notices. Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto):

**if to Parent:**

VOLCANO CORPORATION
2870 Kilgore Road
Rancho Cordova, CA 95670
Attn: John Dahldorf, CFO
Fax: (916) 638-7976

**with copy to (which copy shall not constitute notice):**

COOLEY GODWARD KRONISH LLP
4401 Eastgate Mall
San Diego, CA 92121
Attn: Matthew T. Browne, Esq.
Fax: (858) 550-6420

**if to the Company prior to the Closing or to the Shareholders' Representative:**

COMPANY:

CARDIOSPECTRA, INC.
3463 Magic Drive, Suite 360
San Antonio, TX 7822
Attn: Christopher E. Banas

SHAREHOLDERS' REPRESENTATIVES

CHRISTOPHER E. BANAS
75 Rounds Road, Box 8588
Breckenridge, Colorado 80424

PAUL CASTELLA
15611 Cloud Top
San Antonio, Texas 78248

**with copies to (which copy shall not constitute notice):**

AKIN GUMP STRAUSS HAUER & FELD, LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
Attn: Cecil Schenker
Fax: 210-224-2035

COX SMITH MATTHEWS INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Attn: John Bray
Fax: (210) 226-8395

13.6 **Time of the Essence.** Time is of the essence of this Agreement.

13.7 **Headings.** The headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

13.8 **Counterparts.** This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

13.9 **Governing Law; Jurisdiction and Venue.**

(a) This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

(b) Subject to Sections 10.6(d), any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced exclusively in any state or federal court located in Santa Clara County, California. Subject to Section 10.6(d), the Company and Parent each:

(i) expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in Santa Clara County, California (and each appellate court located in the State of California), in connection with any legal proceeding;

(ii) agrees that service of any process, summons, notice or document by U.S. mail addressed to it at the address set forth in Section 13.5 shall constitute effective service of such process, summons, notice or document for purposes of any such legal proceeding;

(iii) agrees that each state and federal court located in Santa Clara County, California, shall be deemed to be a convenient forum; and

(iv) agrees not to assert (by way of motion, as a defense or otherwise), in any such legal proceeding commenced in any state or federal court located in Santa Clara County, California, any claim by either the Company or Parent that it is not subject personally to the jurisdiction of such court, that such legal proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

13.10 **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns (if any). Prior to the Effective Time, the Company, Merger Sub and Parent shall not assign this Agreement or any rights or obligations hereunder (by operation of law or otherwise) to any Person, it being understood that nothing in this Section 13.10 shall prohibit Parent or any Parent Subsidiary from consummating any merger, acquisition or similar transaction with any Person. Subject to the terms of this Agreement (including the requirements of Section 2.5 in connection with a Change of Control or Carve-Out Transaction), after the Effective Time, Parent, Merger Sub and the Company may freely assign any or all of its rights under this Agreement (including its rights under Section 10), and, subject to Section 2.5, freely delegate and assign any or all of its obligations under this Agreement, in whole or in part, to any other Person without obtaining the consent or approval of any other party hereto or of any other Person.

13.11 **Remedies Cumulative; Specific Performance.** The rights and remedies of the parties hereto shall be cumulative (and not alternative). The parties to this Agreement agree that, in the event of any breach or threatened breach by any party to this Agreement of any covenant, obligation or other provision set forth in this Agreement for the benefit of any other party to this Agreement, such other party shall be entitled (in addition to any other remedy that may be available to it) to (a) a decree or order of specific performance or mandamus to enforce the observance and performance of such covenant, obligation or other provision, and (b) an injunction restraining such breach or threatened breach.

13.12 **Waiver.** No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

13.13 **Amendments.** This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of all of the parties hereto.

13.14 **Severability.** In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and

the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**13.15 Parties in Interest.** Except for the provisions of Section 2.1, Section 10 and Section 12, none of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the parties hereto and, with respect to their right to receive the Merger Consideration following the Effective Time subject to the terms and conditions of this Agreement and the representations and warranties made herein, the Company Shareholders, and their respective successors and assigns (if any).

**13.16 Entire Agreement.** This Agreement and the Related Agreements set forth the entire understanding of the parties hereto relating to the subject matter hereof and thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter hereof and thereof; *provided, however*, that the Mutual Non-Disclosure Agreement, dated August 6, 2007 by and between Parent and the Company shall not be superseded by this Agreement and shall remain in effect in accordance with its terms until the date on which such Confidentiality Agreement is terminated in accordance with its terms.

**13.17 Construction.**

(a) For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b) The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d) Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections of this Agreement and Exhibits to this Agreement.

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

VOLCANO CORPORATION,
a Delaware corporation

By: ______________________

CORAZON ACQUISITION, INC.,
a Texas corporation

By: ______________________

CARDIOSPECTRA, INC.,
a Texas corporation

By: ______________________

CHRISTOPHER E. BANAS,
as Shareholders' Representative

By: ______________________

PAUL CASTELLA,
as Shareholders' Representative

By: ______________________

[SIGNATURE PAGE TO MERGER AGREEMENT]

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

VOLCANO CORPORATION,
a Delaware corporation

By: ______________________

CORAZON ACQUISITION, INC.,
a Texas corporation

By: ______________________

CARDIOSPECTRA, INC.,
a Texas corporation

By: Christopher E. Banas

CHRISTOPHER E. BANAS,
as Shareholders' Representative

By: Christopher E. Banas

PAUL CASTELLA,
as Shareholders' Representative

By: ______________________

The parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

VOLCANO CORPORATION,
a Delaware corporation

By: ______________________________

CORAZON ACQUISITION, INC.,
a Texas corporation

By: ______________________________

CARDIOSPECTRA, INC.,
a Texas corporation

By: ______________________________

CHRISTOPHER E. BANAS,
as Shareholders' Representative

By: ______________________________

PAUL CASTELLA,
as Shareholders' Representative

By: ______________________________

# EXHIBIT A

EXHIBIT A

# CERTAIN DEFINITIONS

For purposes of the Agreement (including this **Exhibit A**):

"**Accredited Investor Form**" has the meaning set forth in Section 2.3 of this Agreement.

"**Accredited Investors**" has the meaning set forth in Section 2.3 of this Agreement.

"**Accredited Outstanding Capital Stock**" has the meaning set forth in Section 2.7 of this Agreement.

"**Accrued Dividends**" means, with respect to each share of Company Preferred Stock, the accrued unpaid dividends on such share as of immediately prior to the Effective Time.

"**Acquiror**" has the meaning set forth in Section 2.5(d) of this Agreement.

"**Acquisition Transaction**" means any transaction directly or indirectly involving:

(a) the sale, license or disposition of all or a material portion of the business or assets of the Company or any direct or indirect subsidiary or division of the Company;

(b) the issuance, grant or disposition of: (i) any capital stock or other equity security of the Company or any direct or indirect subsidiary of the Company; (ii) any option, call, warrant or right (whether or not immediately exercisable) to acquire any capital stock or other equity security of the Company or any direct or indirect subsidiary of the Company; or (iii) any security, instrument or obligation that is or may become convertible into or exchangeable for any capital stock or other equity security of the Company or any direct or indirect subsidiary of the Company;

(iii) any merger, consolidation, business combination, share exchange, recapitalization, reorganization or similar transaction involving the Company or any direct or indirect subsidiary of the Company; or

(iv) any transaction that could reasonably be expected to have an adverse effect upon the Merger and the transactions contemplated by the Agreement;

*provided, however,* that the following will not be deemed to be an "Acquisition Transaction": (A) the grant of Company Options to its employees in the ordinary course of business will not be deemed to be an "Acquisition Transaction" if such grant: (1) is made pursuant to a Company Option Plan; and (2) is consistent with the Company's past practices; (B) the issuance of Company Common Stock to its employees upon the valid exercise of Company Options; (C) the issuance of Company Common Stock to a holder of a Company Warrant outstanding on the date of this Agreement upon the valid exercise of such Company Warrant; (D) the Merger and the transactions contemplated by this Agreement; (E) the issuance of Company Common Stock to the holders of Company Preferred Stock upon the conversion

thereof; (F) the issuing of Company Capital Stock pursuant to an amendment to the Company's exclusive patent license agreement with the Board of Regents of The University of Texas System; and (G) any bridge loan obtained by the Company from its existing investors or from one or more commercial banks, including warrants issued in connection with such bridge loan, stock issued upon the exercise of such warrants and the granting of a security interest in the Company's assets as security for such bridge loan.

**"Affiliate"** means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such Person.

**"Aggregate Option Proceeds"** shall mean the aggregate cash proceeds received by the Company upon the exercise of Company Options and Company Warrants on or after the date of this Agreement less the amount of such proceeds used to satisfy any Company Indebtedness on or prior to the Closing Date.

**"Aggregate Terminated Warrant Exercise Price"** shall mean the aggregate Terminated Warrant Exercise Price for all of the Terminated Warrants subject to the Warrant Cancellation Agreements and cancelled immediately prior to the Effective Time pursuant to Section 2.2(b).

**"Agreed Portion"** has the meaning set forth in Section 10.6 of this Agreement.

**"Agreement"** means the Agreement and Plan of Merger to which this **Exhibit A** is attached (including the Company Disclosure Schedule and the Parent Disclosure Schedule, if any), as it may be amended from time to time.

**"Applicable Public Companies"** means Entities whose common stock is traded on the New York Stock Exchange, The American Stock Exchange or through Nasdaq and that have a market capitalization (calculated by multiplying the closing selling price or, if there is no closing selling price, the closing bid price by the number of shares outstanding on the trading day immediately preceding the date of public announcement of the applicable Change of Control) of $250 million or more.

