EXHIBIT A
FORM OF IRREVOCABLE PROXY

The undersigned Shareholder (the "Shareholder") of CardioSpectra, Inc., a Texas corporation (the "Company"), hereby irrevocably (to the fullest extent permitted by law) appoints and constitutes Vince Burgess and Volcano Corporation, a Delaware corporation ("Parent"), and each of them, the attorneys-in-fact and proxies of the Shareholder with full power of substitution and resubstitution, to the full extent of the Shareholder's rights with respect to (i) the outstanding shares of capital stock of the Company owned of record or beneficially by the Shareholder as of the date of this proxy, which shares are specified on the final page of this proxy, and (ii) any and all other shares of capital stock of the Company which the Shareholder may own of record or beneficially on or after the date hereof. (The shares of the capital stock of the Company referred to in clauses "(i)" and "(ii)" of the immediately preceding sentence are collectively referred to as the "Shares.") Upon the execution hereof, all prior proxies given by the Shareholder with respect to any of the Shares are hereby revoked, and the Shareholder agrees that no subsequent proxies will be given with respect to any of the Shares.

This proxy is coupled with an interest, is irrevocable, and is granted in connection with the Voting Agreement, dated as of the date hereof, between Parent and the Shareholder (the "Voting Agreement"), and is granted in consideration of Parent entering into the Agreement and Plan of Merger, dated as of the date hereof, among Parent, Corazon Acquisition, Inc., the Company and Christopher E. Banas and Paul Castellas as the Shareholders' Representatives (the "Merger Agreement"). This proxy will terminate on the Voting Covenant Expiration Date (as defined in the Voting Agreement).

The attorneys-in-fact and proxies named above will be empowered, and may exercise this proxy, to vote the Shares at any meeting of shareholders of the Company, however called, and to grant or execute written consents in connection with any action by written consent of the Company, in each case at any time until the earlier to occur of the valid termination of the Merger Agreement or the effective time of the Merger.

(i) in favor of the Merger, the execution and delivery by the Company of the Merger Agreement and/or the adoption and approval of the Merger Agreement and the terms thereof, in favor of the Company Charter Amendment (as defined in the Merger Agreement), in favor of each of the other actions contemplated by the Merger Agreement and in favor of any action in furtherance of any of the foregoing; and

(ii) against any action or agreement that would result in a breach of any representation, warranty, covenant or obligation of the Company in the Merger Agreement; and

(iii) against the following actions (other than the Merger and the other transactions contemplated by the Merger Agreement): (A) any extraordinary corporate transaction, such as a merger, consolidation or other business combination involving the Company or any subsidiary of the Company; (B) any sale, lease or transfer of a material amount of assets of the Company or any subsidiary of the Company; (C) any

reorganization, recapitalization, dissolution or liquidation of the Company or any subsidiary of the Company; (D) any change in a majority of the board of directors of the Company; (E) any amendment to the Company's certificate of incorporation or bylaws (except as contemplated by the Merger Agreement); (F) any material change in the capitalization of the Company or the Company's corporate structure; and (G) any other action which is intended, or could reasonably be expected, to impede, interfere with, delay, postpone, discourage or adversely affect the Merger or any of the other transactions contemplated by the Merger Agreement.

The Shareholder may vote the Shares on all other matters not referred to in this proxy, and the attorneys and proxies named above may not exercise this proxy with respect to such other matters.

This proxy shall be binding upon the heirs, estate, executors, personal representatives, successors and assigns of the Shareholder (including any transferee of any of the Shares).

Any term or provision of this proxy that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Shareholder agrees that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this proxy shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the Shareholder agrees to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

Dated: December ___, 2007

______________________________
Signature

| | SHARES HELD OF RECORD | OPTIONS AND OTHER RIGHTS | ADDITIONAL SECURITIES BENEFICIALLY OWNED |
|---|---|---|---|
| **Common Stock** | | | |
| **Series A Preferred Stock** | | | |
| **Series B Preferred Stock** | | | |

# EXHIBIT F

## ACCREDITED INVESTOR FORM

*(PLEASE COMPLETE THIS FORM IF YOU REPRESENT AN ENTITY)*

This Questionnaire is sent in connection with that certain Agreement and Plan of Merger and Reorganization (the "Merger Agreement"), dated as of December ___, 2007, by and among Volcano Corporation., a Delaware corporation ("Volcano"), Corazon Acquisition, Inc., a Texas corporation and wholly owned subsidiary of Volcano ("Merger Sub") and Paul Castella and Chris Banas as the Shareholders' Representative, pursuant to which Merger Sub will merge with and into CardioSpectra, with CardioSpectra surviving as a wholly owned subsidiary of Volcano. Contingent upon the occurrence of certain events and as set forth in the Merger Agreement, you may be entitled to Milestone Merger Consideration payable in the future. Under the terms of the Merger Agreement, Volcano, in its sole discretion, may elect to pay you Milestone Merger Consideration, if any, in the form of cash or Volcano common stock (the "Securities"), or a combination of both, *provided that*, only individuals and entities making the accredited investor representations contained herein shall be eligible to receive Milestone Merger Consideration, if any, in the form of Volcano common stock.

This Questionnaire should be completed by the person who will be making the investment decision on behalf of the entity. All questions should be completed with respect to the entity (*i.e.*, "you" means the entity), unless otherwise directed. The purpose of this Questionnaire is to assure Volcano that all such offers and purchases will meet the standards imposed by the Securities Act of 1933, as amended (the "*Act*"), and applicable state securities laws.

Your answers will be kept confidential. However, by signing this Questionnaire you agree that Volcano and its counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws.

Please complete, sign, date and return one copy of this Questionnaire to [__________], fax: [__________]. If the answer to a question is "none" or "not applicable," please so state.

- **Residence Information.** Please provide the entity's full legal name, primary business address, phone number, fax number, name and e-mail address of contact person, and federal tax I.D. number.

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

- **Domicile Information.** Please indicate the form of the entity and the state and date of its organization (*e.g.*, corporation, state and date of incorporation).

Form ______________________________

State of Organization ____________________

Date of Organization ____________________

- **Accredited Investor Certification.** The undersigned makes one of the following representations regarding its net worth and certain related matters ***and has checked the applicable representation***:

( ) **(i)** The undersigned is a trust with total assets in excess of $5,000,000, not formed for the purpose of acquiring the Securities, whose purchase is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

( ) **(ii)** The undersigned is a bank, insurance company, investment company registered under the United States Investment Company Act of 1940, as amended, a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Company licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the United States Investment Advisers Act of 1940, as amended.

( ) **(iii)** The undersigned is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the undersigned has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are accredited investors.

( ) **(iv)** The undersigned is a corporation, partnership, business trust, or an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), in each case not formed for the purpose of acquiring the Securities and with total assets in excess of $5,000,000.

( ) (v) The undersigned is an entity in which all of the equity owners (in the case of a revocable living trust, its grantor(s)) qualify under any of the above subparagraphs, or, if an individual, each such individual has a net worth[1],

[1] For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value over total liabilities, except that the principal residence owned by a natural person shall be valued either (a) at cost, including the cost of

either individually or upon a joint basis with such individual's spouse, of at least $1,000,000 (within the meaning of such terms as used in the definition of "accredited investor" contained in Rule 501 under the Act), *or* has had an individual income[2] in excess of $200,000 for each of the two most recent years, or a joint income with such individual's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

( ) (vi) The undersigned cannot make any of the representations set forth in paragraphs "i" through "v" above.

The undersigned represents that the information contained herein is complete and accurate and may be relied upon by Volcano, and that the undersigned will notify Volcano of any material change in any of such information prior to the receipt of Volcano Common Stock.

---

improvements, net of current encumbrances upon the property, or (b) at the appraised value of the residence as determined upon a written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property. As used in the preceding sentence, "institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender of loans secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

2 For purposes of this Questionnaire, "income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (a) the amount of any tax exempt interest income received, (b) the amount of losses claimed as a limited partner in a limited partnership, (c) any deduction claimed for depletion, (d) amounts contributed to an IRA or Keogh retirement plan, (e) alimony paid, and (f) any amounts by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code.

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire this __________ day of __________, 2007.

______________________________

Name:______________________________

By:______________________________

Title:______________________________

# EXHIBIT F

## ACCREDITED INVESTOR FORM

*(PLEASE COMPLETE THIS FORM IF YOU ARE AN INDIVIDUAL)*

This Questionnaire is sent in connection with that certain Agreement and Plan of Merger and Reorganization (the "Merger Agreement"), dated as of December ___, 2007, by and among Volcano Corporation., a Delaware corporation ("Volcano"), Corazon Acquisition, Inc., a Texas corporation and wholly owned subsidiary of Volcano ("Merger Sub") and Paul Castella and Chris Banas as the Shareholders' Representative, pursuant to which Merger Sub will merge with and into CardioSpectra, with CardioSpectra surviving as a wholly owned subsidiary of Volcano. Contingent upon the occurrence of certain events and as set forth in the Merger Agreement, you may be entitled to Milestone Merger Consideration payable in the future. Under the terms of the Merger Agreement, Volcano, in its sole discretion, may elect to pay you Milestone Merger Consideration, if any, in the form of cash or Volcano common stock, or a combination of both, *provided that*, only individuals and entities making the accredited investor representations contained herein shall be eligible to receive Milestone Merger Consideration, if any, in the form of Volcano common stock.

The purpose of this Questionnaire is to assure Volcano that all such offers will meet the standards imposed by the Securities Act of 1933, as amended (the "*Act*"), and applicable state securities laws. Your answers will be kept confidential. However, by signing this Questionnaire you agree that Volcano and its counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws.

Please complete, sign, date and return one copy of this Questionnaire to [_________], fax: [_________]. If the answer to a question is "none" or "not applicable," please so state.

