COOLEY LLP
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
MARK F. LAMBERT (197410) (mlambert@cooley.com)
RITESH K. SRIVASTAVA (246477) (rsrivastava@cooley.com)
AMANDA A. MAIN (260814) (amain@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Defendant
VOLCANO CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FORMER SHAREHOLDERS OF CARDIOSPECTRA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>VOLCANO CORPORATION, a Delaware corporation; and DOES 1-10,<br><br>Defendants. | Case No. CV12-01535 (WHO)<br><br>**DEFENDANT VOLCANO CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: March 19, 2014<br>Time: 2:00 p.m.<br>Judge: Hon. William H. Orrick<br><br>**DEMAND FOR JURY TRIAL** |

# Table of Contents


Page

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 1

A. CardioSpectra's Sales Pitch to Volcano Successfully Results in a Merger ..... 2

B. The Merger Agreement and its Milestone Provisions ..... 3

C. Plaintiff Banas Heads Volcano's OCT Division and Supports Volcano's Acquisition of Axsun Technologies ..... 7

D. Volcano's Continued Investment In CardioSpectra's Technology ..... 7

E. Plaintiffs Seek Summary Judgment on Their Claim That Volcano Achieved the Sales Milestones ..... 8

III. SUMMARY JUDGMENT STANDARD ..... 9

IV. PLAINTIFFS' MOTION FAILS AS A MATTER OF LAW ..... 10

A. Plaintiffs Fail to Prove That Axsun's Laser Components Are "OCT Products" Under the Merger Agreement ..... 10

1. Plaintiffs' Interpretation of the "OCT Product" Definition Conflicts with the Plain Language of the Definition ..... 11

2. Plaintiffs' Interpretation of the Sales Milestones Conflicts with the "OCT Product" Definition ..... 13

3. Plaintiffs' Interpretation of "OCT Product[s]" Renders the Merger Agreement Internally Inconsistent ..... 14

4. Plaintiffs' Interpretation Frustrates the Merger Agreement's Scheme ..... 16

B. Plaintiffs' "Extrinsic Evidence" Does Not Demonstrate that a Reasonable Jury Could Only Return A Verdict in Their Favor ..... 18

C. The Admissible Extrinsic Evidence Precludes Summary Judgment In Favor Of Plaintiffs And Warrants Summary Judgment In Favor Of Volcano ..... 22

D. Even If Axsun's Laser Components Are "OCT Products," Plaintiffs Fail To Show That Volcano Attained The Specified "Cumulative Cash Sales" from "Commercial Sales." ..... 24

V. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Airborne Health, Inc. v. Squid Soap, LP*
984 A.2d 126 (Del. Ch. 2009) .......... 17

*Alta Berkeley VI C.V. v. Omneon, Inc.*
41 A.3d 381 (Del. 2012) .......... 13

*Amkor Tech., Inc. v. Motorola, Inc.*
2007 WL 3360039 (Del. Super. Ct. Nov. 14, 2007) .......... 19

*Artesian Water Co. v. Dep't of Highways & Transp.*
330 A.2d 441 (Del. 1974) .......... 22

*Bank of N.Y. Mellon v. Commerzbank*
65 A.3d 539 (Del. 2013) .......... 11, 15, 16

*Cambridge Electrs. Corp. v. MGA Electrs., Inc.*
227 F.R.D. 313 (C.D. Cal. 2004) .......... 22, 24

*Celotex Corp. v. Catrett*
427 U.S. 317 (1986) .......... 10

*Council of Dorset Condo. Apartments v. Gordon*
801 A.2d 1 (Del. 2002) .......... 16

*E.I. du Pont de Nemours v. Shell Oil Co.*
498 A.2d 1108 (Del. 1985) (en banc) .......... 15, 16

*F.T.C. v. Neovi, Inc.*
604 F. 3d 1150 (9th Cir. 2010) .......... 21

*F.T.C. v. Publ'g Clearing House, Inc.*
104 F.3d 1168 (9th Cir. 1997) .......... 21

*Gilbert v. MPM Enters.*
709 A.2d 663 (Del. Ch. 1997) .......... 17

*GRT, Inc. v. Marathon GTF Tech., Ltd.*
2012 Del. Ch. LEXIS 134 (Del. Ch. June 21, 2012) .......... 12, 14

*Hansen v. United States*
7 F.3d 137 (9th Cir. 1993) .......... 20

*Lewis v. Bank of Am.*
343 F.3d 540 (5th Cir. 2003) .......... 22

## TABLE OF AUTHORITIES
## (continued)

Page(s)

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*
68 A.3d 1208 (Del. 2012) .......... 12, 15

*Muench Photography, Inc. v. Pearson Educ., Inc.*
2013 WL 6185200 (N.D. Cal. Nov. 19, 2013) .......... 21

*O'Brien v. Progressive N. Ins. Co.*
785 A.2d 281 (Del. 2001) .......... 16

*Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*
5 F.3d 1255 (9th Cir. 1993) .......... 22

*Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.*
11 F. Supp. 2d 1150 (N.D. Cal. 1998) .......... 9

*Shiftan v. Morgan Joseph Holdings, Inc.*
57 A.3d 928 (Del. Ch. 2012) .......... 11

*SI Mgmt. L.P. v. Wininger*
707 A.2d 37 (Del. 1998) .......... 21

*Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*
2013 WL 1821608 (Del. Ch. May 1, 2013) .......... 10

*Sonitrol Holding Co. v. Marceau Invest.*
607 A.2d 1177 (Del. 1992) .......... 13

**STATUTES**

Del. Code Ann. Title 6
§ 1-303(c) .......... 19

**FEDERAL RULES**

Fed. R. Civ. P.
56(a) .......... 9
56(c)(1) .......... 1
56(c)(2) .......... 18, 9
56(c)(3) .......... 1

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Evid.
401 ..... 19, 20
402 ..... 19, 20
403 ..... 19
602 ..... 19, 20
801 ..... 19
802 ..... 19, 20
901 ..... 20

**OTHER AUTHORITIES**

Brian JM Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 133 (2012) ..... 17

**SUPPLEMENTAL AUTHORITIES**

Black's Law Dictionary (9th ed. 2009) ..... 17

Oxford Dictionaries, Oxford Univ. Press ..... 13

Webster's II New Coll. Dictionary 296 (1999) ..... 13

## I. INTRODUCTION

Hoping to stave off judgment in Volcano's favor on an issue of pure contract interpretation, Plaintiffs' motion appears to be a tactical filing in anticipation of Volcano's cross motion for summary judgment. (*See* Dkt. No. 64-3 ("Pls.' Mtn.")). This is evident, as Plaintiffs fall woefully short of meeting their burden, and the flaws in Plaintiffs' positions demonstrate why this Court should grant Volcano's cross motion. Failing to apply controlling Delaware law, Plaintiffs advocate for an unreasonable interpretation of the definition of "OCT Product" that is at odds with the plain language of the definition itself and cannot be harmonized with other interrelated provisions of the Merger Agreement or the contract as a whole. Further, Plaintiffs' frivolous emphasis of the words "including without limitation" vitiates express, specific, and limiting provisions negotiated by the parties. Plaintiffs also cannot rely on the lead Plaintiff's self-serving and uncorroborated declaration to support an ambiguity and transform the specific "OCT Product" definition and related Milestone provisions into the sweeping, catch-all clauses that Plaintiffs propose. At bottom, Plaintiffs want the court to rewrite and restructure an integrated contract in order to capture a body of consideration they never negotiated for (namely, a windfall payment based on sales of Axsun laser components that have nothing to do with CardioSpectra and the agreement by which Volcano acquired it).

