COOLEY LLP
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
MARK F. LAMBERT (197410) (mlambert@cooley.com)
RITESH K. SRIVASTAVA (246477) (rsrivastava@cooley.com)
AMANDA A. MAIN (260814) (amain@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Defendant
VOLCANO CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

FORMER SHAREHOLDERS OF CARDIOSPECTRA, INC.,

Plaintiffs,

v.

VOLCANO CORPORATION, a Delaware corporation; and DOES 1-10,

Defendants.

Case No. CV12-01535 (WHO)

**DEFENDANT VOLCANO CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION OF PLAINTIFFS' CLAIMS**

Date: March 19, 2014
Time: 2:00 p.m.
Judge: Honorable William H. Orrick

**DEMAND FOR JURY TRIAL**

## Table of Contents

Page

I. VOLCANO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM THAT VOLCANO ACHIEVED THE SALES MILESTONES ..... 1

A. Plaintiffs Persist in Ignoring Controlling Law and the Plain Meaning of the Merger Agreement ..... 1

1. Only Plaintiffs' Interpretation Conflicts with the "OCT Product" Definition ..... 2

2. Only Plaintiffs' Interpretation Renders the Merger Agreement Internally Inconsistent ..... 3

3. Only Plaintiffs' Interpretation Frustrates the Scheme of the Merger Agreement ..... 4

B. The Only Admissible Extrinsic Evidence Shows that the Merger Agreement is not Reasonably or Fairly Susceptible to Plaintiffs' Interpretation ..... 6

C. Plaintiffs Fail to Present Evidence That Volcano Satisfied the Definitional Elements of the Sales Milestones ..... 7

II. PLAINTIFFS' ANTICIPATORY BREACH CLAIM FAILS AS A MATTER OF LAW ..... 8

III. SUMMARY JUDGMENT IS WARRANTED AS TO THE SECOND MILESTONE ..... 9

A. Plaintiffs Do Not Raise A Triable Issue Of Fact That Volcano Failed To Act In Good Faith ..... 9

B. Plaintiffs Do Not Raise A Triable Issue Of Fact That Volcano Failed To Use "Commercially Reasonable Efforts" To Achieve The Second Milestone ..... 11

IV. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) .......... 9

*Artesian Water Co. v. Dep't of Highways & Transp.*
330 A.2d 441 (Del. 1974) .......... 7

*Cambridge Electrs. Corp. v. MGA Electrs., Inc.*
227 F.R.D. 313 (C.D. Cal. 2004) .......... 8

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) .......... 9

*Chamison v. Health Trust, Inc.*
735 A.2d 912 (Del. Ch. 1999) .......... 10

*In re Citric Acid Litig.*
191 F.3d 1090 (9th Cir. 1999) .......... 12

*GRT, Inc. v. Marathon GTF Tech., Ltd.*
2012 Del. Ch. LEXIS 134 (Del. Ch. June 21, 2012) .......... 3

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*
56 A.3d 1072 (Del. Ch. 2012) .......... 7

*Shiftan v. Morgan Joseph Holdings, Inc.*
57 A.3d 928 (Del. Ch. 2012) .......... 3

*SIGA Tech., Inc. v. PharmAthene, Inc.*
67 A.3d 330 (2013) .......... 9

*Sonitrol Holding Co. v. Marceau Invest.*
607 A.2d 1177 (Del. 1992) .......... 3

**OTHER AUTHORITIES**

21 C.F.R. § 814.20(b)(3)(v)(B) .......... 13

5 Corbin on Contracts § 24.10 .......... 7

Fed. R. Civ. P. 56(c)(1)(B) .......... 8

Fed. R. Evid. 702 .......... 10

Plaintiffs' "OCT Product" interpretation and its "anything goes" approach to the Sales Milestones is a made-for-litigation sham that offends Delaware contract law and the plain language of the Merger Agreement. Further, no triable issue of fact exists to support Plaintiffs' claims for anticipatory breach or bad faith or that Volcano failed to use the negotiated "commercially reasonable efforts" to achieve the second Milestone. In a failed attempt to argue that Volcano should have taken the same regulatory actions for the OCT system and catheter that it took for an IVUS catheter called "VIBE," Plaintiffs resort to baseless claims that they omitted from court-ordered interrogatory responses. This last-ditch effort fails because Plaintiffs make no showing that the VIBE catheter had "similar market potential" and was at a "similar stage [of] development" as the OCT system and catheter, as required by the defined "commercially reasonable efforts" standard. Volcano's motion should be granted in its entirety.

## I. VOLCANO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM THAT VOLCANO ACHIEVED THE SALES MILESTONES.

Plaintiffs claim that Volcano has achieved the Sales Milestones through Axsun's sales of its proprietary laser components. This claim fails for each of the following independent reasons: (1) as a matter of law, Axsun's laser components are not "OCT Products;" (2) Plaintiffs present no evidence to establish the contractually required elements of "Commercial Sales;" and (3) Plaintiffs admittedly have no evidence to prove "Cumulative Cash Sales."

