1

2

3

4                           UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   CHRISTOPHER E BANAS, et al.,              Case No. <u>12-cv-01535-WHO</u>

                    Plaintiffs,
8
                                             **ORDER GRANTING DEFENDANT'S**
9        v.                                  **MOTION FOR SUMMARY**
                                             **JUDGMENT; DENYING PLAINTIFFS'**
10  VOLCANO CORPORATION, et al.,              **MOTION FOR SUMMARY JUDGMENT**

                    Defendants.
11                                           Re: Dkt. Nos. 64-3, 65, 88

12

13                                 **INTRODUCTION**

14       Defendant Volcano Corporation merged with CardioSpectra, Inc. in 2007 in exchange for

15  $25 million in cash to CardioSpectra's shareholders, the plaintiffs in this action, and four

16  additional payments if certain milestones were achieved. Volcano achieved the first milestone and

17  made the first payment of $11 million. Milestone 2 obligated Volcano to pay the plaintiffs $10

18  million if Volcano achieved FDA approval of a medical device system developed from

19  CardioSpectra's assets. Milestones 3 and 4 obligated Volcano to pay the plaintiffs $17 million if

20  Volcano achieved sales of $25 million of certain products. Volcano did not make those payments.

21  The plaintiffs allege that Volcano breached its contractual obligation to use good faith and

22  reasonable commercial efforts to achieve Milestone 2. The plaintiffs also allege that Milestones 3

23  and 4 were satisfied by sales of products developed by Volcano's subsidiary, Axsun Technologies.

24       I must decide on the parties' cross-motions for summary judgment whether there is a

25  material factual dispute that would give plaintiffs the right to be paid on the second, third and

26  fourth milestones. Because the plaintiffs have failed to present evidence on which a jury could

27  reasonably conclude either that Volcano did not use good faith or reasonable commercial efforts to

28  achieve Milestone 2, and because the definition of "OCT Products" in the Merger Agreement

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

precludes plaintiffs from counting sales of the Axsun products towards Milestones 3 and 4, I GRANT Volcano's motion for summary judgment and DENY the plaintiffs' motion for summary judgment.  I also DENY plaintiffs' motion for sanctions.

## BACKGROUND

### I.   VOLCANO'S ACQUISITION OF CARDIOSPECTRA

Volcano is a publicly traded medical device company focused on intravascular imaging (within blood vessels).  Huennekens Decl. ¶ 2 [Dkt. No. 66]; Huennekens Depo. 124:19-20 [Dkt. No. 64-10].  In December 2007, Volcano acquired CardioSpectra, Inc., a medical device start-up company.

Cardiospectra had developed an Optical Coherence Tomography ("OCT") system that produced high-resolution images of portions of coronary arteries.  Banas Depo. 220:5-221:6 [Dkt. No. 68-2]; Castella Depo. 90:10-21 [Dkt. No. 67-11].  CardioSpectra's OCT system consisted of three primary parts: a console, a patient interface module and pull-back device ("PIM"), and a catheter.  Castella Depo. 90:10-93:24; Banas Depo. 220:15-221:6; Main Decl. Ex. Q.

The OCT system required Food and Drug Administration ("FDA") approval of a 510(k) application before it could be marketed or sold in the United States.[1]  The OCT system also required FDA approval of an Investigational Device Exemption ("IDE")[2] application before the OCT system could be tested on humans in the event that the FDA required human clinical data to support the 510(k) application.  Banas Depo. 133:21-134:9.  CardioSpectra did not have FDA approval of either a 510(k) application or an IDE application at the time that it presented its OCT system to Volcano in August 2007.  Banas Depo. 216:23-217:3.

### II.  TERMS OF THE MERGER AGREEMENT

Volcano merged with CardioSpectra for approximately $25.2 million in December 2007. The Merger Agreement includes four Milestone Merger Considerations which, if achieved, require

---

[1] *See* Federal Food, Drug, and Cosmetic Act, § 510(k), 52 Stat. 1040, as amended, 21 U.S.C. § 360(k); *see also* 21 C.F.R. § 807 *et seq.* (governing premarket notification procedures for medical devices).

[2] *See* 21 C.F.R. § 812 *et seq.* (governing Investigational Device Exemptions)

United States District Court
Northern District of California

Volcano to pay the plaintiffs an additional $38 million.  The milestones are:

> **Milestone 1:** $11 million upon regulatory approval from European or Japanese authorities, or from the FDA, of a Generation 1 OCT System by December 31, 2009.
>
> **Milestone 2:** $10 million upon FDA approval or FDA 510(k) clearance approval of a Generation 1a OCT System by December 31, 2010.
>
> **Milestone 3:** $10 million if Volcano attains Cumulative Cash Sales totaling $10 million from Commercial Sales of OCT Products by December 31, 2013.
>
> **Milestone 4:** $7 million if Volcano achieves Cumulative Cash Sales totaling $25 million from Commercial Sales of OCT Products by December 31, 2014.

Merger Agreement § 2.5(a)(i)-(iv) [Dkt. No. 64-19].