**"Asserted Damages Amount"** has the meaning set forth in Section 10.6 of this Agreement.

**"Blackout Notice"** has the meaning set forth in Section 11.1 of this Agreement.

**"Board Approval Date"** has the meaning set forth in Section 3.20 of this Agreement.

**"Bonus Payments"** means the aggregate bonus payments of $1,083,734.00 (reduced to the amount provided in the subject termination and bonus agreement in the event the shareholders of the Company do not approve the "parachute payments" as contemplated in Section 7.13) to be made by Parent on behalf of the Company at the Closing to Christopher E. Banas and Paul Castella pursuant to the terms of the termination and bonus agreements between Mssrs. Banas and Castella, as applicable, and the Company.

**"Carve-Out Transaction"** means any transaction (including a sale of assets, merger, sale of stock or other equity interests), other than (a) a Change of Control or (b) a licensing transaction of any nature, pursuant to which a substantial portion of the Intellectual Property Rights held by the Surviving Corporation immediately after the Effective Time and necessary for the production, development and sale of the OCT Products are sold to or acquired by, directly or indirectly, a Person other than Parent or a Subsidiary of Parent.

**"Cash Election Shares"** has the meaning set forth in Section 2.3 of this Agreement.

**"Cash Percentage"** has the meaning set forth in Section 2.3 of this Agreement.

**"Certificate of Merger"** has the meaning set forth in Section 1.3 of this Agreement.

**"CE Mark"** means a marking or similar Governmental Authorization required to export or market certain medical devices to or within the European Union pursuant to any Medical Device Directive.

**"Change of Control"** means (a) a sale or other disposition of all or substantially all of the assets of Parent on a consolidated basis (other than to Parent or any Subsidiary (direct or indirect) of Parent), (b) a merger or consolidation in which Parent is not the surviving entity and in which the stockholders of Parent immediately prior to such consolidation or merger own less than fifty percent (50%) of the surviving entity's voting power immediately after the transaction, and (c) a reverse merger in which Parent is the surviving entity but the shares of Parent Common Stock outstanding immediately preceding the merger are converted by virtue of the merger into other property, whether in the form of securities, cash or otherwise, and in which the stockholders of Parent immediately prior to such reverse merger own less than fifty percent (50%) of Parent's voting power immediately after the transaction.

**"Chase Line"** means the Company's business line of credit with JPMorgan Chase Bank, NA.

**"Claim Notice"** has the meaning set forth in Section 10.5 of this Agreement.

**"Closing"** has the meaning set forth in Section 1.3 of this Agreement.

**"Closing Company Merger Costs"** means those Company Merger Costs to be paid at the Closing by Parent as set forth in the Merger Consideration Spreadsheet.

**"Closing Company Share Number"** means the aggregate of (a) Company Preferred Stock (on an as converted to Company Common Stock basis) outstanding immediately prior to the Effective Time (including any Terminated Warrant Shares that are Company Preferred Stock, which shall be deemed outstanding immediately prior to the Effective Time for purposes of this definition) and (b) Company Common Stock outstanding immediately prior to the Effective Time (including any Terminated Warrant Shares that are Company Common Stock, which shall be deemed outstanding immediately prior to the Effective Time for purposes of this definition).

**"Closing Consideration"** is equal to $25,000,000 *plus* the Aggregate Option Proceeds *minus* the Bonus Payments *minus* Excess Indebtedness *minus* the Closing Company Merger Costs.

**"Closing Date"** has the meaning set forth in Section 1.3 of this Agreement.

**"Closing Per Share Payment"** is equal to the quotient of (a) the Closing Consideration *plus* the Aggregate Terminated Warrant Exercise Price minus the Liquidation Preference minus the aggregate Accrued Dividends divided by (b) the Closing Company Share Number.

**"Closing Stock Price"** is equal to the closing price of Parent Common Stock as reported on Nasdaq (or such other exchange, market or system on which Parent Common Stock is then listed) on the applicable date.

**"Code"** has the meaning set forth in Section 2.6 of this Agreement.

**"COBRA"** means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**"Combination Product"** means a product combining the imaging functionality provided by the OCT Products with any Other Product(s).

**"Commercial Failure"** means, with respect to any OCT System or OCT Product, a reasonable determination that a material change has occurred in market conditions for such OCT System or OCT Product that was not reasonably anticipated by Parent as of the Effective Date and that makes further development or commercialization of such OCT System or OCT Product commercially unreasonable to pursue.

**"Commercial Sale"** means, with respect to any OCT Products or Combination Products, (a) the sale by Parent or its Affiliates of an OCT Product or Combination Product for end use or consumption of such product in a country, (b) the sale by Parent or its Affiliates of an OCT Product or Combination Product to a wholesaler or reseller of OCT Products or Combination Products, (c) the lease or license by Parent or its Affiliates of an OCT Product or Combination Product for end use or consumption by the applicable lessor or licensee of such product in a country, but only to the extent of recurring payments received by Parent or its Affiliates from the applicable lessee or licensee for its continued use or consumption of such products, and excluding in all events any one-time, upfront or other similar non-recurring payments involved with any exclusive lease or license of Parent's or any of its Affiliates' rights to the OCT Products and (d) the sale or license or sublicense of any Licensee of an OCT Product or Combination Product for end use or consumption of such product in a country (but such sales, licenses or sublicenses by Licensee shall only be deemed "Commercial Sales" to the extent of the amounts received by Parent or any of its Affiliates in the form of sales-based royalties, sales-based license fees or other sales-based payments); *provided, however,* that "Commercial Sale" shall not include, in any case described in clauses (a) through (d) above, any sales, leases or licenses of an OCT Product or Combination Product among Parent, its Affiliates or Licensees (except to the extent set forth in clause (d) above).

**"Company"** has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Capital Stock**" means the shares of Company Common Stock and Company Preferred Stock.

"**Company Charter Amendment**" means an amendment to the Company's amended and restated articles of incorporation setting forth liquidation provisions that are consistent with the provisions of this Agreement that relate to valuation of the Parent Common Stock component of the Merger Consideration, if any, and the other provisions relating to distribution of the Merger Consideration that are set forth in this Agreement.

"**Company Common Stock**" means the Common Stock of the Company, par value $0.001 per share.

"**Company Compliance Certificate**" has the meaning set forth in Section 7.5 of this Agreement.

"**Company Constituent Documents**" has the meaning set forth in Section 3.2 of this Agreement.

"**Company Contract**" means any Contract, including any amendment or supplement thereto: (a) to which the Company is a party; (b) by which the Company or, to the Company's knowledge, any of its assets is bound or under which the Company has any obligation; or (c) under which the Company has any right or interest.

"**Company Disclosure Schedule**" means the schedule (dated as of the date of this Agreement) delivered to Parent on behalf of the Company on the date of this Agreement and initialed by the President of the Company.

"**Company Employees**" has the meaning set forth in Section 6.7 of this Agreement.

"**Company Financial Statements**" has the meaning set forth in Section 3.4 of this Agreement.

"**Company Indebtedness**" means the Company's indebtedness (other than the Bonus Payments and the Closing Company Merger Costs, but including indebtedness, if any, under the Chase Line and JPMorgan Note), including (a) notes payable, customer deposits and any other obligations for borrowed money, whether as the primary obligor or as a guarantor, (b) those liabilities of the Company that are required to be listed on a balance sheet of the Company prepared in accordance with GAAP, and (c) Company Merger Costs that have not been paid by or on behalf of the Company on or prior to the Closing Date.

"**Company Indebtedness Estimation**" has the meaning set forth in Section 2.12(a) of this Agreement.

"**Company Indebtedness Schedule**" has the meaning set forth in Section 2.12 of this Agreement.

"**Company Information Statement**" has the meaning set forth in Section 5.5 of this Agreement.

**"Company IP"** means all Intellectual Property Rights and Intellectual Property owned by or exclusively licensed to the Company.

**"Company IP Contract"** means any Contract to which the Company is a party or by which the Company is bound, that contains any assignment or license of, or covenant not to assert or enforce, any Intellectual Property Right or that otherwise relates to any Company IP or any Intellectual Property developed by, with, or for the Company.

**"Company Merger Costs"** has the meaning set forth in Section 3.11 of this Agreement.

**"Company Plan"** has the meaning set forth in Section 3.15 of this Agreement.

**"Company Options"** mean options to purchase shares of Company Common Stock (whether granted by the Company pursuant to a stock option plan, assumed by the Company in connection with any merger, acquisition or similar transaction or otherwise issued or granted).

**"Company Option Plans"** mean the CardioSpectra, Inc. 2005 Stock Option Plan and any other stock option plan of the Company.

**"Company Preferred Stock"** means the Company Series A Stock and the Company Series B Stock.

**"Company Return"** has the meaning set forth in Section 3.14 of this Agreement.

**"Company Shareholder"** means a holder of record of shares of Company Capital Stock outstanding as of immediately prior to the Effective Time.

**"Company Series A Stock"** means the Company's Series A Preferred Stock, with a par value of $0.001 per share.

**"Company Series B Stock"** means the Company's Series B Preferred Stock, with a par value of $0.001 per share.

**"Company Stock Certificate"** means a certificate evidencing ownership of Company Capital Stock.

**"Company Subsidiary"** means any Subsidiary of the Company.

**"Company Warrant"** means any warrant or other right (except for any Company Option) to purchase Company Capital Stock.

**"Consent"** means any approval, consent, ratification, permission, waiver or authorization (including any Governmental Authorization).