- **Residence Information**. Please provide your full legal name, residence address, phone and fax numbers, e-mail address and social security number.

  ______________________________________
  ______________________________________
  ______________________________________
  ______________________________________

- **Personal Information**. Please indicate the state which issued your driver's license and the state in which you are registered to vote.

  ______________________________________
  ______________________________________
  ______________________________________
  ______________________________________

- **My Income.**

Do you reasonably expect either your income,[3] from all sources during this year, to exceed $200,000 or, if you are married, the joint income of you and your spouse from all sources during this year to exceed $300,000?

_____ Yes _____ No

If no, please specify amount of expected income:_______________________________

Was your yearly individual income from all sources during each of the last two years in excess of $200,000 or, if you are married, was the joint income of you and your spouse during each of those years in excess of $300,000?

_____ Yes _____ No

If no, please specify amount of your total individual and/or joint income in the last two years:_______________________________________________________________

- **My Net Worth.**

Is your net worth, including the net worth[4] of your spouse, in excess of $1,000,000? Please remember that your net worth should include the value of your principal residence if owned, any other shares of stock or options held by you and your spouse and your and your spouse's owned personal property (e.g. furniture, jewelry, other valuables, etc.).

_____ Yes _____ No

If no, please specify your net worth:_______________________________________

The undersigned represents that the information contained herein is complete and accurate and may be relied upon by Volcano and that the undersigned will notify Volcano of any material change in any of such information prior to the receipt of Volcano Common Stock.

---

[3] For purposes of this Questionnaire, "income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (a) the amount of any tax exempt interest income received, (b) the amount of losses claimed as a limited partner in a limited partnership, (c) any deduction claimed for depletion, (d) amounts contributed to an IRA or Keogh retirement plan, (e) alimony paid, and (f) any amounts by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code.

[4] For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value over total liabilities, except that the principal residence owned by a natural person shall be valued either (a) at cost, including the cost of improvements, net of current encumbrances upon the property, or (b) at the appraised value of the residence as determined upon a written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property. As used in the preceding sentence, "institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender of loans secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire this _________ day of _________, 2007.

_______________________________________
(Signature)

_______________________________________
(Printed Name)

# EXHIBIT F

## EXHIBIT F

### ACCREDITED INVESTOR FORM

*(PLEASE COMPLETE THIS FORM IF YOU REPRESENT AN ENTITY)*

This Questionnaire is sent in connection with that certain Agreement and Plan of Merger and Reorganization (the "Merger Agreement"), dated as of December ___, 2007, by and among Volcano Corporation., a Delaware corporation ("Volcano"), Corazon Acquisition, Inc., a Texas corporation and wholly owned subsidiary of Volcano ("Merger Sub") and Paul Castella and Chris Banas as the Shareholders' Representative, pursuant to which Merger Sub will merge with and into CardioSpectra, with CardioSpectra surviving as a wholly owned subsidiary of Volcano. Contingent upon the occurrence of certain events and as set forth in the Merger Agreement, you may be entitled to Milestone Merger Consideration payable in the future. Under the terms of the Merger Agreement, Volcano, in its sole discretion, may elect to pay you Milestone Merger Consideration, if any, in the form of cash or Volcano common stock (the "Securities"), or a combination of both, *provided that*, only individuals and entities making the accredited investor representations contained herein shall be eligible to receive Milestone Merger Consideration, if any, in the form of Volcano common stock.

This Questionnaire should be completed by the person who will be making the investment decision on behalf of the entity. All questions should be completed with respect to the entity (*i.e.*, "you" means the entity), unless otherwise directed. The purpose of this Questionnaire is to assure Volcano that all such offers and purchases will meet the standards imposed by the Securities Act of 1933, as amended (the "*Act*"), and applicable state securities laws.

Your answers will be kept confidential. However, by signing this Questionnaire you agree that Volcano and its counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws.

Please complete, sign, date and return one copy of this Questionnaire to [__________], fax: [__________]. If the answer to a question is "none" or "not applicable," please so state.

- **Residence Information.** Please provide the entity's full legal name, primary business address, phone number, fax number, name and e-mail address of contact person, and federal tax I.D. number.

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

- **Domicile Information.** Please indicate the form of the entity and the state and date of its organization (*e.g.*, corporation, state and date of incorporation).

Form ______________________________

State of Organization ____________________

Date of Organization ____________________

- **Accredited Investor Certification.** The undersigned makes one of the following representations regarding its net worth and certain related matters ***and has checked the applicable representation***:

( ) (i) The undersigned is a trust with total assets in excess of $5,000,000, not formed for the purpose of acquiring the Securities, whose purchase is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

( ) (ii) The undersigned is a bank, insurance company, investment company registered under the United States Investment Company Act of 1940, as amended, a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Company licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the United States Investment Advisers Act of 1940, as amended.

( ) (iii) The undersigned is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the undersigned has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are accredited investors.

( ) (iv) The undersigned is a corporation, partnership, business trust, or an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), in each case not formed for the purpose of acquiring the Securities and with total assets in excess of $5,000,000.

( ) (v) The undersigned is an entity in which **all** of the equity owners (in the case of a revocable living trust, its grantor(s)) qualify under any of the above subparagraphs, or, if an individual, each such individual has a net worth[1],

---

[1] For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value over total liabilities, except that the principal residence owned by a natural person shall be valued either (a) at cost, including the cost of

either individually or upon a joint basis with such individual's spouse, of at least $1,000,000 (within the meaning of such terms as used in the definition of "accredited investor" contained in Rule 501 under the Act), *or* has had an individual income[2] in excess of $200,000 for each of the two most recent years, or a joint income with such individual's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

( ) (vi) The undersigned cannot make any of the representations set forth in paragraphs "i" through "v" above.

The undersigned represents that the information contained herein is complete and accurate and may be relied upon by Volcano, and that the undersigned will notify Volcano of any material change in any of such information prior to the receipt of Volcano Common Stock.

---

improvements, net of current encumbrances upon the property, or (b) at the appraised value of the residence as determined upon a written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property. As used in the preceding sentence, "institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender of loans secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

2 For purposes of this Questionnaire, "income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (a) the amount of any tax exempt interest income received, (b) the amount of losses claimed as a limited partner in a limited partnership, (c) any deduction claimed for depletion, (d) amounts contributed to an IRA or Keogh retirement plan, (e) alimony paid, and (f) any amounts by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code.

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire this __________ day of __________, 2007.

______________________________________

Name:______________________________

By:________________________________

Title:______________________________

# EXHIBIT F

## ACCREDITED INVESTOR FORM

*(PLEASE COMPLETE THIS FORM IF YOU ARE AN INDIVIDUAL)*

This Questionnaire is sent in connection with that certain Agreement and Plan of Merger and Reorganization (the "Merger Agreement"), dated as of December ___, 2007, by and among Volcano Corporation., a Delaware corporation ("Volcano"), Corazon Acquisition, Inc., a Texas corporation and wholly owned subsidiary of Volcano ("Merger Sub") and Paul Castella and Chris Banas as the Shareholders' Representative, pursuant to which Merger Sub will merge with and into CardioSpectra, with CardioSpectra surviving as a wholly owned subsidiary of Volcano. Contingent upon the occurrence of certain events and as set forth in the Merger Agreement, you may be entitled to Milestone Merger Consideration payable in the future. Under the terms of the Merger Agreement, Volcano, in its sole discretion, may elect to pay you Milestone Merger Consideration, if any, in the form of cash or Volcano common stock, or a combination of both, *provided that*, only individuals and entities making the accredited investor representations contained herein shall be eligible to receive Milestone Merger Consideration, if any, in the form of Volcano common stock.

The purpose of this Questionnaire is to assure Volcano that all such offers will meet the standards imposed by the Securities Act of 1933, as amended (the "*Act*"), and applicable state securities laws. Your answers will be kept confidential. However, by signing this Questionnaire you agree that Volcano and its counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws.

Please complete, sign, date and return one copy of this Questionnaire to [__________], fax: [__________]. If the answer to a question is "none" or "not applicable," please so state.

- **Residence Information**. Please provide your full legal name, residence address, phone and fax numbers, e-mail address and social security number.

  ______________________________________________
  ______________________________________________
  ______________________________________________
  ______________________________________________

- **Personal Information**. Please indicate the state which issued your driver's license and the state in which you are registered to vote.

  ______________________________________________
  ______________________________________________
  ______________________________________________
  ______________________________________________

- **My Income.**

Do you reasonably expect either your income,[3] from all sources during this year, to exceed $200,000 or, if you are married, the joint income of you and your spouse from all sources during this year to exceed $300,000?

_____ Yes _____ No

If no, please specify amount of expected income:______________________________

Was your yearly individual income from all sources during each of the last two years in excess of $200,000 or, if you are married, was the joint income of you and your spouse during each of those years in excess of $300,000?

_____ Yes _____ No

If no, please specify amount of your total individual and/or joint income in the last two years:______________________________________________________________

- **My Net Worth.**

Is your net worth, including the net worth[4] of your spouse, in excess of $1,000,000? Please remember that your net worth should include the value of your principal residence if owned, any other shares of stock or options held by you and your spouse and your and your spouse's owned personal property (e.g. furniture, jewelry, other valuables, etc.).

_____ Yes _____ No

If no, please specify your net worth:______________________________________

The undersigned represents that the information contained herein is complete and accurate and may be relied upon by Volcano and that the undersigned will notify Volcano of any material change in any of such information prior to the receipt of Volcano Common Stock.

---

[3] For purposes of this Questionnaire, "income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (a) the amount of any tax exempt interest income received, (b) the amount of losses claimed as a limited partner in a limited partnership, (c) any deduction claimed for depletion, (d) amounts contributed to an IRA or Keogh retirement plan, (e) alimony paid, and (f) any amounts by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code.