## II. STATEMENT OF FACTS[1]

CardioSpectra was a start-up medical device company founded in San Antonio, Texas in April 2005, which had developed a prototype OCT imaging system for coronary arteries. Ex. D[2]

[1] The Court should strike the 40 lines of unsupported facts in Plaintiffs' "Preliminary Statement" for their failure to cite supporting evidence as required by Federal Rule of Civil Procedure 56(c)(1). Fed. R. Civ. P. 56(c)(3) (the court need only consider cited materials or other materials in the record). Particularly concerning is Plaintiffs' mischaracterization of the indisputable fact that any additional consideration was expressly contingent upon Volcano achieving the Milestones. (Pls.' Mtn. at 3:6-10) (claiming that the Agreement "allowed Volcano to *defer* four additional 'earnout' payments" and that "these payments would be triggered *when* Volcano achieved a corresponding 'milestone'") (emphasis added)). The Court should also not consider other unsupported facts, mischaracterizations of evidence, or irrelevant facts that Plaintiffs fail to cite even once in their argument. (*See e.g.,* Pls.' Mtn. at 4:4-5:2 (unsupported, misquoted, and irrelevant) and 5:12-6:7 (mischaracterization of evidence)).

[2] For the sake of consistency, citations to Exhibits A through X are to the same exhibits

(SAC at ¶¶ 2, 15, 18, 21); Ex. CC (Castella Depo. at 90:10-21). The system incorporated components purchased from original equipment manufacturers ("OEM") and consisted of three primary parts: a console, a patient interface module and pull-back device (a "PIM"), and a catheter. Ex.CC (Castella Depo. at 90:10-93:24); Ex. AA (Banas Depo. at 220:15-221:6); Ex. Q (Banas Ex. 861 (p. 26)). The console housed an off-the-shelf OCT laser purchased from third-party manufacturer Santec and included other OEM hardware components, such as monitors, computer processors, power supplies, data storage devices, and a printer. Ex. CC (Castella Depo. at 90:10-93:24); Ex. AA (Banas Depo. at 179:10-14, 204:17-205:17). CardioSpectra's OCT system needed approval from the Food & Drug Administration ("FDA") before it could be marketed or sold in the United States. Ex. AA (Banas Depo. at 133:21-134:9, 300:9-21).

**A. CardioSpectra's Sales Pitch to Volcano Successfully Results in a Merger.**

On August 9, 2007, CardioSpectra met with Volcano and presented an overview of CardioSpectra, its OCT System and product development status, and accompanying intellectual property portfolio. Ex. AA (Banas Depo. at 97:8-101:16); Ex. Q (Banas Ex. 861).

The parties subsequently negotiated the terms of the Merger Agreement in November and December 2007. (Dkt. No. 64-23 ("Banas Decl.") at ¶ 2). Volcano's former Vice President of Marketing and Business Development, Vince Burgess, primarily negotiated the terms of the Merger Agreement on behalf of Volcano, while Plaintiff Chris Banas served as CardioSpectra's primary negotiator. Ex. AA (Banas Depo. at 44:19-45:1, 53:19-54:3); Ex. BB (Burgess Depo. at 10:7-17, 33:4-18, 36:14-20). Others also participated in merger-related discussions, including Najla Aftahi on behalf of Volcano, and Plaintiff Paul Castella, Phillip Romano, and Steve Bailey on behalf of CardioSpectra. Ex. AA (Banas Depo. at 52:20-53:8); Ex. BB (Burgess Depo. at 33:4-18). Counsel represented both CardioSpectra and Volcano throughout the negotiations and exchanged multiple drafts of the Merger Agreement. Ex. AA (Banas Depo. at 45:2-11, 57:3-11, 57:22-58:6); Ex. BB (Burgess Depo. at 36:21-37:14).

---

previously filed in support of Volcano's Motion for Summary Judgment (*see* attachments to Dkt. Nos. 66 and 67). For the Court's convenience, Volcano has re-filed such Exhibits with this Opposition to the extent they are cited herein. Additional exhibits cited herein are attached to the Declaration of Amanda A. Main ("Main Decl."), filed concurrently herewith.

On November 13, 2007, Volcano's counsel provided the first draft of the Merger Agreement to CardioSpectra. Ex. EE (Burgess Ex. 194). The draft agreement defined "OCT Product" as "consoles (including OCT laser light sources processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used [to] conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." *Id.* This definition would become the final definition of "OCT Product" in the Merger Agreement. *Compare* Ex. EE (Burgess Ex. 194) *with* Ex. A (Merger Agmt. at A-13).

During the time the parties were negotiating the Merger Agreement, they exchanged a financial model estimating the resources and time needed to further develop and then commercialize CardioSpectra's OCT system. Ex. AA (Banas Depo. at 145:7-149:6), Ex. R (Banas Ex. 863). On November 21, 2007, Ms. Aftahi requested Plaintiff Banas' input on the draft model. *Id.* Plaintiff Banas responded on December 1, 2007, providing cost estimates for developing and commercializing the console, software, PIM, and catheter, including costs relating to manufacturing, human resources, equipment, and floor space. *Id.* The model estimated the time needed to achieve the Milestones, including the sales-related Milestones that would be achieved through sales of consoles and catheters developed and manufactured by Volcano. *Id.*

On December 7, 2007, and pursuant to the Merger Agreement, Volcano acquired CardioSpectra for approximately $25.2 million. Ex. A (Merger Agmt.); Ex. D (SAC at ¶ 21). Plaintiffs are parties to the Merger Agreement in their capacities as Shareholder Representatives of the Former Shareholders of CardioSpectra. Ex. A (Merger Agmt.).

**B. The Merger Agreement and its Milestone Provisions**

Section 2.5 of the Merger Agreement, titled "Milestone Merger Consideration," sets forth the terms, obligations, and rights of the parties with respect to the possibility of additional merger consideration in the event Volcano achieved certain defined goals by an agreed-upon time after the merger (the "Milestone" or "earn-out" provisions). Ex. A (Merger Agmt. at § 2.5).

Section 2.5(a) states the four Milestones. *Id.* at § 2.5(a). The first two Milestones (collectively, the "Regulatory Milestones") relate to regulatory approvals of certain "OCT

System[s]," which, by definition, must incorporate "an imaging and display console substantially similar" to CardioSpectra's OCT system as of the merger. Ex. A (Merger Agmt. at § 2.5(a)(i)-(ii), A-9 (defining "Generation 1 OCT System" and "Generation 1a OCT System" as incorporating a "console substantially similar to the OCT System in use today")).

The last two Milestones (collectively, the "Sales Milestones") are triggered upon Volcano's attainment of defined "Cumulative Cash Sales" totaling $25,000,000 from defined "Commercial Sales of OCT Products (including, without limitation, consoles, patient interface modules and pull-back devices (also referred to as PIMs), catheters and software) . . . ." *Id.* at § 2.5(a)(iii)-(iv). The date on which the Sales Milestones expire depends on whether Volcano achieves the second Milestone. *See id.* The third Milestone expires no later than 3 years after the deadline for the second Milestone (i.e., December 31, 2013), but sooner if Volcano achieves the second Milestone before its deadline (i.e., 3 years from the date of achievement and in any event before December 31, 2013). *Id.* The deadline for the fourth Milestone operates in the same manner, with an ultimate deadline of December 31, 2014. *Id.*

Under the Merger Agreement, "'OCT Product' means consoles (including OCT laser light sources[,][3] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." Ex. A (Merger Agmt. at A-13). It is undisputed that the parenthetical after "consoles" contains a list of components that one would expect to find in a console at the time of the merger. Ex. CC (Castella Depo. at 188:17-20, 197:9-18). The "OCT Product" definition contains no similar parenthetical listing the components of PIMs or catheters. *See* Ex. A (Merger Agmt. at A-13). The last part of the "OCT Product" definition—"any product or service covered by the scope of any Valid Claim[4] contained in any

---

[3] The parties have agreed that a comma was mistakenly omitted between the words "sources" and "processors." (Pls.' Mtn. at 10, n.39).

[4] "'Valid Claim' means a claim of an issued and unexpired patent included within the Licensed Patents that has not been abandoned, permanently revoked or held unenforceable or invalid by a final decision of a court of competent jurisdiction . . . ." Ex. A (Merger Agmt. at A-16).

Licensed Patent[5]" (the "Valid Claim Clause")—encompasses any product or service covered by CardioSpectra's licensed patents as of the merger. Plaintiffs do not contend that Volcano has sold any product covered by the Valid Claim Clause. Ex. V (Pls.' Supp. Resp. Interrog. No. 13).