### A. Plaintiffs Persist in Ignoring Controlling Law and the Plain Meaning of the Merger Agreement.

Plaintiffs contend that "OCT Product"[1] means any possible stand-alone component of an OCT system, including components neither derived from CardioSpectra's assets nor developed or commercialized by Volcano. (Pls.' Opp. at 3:16-19); (Banas Decl. (Dkt. 64-23) at ¶¶ 3-4 (asserting that "OCT Product" includes "any products used in [OCT], including component

[1] Under the Merger Agreement, "'OCT Product' means consoles (including OCT laser light sources[,] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent." Ex. A (Merger Agmt. at A-13).

parts")); Ex. CC (Castella Depo. at 197:20-198:20). The Merger Agreement is not reasonably or fairly susceptible to Plaintiffs' boundless interpretation.

**1. Only Plaintiffs' Interpretation Conflicts with the "OCT Product" Definition.**

Plaintiffs argue that the parenthetical list following "consoles" in the "OCT Product" definition transforms "OCT Product" into a "catch-all term" necessarily encompassing any possible component of an OCT system simply because the parenthetical begins with "including [without limitation]." (Pls.' Opp. at 3:10-22). This is the lynchpin of Plaintiffs' argument that Axsun's laser components by themselves are "OCT Products." Plaintiffs assert that Volcano interprets "including" as a "limiting term that restricts the meaning of 'consoles' to a complete structure that incorporates all of the parts" listed in the parenthetical. (Pls.' Opp. at 3:6-8). Plaintiffs are wrong. It is precisely because the parenthetical refers to an *unlimited* list of console components[2] that Plaintiffs' interpretation fails: a "catch-all" interpretation that renders the definition limitless and defeats the purpose of defining "OCT Product" at all, a flaw Plaintiffs do not contest. (Def.'s MSJ at 14:9-20); (*see also* Def.'s Opp. at 12:14-13:4). Fixating on the words "including without limitation," Plaintiffs ignore the rest of the definition and provide no reason why the unlimited list of console components should swallow the rest of the definition.[3] Only Volcano's interpretation is consistent with the plain language of the definition and interprets the parenthetical for what it is – an illustrative list of components that one would expect to find in a console at the time of the merger.[4] Ex. CC (Castella Depo. at 188:17-20, 197:9-18).

Plaintiffs read "including without limitation" to sweep each and every component of any OCT device into the definition, including components of "PIMs" and "catheters,"

[2] Thus, contrary to Plaintiffs' assertion, Volcano also reads "including" as meaning "including without limitation" in accordance with Section 13.17(c) of the Merger Agreement. (Pls.' Opp. at 3:10-16, 3:23-4:1); (*see also* Def.'s Opp. at 13:17-24).

[3] Plaintiffs claim in a footnote that the words "including, without limitation" in the Sales Milestones support their interpretation. (Pls.' Opp. at 4, n.10). For the reasons stated in Volcano's Opposition, this assertion is meritless. (Def.'s Opp. at 13:27-14:20).

[4] Plaintiffs do not dispute that the parenthetical serves to explain the generic term "consoles" with a non-exhaustive list of components one would expect to find in a console as of the merger.

notwithstanding that a parenthetical list of components only follows "consoles." *See Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 938-40 (Del. Ch. 2012) (refusing to read words into a provision). The Court cannot ignore the plain distinction between the purposeful inclusion and omission of such a parenthetical and must "give effect" to the parenthetical list of components that uniquely follows "consoles" (and not "PIMs" or "catheters"). *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 Del. Ch. LEXIS 134, at *11 (Del. Ch. June 21, 2012) (stating the court "must give effect to all of the terms"). While Volcano's interpretation reconciles each part of the OCT Product definition, Plaintiffs' interpretation vitiates everything but the unbounded list of components in the parenthetical.

Plaintiffs' interpretation also renders the Valid Claim Clause superfluous, because it eliminates the clause's sole function of accounting for products (and services) within the scope of a Valid Claim of a Licensed Patent, but which may or may not fall within the specified "console," "PIM," or "catheters/wand" OCT Product types. (Def.'s Opp. at 13:5-16); *Sonitrol Holding Co. v. Marceau Invest.*, 607 A.2d 1177, 1182-83 (Del. 1992) (rejecting interpretation that renders a portion of the same provision illusory and meaningless).

Plaintiffs' "catch-all" interpretation conflicts with the plain language of the "OCT Product" definition and is therefore unreasonable. (Def.'s MSJ at 13:18-15:17).

**2. Only Plaintiffs' Interpretation Renders the Merger Agreement Internally Inconsistent.**

Plaintiffs argue that their interpretation "could [not] possibly" render Volcano's Section 2.5(c) rights illusory because Volcano declared a "Commercial Failure" in November 2013. (Pls.' Opp. at 7:1-5). That argument falls flat. Section 2.5(c) exclusively applies to *Volcano's* OCT program and *its* right to "terminate all or any part of *its* OCT cardiovascular program, including . . . the development and/or commercialization of all or some OCT Systems or OCT Products." Ex. A (Merger Agmt. at § 2.5(c) (emphasis added)). Section 2.5(c) does not apply to any other entity's programs or products. Consistent with its rights, Volcano declared a Commercial Failure and terminated *its* development and commercialization of *its* "OCT Systems [and] OCT Products," not Axsun's program or products (which Axsun is free to continue selling as a third party). Placing Axsun's lasers within the Sales Milestones as "OCT Products" renders