Volcano met the first milestone by securing European regulatory approval for a Generation 1 OCT System in May 2008 and paid the plaintiffs $11 million in accordance with section 2.5(a)(i) of the Merger Agreement.  Banas Decl. ¶ 5; Banas Depo. 142:5-8.  Volcano did not meet the second milestone.  The plaintiffs allege that Volcano breached the Merger Agreement by failing to act in good faith and to use commercially reasonable efforts to achieve the second milestone, which Volcano denies.

The parties dispute whether the third and fourth milestones were met.  The plaintiffs assert that the $25 million in sales of OCT Products needed to achieve Milestones 3 and 4 were satisfied by sales by Axsun Technologies, a wholly-owned subsidiary which Volcano acquired in late 2008.  In response, Volcano argues that Axsun's sales do not count towards the sales thresholds in Milestones 3 and 4.  Volcano also asserts that if the Axsun sales count, the plaintiffs have not provided evidence of $25 million in qualifying sales by Axsun.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at

United States District Court
Northern District of California

3

trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." *Id*. at 324 (quotation marks omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).

<div align="center">

**DISCUSSION**

</div>

## I.   MILESTONE 2

The plaintiffs allege that Volcano breached the Merger Agreement by failing to use commercially reasonable efforts and to act in good faith to achieve Milestone 2, which provides for a $10 million payment to the plaintiffs upon FDA approval or FDA 510(k) clearance of a Generation 1a OCT System by December 31, 2010.  Merger Agreement § 2.5(a)(ii).  The parties' arguments revolve around the meaning of the Merger Agreement's requirement that Volcano "act in good faith *and* [] use commercially reasonable efforts, to cause each of the Milestones to be achieved." *Id*. § 2.5(b) (emphasis added).  "Commercially reasonable efforts" are defined in the agreement but "act in good faith" is not.

### A.   Commercially reasonable efforts

The Merger defines "commercially reasonable efforts" as

United States District Court
Northern District of California

1

2       the use of efforts, sales terms, expertise and resources normally used
        by [Volcano] for other products, which, as compared with the OCT
3       Products; are of similar market potential at a similar stage in its
        development or product life, taking into account all reasonable
        relevant factors affecting the cost, risk and timing of development
4       and the total potential of the applicable OCT Products, all as
        measured by the facts and circumstances at the time such efforts are
        due.

5    Merger Agreement § 2.5(b).  In light of this contractually defined standard, to defeat summary

6    judgment the plaintiffs must present evidence from which a jury could reasonably conclude that

7    Volcano did not use the same efforts, sales terms, expertise and resources for the OCT Products

8    that Volcano normally uses for other products which have similar market potential and are at a

9    similar stage in their development or product life as the OCT Products, while taking into account

10   relevant factors affecting the cost, risk and timing of development and the total potential of the

11   OCT Products, as measured by the facts and circumstances at the time.  *See, e.g., Anderson*, 477

12   U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the

13   nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable,

14   or is not significantly probative, summary judgment may be granted.") (citations omitted).

15          The plaintiffs failed to identify a relevant comparator product against which Volcano's

16   efforts on the OCT Products could be measured.  Their only attempt was with VIBE, an

17   intravascular ultrasound ("IVUS") catheter developed by Volcano.  The plaintiffs assert that

18   Volcano's "IVUS and OCT technologies had similar market potential and were at a similar stage

19   of development or product life."  In support, the plaintiffs cite the deposition of Volcano's former

20   Vice President of Marketing and Business Development, Vincent Burgess, who stated that IVUS

21   is a "core product," and a presentation slide labeled Volcano OCT Market Opportunity, which,

22   according to the plaintiffs, shows that "OCT had a market potential of $492,000,000

23   ($172,000,000 unique to OCT and $320,000,000 it could cannibalize from IVUS, leaving IVUS

24   with $300,000,000)."  Pltfs.' Opp. at 13 n.40 (citing Second Woodward Decl. Ex. 16 (Burgess

25   Dep. at 241:5-11), Ex. 34 (Ex. 225 to Burgess Depo. at Volcano 94809)).  The plaintiffs also

26   assert that "Volcano's IVUS device VIBE and OCT each received their CE marks by

27   demonstrating "safety" to the same European regulatory body within months of one another – an

28   objective indication that both devices were at a similar stage of development or product life."