**"Continuing Employees"** has the meaning set forth in Section 6.7 of this Agreement.

**"Contract"** means any written, oral or other agreement, contract, subcontract, lease, understanding, instrument, note, warranty, license, sublicense, insurance policy, benefit plan or legally binding commitment or undertaking of any nature, whether express or implied.

"**Corporate Indemnitees**" has the meaning set forth in Section 12(a) of this Agreement.

"**Cumulative Cash Sales**" mean revenues calculated in accordance with GAAP for OCT Products and Combination Products from Commercial Sales less the following amounts directly chargeable to such OCT Products and Combination Products and stated separately on the applicable bill or invoice: (a) customary trade, quantity or cash discounts and rebates actually allowed and taken; (b) amounts repaid or credited to customers on account of rejections or returns; and (c) freight and other transportation costs, including insurance charges, and duties, tariffs, sales and excise taxes and other governmental charges based directly on sales, turnover or delivery of such OCT Products or Combination Products and actually paid or allowed by Parent and its Affiliates. Notwithstanding the foregoing, with respect to a Combination Product, the Cumulative Cash Sales shall be reduced by the fair market value of the Other Product(s), which value shall be determined by Parent in good faith, based upon the then available facts and circumstances, particularly, for example, data as to the sales price of the distinct components when sold or licensed separately, or the increased sales or license price of a Combination Product over the particular Other Product.

"**Damages**" include any loss, damage, injury, liability, claim, demand, settlement, judgment, award, fine, penalty, Tax, fee (including reasonable attorneys' fees), charge, cost (including costs of investigation) or expense of any nature; *provided that*, other than in the case of fraud or intentional and willful misrepresentation, Damages shall not include consequential, special, punitive or statutory multiples of damages, except to the extent payable to a third party; *provided further* that in calculating the amount of Damages suffered or incurred by a party for which indemnification is sought hereunder, there shall be deducted the amount of any insurance proceeds or proceeds from indemnification claims against third parties to the extent actually paid in cash to such party, net of premium increases, retro premium adjustments and collection costs.

"**Deductible**" has the meaning set forth in Section 10.3 of this Agreement.

"**Design Controls**" means procedures established and maintained to control the design of a medical device in order to ensure that specified design requirements are met, which elements of design control may include: design and development planning, design input, design output, design review, design verification, design validation, design transfer, design changes, and design history files.

"**Dispute Company Indebtedness Determination Date**" has the meaning set forth in Section 2.12 of this Agreement.

"**Dispute Notice**" has the meaning set forth in Section 2.12 of this Agreement.

"**Dissenting Shares**" has the meaning set forth in Section 2.11 of this Agreement.

"**Effective Time**" has the meaning set forth in Section 1.3 of this Agreement.

"**Encumbrance**" means any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, claim, infringement, interference, option, right of first refusal, preemptive right, community property interest or restriction of any nature affecting property, real or personal, tangible or intangible, including any restriction on the voting of any security, any

restriction on the transfer of any security or other asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset, any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset, any lease in the nature thereof and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statute of any jurisdiction).

**"Entity"** means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**"Environmental Laws"** has the meaning set forth in Section 3.16 of this Agreement.

**"ERISA"** has the meaning set forth in Section 3.15 of this Agreement.

**"Escrow Agent"** has the meaning set forth in Section 2.9 of this Agreement.

**"Escrow Claim Period"** has the meaning set forth in Section 2.9 of this Agreement.

**"Escrow Fund"** has the meaning set forth in Section 2.9 of this Agreement.

**"Escrow Funds"** has the meaning set forth in Section 2.9 of this Agreement.

**"Escrow Fund Amount"** means $2,500,000.

**"European Union"** means the European Union, as its membership may be altered from time to time, and any successor thereto.

**"Excess Indebtedness"** means any Company Indebtedness as of the Closing Date in excess of $300,000.

**"Exchange Act"** means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

**"Exchange Agent"** means LaSalle Bank National Association.

**"FDA"** means the United States Food and Drug Administration.

**"Filing Date"** has the meaning set forth in Section 11.1 of this Agreement.

**"First Anticipated Closing Date"** has the meaning set forth in Section 2.12 of this Agreement.

**"FMLA"** means the Family Medical Leave Act of 1993, as amended.

**"Foreign Company Plan"** means: (a) any plan, program, policy, practice, Contract or other arrangement mandated by a Governmental Body outside the United States; (b) any Company Plan maintained or contributed to by the Company that is not subject to U.S. federal or

state law; and (c) any Company Plan that covers or has covered employees of the Company whose services are performed primarily outside of the United States.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Generation 1 OCT System**" means an OCT System incorporating (a) an imaging and display console substantially similar to the OCT System in use today, (b) rudimentary medical grade verified and validated application software and a pull-back rotating sled (all of which are developed under Design Control and in compliance with relevant international regulatory standards and requirements including current ISO and IEC standards) and (c) a single use OCT System catheter.

"**Generation 1a OCT System**" means a productized version of the Generation 1 OCT System incorporating (a) an imaging and display console substantially similar to the OCT System in use today but with the elimination of unnecessary components and circuit jumpers, (b) medical grade software with customary features (such features may include but are not limited to measurements, a 3D longitudinal view, and case archiving capabilities) and a pull-back rotating sled with integrated actuation all of which are developed under Design Control and are fully compliant with relevant international regulatory standards and requirements, including current ISO and IEC standards, and (c) a single use OCT System catheter.

"**Governmental Authorization**" means any: (a) approval, permit, license, certificate, franchise, permission, clearance, registration, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Body.

"**Governmental Body**" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, supranational or other government; or (c) governmental, self-regulatory or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal).

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"**IEC**" means the International Electrotechnical Commission.

"**IEC 601 Standards**" mean the 601 series of standards for medical electrical equipment promulgated by the International Electrotechnical Commission.

"**Indemnification Demand**" has the meaning set forth in Section 10.6 of this Agreement.

"**Intellectual Property**" means all data, formulae, inventions (whether or not patentable), know-how, trade secrets, methods, processes, proprietary information, protocols, specifications, techniques, and other forms of technology (whether or not embodied in any

tangible form and including all tangible embodiments of the foregoing, such as laboratory notebooks, samples, studies and summaries).

**"Intellectual Property Rights"** means and includes all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, copyrights, moral rights, and mask works; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patents and industrial property rights; (e) other proprietary rights in Intellectual Property of every kind and nature; and (f) all registrations, renewals, extensions, combinations, divisions, or reissues of, and applications for, any of the rights referred to in clauses (a) through (e) above.

**"ISO"** means International Standards Organization.

**"IVUS"** means intravascular ultrasound.

**"JPMorgan Note"** means the Term Promissory Note issued by the Company to JPMorgan Chase Bank, N.A., dated November 28, 2007, in the principal amount of $500,000.

**"Key Employee"** has the meaning set forth in the Recitals to this Agreement.

**"Key Shareholder"** has the meaning set forth in the Recitals to this Agreement.

**"knowledge"** means an individual will be deemed to have "knowledge" of a particular fact or other matter if such individual has actual knowledge of such fact or other matter. When referring to the "knowledge" of an Entity, such Entity shall be deemed to have "knowledge" of such fact or other matter if any director or executive officer of the corporation (or an individual holding a similar position with another Entity), has actual knowledge of such fact or matter or would reasonably be expected to have actual knowledge of such fact or matter as a result of the performance of their duties. In the case of the Company's knowledge, the Company shall be deemed to have "knowledge" of a fact or matter if Christopher E. Banas, Paul Castella or Nate Kemp has actual knowledge of such fact or matter or would reasonably be expected to have actual knowledge of such fact or matter as a result of the performance of his duties.

**"Lapse Date"** has the meaning set forth in Section 2.12 of this Agreement.

**"Legal Proceeding"** means any ongoing or threatened action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

**"Legal Requirement"** means any federal, state, local, municipal, foreign or international, multinational other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"**Letter of Transmittal**" has the meaning set forth in Section 2.6 of this Agreement.

"**Licensed Patents**" mean any of the patents encompassed by the "Patent Rights" (as defined in each of the OCT Licenses) licensed to the Company pursuant to the OCT Licenses.

"**Licensee**" means any third party (other than an Affiliate of Parent) to whom Parent or an Affiliate of Parent has granted the right, directly or indirectly, to research, develop, make and/or sell any OCT Products or Combination Products to end users or consumers, provided that Licensee shall exclude wholesalers and resellers of OCT Products.

"**Liquidation Preference**" means an amount equal to the sum of $0.317 per share of Company Series A Stock outstanding at the Effective Time and $0.951 per share of Company Series B Stock outstanding at the Effective Time, which aggregate amount is currently expected to be $3,999,996.03.

"**Material Adverse Effect**" An event, violation, inaccuracy, circumstance or other matter shall be deemed to have a "Material Adverse Effect" on the Company if such event, violation, inaccuracy, circumstance or other matter (considered together with all other events, violations, inaccuracies, circumstances or other matters that constitute exceptions to the Company's representations and warranties set forth in this Agreement or in the Company's Compliance Certificate or that would constitute exceptions to the Company's representations and warranties set forth in this Agreement or in the Company's Compliance Certificate but for the presence of materiality qualifications, or any similar qualifications, in such representations and warranties) would have a material adverse effect on the business, condition, assets, liabilities, operations, financial performance or prospects of the Company, *provided, however*, that none of the following shall be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be a Material Adverse Effect on the Company: (a) any change in the business, condition, assets, liabilities, operations, financial performance or prospects of the Company and the Company Subsidiaries taken as a whole caused by, related to or resulting from, directly or indirectly, the transactions contemplated by this Agreement or the announcement thereof, including any reaction or action by third parties to the transaction contemplated by this Agreement, (b) any adverse change, effect or occurrence attributable to the United States economy as a whole or the industries in which the Company competes, (c) any act or threat of terrorism, military conflict or war anywhere in the world, any armed hostilities or terrorist activities anywhere in the world, any threat or escalation of armed hostilities or terrorist activities anywhere in the world or any governmental or other response or reaction to any of the foregoing, or (d) strictly for purposes of Section 7, any adverse change in or effect on the business of the Company, that is cured by the Company prior to the Closing Date.