[4] For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value over total liabilities, except that the principal residence owned by a natural person shall be valued either (a) at cost, including the cost of improvements, net of current encumbrances upon the property, or (b) at the appraised value of the residence as determined upon a written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property. As used in the preceding sentence, "institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender of loans secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire this __________ day of __________, 2007.

______________________________
(Signature)

______________________________
(Printed Name)

# EXHIBIT G

# EXHIBIT G

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the *"Agreement"*) is made and entered into as of [•], 2007, by and among VOLCANO CORPORATION, a Delaware corporation (*"Parent"*), CHRISTOPHER BANAS and PAUL CASTELLA in their capacity as the agents for the former shareholders and warrantholders of CardioSpectra, Inc., a Texas corporation (the *"Company"*) (including any successor as shareholders' representative, each a *"Shareholders' Representative"* and together, the *"Shareholders' Representatives"*), and LASALLE BANK NATIONAL ASSOCIATION, a national banking association duly organized and existing under the laws of the United States of America, with its principal offices in Chicago, Illinois (the *"Escrow Agent"*).

WHEREAS, Parent, Corazon Acquisition, Inc., a Texas corporation and wholly owned subsidiary of Parent, the Company and the Shareholders' Representatives are parties to that certain Agreement and Plan of Merger and Reorganization dated as of [•], 2007, a copy of which is attached hereto as Schedule A (the *"Merger Agreement"*). Capitalized terms used and not defined herein are used as defined in the Merger Agreement;

WHEREAS, pursuant to Section 2.9 of the Merger Agreement Parent agrees to deposit cash otherwise payable as Closing Consideration to the Company Shareholders and Terminating Warrantholders into an escrow fund to be held in accordance with the terms of the Merger Agreement and this Agreement; and

WHEREAS, Escrow Agent has agreed to hold and administer the Escrow Cash (as defined below) in accordance with the terms of the Merger Agreement and this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## ESTABLISHMENT OF ESCROW

**1.1 Escrow Cash.** Simultaneously with or promptly following the execution of this Agreement Parent will deposit cash in the amount of $2,500,000 (the *"Escrow Cash"*) with the Escrow Agent. For purposes of this Agreement, any investment earnings on the Escrow Cash will be deemed part of the Escrow Cash.

**1.2 Escrow Accounts.** The Escrow Agent agrees to accept delivery of the Escrow Cash and to hold the Escrow Cash in an escrow account (the *"Escrow Account"*), subject to the terms and conditions of this Agreement. The Escrow Agent shall maintain an escrow account for each Company Shareholder and Terminating Warrantholder showing the amount of the Escrow Cash held by the Escrow Agent for such Company Shareholder or Terminating Warrantholder. Such amount shall initially equal the initial balance in cash listed next to each Company Shareholder's and Terminating Warrantholder's name on Schedule B hereto. Each Company

Shareholder's and Terminating Warrantholder's escrow account shall be increased by the amount of any income earned on the Company Shareholder's or Terminating Warrantholder's portion of the Escrow Cash.

1.3 **Security Interest.** To the extent and so long as the Escrow Cash is held in the Escrow Account hereunder, Parent shall have, and the Company Shareholders and Terminating Warrantholders (through the Shareholders' Representatives) hereby grant, as of and from the date of this Agreement, a perfected, first-priority security interest in such Escrow Cash to secure payment of amounts, if any, payable to the Parent Indemnitees in respect of Section 10 ("***Parent Security Interest***") of the Merger Agreement. In connection therewith, each Company Shareholder and Terminating Warrantholder (through the Shareholders' Representatives) expressly agrees (i) that the Escrow Agent is acting solely as Parent's agent to the extent necessary to perfect the Parent Security Interest in the Escrow Cash, and (ii) to execute and deliver such instruments as Parent may from time to time reasonably request for the purpose of evidencing and perfecting such Parent Security Interest. Nothing in this Section 1.3 shall grant any rights to the Parent Indemnitees with respect to the Escrow Cash other than the rights expressly set forth in this Escrow Agreement, which shall be exclusive of any other rights or remedies now or hereafter existing at law or in equity. Upon the distribution of the Escrow Cash pursuant to Article 3 to the Company Shareholders and Terminating Warrantholders the security interest created pursuant to this Section 1.3 with respect to such Escrow Cash shall be automatically released and terminated.

1.4 **Transferability.** The interests of the Company Shareholders and Terminating Warrantholders in the Escrow Account and in the Escrow Cash shall not be assignable or transferable, other than (a) by operation of law or (b) by the laws of descent and distribution; provided, however, that no such assignment or transfer shall be recognized or given effect until Parent and the Escrow Agent shall have received written notice of such assignment or transfer.

1.5 **Trust Fund.** The Escrow Cash shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Company Shareholder, Terminating Warrantholder or of any party hereto. Notwithstanding the foregoing, if the Escrow Cash shall be attached, garnished, or levied upon pursuant to judicial process, or the delivery of the Escrow Cash shall be stayed or enjoined by any arbitration decision or court order, or any arbitration decision or court order shall be made or entered into affecting the Escrow Cash, or any part thereof, the Escrow Agent is hereby expressly authorized to obey and comply with such arbitration decision or court order. In the event the Escrow Agent obeys or complies with any arbitration decision or court order, it shall not be liable to any person, firm or corporation by reason of such compliance, notwithstanding the subsequent reversal, modification, annulment, or setting aside of such arbitration decision or court order.

## ARTICLE 2

## INVESTMENT OF ESCROW CASH

2.1 **Permissible Investments.** The Escrow Cash shall be invested as soon as reasonably practicable, including income earned on said investment, in any one or more of the

following investments, as specifically directed in writing by both Shareholders' Representatives acting together:

(a) direct obligations of the United States of America;

(b) obligations for which the full faith and credit of the United States of America is pledged to provide for the payment of principal and interest;

(c) commercial paper rated of the highest quality by Moody's Investors Services, Inc. or Standard and Poor's, a division of the McGraw Hill Companies, Inc.;

(d) certificates of deposit issued by, or other deposit accounts of, a commercial bank having at least $1,000,000,000 in capital surplus;

(e) money market funds that invest substantially all of their assets in securities of the types described in clauses (a) through (d) above; and

(f) such other investments as Parent and either Shareholders' Representative may from time to time mutually agree upon in writing executed and delivered by Parent and either Shareholders' Representative to the Escrow Agent.

2.2 **Tax Matters.** In the absence of written direction by either Shareholders' Representative, funds shall be invested in the Federated Treasury Obligations Fund (Trust Shares). All income earned on the Escrow Cash shall be taxable to Parent and shall be credited to the Escrow Cash. Notwithstanding anything herein to the contrary, Parent shall be entitled to receive from the Escrow Cash an amount equal to the product of (i) 40%, and (ii) the amount of income earned on the Escrow Cash and taxable to Parent (such product, the ***"Escrow Tax Liability"***). The Escrow Agent shall distribute to Parent an amount equal to the Escrow Tax Liability prior to making any distribution to the Shareholders' Representatives, Company Shareholders or Terminating Warrantholders.

## ARTICLE 3

## DISBURSEMENTS OF ESCROW CASH

3.1 **Distributions of Escrow Cash.** The Escrow Agent shall only disburse Escrow Cash in the manner provided in this Article 3.

(a) If any Parent Indemnitee elects to assert a demand against the Escrow Cash in connection with a claim for indemnification, Parent and the Surviving Corporation shall comply with the procedures set forth in Section 10.6 and Section 2.9 of the Merger Agreement.

(b) If the Shareholders' Representatives elect to assert a demand against the Escrow Cash in connection with a claim for indemnification pursuant to Section 13.1 of the Merger Agreement, the Shareholders' Representatives shall submit to the Escrow Agent a certificate (a ***"Cost Certificate"***) stating that the Shareholders' Representatives in such capacity has incurred fees, costs and expenses which are consistent with its obligations under this Agreement and the Merger Agreement.

(c) Any disbursements from the Escrow Cash pursuant to this Section 3.1 shall reduce a Company Shareholder's and Terminating Warrantholder's escrow account on a pro rata basis, in accordance with such Company Shareholder's or Terminating Warrantholder's Escrow Percentage (as set forth on Schedule B).

**3.2 Distributions upon Expiration of Escrow Claim Period.** Subject to the provisions of this Article 3 and Section 10.6, Section 2.9 and Section 13.1 (relating to the Shareholders' Representatives right to receive escrowed funds to pay indemnity obligations owed to the Shareholders' Representatives) of the Merger Agreement, promptly (and in any event within five (5) days) after the expiration of the Escrow Claim Period, the Escrow Agent shall distribute or cause to be distributed: (a) first to Parent, any amount due Parent pursuant to Section 2.2 of this Agreement; (b) second to the Shareholders' Representatives, any amount set forth in the Cost Certificate (it being understood that, to the extent any amounts requested under a Cost Certificate exceed the amounts remaining in the Escrow Account, the Shareholders' Representatives shall seek reimbursement of such amounts from the Company Shareholders and Terminating Warrantholders and not the Company, Parent or Escrow Agent); and (c) third, to LaSalle Bank National Association as the payment agent for the Merger (or its successor pursuant to that certain Payment Agent Agreement of even date herwith) (the ***"Payment Agent"***), the balance of the Escrow Cash, if any. Parent shall give the Escrow Agent and Shareholders' Representatives prompt written notice of the expiration of the Escrow Claim Period and shall instruct the Escrow Agent to promptly distribute the balance of the Escrow Cash to the Payment Agent and cause the Payment Agent to promptly distribute the balance of the Escrow Cash to the Company Shareholders and the Company Warrantholders.