Section 2.5(b) describes Volcano's obligation with respect to achieving the Milestones and Section 2.5(c) sets forth Volcano's corresponding rights to terminate its obligation. Ex. A (Merger Agmt. at §§ 2.5(b), 2.5(c)). Section 2.5(b) states that Volcano must "act in good faith and use commercially reasonable efforts . . . to cause each of the Milestones to be achieved," but expressly disclaims any guarantee that Volcano will achieve any Milestone. *Id.* at § 2.5(b) ("[the Agreement] shall not require that any Milestone be achieved on or before [the specified] dates ***or ever***") (emphasis added). Volcano's obligation to use "commercially reasonable efforts" is "in all circumstances" subject to its right to terminate this obligation upon its declaration of a Commercial or Technical Failure under Section 2.5(c). *Id.* at §§ 2.5(b), 2.5(c).

The obligations and rights in Sections 2.5(b) and 2.5(c) are couched in terms of an "OCT Product" developed and commercialized by "Parent" (i.e. Volcano). *See id.* Specifically, the required "commercially reasonable efforts" are defined as "the use of efforts, sales terms, expertise and resources normally used by Parent for other products, which, as compared with the OCT Products, are of similar market potential at a similar stage in its development or product life, taking into account all reasonable relevant factors affecting the *cost, risk and timing of development* and the total potential of the applicable OCT Products . . . ." *Id.* at § 2.5(b) (emphasis added). Similarly, Volcano has the right, "at its sole discretion," to "terminat[e] the *development and/or commercialization*" of "OCT Products" and extinguish its obligation to use "commercially reasonable efforts" by declaring a Technical or Commercial Failure. *Id.* at § 2.5(c) (emphasis added).

Indeed, the criteria for declaring a "Commercial Failure" or "Technical Failure" require

[5] "'Licensed Patents' means any of the patents encompassed by the 'Patent Rights' (as defined in each of the OCT Licenses) licensed to the Company pursuant to the OCT Licenses." Ex. A (Merger Agmt. at A-11). "'OCT Licenses' means the Patent License Agreement by and between the Board of Regents of the University of Texas System and the Company (fka HSC Light Inc.), dated April 30, 2005, and the Patent License Agreement by and between Thomas Edward Milner and the Company (fka HSC Light), dated April 30, 2005." *Id.* at A-12.

that Volcano determine the likely success or reasonableness of the continued "development" or "commercialization" of the "OCT Product." *See id*. at A-4, A-16. A "Commercial Failure" is defined, in pertinent part, as a "reasonable determination" regarding the market conditions for the "OCT Product that was not reasonably anticipated by [Volcano] as of the [merger] and that makes further development or commercialization of such . . . OCT Product commercially unreasonable to pursue." *Id.* at A-4. A "Technical Failure" is likewise defined, in pertinent part, as a "reasonable determination" that "successful development" or "successful commercialization" of the OCT Product is "not reasonably likely" based on the OCT Product's safety, efficacy, or performance in a clinical trial or on the potential for obtaining FDA marketing approval. *Id.* at A-16. Further, the criteria for declaring a Technical Failure also contemplate that an "OCT Product" requires FDA approval. *Id.* at § 2.5(c), A-16.

Section 2.5(d) describes the parties' rights and obligations in the event that a "Change of Control" or "Carve-Out Transaction" occurs before the Milestones have expired. *Id.* at § 2.5(d). A "Change of Control" occurs if Volcano is no longer in control of all or substantially all of its assets. *Id*. at A-3. A "Carve-Out Transaction"[6] is a transaction in which Volcano sells a substantial portion of the intellectual property rights acquired from CardioSpectra, which are "necessary for the production, development and sale of the OCT Products." *Id.* In either case, Volcano no longer owns the assets acquired from CardioSpectra, and therefore is no longer able to produce, develop, or sell "OCT Products." *Id.* at § 2.5(d), A-3. Thus, Volcano cannot consummate either type of transaction unless Volcano either pays the amount of any Milestones not yet due, or the acquiror agrees to assume Volcano's Section 2.5 obligations. *Id.* at § 2.5(d).

Finally, Section 2.5(e) allows Plaintiffs to monitor the status of progress towards the Sales Milestones and to request a report of "Cumulative Cash Sales of OCT Products" from Volcano twice a year. *Id.* at § 2.5(e). Section 2.5(f) requires that the payment of any Milestones be in U.S. dollars, and Section 2.5(g) concludes by describing the "books and records" Volcano must

[6] "Carve-Out Transaction" is defined as "any transaction . . . pursuant to which a substantial portion of the Intellectual Property Rights held by the Surviving Corporation immediately after the Effective Time and necessary for the production, development, and sale of the OCT Products are sold to or acquired by . . . a Person other than Parent or Subsidiary of Parent." *Id.* at A-3.

maintain regarding its sale of "OCT Products." *Id.* at §§ 2.5(f), 2.5(g).

The Merger Agreement stipulates that Delaware law controls and contains an integration clause, establishing that it is the "entire understanding of the parties hereto relating to the subject matter hereof [] and supersede[s] all prior agreements and understandings among or between any of the parties relating to the subject matter hereof . . . . ." *Id.* at §§ 13.9(a), 13.16.

### C. Plaintiff Banas Heads Volcano's OCT Division and Supports Volcano's Acquisition of Axsun Technologies.

As part of the CardioSpectra acquisition, nearly all of CardioSpectra's employees, almost all of whom were shareholders, joined Volcano to form its new OCT division. Ex. CC (Castella Depo. at 18:20-19:2). This included Plaintiff Banas, CardioSpectra's former CEO, who became the head of Volcano's OCT division. Ex. AA (Banas Depo. at 25:12-25).

Around August 2008, Volcano learned of an opportunity to acquire Axsun Technologies ("Axsun"), a manufacturer of, among other things, compact laser components that could be used in OCT imaging devices in various medical fields, including ophthalmology, dentistry, and cardiology. Ex. AA (Banas Depo. at 304:5-17); Ex. DD (Huennekens Depo. at 17:9-18:14). Plaintiff Banas, then-President of Volcano's OCT division, strongly supported Volcano's acquisition of Axsun and envisioned substituting the console's Santec laser component with an Axsun laser component. Ex. AA (Banas Depo. at 303:24-306:3). Plaintiff Banas participated in the due diligence and was aware that Axsun developed and commercialized laser components, which it supplied to Volcano competitor LightLab Imaging, Inc. ("LightLab") for integration into its OCT system. *Id.* at 180:8-181:9, 306:4-306:11. FDA approval was not required for Axsun to sell its laser components. *Id.* at 196:22-197:1. Volcano acquired Axsun in December 2008 for approximately $20 million, and Axsun operates as a separate, wholly-owned subsidiary of Volcano. Ex. AA (Banas Depo. at 348:24-349:2); Ex. DD (Huennekens Depo. at 20:23-21:13).

### D. Volcano's Continued Investment In CardioSpectra's Technology

By the end of 2009, Volcano achieved the first Regulatory Milestone by obtaining "CE Mark approval" from European regulatory authorities of a "Generation 1 OCT System," and thus paid an additional $11 million to CardioSpectra's Former Shareholders. Ex. CC (Castella Depo.

at 173:14-19); Ex. AA (Banas Depo. at 142:5-8). Beyond the $25.2 million Volcano paid to acquire CardioSpectra and the additional $11 million it paid upon achieving the first Milestone, Volcano invested approximately $31.3 million on OCT R&D alone between 2008 and 2013, separate and apart from regulatory spending. Ex. J (Dahldorf Ex. 164); Ex. Y (Huennekens Decl. at ¶ 4). By contrast, CardioSpectra's shareholders invested only $5.3 million before the merger, substantially less than Volcano's investment of more than $67 million. Ex. CC (Castella Depo. at 37:14-18). Despite its investment in acquiring CardioSpectra and developing their technology, Volcano has not realized any return. Ex. DD (Huennkens Depo. at 147:2-14).