Volcano's mandatory termination rights illusory, because the protections of Section 2.5(c) do not apply. *Id.* at § 2.5(b) (Volcano's obligations "shall in all circumstances be subject to" its Section 2.5(c) rights). Finally, Plaintiffs suggest that Volcano's obligation to pay the Milestones should it achieve them anyway means that "OCT Products" must encompass OCT components developed and commercialized by a separate entity. (Pls.' Opp. at 7:5-9). Section 2.5(c), however, expressly states that "OCT Products" are part of *Volcano's* "OCT cardiovascular program." Ex. A (Merger Agmt. at § 2.5(c) ("its OCT cardiovascular program, *including* . . . OCT Products").

Plaintiffs also fail to address inconsistencies between their interpretation and other provisions in the Merger Agreement. Plaintiffs do not dispute that their interpretation is irreconcilable with Volcano's right to declare a "Technical Failure," because Volcano's right is specific to an "OCT Product" that requires FDA approval. Axsun does not need FDA approval for its lasers. (Def.'s MSJ at 18:4-9). And Plaintiffs do not dispute that their interpretation is inconsistent with Section 2.5(b)'s obligation that "Parent" (i.e. Volcano)[5] use "commercially reasonable efforts," which is defined in terms of *Volcano's* "normal" efforts and the "cost, risk and timing of development" of the OCT Products. Volcano did not develop Axsun's lasers. (Def.'s MSJ at 18:16-19:7); (*see also* Def.'s Opp. at 14:22-16:22).

**3. Only Plaintiffs' Interpretation Frustrates the Scheme of the Merger Agreement.**

Plaintiffs contend that Volcano's interpretation ignores the scheme established by the plain language of the Merger Agreement. (Pls.' Opp. at 4-6). Not so. Plaintiffs concede that the first two Milestones are directly "link[ed] to CardioSpectra's assets," but argue that the Sales Milestones deviate from the scheme of an earn-out agreement and need not have any connection to those assets. (Pls.' Opp. at 4:18-5:2). This is not supported by other provisions in the Milestone Merger Consideration section or the plain language and structure of the Milestones. Section 2.5(d) confirms beyond any doubt that *all* of the Milestones are tied to the development of CardioSpectra's assets. Under that section, Volcano may not sell CardioSpectra's assets unless

[5] Section 2.5(c) also refers to a "Surviving Corporation," defined as CardioSpectra. Ex. A (Merger Agmt. at 1 (Recitals)). This term is irrelevant because it is undisputed that CardioSpectra was a division of Volcano at all relevant times.

it either pays the amount of any Milestones not yet due, or the acquiror agrees to assume Volcano's Milestone-related obligations. *Id.* at § 2.5(d). The parties' mutual understanding that any "OCT Product" would be developed from CardioSpectra's assets is confirmed in the definition of "Carve-Out Transaction," one of two transactions contemplated by Section 2.5(d) and defined as a transaction where Volcano sells the intellectual property rights acquired from CardioSpectra that are "necessary for the production, development and sale of the OCT Products." *Id.* at A-3. Plaintiffs fail to comprehend that Volcano could sell Axsun *in its entirety* without triggering Section 2.5(d), thus demonstrating that the parties never intended for Volcano to achieve the Sales Milestones through Axsun's sale of its lasers.

Also, the Sales Milestones are explicitly tied to CardioSpectra's assets because they relate to "OCT Products," which is defined in terms of the intellectual property acquired from CardioSpectra. Ex. A. (Merger Agmt. at A-13) ("any product or service covered by the scope of any Valid Claim contained in any Licensed Patent"). Second, the structure of the Milestones envisions an order of events with respect to the development of CardioSpectra's assets. It is undisputed that Volcano needs FDA approval before it can market or sell any OCT Product in the U.S. Ex. P (Banas Depo. at 196:22-198:3). The first two Milestones require regulatory approval of iterations of CardioSpectra's OCT System, contemplating that Volcano would develop and obtain regulatory approval for those systems before achieving the Sales Milestones through sales of such systems or defined OCT Products. Ex. A. (Merger Agmt. at § 2.5(a)).

Plaintiffs also argue that the "Commercial Sale" definition includes sales by "Affiliates," like Axsun, but this point does not show that products developed by a third party constitute "OCT Products." (Pls.' Opp. at 6:2-12). Sure, if Volcano licensed CardioSpectra's intellectual property to Axsun, or spun off the CardioSpectra assets to a subsidiary, the subsidiary's sales of OCT Products developed from such assets could qualify as a "Commercial Sale." But it does not follow that Axsun's "Affiliate" status transforms its proprietary lasers into "OCT Products."

Plaintiffs' interpretation unreasonably frustrates the scheme of the Merger Agreement by entitling CardioSpectra's Former Shareholders to windfall compensation based on value realized

from the assets of a third party, and not from CardioSpectra.[6] (*See* Def.'s Opp. at 16:24-18:14).