United States District Court
Northern District of California

Plaintiffs' evidence concerning VIBE fails to draw a colorable comparison with the OCT Products, and based on the record before the Court, neither the OCT Products nor any individual OCT Product has similar market potential as the VIBE catheter or any other product.[3] The OCT Market Opportunity slide, the sole evidence proffered by the plaintiffs to establish similar market potential, discusses OCT and IVUS market projections generally, but it does not refer to VIBE or any OCT Product (or any other product). The slide says nothing about the market potential of the VIBE or OCT Products, much less that those products have similar market potentials. Likewise, Mr. Burgess's statement that IVUS is a "core product" says nothing about the respective market potentials of VIBE or the OCT Products. Given the total absence of any evidence regarding the respective market potentials of VIBE and any OCT Products, the plaintiffs' claim that Volcano failed to use "commercially reasonable efforts" fails.[4]

**B. Act in good faith**

Unlike "commercially reasonable efforts," the Merger Agreement does not define "act in good faith." Volcano argues that the Merger Agreement's express good faith requirement is a subjective standard, requiring "honesty in fact" and that the plaintiffs must come forward with evidence showing that Volcano acted in bad faith. Volcano Mot. at 22 (citing *DV Realty Advisors, LLC v. Policemen's Annuity & Ben. Fund of Chi.*, 75 A.3d 101, 110 (Del. 2013)). Volcano argues that its conduct is in good faith "unless it went so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." The plaintiffs disagree, arguing that the relevant standard is "analogous to the implied covenant of good faith and fair dealing in Delaware law, which restricts a party from acting unreasonably to deny the other side

---

[3] I deny the plaintiffs' motion for sanctions, which alleges that Volcano withheld evidence related to Volcano's use of commercially reasonable efforts, at the end of this order. Plaintiffs failed to request information in discovery about products comparable to the OCT Products.

[4] Volcano also claims that VIBE was a Class III device, which requires clinical data for premarket approval, whereas the OCT Products were Class II devices, for which clinical data is not a requirement, and therefore the plaintiffs cannot shows that the "facts and circumstances" required Volcano to make the same regulatory decisions for OCT Products that it did for VIBE. Volcano Reply at 13-14. The plaintiffs dispute this claim. I need not reach this matter because I find that the "commercially reasonable efforts" claim fails for the reason stated above.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the fruits of the parties' bargain." Pltfs.' Opp. at 16 (citing *Chamison v. Healthtrust, Inc.*, 735

2    A.2d 912, 920 (Del. Ch. 1999)). This is a debate which I do not need to resolve because I find that

3    the plaintiffs have not presented evidence on which a jury could reasonably conclude that

4    Volcano's failed to act in good faith, regardless of which standard of good faith I use.[5]

5          The plaintiffs claim that the following alleged conduct by Volcano precludes summary

6    judgment for Volcano:

7          i.    "Volcano willfully abandoned the prospect of developing a Generation 1a OCT
8                System," the system whose FDA approval would have satisfied Milestone 2;

9          ii.   "Volcano made significant cuts from the OCT budget early in 2009, just months
                 after significant successes in the OCT program";

10

11         iii.  Volcano assigned junior and inexperienced regulatory and clinical employees "to
                 lead regulatory and clinical efforts for OCT, with virtually no oversight from
12               Volcano management";

13         iv.   Five months after the Merger, Volcano Executive Vice-President of Operations and
                 R&D, John Sheridan, dismissed the milestones as a "waste of valuable resources"
14               and stated that Volcano should "focus on other more important initiatives [than
                 those whose] only benefit being achieving a milestone";
15

16         v.    Volcano executives secretly strategized ways to avoid the milestone payments,
                 noting that "[we don't] want to worry Chris Banas that we might do something to
17               put his milestones at risk," and that Volcano can later "kill the program"; and

18         vi.   After the Milestone 2 deadline passed, Volcano identified missteps it made with
                 OCT, including the inadequate and incorrect testing it submitted to the FDA, and
19               cutting corners "wherever possible."

20

21   _____

     [5] Volcano has the better argument. In Delaware, an undefined good faith provision in an
22   agreement is governed by a subjective standard and assessed "in the context of the larger
     provision—or value—it sought to protect." *DV Realty Advisors*, 75 A.3d at 110 (finding that the
23   use of the term "good faith" in the agreement was intended to ensure that the Limited Partners do
     not arbitrarily or capriciously remove the General Partner). In *DV Realty Advisors*, the Delaware
24   Supreme Court defined the lack of good faith as conduct "so far beyond the bounds of reasonable
     judgment that it seems essentially inexplicable on any ground other than bad faith." Nothing in
25   that opinion limited that standard to disputes involving partnership agreements. Contrary to the
     plaintiffs' argument, the distinction between the implied covenant of good faith and contractually
26   obligated good faith is not limited to partnership agreements. *See, e.g., Stewart v. BF Bolthouse
     Holdco, LLC*, 2013 WL 5210220, *17 (Del. Ch. Aug. 30, 2013) (finding, in contract dispute
27   between former employees and company, that "the parties' express agreement to evaluate
     Defendants' use of discretion under the standard of good faith supersedes the implied covenant
28   and precludes its application to that discretionary right").

1     The evidence proffered by the plaintiffs does not support their allegations, does not create

2     a question of fact and does not preclude summary judgment for Volcano.  I will address each

3     allegation in order.