"**Materials of Environmental Concern**" has the meaning set forth in Section 3.16 of this Agreement.

"**Medical Device Directive**" means European Union Council Directive 93/42/EEC of June 14, 1993, concerning medical devices, as the same may be amended, supplemented, modified or replaced from time to time.

**"Merger"** has the meaning set forth in the Recitals to this Agreement.

**"Merger Consideration"** means (a) the Closing Consideration and (b) Milestone Merger Consideration, if any.

**"Merger Consideration Spreadsheet"** has the meaning set forth in Section 2.13 of this Agreement.

**"Merger Sub"** has the meaning set forth in the introductory paragraph of this Agreement.

**"MHLW"** means the Japanese Ministry of Health, Labour and Welfare.

**"Milestone"** has the meaning set forth in Section 2.5 of this Agreement.

**"Milestone Merger Consideration"** has the meaning specified in Section 2.5 of this Agreement.

**"Milestone Merger Consideration Determination"** has the meaning set forth in Section 2.3 of this Agreement.

**"Milestone Notice"** has the meaning set forth in Section 2.3 of this Agreement.

**"Milestone Per Share Payment"** is equal to the quotient of (a) the aggregate consideration payable upon the achievement of a Milestone pursuant to Section 2.5 divided by (b) the Closing Company Share Number.

**"Milestone Stock Exchange Ratio"** is equal to the quotient of (a) the Milestone Per Share Payment divided by (b) the Milestone Stock Price.

**"Milestone Stock Price"** is equal to the average closing price of Parent Common Stock as reported on Nasdaq (or such other exchange, market or system on which Parent Common Stock is then listed) for the ten (10) consecutive trading days ending on the second trading day prior to the date of the applicable Milestone Notice (as appropriately adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to the Parent Common Stock occurring during such ten trading day period).

**"NASD"** has the meaning set forth in Section 11.1 of this Agreement.

**"Non-Dispute Company Indebtedness Determination Date"** has the meaning set forth in Section 2.12 of this Agreement.

**"OCT"** means optical coherence tomography.

**"OCT Licenses"** means the Patent License Agreement by and between the Board of Regents of the University of Texas System and the Company (fka HSC Light Inc.), dated April 30, 2005, and the Patent License Agreement by and between Thomas Edward Milner and the Company (fka HSC Light), dated April 30, 2005.

**"OCT Product"** means consoles (including OCT laser light sources processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent.

**"OCT System"** means a medical device employing interferometric, optical tomographic imaging technique with micrometer-scale axial and lateral resolution.

**"Order"** means any decree, permanent injunction, order or similar action.

**"Other Product"** means IVUS or some other imaging modality and/or a therapeutic technology such as a balloon, stent, or atherectomy device for use in least invasive and invasive procedures.

**"Parent"** has the meaning set forth in the introductory paragraph of this Agreement.

**"Parent Common Stock"** means the Common Stock of Parent, par value $0.001 per share.

**"Parent Common Stock Percentage"** has the meaning set forth in Section 2.3 of this Agreement.

**"Parent Contracts"** mean any Contract, including any amendment or supplement thereto: (a) to which Parent or any Parent Subsidiary is a party; (b) by which Parent or any Parent Subsidiary or any of their respective assets is or may become bound or under which Parent or any Parent Subsidiary has, or may become subject to, any obligation; or (c) under which Parent or any Parent Subsidiary has or may acquire any right or interest.

**"Parent Disclosure Schedule"** means the schedule (dated as of the date of this Agreement) delivered to the Company on behalf of the Parent on the date of this Agreement and initialed by the President of Parent.

**"Parent Employee Plans"** has the meaning set forth in Section 6.7 of this Agreement.

**"Parent Indemnitees"** mean the following Persons: (a) Parent; (b) Parent's current and future Affiliates (including the Surviving Corporation); (c) the respective Representatives of the Persons referred to in clauses "(a)" and "(b)" above; and (d) the respective successors and assigns of the Persons referred to in clauses "(a)," "(b)" and "(c)" above.

**"Parent Material Adverse Effect."** An event, violation, inaccuracy, circumstance or other matter shall be deemed to have a "Parent Material Adverse Effect" if such event, violation, inaccuracy, circumstance or other matter would (considered together with all other events, violations, inaccuracies, circumstances or other matters that constitute exceptions to the Parent's or Merger Sub's representations and warranties set forth in this Agreement or in the certificate delivered by Parent pursuant to Section 8.3 hereof or that would constitute exceptions to the Parent's or Merger Sub's representations and warranties set forth in this Agreement or in the certificate delivered by the Parent pursuant to Section 8.3 hereof but for the presence of

materiality qualifications, or any similar qualifications, in such representations and warranties) have a material adverse effect on the business, condition, assets, liabilities, operations, financial performance or prospects of Parent and the Parent Subsidiaries, taken as a whole; *provided, however,* that none of the following shall be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be a Parent Material Adverse Effect: (a) any change in the market price or trading volume of Parent Comment Stock after the date of this Agreement, (b) any change in the business, condition, assets, liabilities, operations or financial performance of Parent and the Parent Subsidiaries taken as a whole caused by, related to or resulting from, directly or indirectly, the transactions contemplated by this Agreement or the announcement thereof, (c) any failure by Parent to meet internal projections or forecasts or published revenue or earnings predictions for any period, (d) any adverse change, effect or occurrence attributable to the United States economy as a whole or the industries in which Parent competes, (e) any act or threat of terrorism or war anywhere in the world, any armed hostilities or terrorist activities anywhere in the world, any threat or escalation of armed hostilities or terrorist activities anywhere in the world or any governmental or other response or reaction to any of the foregoing or (f) any adverse change in or effect on the business of Parent and its Subsidiaries, taken as a whole, that is cured by Parent prior to the Closing Date.

**"Parent Subsidiary"** means any Subsidiary of Parent.

**"Payment Fund"** has the meaning set forth in Section 2.6 of this Agreement.

**"Payment Period"** has the meaning set forth in Section 2.5 of this Agreement.

**"Pension Company Plan"** has the meaning set forth in Section 3.15 of this Agreement.

**"Per Share Cash Contribution Amount"** is equal to the quotient of the Escrow Fund Amount divided by the Closing Company Share Number.

**"Person"** means any individual, Entity or Governmental Body.

**"PMDA"** means the Pharmaceutical and Medical Devices Agency of the MHLW.

**"Pre-Closing Period"** has the meaning set forth in Section 5.1 of this Agreement.

**"Recommendation"** has the meaning set forth in Section 5.5(b) of this Agreement.

**"Registered IP"** means all Intellectual Property Rights that are registered, filed, or issued under the authority of any Governmental Body, including all patents, registered copyrights, registered mask works, and registered trademarks and all applications for any of the foregoing.

**"Registration Statement"** has the meaning set forth in Section 11.1 of this Agreement.

**"Related Agreements"** mean the Escrow Agreement, Voting Agreement, General Releases, the Non-Competition Agreements, the Proprietary Rights Agreements, the 280G Waiver and any other documents or agreements executed in connection with this Agreement or the transactions contemplated hereby.

**"Related Party"** has the meaning set forth in Section 3.18 of this Agreement.

**"Representatives"** include a Person's officers, directors, employees, agents, attorneys, accountants, advisors and representatives.

**"Required Company Shareholder Approval"** has the meaning set forth in Section 3.20 of this Agreement.

**"Response"** has the meaning set forth in Section 10.6 of this Agreement.

**"SEC Documents"** has the meaning set forth in Section 4.5 of this Agreement.

**"Section 2.5 Obligations"** has the meaning set forth in Section 2.5 of this Agreement.

**"Securities Act"** means the Securities Act of 1933, as amended.

**"Series A Per Share Payment"** is equal to the sum of (i) the Accrued Dividends on such share, (ii) $0.317 and (iii) the Closing Per Share Payment.

**"Series B Per Share Payment"** is equal to the sum of (i) the Accrued Dividends on such share, (ii) $0.951 and the (iii) Closing Per Share Payment.

**"Shareholders' Representative"** has the meaning set forth in the introductory paragraph of this Agreement.

**"Stock Election Shares"** has the meaning set forth in Section 2.3 of this Agreement.

**"Subsequent Anticipated Closing Date"** has the meaning set forth in Section 2.12 of this Agreement.

**"Subsidiary"** Any Entity is deemed to be a "Subsidiary" of another Person if such Person directly or indirectly (a) has the power to direct the management or policies of such Entity or (b) owns, beneficially or of record, (i) an amount of voting securities or other interests in such Entity that is sufficient to enable such Person to elect at least a majority of the members of such Entity's board of directors or other governing body, or (ii) at least 50% of the outstanding equity or financial interests of such Entity.

**"Surviving Corporation"** has the meaning set forth in the Recitals to this Agreement.

**"Tax"** means any tax (including any income tax, franchise tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, withholding tax or payroll tax), levy, assessment, tariff, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Body.