## ARTICLE 4
## COMPENSATION; EXPENSES

**4.1** As compensation for its services to be rendered under this Agreement, the Escrow Agent shall receive a fee in the amount specified in Schedule C to this Escrow Agreement and shall be reimbursed by Parent upon request for all reasonable expenses, disbursements and advances, including reasonable fees of outside counsel, if any, incurred or made by it in connection with carrying out of its duties under this Escrow Agreement.

## ARTICLE 5

## EXCULPATION AND INDEMNIFICATION

**5.1** The obligations and duties of the Escrow Agent are confined to those specifically set forth in this Agreement. As between the parties hereto other than the Escrow Agent it is agreed that in the event that any of the terms and provisions of the Merger Agreement conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of the Merger Agreement shall govern and control in all respects.

**5.2** The Escrow Agent shall not be liable for any act that it may do or omit to do hereunder in good faith and in the exercise of its own best judgment except for its own gross negligence or willful misconduct. Any act done or omitted to be done by the Escrow Agent

pursuant to the advice of its attorneys shall be deemed conclusively to have been performed or omitted in good faith by the Escrow Agent.

5.3 In the event the Escrow Agent is notified of any dispute, disagreement or legal action between a Parent Indemnitee and the Shareholders' Representatives and any third party relating to or arising in connection with the Escrow Cash, or the performance of the Escrow Agent's duties under this Agreement, the Escrow Agent will not be required to determine the controversy or to take any action regarding it. The Escrow Agent may hold all documents and funds and may wait for settlement of any such controversy by final appropriate legal proceedings, arbitration, or other means. Furthermore, the Escrow Agent may, at its option, file an action of interpleader requiring the parties to answer and litigate any claims and rights among themselves, provided that such action must be brought before the arbitrator(s) pursuant to Section 10.6 of the Merger Agreement if the dispute involves solely a Parent Indemnitee and the Shareholders' Representatives. The Escrow Agent is authorized, at its option, to deposit with the Clerk of the Court or the arbitrator(s), as applicable, all funds held in escrow. Solely to the extent that such action is initiated, the Escrow Agent shall be fully released and discharged of and from all obligations and liability imposed by the terms of this Agreement related to this action.

## ARTICLE 6

## TERMINATION OF AGREEMENT

6.1 This Agreement shall terminate if and when, and not before all amounts in Escrow Cash (including all the securities in which any of the Escrow Cash shall have been invested) shall have been distributed by the Escrow Agent in accordance with the terms of this Agreement and the Merger Agreement; provided, however, that the rights and obligations of the parties hereto shall survive the termination hereof.

## ARTICLE 7

## RESIGNATION OF ESCROW AGENT

7.1 The Escrow Agent may resign at any time upon giving at least thirty (30) days prior written notice to the Parent and the Shareholders' Representatives; provided, however, that no such resignation will become effective until the appointment of a successor escrow agent which will be accomplished as follows: the Parent and the Shareholders' Representatives shall use their best efforts to mutually agree on a successor escrow agent within thirty (30) days after receiving such notice. If the Parent and the Shareholders' Representatives fail to agree on a successor escrow agent within such time, the Escrow Agent will have the right to appoint a successor escrow agent, which successor escrow agent will be reasonably acceptable to Parent and the Shareholders' Representatives. The successor escrow agent will execute and deliver an instrument accepting such appointment and it will, without further acts, be vested with all the estates, properties, rights, powers, and duties of the predecessor escrow agent as if originally named as escrow agent. Upon delivery of such instrument and the delivery of the Escrow Cash to the successor escrow agent, the Escrow Agent shall be discharged from any further duties and liability under this Agreement. The Escrow Agent shall be paid any outstanding fees and

expenses prior to transferring assets to a successor escrow agent. If a successor escrow agent is not appointed within the above time frames, then the Escrow Agent may apply to a court of competent jurisdiction for appointment of a successor escrow agent. Upon the appointment of a successor escrow agent and the delivery of the Escrow Cash to the successor escrow agent, (i) the Escrow Agent will be discharged from any further duties and liability with respect to the Escrow Cash (except as otherwise provided herein) and (ii) all references to the "Escrow Agent" will, where applicable, be deemed to include such successor escrow agent and such successor escrow agent will thereafter become the Escrow Agent for all purposes of this Agreement.

## ARTICLE 8

## NOTICES

**8.1** Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received (a) upon receipt when delivered by hand, or (b) two business days after being sent by registered mail or by courier or express delivery service or by facsimile, provided that in each case the notice or other communication is sent to the address or facsimile telephone number set forth beneath the name of such party below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto):

if to Parent:

VOLCANO CORPORATION
2870 Kilgore Road
Rancho Cordova, CA 95670
Attn: John Dahldorf, CFO
Fax: (916) 638-7976

with copy to (which copy shall not constitute notice):

COOLEY GODWARD KRONISH LLP
4401 Eastgate Mall
San Diego, CA 92121
Attn: Matthew T. Browne, Esq.
Fax: (858) 550-6420

if to Shareholders' Representatives:

CHRISTOPHER E. BANAS
75 Rounds Road, Box 8588
Breckenridge, Colorado 80424

PAUL CASTELLA
15611 Cloud Top
San Antonio, Texas 78248

if to the Escrow Agent:

LASALLE BANK NATIONAL ASSOCIATION
Global Escrow Services
135 South LaSalle Street, Suite 1563
Chicago, IL 60603
Attention: Laura Mackey
Telephone: (312) 904-5859
Facsimile: (312) 904-4019

## ARTICLE 9

## GOVERNING LAW

**9.1** This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its choice of law provisions.

## ARTICLE 10

## TAX REPORTING INFORMATION

**10.1** The parties hereto agree that, for all tax purposes, all the Escrow Cash amounts held, including all interest on or other income, if any, attributable to the Escrow Cash shall be the property of Parent unless and until paid to the individuals and/or entities set forth on Schedule B hereto in accordance with the percentages set for them therein. The parties hereto will complete, sign and return a Form W-9 and any other forms and documents that the Escrow Agent may reasonably request (collectively, ***"Tax Reporting Documentation"***) to the Escrow Agent within 30 days after the date hereof. The parties hereto understand that, if such Tax Reporting Documentation is not so furnished to the Escrow Agent, the Escrow Agent shall be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any payment made to a Parent Indemnitee by the Escrow Agent pursuant to this Agreement, and to immediately remit such withholding to the Internal Revenue Service. The sole tax reporting obligations of the Escrow Agent shall be to file all forms required to be filed with the Internal Revenue Service with respect to any income earned on the Escrow Cash and to provide a copy thereof to Parent.

## ARTICLE 11

## AUTOMATIC SUCCESSION

**11.1** Any bank or corporation into which the Escrow Agent may be merged or with which it may be consolidated, or any bank or corporation to whom the Escrow Agent may transfer a substantial amount of its escrow business, shall be the successor to the Escrow Agent without the execution or filing of any paper or any further act on the part of any of the parties, anything herein to the contrary notwithstanding.

## ARTICLE 12

## AMENDMENT AND MODIFICATION

**12.1** The Parent, the Shareholders' Representatives and the Escrow Agent may amend, modify, and/or supplement this Agreement as they may mutually agree in writing.

## ARTICLE 13

## COUNTERPARTS

**13.1** This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument. In making proof of this Agreement it shall be necessary to produce or account for only one such counterpart signed by or on behalf of the party sought to be charged herewith. Facsimile copies shall be deemed to be binding originals.

## ARTICLE 14

## INTERPRETATION

**14.1** The headings used in this Agreement are for convenience only and shall not constitute a part of this Agreement.

**14.2** As used in this Agreement, ***"Business Day"*** means a day other than a Saturday, Sunday, or other day when banking institutions in Chicago, Illinois are authorized or required by law or executive order to be closed.

## ARTICLE 15

## SEVERABILITY

**15.1** The parties agree that if any provision of this Agreement shall under any circumstances be deemed invalid or inoperative this Agreement shall be construed with the invalid or inoperative provisions deleted and the rights and obligations of the parties shall be construed and enforced accordingly.

## ARTICLE 16

## RESOLUTION OF DISPUTES

**16.1** Any controversy or claim relating solely between the Escrow Agent on the one hand, and either or both of the Parent and the Shareholders' Representatives on the other hand, arising out of or relating to this Agreement, or the breach hereof, shall be settled pursuant to this Article 16 and by arbitration in accordance with commercial rules of the American Arbitration Association (***"AAA"***). Arbitration proceedings conducted pursuant to this Article 16 shall be held in the State of California, County of San Diego.

16.2 Arbitrations shall be conducted by a single arbitrator (the "*Arbitrator*") selected at random from a list of arbitrators maintained in the office of AAA in State of California, County of San Diego. The Arbitrator must be a person experienced in corporate law or the law of commercial finance and must have served as an arbitrator in not less than three prior commercial arbitrations involving primarily questions of commercial or corporate law conducted under the AAA rules. The Arbitrator may not be a person who ever has been an affiliate of or attorney for any party or for any of their respective affiliates.

16.3 The parties shall allow and participate in discovery in accordance with the United States Federal Rules of Civil Procedure for a period of 90 days after the filing of an answer or other responsive pleading. Unresolved discovery disputes may be brought to the attention of the Arbitrator for resolution.

16.4 Any provisional remedy that would be available from a court of law shall be available from the Arbitrator to the parties pending arbitration. Any party may, without inconsistency with this Agreement, apply to any court of proper jurisdiction and seek injunctive relief to maintain the status quo until the arbitration award is rendered or the controversy is otherwise resolved.