### E. Plaintiffs Seek Summary Judgment on Their Claim That Volcano Achieved the Sales Milestones.

Plaintiffs move for partial summary judgment on their claim that Volcano has breached the Merger Agreement by achieving the Sales Milestones and not paying the amounts due thereunder. Plaintiffs contend that Volcano has achieved the Sales Milestones through Axsun's sales of four laser components. (Pls.' Mtn. at 8:2-10).

Both before the Axsun acquisition and even after, Plaintiff Banas admits that he never told anyone at Volcano that he believed Axsun's sale of its proprietary laser components would count towards the Sales Milestones, nor did he disclose his purported belief that the Axsun acquisition would personally enrich him and the other Former CardioSpectra Shareholders by potentially doubling Volcano's cost to acquire Axsun through $17 million in milestone payments. Ex. AA (Banas Depo. at 349:19-351:15). Plaintiffs also failed to mention this theory when they sought to negotiate a discounted payment for Milestones 2 through 4 in June 2010, or when they claimed that Volcano achieved the Sales Milestones in January 2012. *See* Exs. C, O. In fact, Plaintiffs first made Volcano aware of the "Axsun sales" theory around the time they filed this lawsuit in March 2012, more than three years after Volcano acquired Axsun. Notably, although Plaintiffs knew about Volcano's ownership of Axsun and Axsun's sales of laser components since December 2008, Plaintiffs never invoked their right to request reports of Cumulative Cash Sales of OCT Products until January 2012, only two months before filing this lawsuit. Ex. C.

During fact discovery, Volcano propounded contention interrogatories to discover the factual bases for Plaintiffs' assertions that Volcano sold "OCT Products" and achieved the Sales

Milestones. Ex. T (Interrog. Nos. 7, 10, 12, 14). Plaintiffs' initial responses were factually deficient, and the Court ordered them to supplement their responses and state all material facts supporting their contentions. Ex. U. Plaintiffs supplemented, and Plaintiff Banas verified the responses with the understanding that he was testifying as to their "truthfulness and accuracy." Ex. V; Ex. AA (Banas Depo. at 35:9-38:11). To ensure that Plaintiffs were not withholding any facts that could support their claims, Volcano's counsel sent a letter to Plaintiffs' counsel, explaining that the supplemental responses still contain factually unsupported and legally irrelevant contentions and asking Plaintiffs to confirm that such responses disclose all material facts supporting their contentions. Ex. W (p. 4). Plaintiffs failed to do so and did not further supplement their responses. Ex. Z (Main Decl. at ¶ 18).

Yet now, Plaintiffs improperly cite to facts not disclosed in response to Volcano's interrogatories regarding the bases for their contentions that Axsun's laser components are "OCT Products" and that Volcano attained the required "Cumulative Cash Sales" from "Commercial Sales of OCT Products." (*See, e.g.,* Pls.' Mtn. at 6:2-6, 14:1-13, 15:22-24, 16:13-18; *see also* Banas Decl. (discussing purported pre-merger conversations not disclosed in their interrogatory responses and divulging how Volcano purportedly achieved the sales requirements)). Plaintiffs offer the declaration of Plaintiff Banas as evidence that he "insisted" on a specific definition of "OCT Product" while the parties were negotiating the Merger Agreement. Further, Plaintiffs only now disclose their theory that Volcano purportedly satisfied the "Commercial Sale" requirement through sales "for end use or consumption" and that Axsun's gross medical revenues equate to "Cumulative Cash Sales," as defined in the Merger Agreement.

## III. SUMMARY JUDGMENT STANDARD

Plaintiffs are not entitled to summary judgment unless they present admissible evidence demonstrating "that there is no genuine dispute as to any material fact" necessary to establish the elements of their claim and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), 56(c)(2). On cross motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial. *Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.*, 11 F. Supp. 2d 1150, 1152 (N.D. Cal. 1998). Because Plaintiffs bear the burden

of proof at trial, they are not entitled to summary judgment unless they affirmatively show that a reasonable jury could find in their favor *only*. *Id.* In contrast, Volcano is entitled to summary judgment if it shows an "absence of evidence" supporting Plaintiffs' claim and Plaintiffs fail to respond with "substantial evidence" raising genuine issues of fact. *Celotex Corp. v. Catrett*, 427 U.S. 317, 324-25 (1986).

## IV. PLAINTIFFS' MOTION FAILS AS A MATTER OF LAW.

Plaintiffs contend that they are entitled to partial summary judgment because Volcano has achieved the Sales Milestones, thereby triggering an obligation to pay an additional $17 million in "Milestone Merger Consideration" to CardioSpectra's Former Shareholders. (Pls.' Mtn. at 1). To prevail, Plaintiffs must prove that Volcano has attained "Cumulative Cash Sales" totaling $25 million "from Commercial Sales of OCT Products." Ex. A (Merger Agmt. at § 2.5(a)(iii)-(iv)). Plaintiffs claim that the Sales Milestones have been met through Axsun's sales of its proprietary laser components. (Pls.' Mtn. at 8). Plaintiffs' motion fails because Axsun's laser components are not "OCT Product[s]" and because Plaintiffs cannot establish either the "Cumulative Cash Sales" or "Commercial Sales" elements.

### A. Plaintiffs Fail to Prove That Axsun's Laser Components Are "OCT Products" Under the Merger Agreement.

Under Delaware law, the court decides the meaning of a contract as a matter of law where it is reasonably susceptible to only one party's interpretation. *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at * 4 (Del. Ch. May 1, 2013). Plaintiffs' primary argument is that the Merger Agreement is unambiguous and that their interpretation is the "only reasonable interpretation."[7] (Pls.' Mtn. at 8-12). According to Plaintiffs, each and every component of any part of an OCT system qualifies by itself as an "OCT Product." (Banas Decl. at ¶¶ 3-4); Ex. CC (Castella Depo. at 197:20-198:20). Construing "OCT Product" as a "broad, catch-all" term, Plaintiffs contend that it encompasses Axsun's laser components. To support their interpretation, Plaintiffs rely solely on a parenthetical list of "console" components in the

[7] Plaintiffs advance an "ambiguity" argument in the alternative, and that argument is addressed below. *See infra* Part IV.B. and IV.C.

definition of "OCT Product" and the phrase "including without limitation" in the Sales Milestones. (Pls.' Mtn. at 11:7-12:1).

Citing only two cases without any analysis, Plaintiffs' motion fails to apply controlling Delaware contract law and, as discussed below, presents an unreasonable interpretation that improperly imports new language into the agreement, conflicts with the plain language and other provisions of the contract, and frustrates the purpose and scheme of the contract as a whole.

**1. Plaintiffs' Interpretation of the "OCT Product" Definition Conflicts with the Plain Language of the Definition.**

Plaintiffs contend that the definition of "OCT Product" includes Axsun's lasers because it "incorporates an open-ended, non-exclusive list" of console components. (Pls.' Mtn. at 11:7-12). The Merger Agreement defines "OCT Product" as follows: "'OCT Product' means consoles (including OCT laser light sources[,] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." Ex. A (Merger Agmt. at A-13). Plaintiffs argue that any and every component listed in the parenthetical following the term "consoles" is a stand-alone "OCT Product." (Pls.' Mtn. at 11:7-12). Plaintiffs further interpret the definition of "OCT Product" to include not only the components of a console but any component of any part of any OCT system, including the unidentified components of a PIM or catheter. (Banas Decl. at ¶¶ 3-4 (stating that the definition of "OCT Product" includes "any products used in Optical Coherence Tomography (OCT), including component parts")); Ex. CC (Castella Depo. at 197:20-198:20).