**B. The Only Admissible Extrinsic Evidence Shows that the Merger Agreement is not Reasonably or Fairly Susceptible to Plaintiffs' Interpretation.**

Plaintiffs attempt to support their interpretation with the same "extrinsic evidence" offered in support of their Motion, including the self-serving, uncorroborated declaration of Plaintiff Banas and irrelevant, post-merger marketing materials created by third-party Axsun. (Pls.' Opp. at 7:18-8:2). As explained in Volcano's Opposition, Mr. Banas' declaration cannot defeat summary judgment and fails to establish a shared understanding among the parties that an OCT asset of a third party, like Axsun, would fall within the "OCT Product" definition. (Def.'s Opp. at 20:11-22:16). Also, the materials created by Axsun are not "trade usage" and are irrelevant and inadmissible. *Id.* at 19:13-20:10. Accordingly, Plaintiffs have no admissible evidence that could create a triable issue of fact.

Plaintiffs assert that no admissible extrinsic evidence supports Volcano's interpretation, yet they fail to respond to evidence cited by Volcano. In particular, Plaintiffs do not dispute that their made-for-litigation interpretation is contrary to their course of performance for years prior to the lawsuit. Plaintiffs make no account for their failure to invoke their contractual right to monitor Volcano's progress towards the Sales Milestones under Section 2.5(e) for more than three years after the Axsun acquisition, or their failure to even mention their "Axsun sales" theory until just before they filed this lawsuit. (Def.'s MSJ at 20:8-13). Plaintiffs also do not contest that the parties' written, pre-merger communications conflict with Plaintiffs' proposed interpretation and reflect only an understanding that Volcano would achieve the Sales Milestones through the development and commercialization of CardioSpectra's assets. *Id.* at 20, n.15; (*see also* Def.'s Opp. at 23:4-5, 23:11-24:1) (Plaintiffs did not mention their theory when asking to renegotiate the Milestones in 2010, and pre-merger evidence undermines their interpretation).

Plaintiffs misplace reliance on *Eagle Industries* to challenge the admissibility of Mr.

[6] Plaintiffs somehow claim that "Volcano does not make this argument to bolster its interpretation of the plain language of 'OCT Product' by citing to other, specific language in the Agreement." (Pls.' Opp. at 4:9-11). This is not true. Volcano argues that the plain language of the Milestones confirms that any future right to deferred compensation is directly tied to development of CardioSpectra's assets. (Def.'s MSJ at 17:1-6); (*see also* Def.'s Opp. at 17:10-18:14).

Banas' conduct in failing to mention his "Axsun sales" theory around the time of the Axsun acquisition and while employed by Volcano. (Pls.' Opp. at 8:18-22). Significantly, Plaintiffs do not dispute that Mr. Banas' conduct conflicts with their proffered interpretation. Further, contrary to their assertion, extrinsic evidence includes any evidence relating to the contract that is "outside" its four corners. 5 Corbin on Contracts § 24.10 ("The varieties of extrinsic evidence . . . are as limitless as are the types of circumstances."). This includes the parties' conduct after entering into the contract. *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1106, 1119 (Del. Ch. 2012), *aff'd*, 68 A.3d 1208 (Del. 2012). Plaintiffs also argue that Mr. Banas' conduct is not evidence of "course of performance." (Pls.' Opp. at 8, n.24). They misconstrue *Artesian Water* as involving a "change in terms" when in fact the court interpreted an ambiguous contract based on the "actions of the parties." *Artesian Water Co. v. Dep't of Highways & Transp.*, 330 A.2d 441, 443-44 (Del. 1974). The court rejected the plaintiff's interpretation that the contracts did not apply, because it was inconsistent with plaintiff's conduct, as evidenced by plaintiff continuing to pay precisely the amount of money contemplated by the contracts. *Id.* at 444; *Martin Marietta*, 56 A.3d at 1119 (finding that plaintiff's post-agreement conduct directly contradicted its "current, litigation-driven position"). As in *Artesian Water*, Plaintiff Banas' pre-litigation actions are inconsistent with Plaintiffs' interpretation, yet consistent with Volcano's. Mr. Banas admits under oath that he never communicated his belief that Axsun's lasers could trigger the Sales Milestones, despite his awareness of Axsun's laser sales and his position as the head of Volcano's OCT division in charge of achieving the Milestones. Ex. P (Banas Depo. at 180:8-181:9, 267:21-268:14, 349:19-351:10). Because the admissible extrinsic evidence only supports Volcano's interpretation, it is entitled to summary judgment.

### C. Plaintiffs Fail to Present Evidence That Volcano Satisfied the Definitional Elements of the Sales Milestones.

Even assuming that Axsun's "gross revenues" exceed $25 million,[7] Plaintiffs make no attempt to state facts satisfying the definitional requirements of "Commercial Sales" and "Cumulative Cash Sales." (*See* Pls.' Opp. at 9:16-20); (Def.'s MSJ at 20:17-21:15); (Def.'s Opp.