4     *First*, the plaintiffs' assertion that Volcano willfully abandoned the prospect of developing

5     a Generation 1a OCT System is based on deposition testimony from former CardioSpectra

6     shareholders Wood and Milner.  *See* Opp. at 17 n.70 (citing Second Woodward Decl. Ex. 23

7     (Wood Dep. at 185:20-186:3, 186:8-20, 187:7-17); Ex. 22 (Milner Dep. at 209:12-210:5).  But

8     Wood's and Milner's testimony merely discusses their disappointment that Volcano failed to bring

9     an OCT system to market; the testimony says nothing about Volcano's "willful abandonment" of

10    its development of such a system.  *See, e.g.,* Milner Depo. 209:17-21 ("[A]fter we had — got the

11    CE mark approval in Europe, at least in my own mind, I questioned, well, why — why isn't

12    Volcano trying to make any sales in Europe? I asked— at least asked myself that question.").  The

13    mere fact that Volcano did not bring a Generation 1a OCT System to market does not, without

14    more, provide a reasonable basis for the jury to conclude that Volcano "willfully abandoned the

15    prospect of developing" such a system, much less that Volcano did not act in good faith.

16    *Second*, the plaintiffs have not provided any evidence that Volcano made significant cuts in

17    the OCT budget early in 2009.  On the contrary, Volcano showed that the OCT budget for 2009

18    exceeded the 2008 budget by more than 35% (approximately $1.2 million). Main Decl., Ex. J.

19    *Third*, with no explanation whatsoever, the plaintiffs cite a slide from a Volcano OCT

20    Basics and Product Update presentation and the expert report of Dr. Zvi Ladin in support of their

21    assertion that Volcano assigned junior and inexperienced regulatory and clinical employees "to

22    lead regulatory and clinical efforts for OCT, with virtually no oversight from Volcano

23    management."  Pltfs.' Opp. at 17 n.72 (citing Second Woodward Decl. Ex. 26 (E-1, p.31 (expert

24    report)); Ex. 37 (Ex. 284 to Jawharkar Dep. at Volcano 193435)).  The plaintiffs do not indicate

25    what portions of the documents cited support their argument, or how.

26    I have reviewed the documents for relevant material.  The slide from the Volcano OCT

27    Basics and Product Update presentation states:

28    CardioMed (Semih Oktay/Elisa Harvey) engaged  for  high  level

United States District Court
Northern District of California

regulatory consulting
– Acting as senior advisory team

Dan Redline and Jwala Jawharkar to manage internal US regulatory
OCT needs
– Handle ground work, document fabrication, compilation
of next IDE
– Work with R+D to acquire needed info to answer all
FDA questions

Ex. 37 (Ex. 284 to Jawharkar Dep. at Volcano 193435). This slide is not evidence of a lack of good faith. It shows that Volcano employees Ms. Jawharkar and Mr. Redline were assigned to "handle ground work" related to OCT regulatory needs, and that they were supported by R&D[6] resources to acquire the information necessary to address the FDA's questions and by CardioMed for high level consulting.[7]

Dr. Ladin's report states that Volcano's "effort for compiling a new IDE was headed by Jwala Jawharkar and Dan Redline," that Ms. Jawharkar had minimal regulatory experience, and that Mr. Redline had minimal understanding of the IDE process. Second Woodward Decl. Ex. 26 (E-1, p.31). Dr. Ladin cites the depositions of Ms. Jawharkar and Mr. Redline in support of these assertions, but the portions that he cites do not appear to be in the record presented to the Court. The pages he cites are not included in the deposition excerpts included with the Second Woodward Declaration. I therefore disregard this assertion. In any event, without more, the fact that inexperienced employees led regulatory or clinical efforts for the OTC Products does not support a finding of a lack of good faith. Moreover, as noted above, Ms. Jawharkar and Mr. Redline were supported by CardioMed for high level regulatory consulting.

*Fourth*, the plaintiffs only quote a portion of the statement by Volcano Executive Vice-President of Operations and R&D, John Sheridan. Reviewing the entire statement (which was addressed to plaintiff Banas), it is clear that Mr. Sheridan's comment regarding a "waste of valuable resources" was about pursuing a 510(k) application for the Generation 1 System, which, he stated, "we've" (presumably including Mr. Banas) decided "is not going to be sold."

---

[6] I assume that R+D refers to research and development.

[7] Volcano asserts that plaintiff Banas himself used CardioMed for regulatory consulting before and after the merger. The plaintiffs do not dispute this.

United States District Court
Northern District of California

1  Woodward Ex. 59.  The Generation 1 System was the subject of Milestone 1, not Milestone 2.

2  Volcano achieved Milestone 1 the same month as this statement, triggering Volcano's obligation

3  to pay the plaintiffs $11 million—which it satisfied.  This statement therefore has nothing to do

4  with a lack of good faith regarding Milestone 2.  On the contrary, in the statement, Mr. Sheridan

5  advocated that Volcano "focus on other more important initiatives," including the Generation 1a

6  System, which was the subject of Milestone 2.  If anything, the email shows that Mr. Sheridan

7  advocated redirecting more resources towards achieving Milestone 2.