**"Tax Return"** means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document

or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

**"TBCA"** has the meaning set forth in the Recitals to this Agreement.

**"TBOC"** has the meaning set forth in the Recitals to this Agreement.

**"Technical Failure"** means, with respect to any OCT System or OCT Product, a reasonable determination that (a) such OCT System or OCT Product presents unacceptable levels of safety risks (based upon the Company's historical quality system), demonstrates an unacceptable level of efficacy (*i.e.*, efficacy that is not equal to or better than Parent's current IVUS system), or fails to achieve the primary end points in its pivotal clinical trials such that, in each case, successful development of such OCT System or OCT Product or its successful commercialization is not reasonably likely, or (b) decisions by Governmental Bodies regarding such OCT System or OCT Product have rendered FDA marketing approval for it not reasonably likely or make substantially more likely a marketing approval with significant use limitations in the approved label such that successful development of such OCT System or OCT Product or its successful commercialization is not reasonably likely.

**"Terminated Warrant Exercise Price"** shall mean, with respect to each Terminated Warrant cancelled under the Warrant Cancellation Agreement, the amount such Terminating Warrantholder would have paid had such Terminating Warrantholder exercised such Company Warrant in full immediately prior to the Effective Time (*i.e.*, the per share exercise price as set forth in the subject Company Warrant multiplied by the number of shares of Company Capital Stock being cancelled under such Warrant Cancellation Agreement).

**"Terminated Warrant Shares"** shall have the meaning set forth in Section 2.3 of this Agreement.

**"Terminated Warrants"** shall have the meaning set forth in Section 2.3 of this Agreement.

**"Terminating Warrantholder"** shall have the meaning set forth in Section 2.3 of this Agreement.

**"Termination Date"** has the meaning set forth in Section 9.1 of this Agreement.

**"Unaccredited Outstanding Capital Stock"** has the meaning set forth in Section 2.7 of this Agreement.

**"Unaudited Interim Balance Sheet"** has the meaning set forth in Section 3.4 of this Agreement.

**"Valid Claim"** means a claim of an issued and unexpired patent included within the Licensed Patents that has not been abandoned, permanently revoked or held unenforceable or

invalid by a final decision of a court of competent jurisdiction, which decision can no longer be appealed.

"**Voting Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Warrant Cancellation Agreement**" has the meaning set forth in Section 2.3 of this Agreement.

# EXHIBIT B

EXHIBIT B
KEY EMPLOYEES

Chris Banas
Paul Castella
Silbiano Gonzales
Nate Kemp
Dan Sims
Parker Wood
Joe Taber
Larry Dick

# EXHIBIT C

# EXHIBIT C

## NONCOMPETITION AND NONSOLICITATION AGREEMENT

This Noncompetition and Nonsolicitation Agreement (the "***Non-Competition Agreement***") between ______________________, a shareholder of CardioSpectra, Inc. ("***CardioSpectra***"), (the "***Shareholder***") and Volcano Corporation ("***Volcano***") is entered into as of December 14, 2007.

## RECITALS

WHEREAS, pursuant to an Agreement and Plan of Merger and Reorganization dated as of December 7, 2007 (the "***Merger Agreement***") by and among Volcano, Corazon, Inc., a wholly owned subsidiary of Volcano (the "***Merger Sub***"), CardioSpectra and the Shareholders' Representative (as defined in the Merger Agreement), Merger Sub will merge with and into CardioSpectra and CardioSpectra will survive as a wholly owned subsidiary of Volcano (the "***Surviving Corporation***") (collectively, the "***Merger***").

WHEREAS, as a consequence of the Merger, Volcano will acquire all of the ownership interest of the Shareholder in CardioSpectra.

WHEREAS, as an employee and Shareholder has developed considerable expertise in the business and operations of CardioSpectra and has had extensive access to valuable trade secrets and other confidential and proprietary information concerning CardioSpectra's business and operations.

WHEREAS, Volcano promises to provide Shareholder access to Confidential Information at the time of the Merger or reasonably soon thereafter.

## AGREEMENT

Now, therefore, in order to induce Volcano to consummate the transactions contemplated by the Merger Agreement, and for other good and valuable consideration, including Volcano's promise to provide Shareholder access to Confidential Information, the Shareholder acknowledges and agrees as follows:

**1. Acknowledgements by Shareholder.** The Shareholder acknowledges and agrees that:

**(a)** as a consequence of the Merger, Volcano will acquire all of the ownership interest of the Shareholder in CardioSpectra;

**(b)** as an employee of CardioSpectra, the Shareholder has developed considerable expertise in the business and operations of CardioSpectra and has had extensive access to valuable trade secrets and other confidential and proprietary information concerning CardioSpectra's business and operations;

(c) to enable Volcano to reap the benefits of the Merger and of Volcano's resultant acquisition of Shareholder's ownership interest in CardioSpectra, and in consideration of the access to Confidential Information provided to Shareholder, Volcano reasonably expects that the Shareholder should refrain from carrying on certain activities competitive with CardioSpectra or Volcano as set forth in this Non-Competition Agreement; and

(d) the terms and conditions of this Non-Competition Agreement are fair and reasonable to the Shareholder and the restraints imposed herein and the enforcement of the terms and conditions hereof will not cause the Shareholder to be unable to engage in lawful professions, trades or businesses.

2. **Restriction on Competition**. The Shareholder agrees that, during the Non-Competition Period, the Shareholder shall not, and shall not permit any of his Affiliates to:

(a) engage in any Competing Business Activities in any Restricted Territory;

(b) solicit or aid any other party in soliciting any client or previously identified prospective client of Volcano or CardioSpectra with whom Shareholder had contact in the performance of his duties to Volcano during the term of his employment with Volcano or about whom Shareholder obtained Confidential Information of Volcano or CardioSpectra;

(c) provide Competing Business Activity services to any client of Volcano or CardioSpectra to whom Shareholder had provided such services in excess of 40 hours in the previous year;

(d) solicit or aid any other party in soliciting for employment any then-current employee of Volcano or CardioSpectra; or

(e) acquire or hold (of record, beneficially or otherwise) any direct or indirect interest in, any Person that engages directly or indirectly in any Competing Business Activities in any Restricted Territory;

*provided, however*, that the Shareholder may, without violating this Section 2 own, as a passive investment, shares of capital stock of a publicly-held corporation that engages in Competing Business Activities if (i) such shares are actively traded on an established national securities market in the United States, (ii) the number of shares of such corporation's capital stock that are owned beneficially (directly or indirectly) by the Shareholder and the number of shares of such corporation's capital stock that are owned beneficially (directly or indirectly) by the Shareholder's Affiliates collectively represent less than five percent of the total number of shares of such corporation's capital stock outstanding, and (iii) neither the Shareholder nor any Affiliate of the Shareholder is otherwise performing services of any kind with or for such corporation.

3. **Representations and Warranties**. The Shareholder represents and warrants, to and for the benefit of Volcano and CardioSpectra, that: (a) the Shareholder has full power and capacity to execute and deliver, and to perform all of the Shareholder's obligations under, this

Non-Competition Agreement; and (b) neither the execution and delivery of this Non-Competition Agreement nor the performance of this Non-Competition Agreement will result directly or indirectly in a violation or breach of (i) any agreement or obligation by which the Shareholder is or may be bound, or (ii) any law, rule or regulation. The Shareholder's representations and warranties shall survive the expiration of the Non-Competition Period. The Shareholder agrees that Volcano and CardioSpectra may provide a copy of this Agreement to any Person for whom Shareholder provides services during the Non-Competition Period.

4. **Specific Performance.** The Shareholder agrees that, in the event of any breach or threatened breach by the Shareholder of any covenant or obligation contained in this Non-Competition Agreement, it would be impossible or inadequate to measure and calculate Volcano's or CardioSpectra's damages suffered by such breach and therefore each of Volcano and CardioSpectra shall be entitled (in addition to any other remedy that may be available to it, including monetary damages) to seek and obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (b) an injunction restraining such breach or threatened breach. The Shareholder further agrees that neither Volcano nor CardioSpectra shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 5, and the Shareholder irrevocably waives any right the Shareholder may have to require either Volcano or CardioSpectra to obtain, furnish or post any such bond or similar instrument.

5. **Non-Exclusivity.** The rights and remedies of Volcano and CardioSpectra under this Non-Competition Agreement are not exclusive of or limited by any other rights or remedies which they may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of Volcano and CardioSpectra under this Non-Competition Agreement, and the obligations and liabilities of the Shareholder under this Non-Competition Agreement, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, under laws relating to misappropriation of trade secrets, under other laws and common law requirements and under all applicable rules and regulations. Nothing in this Non-Competition Agreement shall limit any of the obligations, or the rights or remedies, of Volcano, the Shareholder or CardioSpectra under the Merger Agreement; and nothing in the Merger Agreement shall limit any of the obligations, or any of the rights or remedies of Volcano, the Shareholder or CardioSpectra under this Non-Competition Agreement.

6. **Severability.** Any term or provision of this Non-Competition Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Non-Competition Agreement shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and

enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term. The non-competition agreements contained herein shall be construed as if each agreement is divided into separate and distinct agreements in respect of the Competing Business Activities, each capacity in which the Shareholder is prohibited from competing, and each part of the Restricted Territory in which Volcano and CardioSpectra are carrying on the Competing Business Activities. Each such agreement shall constitute a separate and severable agreement distinct from all other such agreements. Each of the parties hereto agrees: (a) that the territorial restrictions herein are properly required for the adequate protection of Volcano's interests; and (b) that in the event any agreement or other provision contained herein shall be deemed to be void, invalid, unenforceable, or unreasonable by a court or other tribunal of competent jurisdiction with respect to any party of the Restricted Territory, such agreement or provision shall not be affected with respect to any other part of the Restricted Territory. Each of the parties agrees and submits to the reduction of the territorial restriction to the broadest such area as the court shall deem reasonable.