16.5 The Arbitrator's award shall be made in writing, but shall not make any findings of fact or conclusions of law. The Arbitrator shall have no authority to award punitive or other damages not measured by the prevailing party's actual damages and may not, in any event, make any ruling, finding, or award that does not conform to the terms and conditions of this Agreement and the Merger Agreement. Judgment on any arbitration award may be entered by the Arbitrator or by any party in any court having jurisdiction thereof. No party or Arbitrator may disclose the existence, content, or results of any arbitration or arbitration award without the prior written consent of all parties involved in the arbitration except to the extent necessary to enter and enforce a judgment based upon such award.

16.6 The award of the Arbitrator shall be final and not subject to appeal. Each party hereby waives the benefit of any applicable law that would permit it to appeal the decision of the Arbitrator to any court or other authority.

16.7 All fees and expenses of the arbitration shall be borne by the parties equally. However, each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation of proofs.

16.8 The provisions of this Article 16 shall survive termination of this Agreement. Any dispute regarding the applicability of this Article 16 to a particular claim or controversy shall be arbitrated as provided in this Article 16.

## ARTICLE 17

## ASSIGNABILITY

17.1 Parent reserves the right to substitute some other legal entity in its place and/or to assign all rights and obligations hereunder to any other entity. Each Shareholders' Representative reserves the right to substitute another person in his place and/or to assign all

rights and obligations hereunder to any other person but only in accordance with the provisions of Section 13.1 of the Merger Agreement.

## ARTICLE 18

## CONFIDENTIALITY

**18.1** The Escrow Agent agrees to hold in confidence and not disclose all or any portion of the contents of the Merger Agreement to others, except to those of its employees, representatives and agents whose knowledge of such information is required for the Escrow Agent to perform its duties under this Agreement.

[*The next page is the signature page*]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the day and year first above written.

VOLCANO CORPORATION

By: ______________________________
Name: ______________________________
Title: ______________________________

SHAREHOLDERS' REPRESENTATIVES

CHRISTOPHER E. BANAS,
as Shareholders' Representative

By: ______________________________

PAUL CASTELLA,
as Shareholders' Representative

By: ______________________________

LASALLE BANK NATIONAL ASSOCIATION,
as Escrow Agent

By: ______________________________
Name: ______________________________
Title: ______________________________

## Schedule A

## AGREEMENT AND PLAN OF MERGER

## Schedule B

COMPANY SHAREHOLDERS AND TERMINATING WARRANTHOLDERS ESCROW ACCOUNTS

| Name | Escrow Cash | Escrow Percentage |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Schedule C

## ESCROW AGENT
## SCHEDULE OF FEES

| | | |
|---|---|---|
| Acceptance Fee: | $ | 500.00* |
| Administration Fee: | $ | 2,500.00* |
| **Wire Transfers** | **$** | **20.00 each** |
| **Check Preparation and Mailing** | **$** | **25.00 each** |
| **1099 Preparation and Reporting** | **$** | **5.00 each ($250 annual minimum if any 1099 reports required for account)** |

The Acceptance and first year's Annual Administration Fees are due upon execution of the Escrow Agreement.

*Should the Escrow Account remain open for less than a full year after an initial twelve month period, the Annual Administration Fee will be prorated on a six-month basis.

Any investment transaction not in a money market fund or a LaSalle Enhanced Liquidity Management account will incur a $150.00 per transaction fee. The parties to the agreement understand and agree that the Escrow Agent may receive certain revenue on certain mutual fund investments. These revenues take one of two forms:

Shareholder Servicing Payments: Escrow Agent may receive Shareholder Servicing Payments as compensation for providing certain services for the benefit of the Money Market Fund Company. Shareholder Services typically provided by LaSalle include the maintenance of shareholder ownership records, distributing prospectuses and other shareholder information materials to investors and handling proxy-voting materials. Typically Shareholder Servicing payments are paid under a Money Market Fund's 12b-1 distribution plan and impact the investment performance of the Fund by the amount of the fee. The shareholder servicing fee payable from any money market fund is detailed in the Fund's prospectus that will be provided to you.

Revenue Sharing Payments: Escrow Agent may receive revenue sharing payments from a Money Market Fund Company. These payments represent a reallocation to Escrow Agent of a portion of the compensation payable to the fund company in connection with your account's money market fund investment. Revenue Sharing payments constitute a form of fee sharing between the fund company and Escrow Agent and do not, as a general rule, result in any additional charge or expense in connection with a money market fund investment, are not paid under a 12b-1 plan, and do not impact the investment performance of the Fund. The amount of any revenue share, if any, payable to Escrow Agent with respect to your account's investments is available upon request.

All out-of-pocket expenses will be billed at the Escrow Agent's cost. Out-of-pocket expenses include, but are not limited to, professional services (e.g. legal or accounting), travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), and copying charges.

# EXHIBIT H

EXHIBIT H

GENERAL RELEASE

_________, 2007

Volcano Corporation

Ladies and Gentlemen:

Reference is made to that certain Agreement and Plan of Merger and Reorganization, dated as of _______, 2007 (the *"**Merger Agreement**"*), by and among Volcano Corporation, a Delaware corporation ("***Parent***"); Corazon Acquisition, Inc., a Texas corporation and wholly owned subsidiary of Parent ("***Merger Sub***") and Christopher E. Banas and Paul Castella (the "***Stockholders' Representative***") as the representatives of the undersigned (the *"**Releasor**"*), pursuant to which Parent is acquiring the Company (the *"**Acquisition**"*).

Parent has required, as a condition to the consummation of the transactions contemplated by the Merger Agreement, that the Releasor execute and deliver this General Release.

In order to induce Parent to consummate the Acquisition and the transactions contemplated by the Merger Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Releasor, intending to be legally bound, hereby covenants and agrees as follows (*provided*, *however*, that if the Acquisition is not consummated as contemplated under the Merger Agreement, this General Release shall be void):

1. **Release of Claims.** The Releasor, for itself and for each of the Releasor's Associated Parties (as defined below), hereby generally, irrevocably, unconditionally and completely releases and forever discharges each of the Releasees (as defined below) from any and every Claim (as defined below), and hereby irrevocably, unconditionally and completely waives and relinquishes each and every Claim that the Releasor may have had in the past, may now have or may have in the future against any of the Releasees, directly or indirectly relating to or arising out of any events, matters, causes, things, acts, omissions or conduct occurring or existing at any time up to and including the date of this General Release (including Claims arising out of the Acquisition); *provided, however*, that the Releasor is not releasing any rights the Releasor may have (i) under the Merger Agreement or the Escrow Agreement (as defined in the Merger Agreement) or any other documents, certificates, schedules or instruments delivered or executed in connection with the Merger Agreement (including the Company Information Statement ) or (ii) with respect to any indemnification rights of such Releasor (in its capacity as a director and officer) under the current Company Constituent Documents (the "Excluded Claims").

For purposes of this General Release:

(a) the term *"**Associated Parties**"* shall mean and include: (i) the Releasor's predecessors, successors, executors, administrators, heirs and estate; (ii) the Releasor's past, present and future assigns, agents and representatives; (iii) each entity that the Releasor has the power to bind (by the Releasor's acts or signature) or over which the

Releasor directly or indirectly exercises control; and (iv) each entity of which the Releasor owns, directly or indirectly, at least 50% of the outstanding equity, beneficial, proprietary, ownership or voting interests;

(b) the term "***Releasees***" shall mean and include: (i) Parent; (ii) each of the direct and indirect subsidiaries of Parent; (iii) the Company; (iv) each other affiliate of Parent; and (v) the successors and past, present and future assigns, directors, officers, employees, agents, attorneys and representatives of the respective entities identified or otherwise referred to in clauses "(i)" to "(iv)" of this sentence, other than the Releasor; and

(c) the term "***Claims***" shall mean and include all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including: (i) any unknown, unsuspected or undisclosed claim; (ii) any claim or right that may be asserted or exercised by the Releasor in the Releasor's capacity as a stockholder, option holder or warrant holder of the Company, director, officer or employee of the Company or in any other capacity; and (iii) any claim, right or cause of action based upon any breach of any express, implied, oral or written contract or agreement, or of the implied covenant of good faith and fair dealing.

2. **Unknown Claims.** To the extent applicable to any Claim, the Releasor (a) represents, warrants and acknowledges that the Releasor has been fully advised by the Releasor's attorney of the contents of Section 1542 of the Civil Code of the State of California, and (b) hereby expressly waives the benefits thereof and any rights the Releasor may have thereunder. Section 1542 of the Civil Code of the State of California provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

The Releasor also hereby waives the benefits of, and any rights the Releasor may have under, any statute or common law principle of similar effect in Texas or any other jurisdiction.

3. **Representations and Warranties.** The Releasor represents and warrants that:

(a) the Releasor has not assigned, transferred, conveyed or otherwise disposed of any Claim against any of the Releasees, or any direct or indirect interest in any such Claim, in whole or in part;

(b) to the best of the Releasor's knowledge, no other person or entity has any interest in any of the Claims;

(c) no Associated Party of the Releasor has or had any Claim against any of the Releasees (other than any Excluded Claims);

(d) no Associated Party of the Releasor will in the future have any Claim against any Releasee that arises directly or indirectly from or relates directly or indirectly to any

circumstance, agreement, activity, action, omission, event or matter occurring or existing on or before the date of this General Release (other than any Excluded Claims);

(e) this General Release has been duly and validly executed and delivered by such Releasor;

(f) this General Release is a valid and binding obligation of the Releasor and the Releasor's Associated Parties, and is enforceable against the Releasor and each of the Releasor's Associated Parties in accordance with its terms;

(g) there is no action, suit, proceeding, dispute, litigation, claim, complaint or investigation by or before any court, tribunal, governmental body, governmental agency or arbitrator pending or, to the best of the knowledge of the Releasor, threatened against the Releasor or any of the Releasor's Associated Parties that challenges or would challenge the execution and delivery of this General Release or the taking of any of the actions required to be taken by the Releasor under this General Release;

(h) neither the execution and delivery of this General Release nor the performance hereof will (i) result in any violation or breach of any agreement or other instrument to which the Releasor or any of the Releasor's Associated Parties is a party or by which the Releasor or any of the Releasor's Associated Parties is bound, or (ii) result in a violation of any law, rule, regulation, treaty, ruling, directive, order, arbitration award, judgment or decree to which the Releasor or any of the Releasor's Associated Parties is subject; and

(i) no authorization, instruction, waiver, consent or approval of any person or entity is required to be obtained by the Releasor or any of the Releasor's Associated Parties in connection with the execution and delivery of this General Release or the performance hereof.