Plaintiffs' interpretation conflicts with the plain language of the "OCT Product" definition and is thus unreasonable. *Bank of N.Y. Mellon v. Commerzbank*, 65 A.3d 539, 555 (Del. 2013) ("An interpretation that conflicts with the plain language of a contract is not reasonable."). First, Plaintiffs interpret the definition as including the components of PIMs and catheters, but the definition only lists components of a console. Plaintiffs' interpretation improperly requires the Court to read the definition as if it expressly lists the components of PIMs and catheters, as it does for consoles. *See Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 938-40 (Del. Ch. 2012)

(refusing to read words into a provision that were absent from the "logical place" where they would appear as they did in a similar provision). A parenthetical list of components uniquely follows "consoles" (and not "PIMs" or "catheters"), and the Court must give effect to the purposeful inclusion and omission of such a parenthetical. *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 Del. Ch. LEXIS 134, at *11 (Del. Ch. June 21, 2012) (stating the court "must give effect to all of the terms"). As explained in Volcano's Motion, "console" is a generic term with many meanings and the parenthetical explains that term in the context of the Merger Agreement by listing the components one would expect to find in a console at the time of the merger. (Dkt. No. 65 ("Def.'s MSJ") at 14:21-15:17). The parties' inclusion of a parenthetical following the word "consoles" and not PIMs or catheters shows that the parenthetical serves a specific explanatory purpose with respect to the word "consoles" and does not expand the definition into a "broad, catch-all term" encompassing the components of consoles, let alone PIMs and catheters. (Pls.' Mtn. at 11:7-12).

Further, Plaintiffs' interpretation of the parenthetical following "consoles" impermissibly broadens the definition of "OCT Product" beyond any reasonable or meaningful limit, thereby frustrating the purpose of defining "OCT Product" in the first place. Following Plaintiffs' interpretation, generic off-the-shelf computer parts not unique to an OCT console such as "data storage devices" and "printers," constitute "OCT Products" in addition to countless, unspecified "other related components." *See* Ex. A (Merger Agmt. at A-13). Plaintiffs acknowledge that their interpretation leads to an absurd result, because the Sales Milestones could be triggered by Volcano's sale of the most "trivial[]" components, like "roller bearings" in a PIM. Ex. CC (Castella Depo. at 189:9-190:18, 192:7-195:24, 199:21-200:8); *see Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1225 (Del. 2012) (finding interpretation unreasonable where it would lead to an "absurd result"). Plaintiffs treat the parenthetical such that an unlimited list of console components becomes an undefined and unlimited list of "OCT Product[s]." This utterly defeats the purpose of a "definition," which, *by definition*, cannot be

limitless. *See* Oxford Dictionaries, Oxford Univ. Press[8] (stating that "definition" derives its meaning from the Latin verb *definire* which means to "set bounds to"); Webster's II New Coll. Dictionary 296 (1999) (defining "definition" as, among other things, "the act of making clear and distinct" or "a determination of outline, extent, or limits").

Plaintiffs' interpretation also renders the Valid Claim Clause in the "OCT Product" definition mere surplusage. *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 390 (Del. 2012) (finding that provision bestowing an opt out right on only one class of shareholders would be superfluous if court interpreted another provision as effectively giving that same right to all classes of shareholders). The Valid Claim Clause makes clear that, in addition to consoles, PIMs, and catheters, any product or service covered by the patent rights acquired from CardioSpectra will qualify as "OCT Products." The Valid Claim Clause is superfluous following Plaintiffs' interpretation that any component of an OCT System, by itself and regardless of its derivation, is an "OCT Product," because such an interpretation obviates the clause's sole function of accounting for products (and services) within the scope of a Valid Claim of a Licensed Patent. *See Sonitrol Holding Co. v. Marceau Invest.,* 607 A.2d 1177, 1182-83 (Del. 1992) (rejecting interpretation that would render a portion of the same provision illusory and meaningless).

Plaintiffs' assertion that the word "including," which appears at the beginning of the parenthetical following "consoles," means "including without limitation" is inconsequential and cannot save their flawed interpretation. (Pls.' Mtn. at 11:10). There is no dispute that the parenthetical contains a non-exhaustive list of console components, as is apparent from the ending reference to an unlimited class of "other related components." Ex. A (Merger Agmt. at A-13). Only Volcano's interpretation is consistent with the plain language of the definition and interprets the parenthetical for what it is – an illustrative list of components that one would expect to find in a console at the time of the merger. Ex. CC (Castella Depo. at 188:17-20, 197:9-18).

**2. Plaintiffs' Interpretation of the Sales Milestones Conflicts with the "OCT Product" Definition.**

Plaintiffs alternatively argue that the words "including without limitation" in the Sales

[8] http://www.oxforddictionaries.com/us/definition/american_english/definition.

Milestones support their unreasonable interpretation. (Pls.' Mtn. at 11:13-16). The Sales Milestones refer to "Commercial Sales of OCT Products (including, without limitation, consoles, patient interface modules and pull-back devices (also referred to as PIMs), catheters and software) . . . ." Ex. A (Merger Agmt. at § 2.5(a)(iii)-(iv). Like its flawed interpretation of the "OCT Product" definition, Plaintiffs' absurd reading of "including without limitation" in the Sales Milestones vitiates the definition of any meaning or purpose, because it renders that specifically defined term "without [*any*] limitation." *See supra* Part IV.A.1 (a "definition," *by definition*, cannot be limitless).

The Court cannot accept Plaintiffs' interpretation where another interpretation gives effect to all of the Merger Agreement's terms. *GRT*, 2012 Del. Ch. LEXIS 134, at *11 (stating the court "must give effect to all of the terms"). Only Volcano's interpretation of the "including without limitation" language in the Sales Milestones is consistent with the limitations in the "OCT Product" definition.[9] This is because the Valid Claim Clause qualifies "any product or service covered by a Valid Claim of a Licensed Patent," as an "OCT Product," which could "includ[e], without limitation," "software" or other products that may be distinct from the specified consoles, PIMs and catheters that make up the rest of the "OCT Product" definition. Plaintiffs do not contend that Axsun's laser components are consoles, PIMs, catheters or software, and Plaintiffs admit that Axsun's laser components are not covered by the Valid Claim Clause. Ex. V (Pls.' Supp. Resp. Interrog. No. 13). Plaintiffs' interpretation is an improper attempt to circumvent the "OCT Product" definition and render the Valid Claim Clause superfluous.

**3. Plaintiffs' Interpretation of "OCT Product[s]" Renders the Merger Agreement Internally Inconsistent.**

Plaintiffs' tunnel-vision interpretation of the list of "console" components in the "OCT

[9] Plaintiffs also suggest that "OCT Products" as used in the Sales Milestones includes Axsun's laser components, even if the Court finds that Axsun's products do not satisfy the "OCT Product" definition. (*See* Pls.' Mtn. at 11:17-22 ("Whether the definition of 'OCT Product' as used in the definitions section . . . is interpreted to include [Axsun's products] . . . or whether 'OCT Product' as used in the milestones provisions is interpreted to include [Axsun's products] . . . .")). Plaintiffs' proposed approach directly conflicts with the Merger Agreement's mandate that, "[f]or purposes of the Agreement," "OCT Product" has the meaning provided in Exhibit A. Ex. A (Merger Agmt. at A-13). Plaintiffs' invitation to interpret "OCT Products" as used in the Sales Milestones differently from the definition of "OCT Product" must be rejected.

Product" definition and the "including without limitation" language in the Sales Milestones also violates the cardinal rule that every provision in a contract must be construed in reference to the contract "as a whole." *E.I. du Pont de Nemours v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (en banc); *Bank of N.Y. Mellon*, 65 A.3d at 550 (requiring the interpretation of a contract "in a manner that will avoid any internal inconsistencies"). When reading the contract as a whole, Plaintiffs' interpretation conflicts with other provisions in Section 2.5, the "Milestone Merger Consideration" section of the Merger Agreement, which sets forth the terms, obligations, and rights of the parties with respect to the Milestones. *See Martin Marietta*, 68 A.3d at 1225 (interpreting consecutive contract provisions in light of their "relationship to each other").