---

[7] For purposes of this motion, Volcano stipulates that Axsun's "gross revenue" from sales of the products identified in Volcano's interrogatory responses meets the $25 million threshold.

at 24:7-25:13). Plaintiffs present no evidence of "Commercial Sales" to show that Axsun's lasers were sold for "end use or consumption," rather than to manufacturers that buy the components for incorporation into medical devices they then sell to end users. Further, Plaintiffs now concede they have no evidence of "Cumulative Cash Sales" and improperly attempt to shift *their* burden to Volcano, asserting that Volcano has presented no evidence to prove that Axsun's "gross revenues" are not equal to "Cumulative Cash Sales."[8] *Cambridge Electrs. Corp. v. MGA Electrs., Inc.*, 227 F.R.D. 313, 327 (C.D. Cal. 2004) (a plaintiff bearing the burden of proof at trial cannot shift the burden of disproving elements of its claim to the defendant). Plaintiffs then suggest that the Court "infer" that this element has been met and grant summary judgment in their favor.[9] (Pls.' Opp. at 10:11-14). This is improper, and Plaintiffs' inability to meet their burden warrants summary judgment in favor of Volcano. Fed. R. Civ. P. 56(c)(1)(B).

## II. PLAINTIFFS' ANTICIPATORY BREACH CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs do not respond with any facts supporting their anticipatory breach claim. Plaintiffs acknowledge their burden to prove that Volcano unequivocally informed them, through words or acts, that it would not use commercially reasonable efforts to cause the achievement of the Sales Milestones, yet Plaintiffs identify no evidence of such a statement or conduct. (Pls.' Opp. at 19:13-25). Plaintiffs' claim rests entirely on the allegation in their Complaint that "Volcano had effectively abandoned its commercialization plan for a Generation 1a OCT

---

[8] Plaintiffs claim that they requested responsive information through discovery, but Plaintiffs *only* requested quarterly "gross revenues" for Axsun's lasers. Ex. HH (Pls.' Interrog. No. 3). Although Plaintiffs cite a document request relating to "Axsun's . . . sales of . . . OCT Products," Axsun has sold no such products and, thus, Volcano only agreed to produce "materials sufficient to identify" Axsun's lasers. (Pls.' Opp. at 10, n. 31); Ex. II (Def. Resp. No. 7). Plaintiffs never challenged Volcano's response.

[9] Plaintiffs assert that Axsun's CEO, Dale Flanders, "presumably possesses this particularized information" and claim a right to depose him if Volcano disputes that the sales elements have been met. (Pls.' Opp. at 10, n. 32). A deposition of Mr. Flanders is unnecessary and unwarranted. Plaintiffs deposed Volcano's 30(b)(6) designee on Axsun's sales, but disregard their neglect to ask a single question regarding the contractual sales definitions. (Def.'s MSJ at 21:10-12). There is no basis for Plaintiffs' suggestion that Axsun's CEO could competently testify as to whether the components have been sold in accordance with detailed sales and accounting terms in a contract to which he is a stranger.

System." *Id.* at 19:6-9. Plaintiffs fail to "go beyond the pleadings," thereby requiring summary judgment in favor of Volcano. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Moreover, even had Volcano abandoned the commercialization plan for a Generation 1a OCT System, Plaintiffs fail to acknowledge that Volcano could achieve the Sales Milestones through sales of OCT Products beyond a Generation 1a OCT System.

## III. SUMMARY JUDGMENT IS WARRANTED AS TO THE SECOND MILESTONE.

Plaintiffs claim that Volcano breached its obligation to act in "good faith" and use "commercially reasonable efforts to cause the achievement of the second Milestone (i.e., FDA approval of a "Generation 1a OCT System"). Plaintiffs contend that they have "significant evidence" to support their claim and point to their deficient interrogatory responses. (Pls.' Opp. at 11:6-8, 12:9-14). While Plaintiffs argue that their claim is fact-intensive, summary judgment is appropriate because a reasonable jury could not return a verdict for Plaintiffs based on the evidence they present. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52, 254 (1986).

### A. Plaintiffs Do Not Raise A Triable Issue Of Fact That Volcano Failed To Act In Good Faith.

Plaintiffs erroneously claim that Section 2.5(b)'s express "good faith" requirement is not a subjective standard but instead imposes an objective standard of reasonableness like the implied covenant of good faith and fair dealing. (Pls.' Opp. at 15:21-16:24). Notably, Plaintiffs cite no case holding that an express good faith provision imposes an objective reasonableness standard and instead cite only to cases discussing the implied covenant. Plaintiffs maintain that the subjective standard applied in *DV Realty Advisors* pertains only to limited partnership agreements. *Id.* at 16:1-14. However, the court did not limit its holding or otherwise indicate that an express good faith provision carries a unique meaning in such agreements. Moreover, Volcano cited additional authority (outside the limited partnership context) confirming that an express good faith provision imposes a subjective standard requiring that the parties not act in "bad faith." *SIGA Tech., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 346 (2013) ("[b]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating

with furtive design or ill will."). Plaintiffs ignore this authority.[10]