8       *Fifth*, in support of their claim that Volcano executives secretly strategized ways to avoid

9  the milestone payments, the plaintiffs cite an email from Volcano Executive Vice President,

10  Marketing and Business Development, Mr. Burgess, to other Volcano executives, stating "[a]s a

11  reminder for tomorrows BD section, I am going to gloss over our Goodman discussions.  Don't

12  want to worry Chris Banas that we might do something to put his milestones at risk."  Woodward

13  Ex. 60.  Standing alone, this does not evidence a lack of good faith, or even that Volcano was

14  putting the milestones at risk.  Indeed, Volcano met Milestone 1 the following month.  This

15  statement says nothing about Milestone 2.  The plaintiffs also cite Exhibit 63 to the Woodward

16  Declaration, apparently an email where Volcano executives noted that Volcano can later "kill the

17  program."  But there is no Exhibit 63 to the Woodward Declaration (it stops at Exhibit 62).  I

18  therefore disregard this assertion.  In any event, without more, a statement apparently regarding

19  Volcano's contractual right to terminate the program by declaring a commercial or technical

20  failure does not evidence a lack of good faith.

21       *Sixth*, the emails cited by the plaintiffs in support of their assertion that Volcano identified

22  missteps and cut corners do not support a showing of a lack of good faith in Volcano's efforts to

23  achieve Milestone 2.  Second Woodward Decl. Ex. 44 (at Volcano 201047); Ex. 57 (Ex. 258 to

24  Sheehan Dep. at Volcano 182716); Ex. 62 (Ex. 45 to Quaglia Dep at Volcano 201045).  None of

25  the comments relate specifically to FDA approval or 510(k) clearance of a Generation 1a OCT

26  System, the subject of Milestone 2.  More importantly, even assuming that the emails show lack of

27  diligence or incompetence within Volcano's OCT business unit, that is distinct from showing a

28  lack of good faith.  *Cf Hanover Ins. Co. v. Hudak & Dawson Const.*, 946 F. Supp. 2d 1208, 1220

United States District Court
Northern District of California

1   (N.D. Ala. 2013) ("A lack of diligence or negligence is not the equivalent of bad faith, and even

2   gross negligence is not the same as bad faith."); *cf Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F.

3   Supp. 2d 766, 775 (S.D.N.Y. 2011) ("an attorney's ignorance, incompetence, or lack of diligence

4   is not evidence of bad faith").

5           It is also notable that Volcano hired plaintiff Banas to head development of the OCT

6   Products.  Banas was CEO of CardioSpectra and was personally interested in achieving the

7   milestones.  His appointment to such a critical position for achievement of the milestones seems

8   both appropriate and an act of good faith.  That neither Banas nor the other plaintiffs can identify

9   evidence creating a material dispute over Volcano's good faith strengthens the reasons to grant

10  Volcano's motion.

11          The plaintiffs have not presented facts on which a jury could reasonably find that Volcano

12  breached the Merger Agreement by failing to act in good faith to achieve Milestone 2.  Volcano's

13  motion for summary judgment is GRANTED on the good faith claim.

14  **II.  MILESTONES 3 AND 4**

15          Milestones 3 and 4 require Volcano to pay the plaintiffs $17 million if Volcano attains

16  sales totaling $25 million from commercial sales of OCT Products by December 31, 2014.[8]

17  Merger Agreement at § 2.5(a)(iv).  The plaintiffs dispute whether Volcano has achieved these

18  milestones.  At the heart of the dispute is whether OCT Products, a term expressly defined in the

19  Merger Agreement, includes certain products developed by Axsun Technologies, a wholly-owned

20  subsidiary of Volcano that Volcano acquired in December 2008, a year after Volcano acquired

21  CardioSpectra.  The plaintiffs argue that OCT Products, as defined, include the Axsun products.

22  *See, e.g.,* Pltfs.' Mot. at 3 ("sales of the items that Volcano sold through Axsun fall within the

23  category of 'OCT Products' as defined in the Agreement").  Volcano argues that they do not.  The

24  parties both argue that the plain language of the Merger Agreement is unambiguous and in accord

25  with their interpretation of OCT Products.  Both parties also argue that extrinsic evidence supports

26

27  [8] Milestone 3 calls for $10 million if Volcano achieves $10 million in qualifying sales by
    December 31, 2013.  Milestone 4 calls for an additional $7 million if Volcano achieves $25
28  million in total cumulative sales by one year later, December 31, 2014.

United States District Court
Northern District of California

1  their interpretations in the event that I find the language ambiguous.

2       The plaintiffs have two principal hurdles to clear for their interpretation to prevail.  *First*, I

3  must find that OCT Products are not limited to the four categories of products identified in the

4  definition—consoles, patient interface modules and pull-back devices ("PIMs"), OCT catheters

5  or wands, and products contained in a Licensed Patent—but include any component of an OCT

6  system, such as OCT laser light sources, even if not sold as a component of a console.  *Second*, I

7  must find that OCT Products, as defined in the Merger Agreement, are not limited to products

8  developed from assets Volcano acquired from CardioSpectra as part of the merger, but can include

9  products developed by a subsidiary of Volcano which Volcano had not yet acquired when the

10  Merger Agreement was negotiated and executed.

11       For the reasons stated below, the plaintiffs do not clear either hurdle.  I find that the

12  Merger Agreement is unambiguous and only Volcano's interpretation is reasonable.[9]  I therefore

13  GRANT Volcano's motion for summary judgment regarding Milestones 3 and 4 and DENY the

14  plaintiffs' motion for summary judgment.