**7. Governing Law; Venue.**

(a) This Non-Competition Agreement shall be exclusively construed in accordance with, and governed in all respects by, the laws of the State of Texas (without giving effect to principles of conflicts of laws).

(b) Any legal action or other legal proceeding relating to this Non-Competition Agreement or the enforcement of any provision of this Non-Competition Agreement shall be exclusively brought or otherwise commenced in any state or federal court located in Bexar County, Texas. Volcano, CardioSpectra, and the Shareholder:

(i) expressly and irrevocably consent and submit to the jurisdiction of each state and federal court located in Bexar County, Texas (and each appellate court located in the State of Texas), in connection with any such legal proceeding;

(ii) agree that service of any process, summons, notice or document by U.S. mail addressed to them at the address set forth on the signature page of this Non-Competition Agreement shall constitute effective service of such process, summons, notice or document for purposes of any such legal proceeding;

(iii) agree that each state and federal court located in Bexar County, Texas, shall be deemed to be a convenient forum; and

(iv) agree not to assert (by way of motion, as a defense or otherwise), in any such legal proceeding commenced in any state or federal court located in Bexar County, Texas, any claim that such party is not subject personally to the jurisdiction of such court, that such legal proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Non-Competition Agreement or the subject matter of this Non-Competition Agreement may not be enforced in or by such court.

8. **Waiver.** No failure on the part of Volcano or CardioSpectra to exercise any power, right, privilege or remedy under this Non-Competition Agreement, and no delay on the part of Volcano or CardioSpectra in exercising any power, right, privilege or remedy under this Non-Competition Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

9. **Successors and Assigns.** Each of Volcano and CardioSpectra may freely assign any or all of its rights under this Non-Competition Agreement, at any time, in whole or in part, to any Person in connection with the sale, assignment, transfer or acquisition of the business to which the Non-Competition Agreement relates without obtaining the consent or approval of the Shareholder or of any other Person. This Non-Competition Agreement shall be binding upon the Shareholder and his heirs, executors, estate, personal representatives, successors and assigns, and shall inure to the benefit of Volcano and CardioSpectra (and the parties hereby expressly acknowledge and agree that CardioSpectra is an intended third-party beneficiary of this Non-Competition Agreement).

10. **Captions.** The captions contained in this Non-Competition Agreement are for convenience of reference only, shall not be deemed to be a part of this Non-Competition Agreement and shall not be referred to in connection with the construction or interpretation of this Non-Competition Agreement.

11. **Construction.** Whenever required by the context, the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; and the neuter gender shall include the masculine and feminine genders. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Non-Competition Agreement. Neither the drafting history nor the negotiating history of this Non-Competition Agreement shall be used or referred to in connection with the construction or interpretation of this Non-Competition Agreement. As used in this Non-Competition Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation." Except as otherwise indicated in this Non-Competition Agreement, all references in this Non-Competition Agreement to "Sections" are intended to refer to Sections of this Non-Competition Agreement.

12. **Survival of Obligations.** The expiration of the Non-Competition Period shall not operate to relieve the Shareholder of any obligation or liability arising from any prior breach by the Shareholder of any provision of this Non-Competition Agreement. If Shareholder is found to have breached any obligation contained in Section 2 of this Agreement, the 12-month and 24-month periods shall be extended by the period of time for which Shareholder was in breach so that Volcano and/or CardioSpectra have the full benefit of the 12-month and 24-month periods.

13. **Obligations Absolute.** The Shareholder's obligations under this Non-Competition Agreement are absolute and shall not be terminated or otherwise limited by virtue of any breach (on the part of Volcano, CardioSpectra or any other Person) of any provision of the Merger Agreement or any other agreement, or by virtue of any failure to perform or any other breach of any obligation of Volcano, CardioSpectra or any other Person.

**14. Amendment.** This Non-Competition Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the Shareholder, Volcano (or any successor to Volcano), CardioSpectra (or any successor to CardioSpectra), and the Subsidiary (or any successor to the Subsidiary).

**15. Defined Terms.** For purposes of this Non-Competition Agreement:

**(a)** "*Affiliate*" means, with respect to the Shareholder as an individual, the Shareholder's immediate family, and with respect to an any entity, an entity in which the Shareholder or a member of Shareholder's immediate family owns a majority of the outstanding voting securities or similar interests or units evidencing control or the right to direct the activities of such entity or an entity controlling, controlled by or under common control with such entity.

**(b)** "*Competing Business Activities*" means the development, marketing, distribution and sale of medical imaging device technology utilizing optical coherence tomography.

**(c)** "*Confidential Information*," as used in this Agreement, means any technical, economic, financial, marketing, customer or other information which is not common knowledge outside CardioSpectra or Volcano and which provides them with a business advantage and/or would provide a business advantage to their competitors. Some examples of CardioSpectra and Volcano's Confidential Information include, but are not limited to, the following received from CardioSpectra or Volcano: specialized training received by Shareholder; research and development materials; formulae; product and pricing information; customer and supplier lists and information; contracts and licenses; personnel information, including the performance, skills, abilities and payment of employees; purchasing, accounting, business systems and computer programs; financial information, plans and results; business policies; methods of operation; promotional information and techniques; marketing presentations; price lists or pricing strategies; and computer files. Confidential Information, as defined in this Agreement, includes any such information that Shareholder may originate, learn, have access to or obtain during the term of his employment with CardioSpectra or Volcano, whether in tangible form or memorized, but shall not include any information that (i) Shareholder can demonstrate was rightfully in his possession prior to disclosure to Shareholder by CardioSpectra or Volcano; (ii) is now, or hereafter becomes, through no act or failure to act on the part of Shareholder, generally known or available in the public domain; or (iii) is obtained by Shareholder from a third party without a breach of any obligation to CardioSpectra or Volcano. Additionally, Shareholder recognizes that CardioSpectra and Volcano's Confidential Information is dynamic and ever-changing and that, throughout Shareholder's employment relationship with CardioSpectra and/or Volcano, they have agreed to provide Shareholder with access to Confidential Information in a greater quantity and/or expanded nature than any such Confidential Information that may have already been provided to Shareholder.

**(d)** "*Non-Competition Period*" shall mean the later of the period of 24-months following the date of the consummation of the Merger or 12-months following the termination of Shareholder's employment with CardioSpectra or Volcano.

(e) "*Person*" means any: (i) individual; (ii) corporation, general partnership, limited partnership, limited liability partnership, trust, company (including any limited liability company or joint stock company) or other organization or entity; or (iii) governmental body or authority.

(f) "*Restricted Territory*" means any state, territory or possession of the United States of America and all cities, states, provinces, countries or other similar political subdivisions of the foreign jurisdictions of the European Union, Japan, Korea and the People's Republic of China in which Shareholder provided services on behalf of CardioSpectra or Volcano regarding the development, marketing, distribution or sale of medical imaging device technology utilizing optical coherence tomography in the previous year.

**VOLCANO CORPORATION**

By: ______________________________

Title: ______________________________

Address: ______________________________

Date: ______________________________

I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT I AGREE TO ABIDE BY ITS TERMS.

____________________________________

Name:______________________________

Date:_______________________________

Address: ____________________________

Telephone:(    ) ______________________

# EXHIBIT D

# EXHIBIT D

## LIST OF KEY SHAREHOLDERS

1. Christopher E. Banas
2. Marc D. Feldman
3. Scientific Health Development, Ltd.
4. S.C.O.U.T. Healthcare Fund, LP
5. CB Tech Ventures, LLC
6. Samson Investments, LP
7. Paul Castella
8. ATP Partners

# EXHIBIT E

EXHIBIT E

# VOTING AGREEMENT

THIS VOTING AGREEMENT ("Agreement") is entered into as of December [•], 2007, by and between VOLCANO CORPORATION, a Delaware corporation ("Parent") and [•] (the "Shareholder").

RECITALS

A. Shareholder is a holder of record and the "beneficial owner" (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934) of certain shares of common stock, par value $0.001 per share ("Common Stock"), Series A Preferred Stock, par value $0.001 per share ("Series A Preferred Stock"), and/or Series B Preferred Stock, par value $0.001 per share ("Series B Preferred Stock") of CardioSpectra, Inc., a Texas corporation (the "Company").

B. Parent, Corazon Acquisition, Inc., a Texas corporation ("Merger Sub"), the Company and Christopher E. Banas and Paul Castella as the Shareholders' Representatives, are entering into an Agreement and Plan of Merger of even date herewith (the "Merger Agreement") which provides (subject to the conditions set forth therein) for the merger of Merger Sub with and into the Company (the "Merger") with the Company surviving the Merger (the "Surviving Corporation"). Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Merger Agreement.

C. In order to induce Parent to enter into the Merger Agreement, Shareholder is entering into this Agreement.

AGREEMENT

The parties to this Agreement, intending to be legally bound, agree as follows:

SECTION 1. CERTAIN DEFINITIONS

For purposes of this Agreement:

(a) "Acquisition Proposal" shall mean any offer or proposal (other than an offer or proposal made or submitted by Parent) contemplating or otherwise relating to any Acquisition Transaction.

(b) The term "Acquisition Transaction" shall have the meaning assigned to that term in the Merger Agreement.

(c) Shareholder shall be deemed to "Own" or to have acquired "Ownership" of a security if Shareholder: (i) is the record owner of such security; or (ii) is the "beneficial owner" (within the meaning of Rule 13d-3 under the Securities Exchange Act

of 1934) of such security, regardless of whether Shareholder Owns such security on the date hereof or has acquired Ownership of such security at any time after the date hereof and regardless of the manner in which Shareholder has acquired Ownership of such security, including, without limitation, as a result of the exercise of stock options or warrants, conversion of convertible securities, exchange of any securities or otherwise.