4. **Indemnification.** Without in any way limiting any of the rights or remedies otherwise available to any Releasee, each Releasor shall indemnify and hold harmless each Releasee against and from any loss, damage, injury, harm, detriment, lost opportunity, liability, exposure, claim, demand, settlement, judgment, award, fine, penalty, tax, fee, charge or expense (including attorneys' fees) that is directly or indirectly suffered or incurred at any time by such Releasee, or to which such Releasee otherwise becomes subject at any time, and that arises directly or indirectly out of or by virtue of, or relates directly or indirectly to, (a) any failure on the part of the Releasor to observe, perform or abide by, or any other breach of, any restriction, covenant, obligation, representation, warranty or other provision contained herein, or (b) the assertion or purported assertion of any of the Claims by the Releasor or any of the Releasor's Associated Parties (other than any Excluded Claims or alleged Excluded Claims).

5. **Miscellaneous.**

(a) This General Release sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings among or between the Releasor and Releasees relating to the subject matter hereof.

(b) Any term or provision of this General Release that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of

the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this General Release shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

(c) This General Release shall be construed in accordance with, and governed in all respects by, the laws of the State of California (without giving effect to principles of conflicts of law).

Nothing contained in this General Release shall be deemed to limit or otherwise affect the right of any Releasee (1) to commence any legal proceeding or to otherwise proceed against the Releasor or any other person or entity in any other forum or jurisdiction, or (2) to raise this Release as a defense in any legal proceeding in any other forum or jurisdiction.

(d) The Releasor shall execute and/or cause to be delivered to each Releasee such instruments and other documents, and shall take such other actions, as such Releasee may reasonably request for the purpose of carrying out or evidencing any of the actions contemplated by this General Release.

(e) If any legal action or other legal proceeding relating to this General Release or the enforcement of any provision hereof is brought by the Releasor or any Releasee, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements to the extent actually incurred (in addition to any other relief to which the prevailing party may be entitled).

(f) Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this General Release.

(g) As used in this General Release, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

IN WITNESS WHEREOF, the Releasor has caused this General Release to be executed as of the date first above written.

RELEASOR:

_______________________________
*Signature*

_______________________________
*Name*

_______________________________
*Address*

_______________________________

( ) _______________________________
*Telephone*

( ) _______________________________
*Facsimile*

# EXHIBIT I

EXHIBIT I

VOLCANO™

EMPLOYEE PROPRIETARY INFORMATION
AND INVENTIONS AGREEMENT

In consideration of my employment or continued employment by Volcano Corporation (the "Company"), and the compensation now and hereafter paid to me, I hereby agree as follows:

1. NONDISCLOSURE

1.1 **Recognition of Company's Rights; Nondisclosure.** At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns.

1.2 **Proprietary Information.** The term "**Proprietary Information**" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, "**Proprietary Information**" includes tangible and intangible information relating to trade secrets or other confidential information respecting inventions, research, products, data, designs, methods, know-how, formulae, techniques, systems, processes, software programs, works of authorship, improvements, discoveries, plans for research, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers, and information regarding the skills and compensation of other employees of the Company.

1.3 **Third Party Information.** I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("**Third Party Information**") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

1.4 **No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.

2. ASSIGNMENT OF INVENTIONS.

2.1 **Proprietary Rights.** The term "**Proprietary Rights**" shall mean all trade secret, patent, copyright, mask work and other intellectual property rights throughout the world.

2.2 **Prior Inventions.** Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on *Exhibit B* (Previous Inventions) attached hereto a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "**Prior Inventions**"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in *Exhibit B* but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. A space is

provided on *Exhibit B* for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

2.3 **Assignment of Inventions.** Subject to Sections 2.4, and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as "**Company Inventions.**"

2.4 **Nonassignable Inventions.** This Agreement does not apply to an Invention which qualifies fully as a nonassignable Invention under Section 2870 of the California Labor Code (hereinafter "**Section 2870**"). I have reviewed the notification on *Exhibit A* (Limited Exclusion Notification) and agree that my signature acknowledges receipt of the notification.

2.5 **Obligation to Keep Company Informed.** During the period of my employment and for six (6) months after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf within a year after termination of employment. At the time of each such disclosure, I will advise the Company in writing of any Inventions that I believe fully qualify for protection under Section 2870; and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement relating to Inventions that qualify fully for protection under the provisions of Section 2870. I will preserve the confidentiality of any Invention that does not fully qualify for protection under Section 2870.

2.6 **Government or Third Party.** I also agree to assign all my right, title and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by the Company.

2.7 **Works for Hire.** I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

2.8 **Enforcement of Proprietary Rights.** I will assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

3. RECORDS. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all Proprietary Information developed by me and all Inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

4. ADDITIONAL ACTIVITIES. I agree that during the period of my employment by the Company I will not,

without the Company's express written consent, engage in any employment or business activity which is competitive with, or would otherwise conflict with, my employment by the Company. I agree further that for the period of my employment by the Company and for one (l) year after the date of termination of my employment by the Company I will not, either directly or through others, solicit or attempt to solicit any employee, independent contractor or consultant of the company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or entity.

5. NO CONFLICTING OBLIGATION. I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

6. RETURN OF COMPANY DOCUMENTS. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company in completing and signing the Company's return of company property paperwork.

7. LEGAL AND EQUITABLE REMEDIES. The Company and I agree that all disputes relating to the terms and conditions, interpretation, enforcement, or breach of this Agreement shall be submitted to binding arbitration with the American Arbitration Association ("AAA") under the then existing Employment Arbitration Rules of the AAA. Any such arbitration proceeding shall be brought in Sacramento, California. Any court of competent jurisdiction shall have authority to enter judgment in accordance with the arbitration award. The court shall also have authority to exercise all other rights and remedies allowable under the law, including the issuance of injunctive relief.

8. NOTICES. Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

9. NOTIFICATION OF NEW EMPLOYER. In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

10. GENERAL PROVISIONS.

10.1 **Governing Law; Consent to Personal Jurisdiction.** This Agreement will be governed by and construed according to the laws of the State of California, as such laws are applied to agreements entered into and to be performed entirely within California between California residents. I hereby expressly consent to the personal jurisdiction of the state of California for resolving any disputes with the Company arising from or relating to the Agreement

10.2 **Severability.** In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

10.3 **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

10.4 **Survival.** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

10.5 **Employment.** I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

10.6 **Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

10.7 **Entire Agreement.** The obligations pursuant to Sections 1 and 2 of this Agreement shall

apply to any time during which I was previously employed, or am in the future employed, by the Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

10.8 **Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

10.9 A signed copy of this Agreement shall be deemed equivalent to an original.

This Agreement shall be effective as of the first day of my employment with the Company, namely: ____________, 2007.

I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT B TO THIS AGREEMENT.

Dated: __________

______________________________________
**(Signature)**

______________________________________
**(Printed Name)**

ACCEPTED AND AGREED TO:

VOLCANO CORPORATION

By:___________________________________

Title:_________________________________

______________________________________
**(Address)**

______________________________________

Dated: __________

EXHIBIT A

LIMITED EXCLUSION NOTIFICATION

THIS IS TO NOTIFY you in accordance with Section 2872 of the California Labor Code that the foregoing Agreement between you and the Company does not require you to assign or offer to assign to the Company any invention that you developed entirely on your own time without using the Company's equipment, supplies, facilities or trade secret information except for those inventions that either:

1. Relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or

2. Result from any work performed by you for the Company.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is unenforceable.

This limited exclusion does not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

I ACKNOWLEDGE RECEIPT of a copy of this notification.

By:________________________________________
(PRINTED NAME OF EMPLOYEE)

________________________________________
(SIGNATURE)

Date:_______________________________________

__________________________________
COMPANY REPRESENTATIVE SIGNATURE

# EXHIBIT B

TO: Volcano Corporation

FROM: __________________

DATE: __________________

SUBJECT: Previous Inventions

1. Except as listed in Section 2 below, the following is a complete list of all inventions or improvements including those relevant to the subject matter of my employment by Volcano Corporation that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company (check appropriate box and provide details as appropriate):

☐ No inventions or improvements.

☐ Inventions/improvements noted below:

________________________________________________

________________________________________________

________________________________________________

☐ Additional sheets attached.

2. Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following parties:

| | Invention or Improvement | Party | Relationship |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

☐ Additional sheets attached.

# EXHIBIT J

**EXHIBIT J**

December [•], 2007

VOLCANO CORPORATION
2870 Kilgore Road
Rancho Cordova, CA 95670
Attn: John Dahldorf, CFO

**Re: CardioSpectra, Inc.**

Ladies and Gentlemen:

We have acted as counsel for CardioSpectra, Inc., a Texas corporation (the "***Company***"), in connection with the acquisition of the Company by Volcano Corporation, a Delaware corporation ("***Parent***") via the merger of Corazon Acquisition, a Texas corporation and wholly owned subsidiary of Parent ("***Merger Sub***") with and into the Company, with the Company remaining as the surviving corporation (the "***Surviving Corporation***") (the "***Merger***"), under the Agreement and Plan of Merger dated as of December [•], 2007 by and among the Company, Parent, Merger Sub and Christopher E. Banas and Paul Castella, as the Shareholders' Representatives (the "***Merger Agreement***"). We are rendering this opinion pursuant to Section 7.5(vii) of the Merger Agreement. Except as otherwise defined herein, capitalized terms used but not defined herein have the respective meanings given to them in the Merger Agreement.