To begin with, Plaintiffs' interpretation is internally inconsistent with Sections 2.5(b) and 2.5(c), which describe Volcano's obligation to use "commercially reasonable efforts" to achieve the Milestones and Volcano's right to terminate that obligation. Sections 2.5(b) and 2.5(c) are both couched in terms of an "OCT Product" developed and commercialized by Volcano. Section 2.5(b) defines Volcano's obligation to use "commercially reasonable efforts" to achieve the Milestones in terms of the "cost, risk and timing of development" of the "OCT Product." Ex. A (Merger Agmt. at § 2.5(b)). Section 2.5(c) likewise describes Volcano's right to "terminat[e] the development and/or commercialization" of the "OCT Product" and extinguish its obligation to use "commercially reasonable efforts" by declaring a Technical or Commercial Failure.[10] *Id.* at § 2.5(c). The obligations and rights with respect to the Milestones are defined in relation to Volcano's development and commercialization of the "OCT Product," yet it is undisputed that Volcano did not develop or commercialize Axsun's laser components (the purported "OCT Product" according to Plaintiffs) because they had already been commercialized at the time that Volcano bought Axsun. *See* Ex. AA (Banas Depo. at 180:8-181:9, 306:4-306:11). Plaintiffs' interpretation ignores the relationship among Section 2.5's sub-sections by disconnecting

[10] "Commercial Failure" and "Technical Failure," by definition, require a determination regarding the likely success/reasonableness of the "development" or "commercialization" of the "OCT Product." Ex. A (Merger Agmt. at A-4, A-16 ("Commercial Failure" is a "reasonable determination" that "further development or commercialization" of "OCT Product" is "commercially unreasonable" and "Technical Failure" is a "reasonable determination" that "successful development" or "commercialization" of "OCT Product" is not reasonably likely)).

Volcano's achievement of the Milestones from its obligations and rights with respect thereto. *See Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 6-7 (Del. 2002) (rejecting interpretation that would "ignore the plain language" of another provision in Article 13(C); (*see also* Def.'s MSJ at 18:16-19:7).

Additionally, the criteria for declaring a Technical Failure also contemplate that the "OCT Product" requires FDA approval. Ex. A (Merger Agmt. at § 2.5(c), A-16). It is undisputed that Axsun does not need FDA approval to sell its laser components, rendering Plaintiffs' interpretation irreconcilable with Volcano's right to declare a Technical Failure. Ex. AA (Banas Depo. at 194:20-198:3).

Moreover, Section 2.5(b) unambiguously provides that Volcano's obligation to cause the achievement of the Milestones "*shall in all circumstances be subject to*" Volcano's right to declare a Technical or Commercial Failure. Ex. A (Merger Agmt. at § 2.5(b) (emphasis added)). As discussed above, Volcano's right to declare a Technical or Commercial Failure relates only to an "OCT Product" developed and commercialized by Volcano. If Axsun's laser components are "OCT Product[s]," then Volcano's unconditional right to declare a Technical or Commercial Failure is illusory because Axsun's components were developed and commercialized by third-party Axsun, not Volcano. *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (rejecting interpretation that rendered contract's "stated choice between the lowest of actual cash value of the property and the amount necessary to repair or replace damaged property both illusory and meaningless"). The Court cannot accept an interpretation that interferes with Volcano's rights and deprives it of the benefit of its bargain. *See Bank of N.Y. Mellon*, 65 A.3d at 556 (dismissing an interpretation that would "gut the protections afforded" by the contract).

**4. Plaintiffs' Interpretation Frustrates the Merger Agreement's Scheme.**

Plaintiffs' interpretation also frustrates the fundamental scheme and plan of the Merger Agreement. *E.I. du Pont*, 498 A.2d at 1113 (stating that a "meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan").

Earn-out provisions, like the Milestone provisions in the Merger Agreement, defer the

ultimate determination of the value of the seller's business by providing for the possibility of future payments to the seller if and when the value of the transferred assets is realized, as measured by the agreed-upon criteria in the contract. *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 132 (Del. Ch. 2009) (an earn-out provision "requir[es] the buyer to pay more only if the business proves that it is worth more"); *Gilbert v. MPM Enters.*, 709 A.2d 663, 670 (Del. Ch. 1997) (explaining that, with an earn-out agreement, the buyer has the advantage of "pay[ing] now for value he perceives now and pay[ing] later for additional value, but only if that additional value materializes").[11] The seller's right to additional, deferred compensation is dependent on, and tied to, the post-acquisition value realized by the buyer from the acquired assets. *See id.*

The plain language of the Milestones confirms that the parties understood as much. Specifically, the Regulatory Milestones can only be achieved with regulatory approval of Generation 1 and Generation 1a OCT Systems—each defined as "substantially similar" to the system acquired from CardioSpectra. Ex. A (Merger Agmt. at § 2.5(a)(i)-(ii), A-9). And the parties linked the expiration of the Sales Milestones to the second Regulatory Milestone. For instance, the third Milestone expires no later than 3 years after the deadline for the second Milestone (i.e., December 31, 2013), but expires sooner if Volcano achieves the second Milestone before its deadline. *Id.* at § 2.5(a)(iii). The Milestones envision a specific order of events – that Volcano will develop CardioSpectra's OCT system and seek regulatory approval, and then sell the OCT Products which make up the approved OCT system.

Section 2.5(d) likewise reflects the parties' understanding that the Milestones are tied to CardioSpectra's assets. Section 2.5(d) contemplates a transaction by which Volcano sells CardioSpectra's assets post merger and prohibits Volcano from consummating this type of transaction unless Volcano either pays the amount of any Milestones not yet due, or the acquiror agrees to assume Volcano's Milestone-related obligations under Section 2.5, making clear that

[11] Black's Law Dictionary (9th ed. 2009) (defining "earnout agreement" as one "for the sale of a business whereby the buyer first pays an agreed amount up front, leaving the final purchase price to be determined by the business's future profits"); Brian JM Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 133 (2012) (using earn-out provisions, the parties "defer the ultimate valuation question until a later point in time when the uncertainties with respect to valuation have been resolved").

the Milestones follow CardioSpectra's assets. The parties' understanding that any "OCT Product" is necessarily derived from CardioSpectra's assets is further apparent from their definition of "Carve-Out Transaction," defined as a transaction where Volcano sells the intellectual property rights acquired from CardioSpectra that are "necessary for the production, development and sale of the OCT Products." *Id.* at A-3.

As is apparent from the four corners of the Merger Agreement, the Milestone provisions reflect the parties' intent to provide additional compensation to CardioSpectra's Former Shareholders if, and only if, Volcano realizes value from the acquired assets, as measured by the targets specified in the Milestones. Plaintiffs' contention that Axsun's OCT laser components are "OCT Products" under the Sales Milestones unacceptably negates this scheme by entitling CardioSpectra's Former Shareholders to windfall compensation based on value realized ***<u>not</u> from CardioSpectra's assets,*** but instead from OCT-related components developed and commercialized by a third party. Such an interpretation is neither reasonable nor fair. Accordingly, the Court must reject it.

### B. Plaintiffs' "Extrinsic Evidence" Does Not Demonstrate that a Reasonable Jury Could Only Return A Verdict in Their Favor.

Should the Court find that the disputed provisions are ambiguous, Plaintiffs alternatively claim that the only admissible extrinsic evidence supports their interpretation that Axsun's laser components are "OCT Products." (Pls.' Mtn. at 12-14). Plaintiffs' argument fails, chiefly because the agreement is not susceptible to their proffered interpretation. Moreover, to resolve a purported ambiguity, Plaintiffs offer the following inadmissible "extrinsic evidence:" (1) a draft agreement between Volcano *and a third party*; (2) a post-merger presentation created by third-party Axsun and a post-merger screenshot of Axsun's website; and (3) the declaration of Plaintiff Banas. *Id.* at 13-14; *see* Fed. R. Civ. P. 56(c)(2) (stating that cited material is objectionable where it "cannot be presented in a form that would be admissible in evidence"). Not only does this proffered evidence fail to demonstrate that a reasonable jury could *only* find in Plaintiffs' favor, the overwhelming extrinsic evidence requires a ruling in favor of Volcano.