Plaintiffs then rely on inadmissible evidence that, even if admissible, could not support a reasonable jury finding that Volcano acted in bad faith (i.e., acted with the purpose of avoiding the Milestone payments). (*See* Pls.' Opp. at 17:1-18:7). In particular, Plaintiffs make assertions not supported by their evidence. They claim that Volcano "willfully abandoned the prospect of developing a Generation 1a OCT System,"[11] citing the deposition testimony of two Former CardioSpectra Shareholders who admitted having no personal knowledge of Volcano's intent and whose testimony says nothing about Volcano's abandonment of a Generation 1a OCT System or any attempt to purposefully avoid paying the Milestones. (Pls.' Opp. at 17, n. 70). Plaintiffs also claim that "Volcano made significant budget cuts" in early 2009,[12] but cite no evidence showing that Volcano reduced the budget at all from 2008, or that Volcano made any decisions to avoid paying the Milestones. (Pls.' Opp. at 17:9-11). Nor does the evidence support an allegation of bad faith, as it merely reflects the concern of Volcano's CEO that Volcano may be over-allocating resources to its OCT program to the detriment of other programs. (Pls.' Exs. 36 and 39). Moreover, the OCT budget for 2009 exceeded the 2008 budget by more than 35% (approximately $1.2 million).[13] Ex. J.

---

[10] Plaintiffs' proposed standard would also "contravene the parties' express agreement" by imposing an objective reasonableness standard that "forge[s] a new agreement beyond the scope" of the "commercially reasonable efforts" standard, which is Volcano-specific and only requires Volcano to use efforts it "normally use[s]" for similarly-situated products. *Chamison v. Health Trust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999).

[11] Plaintiffs employ words like "willfully" and "deliberately" as an illusion of purposeful action towards an illegitimate goal, but the evidence belies the rhetoric. (Pls.' Opp. at 17:5-8, 17:12-13).

[12] Plaintiffs cite exhibits 35 and 41 to show "significant successes in the OCT program, including further reduction of NURD . . . and successful first-in-man trials" but have plucked these May 2008 emails out of context. By Plaintiffs' own admission, the May 2008 first-in-man study led to Volcano's discovery of excessive NURD, an unforeseen development challenge that took many months to resolve. Ex. P (Banas Depo. at 284:15-288:8); (Def.'s MSJ at 7:3-12).

[13] Plaintiffs also argue that "Volcano deliberately assigned junior and inexperienced regulatory and clinical employees," but none of the cited evidence supports their assertion. (Pls.' Opp. at 17:12-13). Notably, Plaintiffs cite no evidence showing that Volcano withheld better human resources to avoid paying the Milestones. Their expert's report is not admissible to prove the cited fact. Fed. R. Evid. 702. And the cited presentation only identifies the employees who

Plaintiffs also mischaracterize emails in a failed attempt to manufacture a factual dispute. Specifically, Plaintiffs rely on a comment by a former Volcano executive directly *to* Mr. Banas, advocating that Volcano file a 510(k) for a Generation 1a OCT System and not "waste [] valuable resources" on a submission for a Generation 1 System in light of "more important initiatives." (Pls.' Opp. at 17:14-16, n. 73). An executive's opinion on how Volcano should allocate its finite resources comes nowhere near showing bad faith. Moreover, the comment is irrelevant because regulatory approval for a Generation 1 OCT System relates to the first Milestone, which was paid.

Plaintiffs further claim that Volcano had "[s]ecret plans to 'kill' the OCT program." (Pls.' Opp. at 17:17-18:2). Plaintiffs cite an email from Mr. Burgess expressing concern that discussions regarding another OCT company could worry Mr. Banas that the Milestones were at risk. (Pls.' Ex. 60). Plaintiffs also cite an email containing a summary of Volcano's contractual rights to declare a Commercial or Technical Failure and "terminate" (or "kill") the OCT program. (Pls.' Ex. 61). Neither email suggests bad faith intent to avoid paying any Milestone.

Plaintiffs finally point to irrelevant "missteps" by Volcano, citing documents that have nothing to do with the Milestones much less showing that Volcano purposefully avoided paying them. (Pls.' Opp. at 18:2-4, n. 75). Indeed, Plaintiffs admit that Volcano did not intentionally jeopardize the development, regulatory approval, or commercialization of the acquired OCT system. (Def.'s MSJ at 23:11-13). No reasonable jury could conclude from these facts that Volcano acted in bad faith to avoid any Milestone payment.

**B. Plaintiffs Do Not Raise A Triable Issue Of Fact That Volcano Failed To Use "Commercially Reasonable Efforts" To Achieve The Second Milestone.**

Plaintiffs rattle off unsupported and irrelevant "facts" in an unsuccessful attempt to establish a triable issue on their claim that Volcano failed to use "commercially reasonable efforts" in pursuit of the second Milestone.[14] Plaintiffs do not dispute that the governing

---

would manage OCT regulatory needs, who would be guided by regulatory consultants (CardioMed) that Plaintiff Banas himself used before and after the merger. (Pls.' Ex. 37). Plaintiffs cite the performance reviews of two Senior Directors of Regulatory Affairs (exhibits 32 and 54) as purported evidence of a disparity between the employees staffed on OCT versus VIBE, irrelevantly comparing a comment made about a lower-level regulatory employee to a a statement about a Senior Director. (Pls.' Opp. at 17, n. 71). They improperly compare apples and oranges.