15      **A.  Volcano's acquisition of Axsun Technologies**

16       In December 2008, Volcano acquired Axsun Technologies, a manufacturer of compact

17  laser components that can be used in OCT imaging devices.  Axsun became a wholly-owned

18  subsidiary of Volcano.  Banas Depo. 348:24-349:2; Huennekens Depo. 144:14-16.  Axsun

19  developed and sold four products which the plaintiffs argue fall within the definition of OCT

20  Products for purposes of Milestones 3 and 4:  Axsun Swept Laser OEM Engine, Axsun Swept

21  Laser Benchtop Engine, Axsun Camera Link DAQ Board, and Axsun Swept Laser Engine with

22  Integrated DAQ.  The plaintiffs assert that these Axsun products are "OCT laser light sources."

23  *See* Pltfs.' Mot. at 11.

24      **B.  Interpretation of OCT Products**

25       The Merger Agreement defines OCT Product as:

26

27

28  [9] Because I find the Merger Agreement unambiguous, I do not consider the extrinsic evidence offered by the parties.

[C]onsoles (including OCT laser light sources[,][10] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid Claim contained in any Licensed Patent.

Merger at A-13.

Importantly, the plaintiffs do not argue that the Axsun products are consoles, patient interface modules and pull-back devices, or OCT catheters or wands, i.e., the products specifically identified in the definition of OCT Product.[11]  Likewise, the plaintiffs concede that the Axsun products are not covered by the scope of any Valid Claim contained in any Licensed Patent.  *See* Ex. V (Pltfs.' Supp. Resp. Interrog. No. 13).  Rather, the plaintiffs argue that OCT Product, as defined in the Merger Agreement, is "a broad, catch-all term" because "within its initial example of 'consoles,' it incorporates an open-ended, non-exclusive list of items."  Pltfs.' Mot. at 11.  The plaintiffs argue that OCT Products therefore include "OCT laser light sources, such as the swept laser engines made by Axsun and sold by Volcano."  Pltfs.' Mot. at 11.  In contrast, Volcano argues that the plaintiffs' interpretation (i) conflicts with the plain language of the Merger Agreement; (ii) frustrates the scheme of the Merger Agreement; and (iii) nullifies other provisions in the Merger Agreement.  I address each argument in turn below.

  1.  <u>The language of the Merger Agreement</u>[12]

"[T]he threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous."  *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (citation omitted).  The court decides the meaning of an

---

[10] The parties agree that a comma was mistakenly omitted between the words "sources" and "processors."

[11] Volcano asserts that "Plaintiffs do not contend that Axsun's laser components are consoles, PIMs, catheters or software."  Def. Opp. at 11.  The plaintiffs do not dispute this assertion in their briefing.  However, at oral argument, counsel for the plaintiffs appeared to argue that a laser light source *is* a console, stating: "I don't understand the Court's — if you see 'including without limitation' and you understand what a console is, how an OCT laser light source could not be a console."  But there is no evidence that laser light sources are consoles.

[12] The parties agree that Delaware law governs the interpretation of the Merger Agreement.  *See* Merger Agreement § 13.9(a).

1   unambiguous contract as a matter of law.  *JANA Master Fund Ltd. v. CNET Networks, Inc.*, 954

2   A.2d 335, 338-39 (Del. Ch. 2008).  "Ambiguity does not exist simply because the parties disagree

3   about what the contract means."  *United Rentals*, 937 A.2d at 830.  Rather, contracts are

4   ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different

5   interpretations or may have two or more different meanings."  *Id.* (citation omitted).  "If a contract

6   is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary

7   the terms of the contract or to create an ambiguity."  *Eagle Indus., Inc. v. DeVilbiss Health Care,*

8   *Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997).  However, "when there is uncertainty in the meaning

9   and application of contract language," a court must consider extrinsic evidence "to arrive at a

10  proper interpretation of contractual terms."  *Id.*  To succeed on a motion for summary judgment, a

11  party must establish that its interpretation is the only reasonable interpretation.

12       The plaintiffs' interpretation of OCT Products is unreasonable.  OCT Products are

13  specifically defined as four types of products: consoles; PIMs; OCT catheters and wands; and

14  products covered by a Licensed Patent.  The term "consoles" is immediately followed by a

15  parenthetical which states: "(including  OCT laser light sources[,] processors, application

16  software,  data storage devices, printers and other related components)."  The plaintiffs'

17  interpretation unreasonably treats the components listed in the parenthetical as OCT Products on

18  equal footing with the four categories of products specifically identified as OCT Products, thereby

19  depriving OCT Products of the limits expressly provided in the definition.  If an OCT laser light

20  source is a qualifying OCT Product—not as a component of a console, but standing alone—then

21  so are the other components listed in the parenthetical, including data storage devices and printers,

22  even when not used as components of a console.  Such a broad interpretation of OCT Products is

23  unreasonable given that the definition expressly limits OCT Products to four specific categories of

24  products.