(d) "Person" shall mean any (i) individual, (ii) corporation, limited liability company, partnership or other entity, or (iii) governmental authority.

(g) "Subject Securities" shall mean: (i) all securities of the Company (including all shares of Common Stock, Series A Preferred Stock and Series B Preferred Stock and all options, warrants and other rights to acquire shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock) Owned by Shareholder as of the date of this Agreement; and (ii) all additional securities of the Company (including all additional shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock and all additional options, warrants and other rights to acquire shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock) of which Shareholder acquires Ownership during the period from the date of this Agreement through the Voting Covenant Expiration Date.

(h) A Person shall be deemed to have a effected a "Transfer" of a security if such Person directly or indirectly: (i) sells, pledges, encumbers, grants an option with respect to, transfers or disposes of such security or any interest in such security to any Person other than Parent; (ii) enters into an agreement or commitment contemplating the possible sale of, pledge of, encumbrance of, grant of an option with respect to, transfer of or disposition of such security or any interest therein to any Person other than Parent; or (iii) reduces such Person's beneficial ownership of, interest in or risk relating to such security.

(i) "Voting Covenant Expiration Date" shall mean the earlier of the date upon which the Merger Agreement is validly terminated, or the date upon which the Merger is consummated.

## SECTION 2. TRANSFER OF SUBJECT SECURITIES AND VOTING RIGHTS

**2.1 Restriction on Transfer of Subject Securities.** Subject to Section 2.3, during the period from the date of this Agreement through the Voting Covenant Expiration Date, Shareholder shall not, directly or indirectly, cause or permit any Transfer of any of the Subject Securities to be effected.

**2.2 Restriction on Transfer of Voting Rights.** During the period from the date of this Agreement through the Voting Covenant Expiration Date, Shareholder shall ensure that: (a) none of the Subject Securities is deposited into a voting trust; and (b) no proxy or power of attorney is granted (other than in connection with Shareholder's compliance with Section 2.3 or 3.2 of this Agreement), and no voting agreement or similar agreement is entered into, with respect to any of the Subject Securities. During the period from the date of this Agreement through the Voting Covenant Expiration Date, Shareholder shall not enter into any agreement or

understanding with any person that is inconsistent with, violates, contravenes, or results in a violation, breach or contravention of, any of the provisions of this Agreement.

2.3 **Permitted Transfers.** Section 2.1 shall not prohibit a transfer of any Subject Securities by Shareholder (i) to Parent or to any wholly-owned subsidiary of Parent, (ii) to any member of Shareholder's immediate family, or to a trust for the benefit of Shareholder or any member of Shareholder's immediate family, (iii) upon the death of Shareholder, or (iv) if Shareholder is a partnership or limited liability company, to one or more partners or members of Shareholder or to an affiliated corporation under common control with Shareholder; *provided, however,* in the case of each of clauses (ii), (iii) and (iv) above, that a transfer referred to in this sentence shall be permitted only if, as a precondition to such transfer, the transferee agrees in a writing, satisfactory in form and substance to Parent, to be bound by the terms of this Agreement and delivers a duly executed proxy in the form attached hereto as Exhibit A with respect to such transferred Subject Securities.

SECTION 3. VOTING OF SHARES

3.1 **Voting Covenant Prior to Termination of Merger Agreement.** Shareholder hereby agrees that prior to the Voting Covenant Expiration Date, at any meeting of the Shareholders of the Company, however called, and in any written action by consent of Shareholders of the Company, unless otherwise directed in writing by Parent, Shareholder shall cause the Subject Securities to be voted:

(a) in favor of the Merger, the execution and delivery by the Company of the Merger Agreement and the adoption and/or approval of the Merger Agreement and the terms thereof, in favor of the Company Charter Amendment (as defined in the Merger Agreement), in favor of each of the other actions contemplated by the Merger Agreement and in favor of any action in furtherance of any of the foregoing; and

(b) against any action or agreement that would result in a breach of any representation, warranty, covenant or obligation of the Company or any subsidiary of the Company in the Merger Agreement; and

(c) against the following actions (other than the Merger and the transactions contemplated by the Merger Agreement): (A) any extraordinary corporate transaction, such as a merger, consolidation or other business combination involving the Company or any subsidiary of the Company; (B) any sale, lease or transfer of a material amount of assets of the Company or any subsidiary of the Company; (C) any reorganization, recapitalization, dissolution or liquidation of the Company or any subsidiary of the Company; (D) any change in a majority of the board of directors of the Company; (E) any amendment to the Company's articles of incorporation or bylaws (except as contemplated by the Merger Agreement); (F) any material change in the capitalization of the Company or the Company's corporate structure; and (G) any other action which is intended, or could reasonably be expected, to impede, interfere with, delay, postpone, discourage or adversely affect the Merger or any of the other transactions contemplated by the Merger Agreement or this Agreement.

Prior to the earlier to occur of the valid termination of the Merger Agreement or the consummation of the Merger, Shareholder shall not enter into any agreement or understanding with any Person to vote or give instructions in any manner inconsistent with clause "(a)", "(b)", or "(c)" of the preceding sentence.

3.2 **Proxy**. Contemporaneously with the execution of this Agreement: (i) Shareholder shall deliver to Parent an irrevocable proxy in the form attached to this Agreement as Exhibit A, which shall be irrevocable to the fullest extent permitted by law (at all times prior to the Voting Covenant Expiration Date) with respect to the shares referred to therein (the "Proxy"); and (ii) Shareholder shall cause to be delivered to Parent an additional proxy (in the form attached hereto as Exhibit A) executed on behalf of the record owner of any outstanding shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock that are owned beneficially (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934), but not of record, by Shareholder.

SECTION 4. WAIVER OF CERTAIN RIGHTS

4.1 **Appraisal Rights**. Shareholder hereby irrevocably and unconditionally waives, and agrees to waive and cause to be waived and to prevent the exercise of, any rights of appraisal, any dissenters' rights and any similar rights relating to the Merger or any related transaction that Shareholder or any other Person may have by virtue of any outstanding shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock Owned by Shareholder (***"Appraisal Rights"***).

4.2 **Notice Rights**. Shareholder acknowledges and agrees that the Company's Amended and Restated Articles of Incorporation dated August 29, 2007 provide for a period of at least twenty (20) days between the date on which the material terms and conditions of the Merger (and the date of any subequent material change in such terms and conditions) are first communicated to Shareholder and the date the Merger is consummated, *provided that*, such periods may be shortened upon the written consent of the holders of at least a majority of the shares of Series A Preferred Stock and a majority of the Preferred Stock, then outstanding. Solely with the respect to the Merger and Merger Agreement described above, and the transactions contemplated thereby, Shareholder hereby irrevocably and unconditionally consents to the shortening of the periods described in the preceding sentence from twenty (20) days to two (2) days.

SECTION 5. NO SOLICITATION

Shareholder agrees that, during the period from the date of this Agreement through the Voting Covenant Expiration Date, Shareholder shall not, directly or indirectly: (i) solicit, initiate, encourage, induce or facilitate the making, submission or announcement of any Acquisition Proposal or knowingly take any action that could reasonably be expected to lead to an Acquisition Proposal; (ii) furnish any information regarding the Company or any subsidiary of the Company to any Person in connection with or in response to an Acquisition Proposal or an inquiry or indication of interest that could reasonably be expected to lead to an Acquisition Proposal; (iii) engage in discussions or negotiations with any Person with respect to any Acquisition Proposal; (iv) approve, endorse or recommend any Acquisition Proposal; or (v) enter

into any letter of intent or similar document or any agreement or understanding contemplating or otherwise relating to any Acquisition Transaction. Shareholder shall immediately cease and discontinue any existing discussions with any Person that relate to any Acquisition Proposal.

SECTION 6. REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER

Shareholder hereby represents and warrants to Parent as follows:

6.1 **Authorization, etc.** Shareholder has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and the Proxy and to perform Shareholder's obligations hereunder and thereunder. Shareholder has sole power of disposition, sole power of conversion, sole power to demand and waive Appraisal Rights, and sole power to vote or otherwise agree to all of the matters set forth in this Agreement, in each case with respect to all shares of Common Stock, Series A Preferred Stock and Series B Preferred Stock owned by such Shareholder on the date of this Agreement. This Agreement and the Proxy have been duly executed and delivered by Shareholder and constitute legal, valid and binding obligations of Shareholder, enforceable against Shareholder in accordance with their terms, subject to (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies. If Shareholder is a general or limited partnership, then Shareholder is a partnership duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was organized. If Shareholder is a limited liability company, then Shareholder is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was organized.

6.2 **No Conflicts or Consents.**

(a) The execution and delivery of this Agreement and the Proxy by Shareholder do not, and the performance of this Agreement and the Proxy by Shareholder will not: (i) conflict with or violate any law, rule, regulation, order, decree or judgment applicable to Shareholder or by which Shareholder or any of Shareholder's properties is or may be bound or affected; or (ii) result in or constitute (with or without notice or lapse of time) any breach of or default under, or give to any other Person (with or without notice or lapse of time) any right of termination, amendment, acceleration or cancellation of, or result (with or without notice or lapse of time) in the creation of any encumbrance or restriction on any of the Subject Securities pursuant to, any contract to which Shareholder is a party or by which Shareholder or any of Shareholder's affiliates or properties is or may be bound or affected.