In connection with this opinion, we have examined and relied, without any independent investigation, upon the representations and warranties as to factual matters contained in and made pursuant to the Merger Agreement by the various parties and originals or copies certified to our satisfaction, of such records, documents, certificates, opinions, memoranda and other instruments as in our judgment are necessary to enable us to render the opinion expressed below.

As to certain factual matters, we have relied upon a certificate executed by officers of the Company and have not sought to independently verify such matters. Where we render an opinion "to our knowledge" or concerning an item "of which we are aware" or our opinion otherwise refers to our knowledge, it indicates that those attorneys in this Firm who have rendered legal service in connection with this transaction do not have actual knowledge of the inaccuracy of the statement, based solely upon (i) an inquiry of attorneys within this firm who have represented the Company in this Transaction and (ii) receipt of a certificate executed by officers of the Company covering such matters and, except as may be expressly provided herein, we have not conducted any independent investigation of such matter.

In rendering this opinion, we have assumed: the authenticity of all documents submitted to us as originals; the conformity to originals of all documents submitted to us as copies; the accuracy,

completeness and authenticity of certificates of public officials; the due authorization, execution and delivery of all documents (except the due authorization, execution and delivery by the Company of the Merger Agreement), where authorization, execution and delivery are prerequisites to the effectiveness of such documents; and the genuineness and authenticity of all signatures on original documents (except the signatures on behalf of the Company on the Merger Agreement). We have also assumed: that all individuals executing and delivering documents had the legal capacity to so execute and deliver; that each of the parties to the Merger Agreement (other than the Company) is duly organized, validly existing and in good standing under the laws of incorporation or formation and has full power and authority to execute, deliver and perform its obligations under the Merger Agreement; that the Merger Agreement is an obligation binding upon the parties thereto other than the Company; that each of such parties has fulfilled and complied with its obligations under the Merger Agreement to the extent required to date; that the representations and warranties made by you in the Merger Agreement and pursuant thereto are true and correct; and that there are no extrinsic agreements or understandings, nor any usage of trade, course of conduct or prior dealing, among the parties to the Merger Agreement or to the Material Agreements (as defined below) that would modify or interpret the terms of any such agreements or the respective rights or obligations of the parties thereunder.

We are members of the bar of the State of Texas and the opinions expressed herein relate only to the presently existing federal laws of the United States of America and the laws of the State of Texas and the General Corporation Law of the State of Delaware (the *"DGCL"*). We express no opinion as to legal matters governed by any other laws or whether the laws of any particular jurisdiction apply, and we disclaim any opinion as to the application or effect of any statute, rule, regulation, ordinance, order or other promulgation of any other jurisdiction.

We are not rendering any opinion as to any statute, rule, regulation, ordinance, decree or decisional law relating to antitrust, banking, land use, environmental, pension, employee benefit, tax, fraudulent conveyance, intellectual property, usury or local law. Furthermore, we express no opinion with respect to compliance with antifraud laws, rules or regulations relating to securities or the offer and sale thereof; compliance with fiduciary duties by the Company's Board of Directors or shareholders; compliance with safe harbors for disinterested Board of Director or shareholder approvals; compliance with state securities or blue sky laws; compliance with the Investment Company Act of 1940; compliance with laws that place limitations on corporate distributions; the effect or rules of law governing specific performance, injunctive relief or other equitable remedies, the effect of applicable bankruptcy, insolvency, reorganization, moratorium, or other similar federal or state laws affecting the rights of creditors generally; or the enforceability of the Merger Agreement, including, without limitation, any provision therein with respect to any covenant not to compete or any covenant in restraint of trade.

With regard to our opinion in paragraph 1 below with respect to the incorporation, existence and good standing of the Company, we have relied solely upon certificates of the Secretaries of State of the indicated jurisdictions as of a recent date.

With regard to our opinion in paragraph 5 below and the "knowledge" qualification therein, we have performed and based our knowledge upon our examination on the Amended and Restated Articles of Incorporation (as amended by Articles of Amendment to the Amended and Restated Articles of Incorporation filed with the Secretary of State of the State of Texas on December __, 2007), the Bylaws, the stock record books and journals of the Company provided to us by the Company, the Company's stock certificate books and the Company's minute books provided to us by the Company. The Company has represented to us that these books and records are complete and accurate and constitute all of the Company's documents with respect to the issuance of shares of its capital stock, options, warrants, and other rights to purchase shares of its capital stock. We have relied on the Company's representation to us that the information expressed in paragraph 5 below with respect to the outstanding options, warrants or other rights is true and complete. In addition, we have examined and relied upon a certificate executed by officers of the Company, to the effect that the consideration for all outstanding shares of capital stock of the Company was received by the Company in accordance with the provisions of the applicable Board of Directors resolutions and any plan or agreement relating to the issuance of such shares, and we have undertaken no independent verification with respect thereto.

With regard to our opinion in paragraph 6 below concerning defaults under and any material breaches of any Material Agreement, we have relied solely upon (i) inquiries of officers of the Company, (ii) a list supplied to us by the Company of material agreements to which the Company is a party, or by which it is bound, a copy of which is attached hereto as **Exhibit A** (the *"Material Agreements"*), and (iii) an examination of the Material Agreements in the form provided to us by the Company. We have made no further investigation. Further, with regard to our opinion in paragraph 6 below concerning Material Agreements, we express no opinion as to (i) financial covenants or similar provisions therein requiring financial calculations or determinations to ascertain compliance, (ii) provisions therein relating to the occurrence of a "material adverse event" or words of similar import, or (iii) any statement or writing that may constitute parol evidence bearing on interpretation or construction.

On the basis of the foregoing, in reliance thereon and with the foregoing qualifications, we are of the opinion that:

1. The Company has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Texas.

2. The Company has the requisite corporate power to own its property and assets and to conduct its business as it is currently being conducted.

3. The Company has the requisite corporate power to execute, deliver and perform its obligations under the Merger Agreement.

4. The Merger Agreement has been duly and validly authorized, executed and delivered by the Company.

5. The Company's authorized capital stock consists of (a) [•] shares of Common Stock, par value $[•] per share, of which, to our knowledge, [•] shares are issued and outstanding, (b) [•] shares of Series A Preferred Stock, par value $[•] per share, of which, to our knowledge, [•] shares are issued and outstanding, and (a) [•] shares of Series B Preferred Stock, par value $[•] per share, of which, to our knowledge, [•] shares are issued and outstanding. The outstanding shares of Common Stock, Series A Preferred Stock and Series B Preferred Stock have been duly authorized and validly issued and are fully paid and nonassessable. To our knowledge and except as set forth in Section 3.3 of the Merger Agreement and Part 3.3 of the Company Disclosure Schedule, there are no options, warrants, conversion privileges, preemptive rights or other rights presently outstanding to purchase any of the authorized but unissued capital stock of the Company.

6. The execution and delivery of the Merger Agreement by the Company and the consummation of the Merger by the Company pursuant thereto do not violate any provision of the Company's Articles of Incorporation or Bylaws, and do not constitute a default under or a material breach of any Material Agreement except as set forth in the Company Disclosure Schedule.

7. The Merger has been duly approved by the Company by all requisite Board of Directors and shareholder action and, upon acceptance of the Articles/Certificate of Merger for filing by the Secretary of State of the State of Texas, and the issuance of the related Certificate of Merger by the Secretary of State of the State of Texas, the Merger will become effective under Texas law.

This opinion letter is limited to laws as currently in effect in the State of Texas and the DGCL on the date hereof and to the facts as they currently exist or are otherwise known to us. We assume no obligation to revise, supplement, or otherwise update this opinion or to otherwise advise you if, after the date hereof, any applicable laws change or we become aware of any facts that might change the opinions set forth above. The opinions contained herein are expressly limited to the matters stated in paragraphs 1-7 hereof, and no opinion is implied or may be inferred beyond the matters expressly stated. This letter is solely for the benefit of the addressee hereof in connection with the execution and delivery of the Merger Agreements. This opinion may not be relied upon in any manner by any person other than the addressee hereof and may not be disclosed, quoted, filed with a governmental agency or otherwise referred to without our prior written consent.