Plaintiffs point to the definition of "Product" in a draft merger agreement between

Volcano and OCT Medical Imaging, Inc.—a third-party and complete stranger to the Merger Agreement—as purported evidence of Volcano's knowing agreement to Plaintiffs' interpretation of "OCT Product." (Pls.' Mtn. at 13:15-18). The unexecuted draft, however, is irrelevant to interpret the definition of "OCT Product" in the executed Merger Agreement between Volcano and CardioSpectra. Fed. R. Evid. 401 (evidence is only relevant if it has "any tendency to make a fact more or less probable"); Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). The draft OCT Medical agreement has no probative value of any kind, as there is no evidence regarding who drafted the agreement, who proposed the various terms therein, or what those terms were understood to mean. Further, it was never executed and there is no evidence that either party, let alone Volcano, had settled on any terms it would accept as final. Plaintiffs cite no authority supporting the admissibility of a draft agreement concerning a possible transaction with a third party. The draft agreement is inadmissible.[12]

Plaintiffs also cite an Axsun presentation containing a single slide referring to "Axsun OCT products" and a screenshot of Axsun's website referring to its "OCT swept lasers."[13] Without identifying any authority, Plaintiffs claim that these documents are evidence of "trade usage." This argument lacks merit. Trade usage is "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." Del. Code Ann. tit. 6, § 1-303(c); *Amkor Tech., Inc. v. Motorola, Inc.*, 2007 WL 3360039, at *6-7, n.12 (Del. Super. Ct. Nov. 14, 2007)

---

[12] Even if the draft agreement were relevant, Federal Rule of Evidence 403 requires its exclusion because any probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Further, Plaintiffs fail to establish any evidentiary foundation for their propositions concerning the meaning of "Product" in the draft agreement. Fed. R. Evid. 602 (requiring personal knowledge). The draft agreement is also inadmissible hearsay as Plaintiffs rely on it for the truth of the matter asserted (i.e., that it is a draft agreement between Volcano and a non-party), and Plaintiffs fail to demonstrate that it falls within any hearsay exception. Fed. R. Evid. 801, 802 (hearsay is not admissible). Plaintiffs cannot cite the testimony of Mr. Burgess to establish that the draft agreement is an admission by a party opponent, as Mr. Burgess testified that he did not recall who drafted the contents of the unexecuted agreement. Ex. BB (Burgess Depo. at 93:20-94:24).

[13] Plaintiffs state that Axsun's website "describe[s] its swept source lasers as 'OCT products,'" but this language is absent from the cited exhibit. (Pls.' Mtn. at 14:14-17; Dkt. No. 64-22).

(applying Illinois law which, like Delaware, adopted the UCC's definition of "trade and local usage"), *aff'd* 958 A.2d 852 (Del. 2008). First, Plaintiffs make no attempt to establish that non-party Axsun's reference to its own OCT-related products as "OCT products" is a regularly observed practice in the relevant industry such that it could dictate the meaning of "OCT Product," a defined term. And the legal standard for trade usage cannot be established by a solitary reference to a single page of Axsun's website. Even more, these documents post-date the Merger Agreement by years and could not demonstrate trade usage at the time the parties entered the agreement. Further, Axsun's (or any other's) off-hand reference to "OCT products" is entirely irrelevant to the interpretation of "OCT Product," a defined term in the Merger Agreement to which Axsun is not a party. Fed. R. Evid. 401, 402. It is inadmissible.[14]

Finally, Plaintiffs make a last-ditch attempt to support their unreasonable interpretation with the self-serving declaration of Plaintiff Banas. (Pls.' Mtn. at 14:1-13). Plaintiffs claim that Mr. Banas "made clear to Mr. Burgess that the definition must be sufficiently expansive to include sales of component parts to be used in OCT, exactly like the four 'Axsun OCT products.'" (Pls.' Mtn. at 14:2-6 (citing Banas Decl. at ¶¶ 3-4 and Banas Depo. at 139:7-21)). Neither Plaintiff Banas' declaration nor his deposition testimony establish that any discussions with Volcano resulted in a shared understanding between the parties that a console component developed and commercialized entirely by a third party, like Axsun's laser components, would fall within the "OCT Product" definition.[15] *See Hansen v. United States*, 7 F.3d 137, 138 (9th

---

[14] The Axsun presentation is also inadmissible under Federal Rules of Evidence 602 (requiring personal knowledge), 802 (excluding hearsay), and 901 (requiring authentication of evidence). Plaintiffs establish no foundation, as they cite to the deposition transcript of Mr. Huennekens (Volcano's CEO), who testifies that he has no personal knowledge regarding the statements made in the Axsun presentation. (*See* Pls.' Mtn. at 14, n.60 (citing Huennekens Depo. at 22:2-23:21)). Further, Plaintiffs offer the Axsun presentation for the truth of the matter asserted (i.e., to show that Axsun's products are, in fact, "OCT Products") and such evidence constitutes inadmissible hearsay from non-party Axsun. Finally, Plaintiffs make no attempt at authentication.

[15] Plaintiffs mischaracterize Plaintiff Banas' exceedingly vague deposition testimony. His references to "[CardioSpectra's] intention" and "[his] understanding" are irrelevant to determining the parties' shared understanding of the meaning of "OCT Product." *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998) ("unless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide").

Cir. 1993) (concluding that declaration alleging that notice was never received was insufficient to prove that notice was never sent). Plaintiff Banas states that he was "aware" that Volcano could acquire other companies with OCT technology, but never states that he disclosed his subjective awareness to Mr. Burgess during their purported negotiation of the "OCT Product" definition. (Banas Decl. at ¶ 4); *see SI Mgmt.*, 707 A.2d at 43 (stating that extrinsic evidence must "speak to the intent of *all* parties to a contract"). And while Plaintiff Banas claims that the definition of "OCT Product" is the "successful result of [his] negotiation to ensure that the CardioSpectra shareholders would be compensated for post-merger sales of any products used in [OCT], including component parts," he makes no mention of OCT products or components developed by a third party from its own technology.[16] (Banas Decl. at ¶ 4).

Moreover, Plaintiff Banas' self-serving, uncorroborated, and conclusory declaration cannot defeat summary judgment much less warrant summary judgment in their favor. *See Muench Photography, Inc. v. Pearson Educ., Inc.*, 2013 WL 6185200, at *6 (N.D. Cal. Nov. 19, 2013) (Orrick, J.) (*quoting F.T.C. v. Neovi, Inc.*, 604 F. 3d 1150, 1159 (9th Cir. 2010) (refusing to credit declaration that presented "nothing more than a few bald, uncorroborated, and conclusory assertions rather than evidence")). Without a scintilla of evidence corroborating his statements, Plaintiff Banas' declaration amounts to nothing more than self-serving testimony aimed at enriching himself and the other Former CardioSpectra Shareholders to the tune of $17 million. *See F.T.C. v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir. 1997) (rejecting self-

---

[16] Plaintiffs claim that this broad "OCT Product" definition "was necessary to protect the Shareholders' interests" as Volcano "could have 'shelved' the CardioSpectra system in favor of other OCT systems." (Pls.' Mtn. at 14:6-13). Plaintiffs fail to mention that the Merger Agreement already protects Plaintiffs from any such conduct, because Volcano is obligated to "act in good faith" to cause the achievement of the Milestones and would have breached that obligation if it intentionally "shelved" CardioSpectra's system to avoid paying the Milestones. *See* Ex. A (Merger Agmt. at § 2.5(b)). Thus, Plaintiffs' reasoning as to the purported necessity for a broad "OCT Product" definition is unpersuasive. Even more, following Plaintiffs' reasoning, if Volcano acquired another company and shelved CardioSpectra's system, Plaintiffs could claim that Volcano breached its obligation to act in good faith with respect to the Regulatory Milestones and at the same benefit from Volcano's acquisition by claiming that the acquired company's sales satisfied the Sales Milestones. This absurd result shows that Plaintiffs' "interests" are in fact protected by the obligation to act in good faith and not the definition of "OCT Product."

serving and uncorroborated statements offered by a party in an attempt to disclaim liability). The declaration also lacks "detailed facts" regarding where his conversation with Mr. Burgess allegedly took place, what Mr. Burgess said, approximately when it took place, whether it was in person or by phone or e-mail, or whether any other individuals witnessed the conversation. *See Cambridge Electrs. Corp. v. MGA Electrs., Inc.*, 227 F.R.D. 313, 335 (C.D. Cal. 2004) (concluding that declaration with "no details regarding the circumstances surrounding the statement" could not defeat summary judgment) (*citing Lewis v. Bank of Am.*, 343 F.3d 540, 546 (5th Cir. 2003) (finding that testimony "omitt[ing] critical details" such as the specific nature of the discussion and the other side's response was insufficient to raise an issue of fact)).