[14] Plaintiffs improperly rely on their expert's report to establish the existence of the facts

"commercially reasonable efforts" standard rejects the imposition of other performance measures, such as "industry standards" or "best practices," and only requires Volcano to use its "normal[]" efforts.[15] (Def.'s MSJ at 24:1-7). Yet, Plaintiffs make repeated references to the alleged practices of a "medical device company," "industry norms," and the objective "reasonableness" of Volcano's decisions. (Pls.' Opp. at 13:3-6, 13:9-15, 14:2-4, 14:11-14, 14:14-16, 15:3-6). The Court must disregard such evidence, as it is irrelevant to the contractual standard and cannot save Plaintiffs from summary judgment.

Plaintiffs also assert that Volcano took different actions in pursuit of FDA approval for the OCT system and catheter than it did for an IVUS catheter called "VIBE."[16] But reliance on VIBE fails because Plaintiffs cannot demonstrate similarity to the OCT devices, as required by the "commercially reasonable efforts" standard. (Pls.' Opp. at 13-15). First, Plaintiffs cannot establish the requisite "similar market potential." Plaintiffs randomly quote a single document discussing "OCT" and "IVUS" market projections generally, but which does not even mention VIBE or any OCT system or device and, thus, does not show any similarity in market potential between VIBE and any OCT product. (Pls.' Ex. 34).

Further, Plaintiffs insist that Volcano breached the commercially reasonable efforts standard by having a pre-submission meeting (formerly known as a "pre-IDE meeting") for VIBE but not for its OCT devices. (Pls.' Opp. at 13:3-8). Plaintiffs, however, cannot show that the

---

purportedly supported by footnotes 45, 55, 60, and 72. *In re Citric Acid Litig.*, 191 F.3d 1090, 1101-02 (9th Cir. 1999) (holding that "an expert report cannot be used to establish the existence of the facts set forth therein"); (*see* Pls.' Opp. 13:11-12 (concerning the purpose of Volcano's 2008 IDE submission), 14:8-9 (Volcano knew that clinical data was necessary), 14:16-15:1 (the VIBE submission contained all required elements), 17:12-13 (Volcano deliberately assigned junior and inexperienced employees to OCT)).

[15] "'[C]ommercially reasonable efforts' means the use of efforts, sales terms, expertise and resources normally used by [Volcano] for other products, which, as compared with the OCT Products, are of similar market potential at a similar stage in its development or product life, taking into account all reasonable relevant factors affecting the cost, risk and timing of development and the total potential of the applicable OCT Products, all as measured by the facts and circumstances at the time such efforts are due." Ex. A (Merger Agmt. at § 2.5(b)).

[16] Plaintiffs refer to "other devices" but identify no such other devices. Plaintiffs also rely on facts not disclosed in response to Volcano's contention interrogatories and thus should be barred from introducing them now.

VIBE catheter was at a "similar stage in its development" as the OCT system and catheter. The FDA instructs that "[o]nce an IDE sponsor has progressed to the point of actually collecting bench or animal data, the formal IDE application should be submitted rather than a pre-IDE." Ex. VV. Whereas CardioSpectra had progressed to the point of actually collecting bench and animal data for the OCT products prior to the acquisition, Volcano sought a pre-submission meeting to obtain feedback on planned bench and animal testing for the VIBE catheter. Ex. Q (p. 28); Ex. OO. Pursuant to FDA Guidance at the time, a pre-submission meeting was recommended for VIBE but not OCT. Even if a comparison could be made between the products, the FDA responded to both IDEs with disapproval letters identifying a host of deficiencies. (Pls.' Exs. 30, 43). Further, the FDA denied Volcano's June 2010 IDE application for the OCT devices notwithstanding a March 2010 pre-submission meeting, thus negating any claim that a pre-IDE meeting before the 2008 regulatory applications would have resulted in a different outcome. Ex. JJ (Quaglia Depo. at 110:12-18); Ex. LL (Harvey Depo. at 119:11-120:8). Even more, approximately 2.5 years lapsed between the VIBE pre-IDE submission and IDE submission. Ex. OO; (Pls.' Ex. 43). Following this timeline and assuming that Volcano filed a pre-IDE submission in January 2008 (just after the acquisition), Volcano would not have submitted an IDE for the OCT devices until June 2010, a year past the date that Volcano needed the IDE approved to potentially meet the deadline for the second Milestone, according to Plaintiffs' own expert. (Pls.' Ex. 26 at p. 9 (opining that FDA approval for IDE needed by June 2009)).

Additionally, Plaintiffs have not met their burden to show "facts and circumstances" existing at the time of Volcano's performance that required it to make the same regulatory decisions for the OCT devices that it made for VIBE. Ex. A (Merger Agmt. at § 2.5(b)). Moreover, Plaintiffs cannot dispute a critical difference: VIBE was a Class III device under FDA regulations at the time, while the OCT products were in Class II. Ex. KK (Redline Depo. at 103:5-104:2); Ex. OO (p. 6); Ex. S (pp. 60, 62). Class III devices require Pre-Market Approval ("PMA") for which clinical data is *always* necessary (21 C.F.R. § 814.20(b)(3)(v)(B)), unlike Class II devices, which are subject to 510(k) approval and for which clinical data is not a requirement. Ex. P (Banas Depo. at 293:3-293:21). Thus, unlike the OCT devices, VIBE could

not receive PMA clearance without clinical data. Plaintiffs suggest that Volcano knew that clinical data was required to support clearance for its OCT devices, but submitted a 510(k) without clinical data. (Pls.' Opp. at 14:6-9). However, unlike the Class III VIBE catheter, Federal regulations did not impose a clinical data requirement on the Class II OCT devices, and the undisputed facts show that Volcano and Plaintiff Banas were uncertain whether clinical data would be required to support the 510(k) applications. Ex. P (Banas Depo. at 293:3-297:9).