25       The plaintiffs' interpretation ignores that the supposedly "open-ended" parenthetical on

26  which it relies appears only after the term "consoles" and therefore modifies only "consoles"; it

27  does not mean that "OCT laser light sources, processors, application software, data storage

28  devices, printers and other  related components," standing alone, in any context, are OCT

United States District Court
Northern District of California

Products.  The parenthetical itself may be open-ended in the sense that it does not list every conceivable component of a console.  But the definition of OCT Products is decidedly *not* open-ended; it is expressly limited to four categories of products: consoles, PIMs, OCT catheters and wands, and products covered by a licensed patent.  The plaintiffs' interpretation disregards this limitation.

As Volcano points out, the plaintiffs' interpretation "broadens the definition of 'OCT Product' beyond any reasonable or meaningful limit."  Volcano Opp. at 12.  The plaintiffs respond that "[t]his argument is irrelevant, as there is evidence only of Volcano's sales of the four Axsun OCT products."  Pltfs.' Reply at 2.  The plaintiffs miss the point.  An interpretation that broadens the definition of OCT Product beyond any meaningful limit is compelling evidence that the interpretation is unreasonable.

The only fair and reasonable interpretation of the parenthetical is that it explains what a console is by providing an illustrative list of components of a console.  Unlike PIMs, catheters and wands, or products covered by a Licensed Patent, the term "consoles" evidently required further explanation.  By comparison, immediately following the product category "patient interface modules and pull-back devices" is a parenthetical stating "(also referred to as a PIM)."  There can be no doubt that this parenthetical only modifies, or explains, the term that precedes it: "patient interface modules and pull-back devices."

2.  The plaintiffs' interpretation frustrates the scheme of the Merger Agreement

The plaintiffs' interpretation frustrates the purpose of the Merger Agreement because it requires Volcano to pay the plaintiffs millions of dollars for sales achieved by Volcano which have nothing to do with the assets Volcano acquired from the plaintiffs.

The structure and substance of the Merger Agreement makes clear that all of the milestone payments are intended as earn-out provisions tied to development of the intellectual property Volcano acquired from CardioSpectra.  Milestone 1 is triggered by regulatory approval of a first generation OCT System by December 31, 2009.  Milestone 2 is triggered by regulatory approval of a subsequent OCT System one year later, by December 31, 2010.  Milestones 3 and 4 are triggered by sales of OCT Products by December 31, 2013 and December 31, 2014, respectively.

United States District Court
Northern District of California

1    The plaintiffs concede that Milestones 1 and 2 are specifically linked to regulatory approval of

2    intellectual property acquired from CardioSpectra.  *See* Pltfs.' Opp. at 4.  Given the sequence of

3    events, there is no reasonable explanation for tying Milestones 1 and 2 to CardioSpectra's assets,

4    but not Milestones 3 and 4.  The plaintiffs have provided no reasonable explanation for why the

5    drafters would reward the plaintiffs only for regulatory approval of products developed from

6    CardioSpectra's assets, but would reward them for sales of products developed from *other* assets.

7    If, as the plaintiffs assert, the intent was to protect the plaintiffs from the possibility that Volcano

8    acquired a different OCT company and "shelved" the plaintiffs' assets, then *all* the milestones

9    should be triggered without being pegged to the plaintiffs' assets.  The plaintiffs concede that that

10   is not the case.  *See* Pltfs.' Opp. at 4.  On the contrary, the chronological timing of the milestones

11   implicitly presupposes a sequence of events: first Volcano obtains regulatory approval of the

12   assets acquired from CardioSpectra and then it commercializes *those* products.

13                    3.    <u>The plaintiffs' interpretation nullifies other provisions of the Merger Agreement</u>

14             The plaintiffs' interpretation that OCT Products are not limited to products developed from

15   the plaintiffs' assets conflicts with other provisions in the agreement.  The Merger Agreement

16   defines commercially reasonably efforts as "the use of efforts, sales terms, expertise and resources

17   normally used by [Volcano] for other products, which, as compared with the *OCT Products*; are of

18   similar market potential . . . ."  Merger Agreement at A-9 (emphasis added).  This definition is

19   meaningless if OCT Products include products by other companies, including those not yet

20   acquired by Volcano.  For example, there is no argument that Volcano could satisfy the

21   "commercially reasonable efforts" standard by matching the efforts used by Volcano for products

22   comparable to *Axsun's* products (as opposed to products comparable to the OCT Products being

23   developed from CardioSpectra's assets).  Rather, it is clear that "OCT Products" in the

24   "commercially reasonable efforts" definition refers to products developed from CardioSpectra's

25   assets.