(b) Any proxies heretofore given in respect of any Subject Securities are not irrevocable and all such proxies have been or are hereby revoked.

(c) The execution and delivery of this Agreement and the Proxy by Shareholder do not, and the performance of this Agreement and the Proxy by Shareholder will not, require any consent or approval of any Person other than those obtained prior to Shareholder's execution and delivery of this Agreement.

6.3 **Title to Securities**. As of the date of this Agreement: (a) Shareholder holds of record (free and clear of any encumbrances or restrictions other than encumbrances and restrictions that do not or will not prevent the performance of Shareholder's obligations hereunder) the number of outstanding shares of Common Stock, Series A Preferred Stock and Series B Preferred Stock set forth under the heading "Shares Held of Record" on the signature page hereof; (b) Shareholder holds (free and clear of any encumbrances or restrictions other than encumbrances and restrictions that do not or will not prevent the performance of Shareholder's obligations hereunder) the options, warrants and other rights to acquire shares of Common Stock, Series A Preferred Stock and Series B Preferred Stock set forth under the heading "Options and Other Rights" on the signature page hereof; (c) Shareholder Owns the additional securities of the Company set forth under the heading "Additional Securities Beneficially Owned" on the signature page hereof; and (d) Shareholder does not directly or indirectly Own any shares of capital stock or other securities of the Company, or any option, warrant or other right to acquire (by purchase, conversion or otherwise) any shares of capital stock or other securities of the Company, other than the shares and options, warrants and other rights set forth on the signature page hereof.

6.4 **Accuracy of Representations.** The representations and warranties contained in this Agreement are accurate in all material respects as of the date of this Agreement, will be accurate in all material respects at all times through the Voting Covenant Expiration Date and will be accurate in all material respects as of the date of the consummation of the Merger as if made on that date.

SECTION 7. ADDITIONAL COVENANTS OF SHAREHOLDER

7.1 **Further Assurances.** From time to time and without additional consideration, Shareholder shall (at Shareholder's sole expense) execute and deliver, or cause to be executed and delivered, such additional transfers, assignments, endorsements, proxies, consents and other instruments, and shall (at Shareholder's sole expense) take such further actions, as Parent may reasonably request for the purpose of carrying out and furthering the intent of this Agreement and the Proxy.

7.2 **Legends.** Immediately after the execution of this Agreement (and from time to time upon the acquisition by Shareholder of Ownership of any shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock prior to the Voting Covenant Expiration Date), Shareholder shall cause each certificate evidencing any outstanding shares of Common Stock, Series A Preferred Stock or Series B Preferred Stock or other securities of the Company Owned by Shareholder to be surrendered so that the transfer agent for such securities may affix thereto a legend in the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND VOTING AND OTHER RESTRICTIONS, PURSUANT TO THE TERMS OF THE VOTING AGREEMENT DATED AS OF ____________________, 2007, BY AND AMONG VOLCANO CORPORATION AND ________________ (AND THE IRREVOCABLE PROXY EXECUTED IN CONNECTION THEREWITH). COPIES OF SUCH VOTING AGREEMENT AND IRREVOCABLE PROXY ARE ON DEPOSIT WITH THE COMPANY AT ITS

PRINCIPAL PLACE OF BUSINESS AND THE COMPANY WILL FURNISH SUCH COPIES TO THE HOLDER OF THIS CERTIFICATE, WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

SECTION 8. MISCELLANEOUS

8.1 **Survival of Representations, Warranties and Agreements.** All claims for breaches of representations, warranties, covenants and agreements made by Shareholder in this Agreement shall survive (i) the consummation of the Merger, (ii) any termination of the Merger Agreement, and (iii) the Voting Covenant Expiration Date.

8.2 **Expenses.** All costs and expenses incurred in connection with the transactions contemplated by this Agreement shall be paid by the party incurring such costs and expenses.

8.3 **Notices.** Any notice or other communication required or permitted to be delivered to either party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by facsimile) to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other party):

**if to Shareholder:**

______________________________
______________________________
______________________________
______________________________

**if to Parent:**

VOLCANO CORPORATION
c/o John Dahldorf, CFO
2870 Kilgore Road
Rancho Cordova, CA 95670
Fax: 916-638-7976

with a required copy to (which alone shall not constitute notice):

Cooley Godward Kronish LLP
4401 Eastgate Mall
San Diego, CA 92121
Attn: Matthew Browne, Esq.

8.4 **Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term

or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

8.5 **Entire Agreement**. This Agreement, the Proxy and any other documents delivered by the parties in connection herewith constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings between the parties with respect thereto. No addition to or modification of any provision of this Agreement shall be binding upon either party unless made in writing and signed by both parties.

8.6 **Assignment; Binding Effect**. Except as provided herein, neither this Agreement nor any of the interests or obligations hereunder may be assigned or delegated by Shareholder, by operation of law or otherwise, and any attempted or purported assignment or delegation of any of such interests or obligations shall be void. Subject to the preceding sentence, this Agreement shall be binding upon Shareholder and Shareholder's heirs, estate, executors and personal representatives and Shareholder's successors and assigns, and shall inure to the benefit of Parent and its successors and assigns. Without limiting any of the restrictions set forth in Section 2 or elsewhere in this Agreement, this Agreement shall be binding upon any Person to whom any Subject Securities are transferred. Nothing in this Agreement is intended to confer on any Person (other than Parent and its successors and assigns) any rights or remedies of any nature.

8.7 **Indemnification**. Shareholder shall hold harmless and indemnify Parent and Parent's affiliates from and against, and shall compensate and reimburse Parent and Parent's affiliates for, any loss, damage, claim, liability, fee (including attorneys' fees), demand, cost or expense (regardless of whether or not such loss, damage, claim, liability, fee, demand, cost or expense relates to a third-party claim) that is directly or indirectly suffered or incurred by Parent or any of Parent's affiliates, or to which Parent or any of Parent's affiliates otherwise becomes subject, and that arises directly or indirectly from, or relates directly or indirectly to, (a) any inaccuracy in or breach in any material respect of any representation or warranty contained in this Agreement, or (b) any failure on the part of Shareholder to observe, perform or abide by, in any material respect, or any other breach, in any material respect, of, any restriction, covenant, obligation or other provision contained in this Agreement or in the Proxy.

8.8 **Specific Performance**. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the Proxy were not performed in accordance with its specific terms or were otherwise breached. Shareholder agrees that, in the event of any breach or threatened breach by Shareholder of any covenant or obligation contained in this Agreement or in the Proxy, Parent shall be entitled (in addition to any other remedy that

may be available to it, including monetary damages) to seek and obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (b) an injunction restraining such breach or threatened breach. Shareholder further agrees that neither Parent nor any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 8.8, and Shareholder irrevocably waives any right he or it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

8.9 **Non-Exclusivity**. The rights and remedies of the parties under this Agreement are not exclusive of or limited by any other rights or remedies which the parties may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of the parties under this Agreement, and the obligations and liabilities of the parties under this Agreement, are in addition to their respective rights, remedies, obligations and liabilities under common law requirements and under all applicable statutes, rules and regulations.

**8.10 Governing Law; Venue.**

(a) This Agreement and the Proxy shall be construed in accordance with, and governed in all respects by, the laws of the State of Texas (without giving effect to principles of conflicts of laws).

(b) Any legal action or other legal proceeding relating to this Agreement or the Proxy or the enforcement of any provision of this Agreement or the Proxy may be brought or otherwise commenced in any state or federal court located in the State of Texas. Shareholder:

(i) expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in the State of Texas in connection with any such legal proceeding;

(ii) agrees that service of any process, summons, notice or document by U.S. mail addressed to him or it at the address set forth in Section 8.3 shall constitute effective service of such process, summons, notice or document for purposes of any such legal proceeding;

(iii) agrees that each state and federal court located in the State of Texas shall be deemed to be a convenient forum; and

(iv) agrees not to assert (by way of motion, as a defense or otherwise), in any such legal proceeding commenced in any state or federal court located in Texas, any claim that Shareholder is not subject personally to the jurisdiction of such court, that such legal proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

(c) SHAREHOLDER IRREVOCABLY WAIVES THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE PROXY OR THE ENFORCEMENT OF ANY PROVISION OF THIS AGREEMENT OR THE PROXY.

8.11 **Counterparts.** This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

8.12 **Captions.** The captions contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

8.13 **Attorneys' Fees.** If any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought by either party, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

8.14 **Amendment; Waiver.** This Agreement may not be amended, changed, supplemented, or otherwise modified or terminated, except upon the execution and delivery of a written agreement executed by the parties hereto. No failure on the part of either party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of either party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. Neither party shall be deemed to have waived any claim available to such party arising out of this Agreement, or any power, right, privilege or remedy of such party under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered by or on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

8.15 **Construction.**

(a) For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include masculine and feminine genders.

(b) The parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d) Except as otherwise indicated, all references in this Agreement to "Sections" and "Exhibits" are intended to refer to Sections of this Agreement and Exhibits to this Agreement.

IN WITNESS WHEREOF, Parent and Shareholder have caused this Agreement to be executed as of the date first written above.

VOLCANO CORPORATION

By:______________________________

[NAME]

By: __________________________
Name: __________________________
Title: __________________________

Address: ______________________
______________________

Facsimile: _______________

| | SHARES HELD OF RECORD | OPTIONS AND OTHER RIGHTS | ADDITIONAL SECURITIES BENEFICIALLY OWNED |
|---|---|---|---|
| Common Stock | | | |
| Series A Preferred Stock | | | |
| Series B Preferred Stock | | | |