Very truly yours,

COX SMITH MATTHEWS INCORPORATED

Cooley
GODWARD KRONISH LLP

EXHIBIT A

MATERIAL AGREEMENTS

[PLEASE LIST ALL OF THE CONTRACTS FROM 3.10 OF DISCLOSURE SCHEDULE]

# EXHIBIT K

# EXHIBIT K

## 280G Parachute Payment Waiver

**WHEREAS,** it is expected that Volcano Corporation, a Delaware corporation ("**Purchaser**"), and CardioSpectra, Inc., a Texas corporation (the "**Company**") will enter into an Agreement and Plan of Merger (the "**Merger Agreement**") in substantially the same form given to the undersigned (the "**Executive**");

**WHEREAS,** pursuant to the terms, and subject to the conditions, of the Merger Agreement, Purchaser is to purchase the Company (the "**Merger**");

**WHEREAS,** Executive is or may be entitled to receive certain payments and benefits as described in Appendix A;

**WHEREAS,** a portion of the benefits described in Appendix A (collectively, the "**Potential Parachute Payments**") could result in Executive's receipt or deemed receipt of a "parachute payment" under Section 280G ("**Section 280G**") of the Internal Revenue Code of 1986, as amended (the "**Code**");

**WHEREAS,** Section 280G(b)(5)(A)(ii) of the Code provides that a payment will not constitute a parachute payment if the individual's right to receive or retain that payment is contingent upon the approval of such payment by the corporation's stockholders and the requisite stockholder approval is obtained in accordance with the requirements of Section 280G and the applicable Treasury Regulations thereunder, as amended from time to time (the "**Treasury Regulations**");

**WHEREAS,** Executive is willing to waive any and all of Executive's right or entitlement to receive the Potential Parachute Payments to the extent that the Potential Parachute Payments, in the absence of this waiver, would constitute "parachute payments" within the meaning of Section 280G(b)(2) of the Code (the "**280G Excess Payment**"), unless such 280G Excess Payment is approved by the Company's stockholders in accordance with the provisions of Section 280G and the applicable Treasury Regulations, so that the Potential Parachute Payments will not result in (i) the loss of tax deductions by the Company or Purchaser under Section 280G or (ii) an imposition of an excise tax on Executive under Section 4999 of the Code; and

**WHEREAS,** the maximum value of Potential Parachute Payments which Executive will receive and the 280G Excess Payment, or the amount that Executive agrees to put at risk (assuming that the Potential Parachute Payments are included, for purposes of this waiver, at their maximum value), are approximately:

| Maximum Value of Potential Parachute Payments | 280G Excess Payment (Maximum Amount At Risk) |
|---|---|
| $[________] | $[______] |

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Executive hereby agrees as follows:

1. Notwithstanding anything contained to the contrary in the Merger Agreement or any document governing any of the Potential Parachute Payments, Executive hereby waives any and all of Executive's right or entitlement to receive or retain any payment or benefits described in Appendix A to the extent they would otherwise constitute a 280G Excess Payment unless the Potential Parachute Payments, to the extent they would otherwise constitute 280G Excess Payments, are approved by the stockholders of the Company in accordance with the provisions of Section 280G and the Treasury Regulations. The Executive understands that Section 280G and the Treasury Regulations, require that the 280G Excess Payments be approved by stockholders of the Company owning stock possessing more than 75% of the voting power of all outstanding stock of the Company, excluding stock owned by (a) Executive, (b) persons and entities whose stock holdings may be attributed to Executive under applicable tax rules (e.g., family members and affiliated entities), and (c) other individuals who are entitled to receive any 280G Excess Payments. Accordingly, in the absence of such stockholder approval, Executive shall not be paid the Potential Parachute Payments to the extent their aggregate value constitutes a 280G Excess Payment and Purchaser and Executive shall agree upon the individual payments to which this Parachute Payment Waiver shall apply.

2. THIS PARACHUTE PAYMENT WAIVER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REFERENCE TO TEXAS' PRINCIPLES OF CONFLICTS OF LAW. Executive hereby (i) irrevocably consents to the exclusive jurisdiction of any court located within Bexar County in connection with any matter based upon or arising out of this Parachute Payment Waiver, (ii) agrees that process may be served upon Executive in any manner authorized by the laws of the State of Texas, and (iii) irrevocably waives, and covenants not to assert or plead, any objection which Executive might otherwise have to such jurisdiction and such process.

3. This Parachute Payment Waiver is irrevocable to the fullest extent provided under the laws of the State of Texas and may not be amended or otherwise modified without the prior written consent of Purchaser and Executive.

4. Executive acknowledges and agrees that conditions to the obligations of Purchaser to consummate the transactions contemplated by the Merger Agreement set forth in the Merger Agreement are solely for the benefit of Purchaser and may be waived by Purchaser in its sole discretion without notice, liability or obligation to Executive or any other person.

5. Executive hereby authorizes the Company and Purchaser to deliver a copy of this Parachute Payment Waiver to the other and hereby agrees that each of the Company and Purchaser may rely upon such delivery as conclusively

evidencing the waivers referred to in Section 1 for purposes of all agreements and instruments to which such waivers are applicable or relevant.

6. Unless the stockholders of the Company either approve or disapprove of the Executive's 280G Excess Payment, this Parachute Payment Waiver shall be without force or effect should the Merger fail to become effective.

Executive has executed this Parachute Payment Waiver as of December ___, 2007.

______________________
Signature

______________________
Name

______________________
Title

# EXHIBIT L

# EXHIBIT L

## OFFICERS AND DIRECTORS

Directors

1. Christopher E. Banas
2. Paul Castella
3. Marc Feldman
4. Philip J. Romano
5. Alan H. Dean
6. Steven R. Bailey

Officers

1. Christopher E. Banas (CEO)
2. Paul Castella (President and CFO)

# EXHIBIT 1.4(a)

## EXHIBIT 1.4(a)

The Articles of Incorporation of the Surviving Corporation shall be amended as of the Effective Time as follows:

(a) Article IV is hereby deleted in its entirety and replaced with a new Article IV which addresses the authorized capital of the Surviving Corporation as well as the voting rights of the holders of Common Stock of the Surviving Corporation and reads as follows:

**"Section 4.1 Authorized Capital. The aggregate number of shares of stock that the Corporation shall have authority to issue is 1,000 shares of common stock, par value of $.001 per share ("Common Stock"). Shares of Common Stock shall only be represented by certificates, the form of which shall be adopted by the board of directors of the Corporation.**

**Section 4.2 Voting Rights. The voting power of the Corporation shall be vested in the Common Stock. Each share of Common Stock shall entitle the holder thereof to one vote at all meetings of the shareholders of the Corporation."**

(b) Article V is hereby deleted in its entirety and replaced with a new Article V which sets forth the name and address of the registered agent of the Surviving Corporation and reads as follows:

**"The street address of the registered office of the Corporation in the state of Texas is 701 Brazos, Suite 360, Austin, TX 78701. The name of its registered agent at that address is CT Corporation."**

(c) Article VI is hereby deleted in its entirety and replaced with a new Article VI which sets forth the number of members of the board of directors as well as the names and addresses of the members of the board of directors and reads as follows:

**"The number of directors of the Corporation shall not be less than one. From time to time hereafter, the number of directors shall be fixed (a) pursuant to a resolution adopted by the affirmative vote of a majority of the board of directors of the Corporation or (b) pursuant to a resolution adopted by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock of the Corporation. The name and address of the person who is to serve as the director until the next annual meeting of the shareholders or until his successors is elected and qualified is:**

Vince Burgess
2780 Kilgore Road
Rancho Cordova, CA 95670"

(d) Article VII is hereby deleted in its entirety and replaced with a new Article VII which provides for the taking of shareholder action by written consent and shall read as follows:

**"Any action required by law to be taken at any annual or special meeting of the shareholders of the Corporation, or any action that may be taken at any annual or special meeting of the shareholders of the Corporation, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted."**

(e) Article VIII is hereby deleted in its entirety and replaced with a new Article VIII which prohibits cumulative voting and shall read as follows:

**"The right of cumulative voting is expressly prohibited."**

(f) Article IX is hereby deleted in its entirety and replaced with a new Article IX which addresses indemnification of officers and directors and reads as follows:

**"The Corporation shall indemnify and advance expenses to any person who (a) is or was a director of the Corporation or (b) is or was both a director and an officer of the Corporation ("Covered Officer") to the fullest extent permitted by the TBCA or any other statute of similar purport as now written or hereafter enacted. The Corporation may indemnify and advance expenses to an officer, employee or agent of the Corporation, and to persons who are not or were not officers, employees or agents of the Corporation but who were serving at the request of the Corporation as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic corporation, employee benefit plan, or other entity or enterprise, in each case to the fnllest extent permitted by the TBCA or any other statute of similar purport as now written or hereafter enacted.**

**The provisions of this Article IX shall not be deemed exclusive of any other rights to which any director, Covered Officer, officer, employee, agent or other person may be entitled under any other agreement, pursuant to a vote of directors or any committee thereof or a vote of shareholders, as a matter of law or otherwise, either as to action in his official capacity or as to action in another capacity while holding such office, and shall inure to the benefit of the heirs, executors and administrators of such person. No person shall be entitled to indemnification pursuant to this Article IX in relation to any matter as to which indemnification shall not be permitted by law."**

(g) Article X is hereby deleted in its entirety and replaced with a new Article X which addresses the personal liability of directors and reads as follows:

**"To the maximum extent permitted by the TBCA or any other statute of similar purport as now written or hereafter enacted, a director of the Corporation shall not be liable to the Corporation or its shareholders for monetary damages for an act or omission in the director's capacity as a director, except for liability: (a) for any breach of the director's duty of loyalty to the Corporation or its shareholders; (b) for acts or omissions not in good faith that constitute a breach of duty of the director to the Corporation or which involve intentional misconduct or a knowing violation of law; (c) for any transaction from which the director receives an improper benefit, whether or not the benefit results from an action taken within the scope of the director's office; or (d) for acts or omissions for which the liability of a director is expressly provided by statute. Any repeal or amendment of this Article XI by the shareholders of the Corporation shall be prospective only, and shall not adversely affect any limitation on the liability of a director of the Corporation existing at the time of such repeal or amendment. In addition to the circumstances in which a director of the Corporation is not liable as set forth in the preceding sentences, a director shall not be liable to the fullest extent permitted by any provision of the statutes of Texas hereafter enacted that further limits the liability of a director."**

# SCHEDULE 7.9

**Schedule 7.9**
**Employees / Consultants**

Employees
Chris Banas
Silbiano Gonzales
Nate Kemp
Dan Sims
Parker Wood
Joe Taber
Larry Dick
Maria Grady
Roman Kuranov
Waralee Sattam
Louise Mousseau
Austin McElroy
Lynn Caton
Joe Piercy

Consultants
Paul Castella