Further, the Court should entirely disregard Mr. Banas' declaration as a "sham," since Plaintiffs failed to disclose his purported communications with Mr. Burgess in their responses to Volcano's contention interrogatories. *See Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993) (discussing court's authority to find that an affidavit containing facts not disclosed in interrogatory responses is a "sham"); *Cambridge*, 227 F.R.D. at 323-24 (excluding declaration regarding a conversation not disclosed in the offering party's deficient interrogatory responses).

**C. The Admissible Extrinsic Evidence Precludes Summary Judgment In Favor Of Plaintiffs And Warrants Summary Judgment In Favor Of Volcano.**

Plaintiffs claim that no admissible extrinsic evidence supports Volcano's interpretation. (Pls.' Mtn. at 13-14). However, as discussed below, the extrinsic evidence, like the Merger Agreement itself, overwhelmingly supports only the conclusion that Axsun's laser components are not "OCT Products."

The strongest evidence reflecting the parties' understanding of the contract is their course of performance under the agreement. *Artesian Water Co. v. Dep't of Highways & Transp.*, 330 A.2d 441, 443 (Del. 1974) (stating that the parties conduct in the performance of their contract is of "great weight in determining the meaning and applicability of the contract"). Notably, Plaintiff Banas' conduct belies Plaintiffs' contention that the parties shared an understanding that the sale of any OCT component, even if not derived from CardioSpectra's assets, would count towards the Sales Milestones. For instance, notwithstanding his role as President of Volcano's OCT

Division and his active participation in, and support of, the Axsun acquisition, Plaintiff Banas never mentioned to anyone at Volcano that he believed that Axsun's sale of its proprietary laser components could trigger the Sales Milestones. Ex. AA (Banas Depo. at 349:19-351:15). Plaintiffs also failed to mention this theory when they sought to re-negotiate the Milestones in 2010. Ex. O. Even more, if Plaintiffs believed that Axsun was selling "OCT Products," it is telling that neither of them exercised their contractual right to request "a report of Cumulative Cash Sales of OCT Products" until January 2012, more than three years after Volcano acquired Axsun, and on the eve of filing suit. Ex. C. Plaintiffs' conduct thwarts their post-litigation position that, at the time of the merger, they believed that the "OCT Product" definition could encompass Axsun's lasers, and confirms the absence of any mutual understanding to that effect.

The parties' written, pre-merger communications further demonstrate that the parties contemplated that Volcano would achieve the Sales Milestones through the development and commercialization of CardioSpectra's assets. The parties created a "model" reflecting their understanding that Volcano would develop CardioSpectra's assets and manufacture consoles, PIMs, catheters and software—the exact "OCT Products" identified in the Sales Milestones—and that Volcano would sell whole consoles continuing to house Santec's off-the shelf laser light source and other components. Ex. AA (Banas Depo. at 147:1-149:2); Ex. R (Banas Ex. 863). Further, as relayed by Vince Burgess, CardioSpectra represented during discussions that they were "'close to done' with the development" of their OCT system, to which Volcano "respond[ed] with Milestones that expire if it takes them too long . . . [but] [i]f they are, in fact, fast and meet the milestone dates, then we all win." Ex. FF; Ex. AA (Banas Depo. at 129:11-130:6, 134:10-19) (confirming Volcano suggested the use of Milestones and Banas advocated for the value of the technology CardioSpectra had developed). Plaintiffs have not similarly offered any admissible extrinsic evidence supporting their made-for-litigation contention that the parties agreed that the sale of any component of an OCT system would count towards the Sales Milestones, including one not derived from CardioSpectra's assets. Although Plaintiff Banas now claims that he "insisted" on a "very broad definition" of "OCT Product" during negotiations in "November and December 2007," the definition never changed from the initial draft provided

to CardioSpectra on November 12, 2007.

Because the only admissible extrinsic evidence supports an interpretation that Axsun's laser components are not "OCT Products," the Court should make this determination as a matter of law and deny Plaintiffs' Motion.

### D. Even If Axsun's Laser Components Are "OCT Products," Plaintiffs Fail To Show That Volcano Attained The Specified "Cumulative Cash Sales" from "Commercial Sales."

A denial of Plaintiffs' Motion is further warranted because Plaintiffs cannot prove that Volcano has attained "Cumulative Cash Sales" totaling $25 million "from Commercial Sales of OCT Products." Ex. A (Merger Agmt. at § 2.5(a)(iii)-(iv)). Plaintiffs purport to satisfy their burden by stating that Axsun, a Volcano affiliate, "has attained more than $25 million in gross revenues" for its laser components. (Pls.' Mtn. at 17:1-6). Assuming that Axsun's laser components are "OCT Product[s]," Plaintiffs argue that Volcano cannot dispute that "these revenues qualify as 'Cumulative Cash Sales' from 'Commercial Sales.'" *Id.* at 17:3-6. Plaintiffs, however, bear the burden of proof on these issues at trial and cannot shift the burden of disproving such elements to Volcano. *Cambridge*, 227 F.R.D. at 327. As discussed below, Plaintiffs have not and cannot come forward with evidence that the sales of Axsun components meet the definitional elements of "Cumulative Cash Sales" from "Commercial Sales."

The "Commercial Sale" definition can be met through "the sale by Parent or its Affiliates of an OCT Product or Combination Product for end use or consumption of such product in a country."[17] Ex. A (Merger Agmt. at A-4). Plaintiffs make no attempt to demonstrate that Axsun's sale of its laser components were "for end use or consumption," but instead assume that is the case. (Pls.' Mtn. at 16:4-17). Plaintiffs thus have not established that Axsun's sales qualify as "Commercial Sales."

Further, Plaintiffs claim that "'Cumulative Cash Sales' essentially means revenues from such sales" and that Volcano has attained the requisite amount of sales by achieving "more than

---

[17] Although the definition of "Commercial Sale" can be met in a number of ways, Plaintiffs argue for the very first time that they satisfy this element because Volcano has sold OCT Products "for end use or consumption." (Pls.' Mtn. at 15:22-16:1).

$25 million in gross revenues" for Axsun's laser components. (Pls.' Mtn. at 16:16-18, 17:1-6). Plaintiffs' conclusion flows from a misstatement of the standard. "Cumulative Cash Sales" are not equivalent to gross revenue, but instead require specific deductions from revenue. *See* Ex. A (Merger Agmt. at A-7). Plaintiffs have not established the requisite "Cumulative Cash Sales."

Moreover, Plaintiffs cannot present evidence satisfying these requirements. Even after the Court ordered Plaintiffs to state all materials facts supporting their contention that Volcano achieved the Sales Milestones, Plaintiffs still state no facts from which a reasonable jury could conclude that the "Cumulative Cash Sales" and "Commercial Sales" elements have been met.[18] Plaintiffs also conducted no discovery regarding whether Axsun's laser components were purchased for "end use or consumption," or to calculate "Cumulative Cash Sales." Significantly, Volcano designated a corporate representative to testify as to Axsun's sales of its OCT laser components (Ex. F), but Plaintiffs failed to ask a single question regarding the required elements. Accordingly, they cannot satisfy their burden.

## V. CONCLUSION

For the foregoing reasons, Volcano respectfully requests that the Court deny Plaintiffs' Partial Motion for Summary Judgment.

Dated: February 11, 2014

COOLEY LLP

*/s/ Michael G. Rhodes*
Michael G. Rhodes (116127)

Attorneys for Defendant
VOLCANO CORPORATION

1211793/HN

[18] *See* Ex. V (Pls.' Supp. Interrog. Resp. Nos. 7, 14).