Plaintiffs also criticize Volcano for submitting the 2008 IDE for the purpose of collecting clinical data to support its anticipated Japanese regulatory application rather than its 510(k) application and for limiting the scope of the proposed study to safety.[17] (Pls.' Opp. at 13:9-14). Plaintiffs' criticism is irrelevant because Japanese approval only pertains to the first Milestone (which was paid). Further, Volcano had already filed a 510(k) for the OCT system and catheter, seeking clearance without clinical data, thus rendering an IDE pointless and unnecessary (unless the FDA subsequently informed it that clinical data was needed). Besides, even had Volcano submitted the IDE to collect data in support of its 510(k) and not limited the scope of its proposed study, the FDA disapproved the IDE submission due to various other deficiencies. (Pls.' Ex. 30).

Plaintiffs' final attacks relate to the contents of Volcano's IDE submissions and responses to subsequent FDA questions, but they present no evidence of Volcano's regulatory efforts with respect to any similarly situated product. (Pls.' Opp. at 14:9-15:9). While Plaintiffs quibble over omissions in Volcano's initial IDE, pointing to a "Refuse to Accept" letter from the FDA and missing case report forms, Plaintiffs make no effort to show that the VIBE submission was free of similar flaws. *Id.* at 15:3-8. Even if they could, they cannot overcome the fact that Volcano provided the missing information within two weeks of discovering the omissions, rendering the omissions immaterial to Volcano's ability to achieve the second Milestone. Ex. RR; (Pls.' Ex.

[17] Plaintiffs attack the objective reasonableness of Volcano's decision, but that is irrelevant to the "commercially reasonable efforts" standard. Moreover, Volcano communicated the business purpose of its IDE to the FDA, and the FDA responded that it would limit its review to "safety" "and not efficacy or statistical validity," thereby validating Volcano's purpose. Ex. PP. Plaintiffs also rely on the inadmissible opinion of Dr. Harvey, which is taken out of context and contradicted by evidence that she endorsed the approach. Ex. QQ; Ex. LL (Harvey Depo. at 256:22-257:12).

50). Plaintiffs suggest that Volcano submitted timely and complete responses to FDA questions regarding the VIBE catheter, but provide no support for these assertions[18] and the undisputed facts show that the FDA disapproved the VIBE submission, citing dozens of deficiencies, and found subsequent responses also deficient. (Pls.' Ex. 43); Exs. SS and TT. Further, no evidence supports Plaintiffs' assertion that Volcano responded to some deficiencies as "pending" when it had the "means, the ability, and the data to provide the FDA with substantive answers." (Pls.' Opp. at 14:13-14). The undisputed facts show that Volcano did not have the data necessary to answer all of the FDA's questions at the time they came due. (Pls.' Ex. 31 (answered questions 4, 6, 7, 8, and 10 as "pending")); Ex. UU (confirming that Volcano did not have data to answer these "un-highlighted" questions). Moreover, Volcano's purported ability to provide such information is immaterial—Plaintiffs cannot show that the FDA would have responded differently, as a subsequent disapproval letter cited *additional* deficiencies. *See* Ex. UU.

Finally, Plaintiffs' claim fails, because it is predicated entirely on conduct in which they participated or acquiesced. Fatally, Plaintiff Banas, as the President of Volcano's OCT division, not only participated and agreed in, but also helped make the decisions to forego meeting with the FDA before filing the 510(k) applications and to file such applications without clinical data. Ex. P (Banas Depo. at 293:3-299:16). Additionally, a number of CardioSpectra's Former Shareholders helped prepare the 510(k) and IDE applications and provide responses to the FDA's disapproval letters. Ex. NN (Sims Depo. at 204:6-205:6, 209:9-23, 251:20-252:16); Ex. MM (Gonzales Depo. at. 180:3-21, 222:13-225:14). Citing no authority, Plaintiffs only respond that Plaintiff Banas did not have "control" of or "direct responsibility" for these decisions. (Pls.' Opp. at 20:6-21:4). The law requires only participation or acquiescence, and the Court cannot allow them to now play Monday morning quarterback. (Def.'s MSJ at 25:8-11).

## IV. CONCLUSION

For the foregoing reasons, Volcano Motion should be granted.

[18] Plaintiffs cite their expert's report, but it says nothing about whether Volcano's initial response substantively addressed all of the FDA's questions regarding VIBE. Exhibits 48 and 51 merely reflect Volcano's intent to respond to the FDA in the future, while Exhibit 25 is deposition testimony stating nothing about Volcano's VIBE-related responses.

Dated: February 25, 2014

COOLEY LLP

*/s/ Michael G. Rhodes*

Michael G. Rhodes (116127)

Attorneys for Defendant
VOLCANO CORPORATION

1218161 /HN