26             In addition, the Merger Agreement allows Volcano to "terminat[e] the development and/or

27   commercialization of all or some OCT Systems or OCT Products" upon the reasonable

28   determination that a Technical Failure or Commercial Failure has occurred.  Merger Agreement §

United States District Court
Northern District of California

16

2.5(c).  By definition, Technical and Commercial Failures occur where events cause Volcano's development or commercialization of the OCT Products to be commercially unreasonable or not reasonably likely.  Merger Agreement at A-4, A-16.  That provision is meaningless if OCT Products refers to Axsun products, which were not developed by Volcano and which Volcano had not even acquired at this time.  The fact that Volcano did in fact declare a commercial failure, as the plaintiffs claim, is immaterial; the point is that Volcano's power to declare commercial and technical failures, as set forth in the agreement, is limited to the products developed from CardioSpectra's assets, which is what happened.

## III.  ANTICIPATORY BREACH

The plaintiffs' complaint alleges that "Volcano is in anticipatory breach of the Agreement, and is preventing the achievement of the third and fourth milestones, thus depriving Plaintiffs of the milestone payments."  SAC ¶ 36.  "A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions."  *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, *4 (Del. Ch. Feb. 23, 2009) (citation omitted).  A party's refusal to perform may be evidenced by words or by conduct.  A refusal to perform through conduct requires "a voluntary and affirmative act rendering performance apparently or actually impossible."  *Id.*  The plaintiffs claim that "by the time Plaintiffs sued Volcano in [March] 2012, Volcano had effectively abandoned its commercialization plan for a Generation 1a OCT System, ensuring there would never be sales of that System sufficient to trigger Milestones 3 and 4."  Pltfs.' Opp. at 19.  The plaintiffs, however, have presented no evidence that Volcano refused to achieve Milestones 3 and 4 in March 2012 or at any other time before Volcano declared a Commercial Failure in November 2013, pursuant to the Merger Agreement.[13]  The anticipatory claim therefore fails as a matter of law and I GRANT Volcano's motion for summary judgment regarding this claim.

## IV.  MOTION FOR SANCTIONS

The plaintiffs filed a motion for sanctions (Dkt. No. 88), alleging that Volcano withheld responsive material regarding its commercially reasonable efforts from its discovery responses and

---

[13] There is no dispute that Volcano declared a Commercial Failure in November 2013.  *See, e.g.,* Pltfs.' Opp. at 19.

United States District Court
Northern District of California

1    then attached the responsive material to its reply brief in support of its motion for summary

2    judgment.  The allegedly responsive material attached to Volcano's reply brief relates to

3    Volcano's commercial efforts for VIBE, a catheter developed by Volcano.

4          The plaintiffs argue that Volcano should have provided material regarding VIBE and

5    Volcano's other products in response to the following requests for production:

6          RFP No. 5: "All material relating to Volcano's efforts to achieve Milestone 2.";

7          RFP No. 9: "All material showing Volcano's use of Commercially Reasonable Efforts to
8                market and sell OCT Products.";

9          RFP No. 18: "All material constituting '[d]ocuments reflecting Volcano's business
10               decisions and efforts in pursuit of regulatory approval for the 'Generation
                 I(a) OCT System' as provided for in the Agreement" that you described in
11               your Initial Disclosures . . ."; and

12         RFP No. 19: "All material constituting '[d]ocuments sufficient to show Volcano's
13               compliance with its obligations under the Milestone provisions in the
                 Agreement' that you described in your Initial Disclosures . . ."

14   The plaintiffs' Milestone 2 claim required the plaintiffs to establish that the OCT Products

15   were comparable to other Volcano products for purposes of the "commercially reasonable efforts

16   comparison" standard.  Plaintiffs contend that the above requests required Volcano to produce

17   documents regarding VIBE and its other products, including the material that Volcano attached to

18   its reply brief, because "commercially reasonable efforts" are defined as the efforts normally used

19   by Volcano for other products similar to the OCT Products.  But this assertion is meritless for at

20   least two reasons.

21         First, Volcano does not consider VIBE, or any other product, to be similar to the OCT

22   Products.  It had no reason to produce documents regarding VIBE or other products in response to

23   the requests.  It attached the VIBE documents to its reply brief in order to dispute the plaintiffs'

24   contention that VIBE is similar to OCT Products, which was appropriate.

25         Second, the plaintiffs were provided a list of Volcano's products, including VIBE, in

26   discovery.  They could have and should have propounded discovery specifically directed to

27   discovering whether Volcano's other products were valid comparisons. Yet they never did.  The

28   requests listed above were not reasonably directed at the material the plaintiffs accuse Volcano of

18

withholding.  The failure to identify an adequate comparator against which to measure Volcano's

commercially reasonable efforts was caused by the way in which plaintiffs drafted their discovery,

not the way in which Volcano responded. The motion for sanctions is DENIED.

### CONCLUSION

Volcano's motion for summary judgment is GRANTED.  The plaintiffs' motion for

summary judgment is DENIED.  The plaintiffs' motion for sanctions is DENIED.  The trial set for

May 27, 2014 and all related pre-trial deadlines are VACATED.

**IT IS SO ORDERED**.

Dated: March 31, 2014



WILLIAM H. ORRICK
United States District Judge