STANLEY LAW GROUP
MATTHEW J. ZEVIN, SBN: 170736
225 Broadway, Suite 1350
San Diego, CA 92101
Telephone: (619) 235-5306
Facsimile: (815) 377-8419
e-mail: mzevin@aol.com

Attorneys for Plaintiffs, Former Shareholders of CardioSpectra, Inc.
[Additional Counsel Listed on Signature Page]

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

| | |
|---|---|
| FORMER SHAREHOLDERS OF CARDIOSPECTRA, INC.<br><br>Plaintiffs,<br><br>v.<br><br>VOLCANO CORPORATION, a Delaware corporation; and DOES 1-10,<br><br>Defendant. | CASE NO. CV12-01535WHO<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE: March 19, 2014<br>TIME: 2:00 p.m.<br>JUDGE: Honorable William H. Orrick<br>CTRM: 2 |

**CORRECTED REDACTED VERSION OF DOCUMENTS FILED UNDER SEAL PURSUANT TO COURT ORDER DATED MARCH 31, 2014 [DKT. NO. 96]**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 2

II. PRELIMINARY STATEMENT .......... 2

III. FACTUAL BACKGROUND AND SUMMARY JUDGMENT EVIDENCE .......... 4

- A. Volcano Shops Around for an OCT Company and Decides on Cardiospectra .......... 4
- B. Volcano and CardioSpectra Negotiate the Terms of the Agreement .......... 5
- C. Volcano Acquires Axsun, and Sells in Excess of $25 Million of "Axsun OCT Products" Before the End of 2013 .......... 7
- D. Volcano Fails to Pay the Shareholders .......... 8

IV. ARGUMENT .......... 8

- A. The Only Reasonable Interpretation of the Agreement's Plain Language Entitles Plaintiffs to Summary Judgment on the Issue of Whether the "Axsun OCT Products" Are "OCT Products" as Defined in the Agreement .......... 8
- B. Alternatively, the Only Admissible Extrinsic Evidence Supports Plaintiffs' Interpretation that the "Axsun OCT Products" are "OCT Products" Under the Agreement, Entitling Plaintiffs to Summary Judgment .......... 12
- C. Because "OCT Products" Includes the "Axsun OCT Products" Volcano Sold, Plaintiffs are Entitled to a Partial Summary Judgment in the Amount of $17 Million .......... 15

V. CONCLUSION .......... 17

# TABLE OF AUTHORITIES

## CASES

*Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*,
702 A.2d 1228 (Del. 1997) ........ 13, 14

*United Rentals, Inc. v. RAM Holdings, Inc.*,
937 A.2d 810 (Del. Ch. 2007) ........ 9, 12

## SECONDARY AUTHORITIES

Federal Rules of Civil Procedure
Rule 30(b)(6) ........ 7, 17
Rule 56 ........ 8
Rule 56(a) ........ 8

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 19, 2014, at 2:00 p.m., or when this motion may be heard by the above-captioned Court, Christopher E. Banas and Paul Castella, in their capacities as Shareholders' Representatives of the Former Shareholders of CardioSpectra, Inc. ("Plaintiffs") will move for partial summary judgment on their claim for breach of contract against Defendant Volcano Corporation ("Defendant"). This motion is based on the accompanying Memorandum of Points and Authorities; the Declarations of Christopher E. Banas, Scott A. Kitner, Martin Woodward, and the exhibits thereto; all pleadings and papers on file in this action; and such other matters as presented to the Court at the time of the hearing.

## STATEMENT OF RELIEF SOUGHT

Under Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs seek an order granting partial summary judgment in their favor and against Defendant on their claim for breach of contract, and ordering Defendant to pay $17,000,000 in damages to Plaintiffs.

## STATEMENT OF ISSUES TO BE DECIDED

(1) Whether there is a genuine dispute of material fact that Defendant attained "Cumulative Cash Sales" totaling $10,000,000 from "Commercial Sales" of "OCT Products" (as those terms are defined in the Merger Agreement entered into by the parties to this action) prior to December 31, 2013.

(2) Whether there is a genuine dispute of material fact that Defendant attained "Cumulative Cash Sales" totaling $25,000,000 from "Commercial Sales" of "OCT Products" (as those terms are defined in the Merger Agreement entered into by the parties to this action) prior to December 31, 2014.

(3) Whether there is a genuine dispute of material fact that Defendant's attainment of these sales triggered its obligations to pay $10,000,000 and $7,000,000 respectively in "Milestone Merger Consideration" under Milestones 3 and 4, § 2.5(a)(iii-iv) of the Merger Agreement entered into by the parties to this action.

(4) Whether there is a genuine dispute of material fact that Defendant paid none of the aforementioned "Milestone Merger Consideration" and this failure is a breach of the Merger Agreement entered into by the parties to this action.

(5) Whether there is a genuine dispute of material fact that Defendant's breach of the Merger Agreement damaged Plaintiffs, in their capacities as Shareholders' Representatives of the Former Shareholders of CardioSpectra, Inc., in the amount of $17,000,000.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In this Motion, Plaintiffs ask the Court to grant them summary judgment on a portion of their breach of contract claim. Plaintiffs' request rests on whether there is a genuine issue of material fact that Defendant's sales of specific products triggered its obligation under the contract in issue to make $17 million in contractually-agreed payments to Plaintiffs. Because a straightforward analysis of the contract shows that the parties agreed that sales of these products require Defendant to pay these amounts, there is nothing for a jury to decide as to these issues. The Court should immediately enter judgment in favor of Plaintiffs and should order Defendant to pay them $17 million.

### II. PRELIMINARY STATEMENT

In 2007, Volcano Corporation ("Volcano") – a big player in the endovascular imaging industry – was in an expansion mode. Volcano had a lot of cash on hand, and it anxiously wanted to expand the scope of its business and address a possible competitive threat by acquiring other companies: its primary offerings used intravascular ultrasound ("IVUS") technology, and its competitors were developing a new, light-wave based technology called Optical Coherence Tomography ("OCT"). Volcano feared that OCT might eventually replace IVUS as the industry standard in the same way that, for example, touch-screen technology became the standard for smartphones (and crippled companies that did not quickly acquire and implement this technology).

Thus, Volcano spent much of 2007 looking to acquire a company that had already made advancements in OCT. For a time, Volcano considered buying a company ("UCI") associated

with the University of California, Irvine that had developed OCT technology, even drafting a proposed merger agreement for such an acquisition. But, by late 2007, Volcano decided that the startup company CardioSpectra, Inc. ("CardioSpectra") was a more attractive target, as CardioSpectra had developed a groundbreaking, advanced-stage prototype of an OCT imaging system.

The parties signed a merger agreement ("Agreement"), and Volcano committed to pay up to $63.2 million to the former shareholders of CardioSpectra ("Shareholders"). The Agreement provided for an upfront payment of $25.2 million in cash, and it allowed Volcano to defer four additional "earnout" payments to the Shareholders: each of these payments would be triggered when Volcano achieved a corresponding "milestone." Relevant to this motion, upon reaching sales goals of $10 million worth of "OCT Products" as defined in the Agreement by December 31, 2013 ("Milestone 3"), Volcano would become obligated to pay the Shareholders $10 million. And, upon selling $25 million worth of "OCT Products" by December 31, 2014 ("Milestone 4"), Volcano would become obligated to pay the Shareholders an additional $7 million.

In 2008, Volcano purchased another company, Axsun Technologies, Inc. ("Axsun"), which manufactured products for use in connection with OCT. From 2009 through 2013, Volcano – through its now-wholly-owned subsidiary, Axsun – sold over $25 million worth of these OCT medical imaging products. Importantly, under the definition of "OCT Product" in the Agreement, Volcano met the sales goals that triggered its obligation to pay $17 million to the Shareholders under Milestones 3 and 4.

Plaintiffs – the two authorized Shareholder representatives who signed the Agreement – move for a partial summary judgment on the ground that Volcano, in breach of the Agreement, failed to make the milestone payments and damaged the Shareholders in the amount of $17 million. The Court should find there is no genuine issue of material fact that the Agreement reflects the parties' understanding that sales of the items that Volcano sold through Axsun fall within the category of "OCT Products" as defined in the Agreement. The Court should also summarily find that Volcano's failure to pay the Shareholders $17 million in milestone payments is a breach of contract, and that the Shareholders have been damaged in that amount, entitling

them to a judgment forthwith.

## III. FACTUAL BACKGROUND AND SUMMARY JUDGMENT EVIDENCE

### A. Volcano Shops Around for an OCT Company and Decides on Cardiospectra

As Volcano CEO Scott Huennekens testified, Volcano is a leading manufacturer of IVUS catheters.[1] In 2007, Volcano was very eager to expand into OCT through acquiring other companies which had already started developing OCT technology. As Vince Burgess, former Volcano Vice President,[2] testified:

Q. Were you looking for a company that was involved in OCT?

A. Yes.

Q. Why?

A. Because it was a competitive threat to our IVUS business and a potential revenue growth opportunity, new market expansion opportunity for us, in addition to being competitive.[3]

Two internal powerpoint presentations from 2007 illustrate the high level of Volcano's interest in OCT.[4] Volcano noted the technology was "likely superior for use" in some situations, and had "outstanding image quality."[5] But Volcano also recognized that OCT represented a "credible threat to IVUS . . ." and "if we don't, others will"[6] begin selling the technology. As Mr. Burgess explained: "If we don't push OCT and aggressively commercialize it, others will, which could make our life difficult in the marketplace."[7] Volcano identified "current OCT

---

[1] *See* Scott Huennekens Deposition Transcript ("Huennekens Dep.") 124:19-20, attached as Ex. 5 to the Declaration of Martin Woodward filed in Support of Plaintiffs' Motion for Partial Summary Judgment ("Woodward Decl.").

[2] *See* Vincent J. Burgess Deposition Transcript, attached as Ex. 2 to the Woodward Decl. ("Burgess Dep.") at 10:5-17.

[3] *See* Burgess Dep. 13:15-22.

[4] *See* Burgess Dep. 108:10-20, 109:25-110:7 & Ex. 205, attached as Ex. 10 to the Woodward Decl.; Burgess Dep. 123:13-22, 125:17:22 & Ex.209, attached as Ex. 11 to the Woodward Decl.

[5] *See* Burgess Dep. Ex. 205 (p2, VOLCANO_00047162).

[6] *See* Burgess Dep. Ex. 205 (p2, VOLCANO_00047162); Ex. 209 (p4, VOLCANO_00047365),

[7] *See* Burgess Dep. 125:17-22 & Ex. 209 (p4, VOLCANO_00047365).

competitors,"[8] and determined that "Volcano will be in OCT."[9] Volcano was considering spending hundreds of millions of dollars on an OCT acquisition, and on others.[10]

One of the companies Volcano identified as a target for acquisition was UCI.[11] In August of 2007, Volcano sent a draft merger agreement to UCI for review.[12] Despite this step, however, the draft agreement with UCI was never signed or executed.[13]

Volcano didn't close the deal because it was also looking at other OCT companies besides UCI, and it ultimately decided CardioSpectra was a more appealing alternative than UCI.[14] As Mr. Burgess testified: "We looked at the two opportunities and decided that CardioSpectra was a more attractive opportunity for us, all things considered."[15]

**B. Volcano and CardioSpectra Negotiate the Terms of the Agreement**

Volcano and CardioSpectra negotiated the terms of the Agreement in November and December of 2007.[16] Mr. Burgess was the sole negotiator for Volcano, and former CardioSpectra CEO Christopher Banas was the sole negotiator for CardioSpectra.[17] Nobody else was materially involved in negotiating either the price or the deal structure (although Mr. Burgess and Mr. Huennekens had discussed the negotiations, as did Mr. Banas and former CardioSpectra CFO Paul Castella).[18] But Mr. Burgess cannot now recall or explain why any of the iterative changes in the different drafts of the Agreement were made – including the defined term "OCT Product"

---

8 *See* Burgess Dep. Ex. 205 (p5, VOLCANO_00047165).

9 *See* Burgess Dep. Ex. 205 (p5, VOLCANO_00047165); *see also* Ex. 209 (p8, VOLCANO_00047369).

10 *See* Burgess Dep. Ex. 209 (p18-19, VOLCANO_00047379-80).

11 *See* Burgess Dep. Ex. 205 (p6-8, 12 VOLCANO_00047166-68, 72).

12 *See* Burgess Dep. 93:19-94:24 & Ex. 201, attached as Ex. 9 to the Woodward Decl.

13 *See* Burgess Dep. 94:22-24.

14 *See* Burgess Dep. 15:4-17:15.

15 *See* Burgess Dep. 17:1-3.

16 *See* Burgess Dep. 36:2-4.

17 *See* Burgess Dep. 33:14-36:20.

18 *See* Burgess Dep. 36:14-20; Huennekens Dep. 128:21-24; 140:2-3; 157:23-24; Christopher Banas Deposition Transcript ("Banas Dep."), attached as Ex. 1 to the Declaration of Scott Kitner filed in support of Plaintiffs' Motion for Partial Summary Judgment ("Kitner Decl.") 52:7-53:8, 53:19-54:4.

in the Agreement.[19] And Mr. Huennekens likewise cannot now recall anything about the negotiations that led to the defined term "OCT Product" in the Agreement.[20] Mr. Banas, however, recalls negotiating over the term "OCT Product" – including his insistence to Mr. Burgess that the term be defined very broadly to protect the Shareholders, who, in the Agreement, were giving up their ability to profit from any future OCT-related sales except through Volcano.[21]

Despite the lack of recollection of Volcano's lone negotiator about how the language of the Agreement came to be, Volcano CFO John Dahldorf acknowledged in July of 2010:

> The Agreement was carefully and vigorously negotiated among sophisticated parties, and it constitutes the entire agreement and the only agreement among the parties pertaining to consideration for the acquisition of CardioSpectra stock. . . . The parties negotiated the Agreement in 2007 and gave careful attention to establishing the agreed upon terms and conditions of the Milestone Merger Consideration.[22]

The complete Agreement ranges 75 pages, and includes 14 exhibits.[23] The material provisions of the Agreement important to this Motion are:

- The Milestone provisions, and in particular the third and fourth milestones (Agreement § 2.5(iii-iv));
- Certain definitions from Exhibit A of the Agreement, in particular "OCT" and "OCT Product"; other significant definitions are "Affiliate," "Commercial Sale," "Cumulative Cash Sale," "Entity," "Parent," and "Person" (Agreement Ex. A);

---

[19] *See* Burgess Dep. 49:19-50:3, 51:14-61:13; 65:10-66:13.

[20] *See* Huennekens Dep. 136:16-25, 144:10-13, 159:16-19.

[21] *See* Declaration of Christopher Banas filed in support of Plaintiffs' Motion for Partial Summary Judgment ("Banas Decl.") ¶¶ 3-4; *see generally id.*

[22] *See* Dahldorf Dep. Ex. 185 (CS004954-55), attached as Ex. 7 to the Kitner Decl. ("Agreement"), 45:20-58:4.

[23] *See* Huennekens Dep. Ex. 198, attached as Ex. 8 to the Kitner Decl.; Huennekens Dep. 127:10-128:13.

- The choice of law provision mandating the application of Delaware law (Agreement § 13.9(a)); and
- The integration clause and construction provisions (Agreement §§ 13.16-17).[24]

### C. Volcano Acquires Axsun, and Sells in Excess of $25 Million of "Axsun OCT Products" Before the End of 2013

In December of 2008, Volcano acquired Axsun.[25] Axsun became Volcano's wholly-owned subsidiary.[26] As Volcano puts it, Axsun "sells certain component parts that can be used in the field of Optical Coherence Tomography ("OCT")."[27]

As Axsun itself put it in a 2011 powerpoint for a conference, it makes four "Axsun OCT products."[28] These are the Axsun Swept Laser OEM Engine, Axsun Swept Laser Benchtop Engine, Axsun Camera Link DAQ Board, and Axsun Swept Laser Engine with Integrated DAQ.[29] And, Axsun's website displays and describes its OCT Swept Lasers under its "Products Overview."[30]

By the end of 2102, Volcano (through Axsun) had sold more than $21 million of the four "Axsun OCT products."[31] By the end of the second quarter of 2013, these sales had reached more than $24.6 million.[32] And Volcano believed these sales had reached over $25 million by the third quarter of 2013.[33]

---

[24] *See* Huennekens Dep. Ex. 198.

[25] Volcano's Interrogatory Answers, Response No. 2, attached as Ex. 13 to the Kitner Decl.

[26] *See* Volcano's Interrogatory Answers, Response No. 2; Huennekens Dep. 144:14-16.

[27] *See* Volcano's Interrogatory Answers, Response No. 2.

[28] *See* Huennekens Dep. Ex. 420, attached as Ex. 12 to the Kitner Decl. (p9, VOLCANO_00004703), Huennekens Dep. 22:2-23:21.

[29] *See* Huennekens Dep. Ex. 420 (p9, VOLCANO_00004703).

[30] *See* Kitner Decl., Ex. 14.

[31] *See* Volcano's Interrogatory Answers, Response No. 3.

[32] *See* Volcano's Interrogatory Answers, Response No. 3; John Dahldorf Deposition Transcript, attached as Ex. 4 to the Woodward Decl. ("Dahldorf Dep.") 75:15-78:13; John Dahldorf Rule 30(b)(6) Deposition Transcript, attached as Ex. 3 to the Woodward Decl. ("Dahldorf Rule 30(b)(6) Dep.") 110:13-23 & Ex. 180.

[33] *See* Dahldorf Rule 30(b)(6) Dep.109:7-17 & Ex. 180, attached as Ex. 6 to the Kitner Decl.

**D. Volcano Fails to Pay the Shareholders**

The third and fourth milestone provisions of the Agreement state that if Volcano attains $25 million in commercial sales of OCT Products by the end of 2014, Volcano must pay the Shareholders $17 million.[34] But, despite achieving over $25 million in sales of the four "Axsun OCT products" before the end of 2013, Volcano has not paid the Shareholders anything under Milestones 3 and 4.[35]

As Volcano frames the issue: "Volcano's subsidiary, Axsun, which Volcano acquired on or around December 23, 2008, sells certain component parts that can be used in the field of Optical Coherence Tomography ("OCT"); however, Volcano disputes that any such component parts are OCT Products as defined in the Merger Agreement."[36]

## IV. ARGUMENT

As the Court is aware, under Rule 56, Plaintiffs are entitled to summary judgment on the part of their breach of contract claim that is the subject of this Motion if they can show that there is no genuine issue of material fact. Fed. R. Civ. P. 56(a).

The Agreement states: "This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws)."[37] The Court must therefore apply Delaware law in deciding this Motion.

### A. The Only Reasonable Interpretation of the Agreement's Plain Language Entitles Plaintiffs to Summary Judgment on the Issue of Whether the "Axsun OCT Products" Are "OCT Products" as Defined in the Agreement

Under Delaware law,

> [T]he threshold inquiry when presented with a contract dispute on a motion for

---

Notably, these sales are only a subset of Volcano's sales for all of the products that Axsun makes – this particular subset is for medical sales, i.e. the "Axsun OCT products." *Id.* 110:13-23 & Ex. 180. Separate and apart from these sales figures, Volcano – through Axsun – sells industrial processing and telecommunications products. Kitner Decl. Ex. 14.

[34] *See* Ex. 198 ("Agreement") § 2.5(iii-iv).

[35] *See* Banas Decl. ¶ 5.

[36] *See* Volcano's Interrogatory Answers, Response No. 2.

[37] *See* Agreement § 13.9(a).

> summary judgment is whether the contract is ambiguous. Ambiguity does not exist simply because the parties disagree about what the contract means. Moreover, extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning. Rather, contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.

*United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (other internal citations omitted).

Thus, if Plaintiffs establish that the contract is not reasonably susceptible of different interpretations, the Court should find that the contract is not ambiguous, and that Plaintiffs are entitled to summary judgment. *United Rentals, Inc.*, 937 A.2d at 830 (citing *Modern Telecomms., Inc. v. Modern Talking Picture Serv.*, C.A. No. 8688, 1987 WL 11286, *3 (Del. Ch. May 27, 1987)).

The first issue for the Court to determine is whether the four "Axsun OCT products" are "OCT Products" as defined in the Agreement. For this inquiry, the relevant contract language for the Court to consider is:

- The definition of "OCT." The Agreement states: "'**OCT**' means optical coherence tomography."[38]
- The definition of "OCT Product." The Agreement states: "'**OCT Product**' means consoles (including OCT laser light sources[,] processors, application software, data storage devices, printers and other related components), patient interface modules and pull-back devices (also referred to as a PIM) and OCT catheters or wands used to conduct visualization, and any product or service covered by the scope of any Valid

[38] *See* Agreement (Kitner Decl. Ex. 8) at A-12.

Claim contained in any Licensed Patent."[39]

- The integration clause. The Agreement states (in relevant part): "**Entire Agreement.** This Agreement and the Related Agreements set forth the entire understanding of the parties hereto relating to the subject matter hereof and thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter hereof and thereof . . . ."[40]
- The construction provisions. The Agreement states (in relevant part): "As used in this Agreement, the words 'include' and 'including,' and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words 'without limitation.'"[41]
- The milestone provisions. The Agreement states (in relevant part): "[T]he ***'Milestone Merger Consideration'*** shall consist of . . . **(iii)** $10,000,000 upon the attainment of Cumulative Cash Sales totaling $10,000,000 from Commercial Sales of OCT Products (including, without limitation, consoles, patient interface modules and pull-back devices (also referred to as PIMs), catheters and software), *provided that* such Cumulative Cash Sales are attained prior to the earlier of (A) the date that is 3 years after FDA approval or premarket notification clearance of the Generation 1a OCT System or (B) December 31, 2013 (whether or not FDA approval or premarket notification clearance of the Generation 1a OCT System has been obtained at such time; and **(iv)** $7,000,000 upon the attainment of Cumulative Cash Sales totaling $25,000,000 from Commercial Sales of OCT Products (including, without limitation, consoles, patient interface modules and pull-back devices (also referred to as PIMs), catheters and

---

[39] *See* Agreement at A-13. As the parties have stipulated, there is supposed to be a comma between the words "sources" and "processors." Banas Dep. 185:10-25.

[40] *See* Agreement § 13.16 (p75).

[41] *See* Agreement § 13.17(c) (p75).

> software), *provided that* such Cumulative Cash Sales are attained prior to the earlier of (A) the date that is 4 years after FDA approval or premarket notification clearance of the Generation 1a OCT System or (B) December 31, 2014 (whether or not FDA approval or premarket notification clearance of the Generation 1a OCT System has been obtained at such time).[42]

Plaintiffs interpret the plain language of the Agreement to include each of the four "Axsun OCT products" within the definition of "OCT Product." The Agreement defines "OCT Product" as a broad, catch-all term: within its initial example of "consoles," it incorporates an open-ended, non-exclusive list of items.[43] These "include" – "without limitation," per the Agreement's construction provisions[44] – the OCT laser light sources, such as the swept laser engines made by Axsun and sold by Volcano.[45]

The Agreement's milestone provisions also use the defined term "OCT Product" – and here, as if to emphasize its breadth and inclusiveness, the term is followed by a parenthetical echoing the items in the definition section and explicitly beginning with the words "including, without limitation . . . ."[46]

The Court should find that Plaintiffs' interpretation of "OCT Product" as including the four "Axsun OCT products" is reasonable. Whether the definition of "OCT Product" as used in the definitions section of the Agreement is interpreted to include the four "Axsun OCT products" as within the parenthetical list following the word "consoles,"[47] or whether "OCT Product" as used in the milestone provisions is interpreted to include the four "Axsun OCT products" within its non-exclusive parenthetical list,[48] they are inescapably "OCT Products" under the plain

---

[42] *See* Agreement § 2.5(a)(iii-iv) (p6-7).

[43] *See* Agreement at A-13.

[44] *See* Agreement § 13.17(c) (p75).

[45] *See* Volcano's Interrogatory Answers, Response No. 2; Huennekens Dep. Ex. 420 (p9, VOLCANO_00004703).

[46] *See* Agreement § 2.5(a)(iii-iv) (p6-7).

[47] *See* Agreement at A-13.

[48] *See* Agreement § 2.5(a)(iii-iv) (p6-7).

language of the Agreement.

And although Volcano disputes that the four "Axsun OCT products" are "OCT Products" under the Agreement,[49] Volcano cannot offer a reasonable interpretation of the relevant contractual language that would support its position. Indeed, with the parties having defined "OCT Product" in such a palpably broad and non-exclusive way, it would fly in the face of reason to suggest that the "Axsun OCT products" are not within the scope of "OCT Product" as it is used in the Agreement. Neither can Volcano point to anything outside of the Agreement to support its position: the Agreement contains an integration clause,[50] as Volcano CFO Dahldorf noted:

> The Agreement was carefully and vigorously negotiated among sophisticated parties, and it constitutes the entire agreement and the only agreement among the parties pertaining to consideration for the acquisition of CardioSpectra stock. . . . The parties negotiated the Agreement in 2007 and gave careful attention to establishing the agreed upon terms and conditions of the Milestone Merger Consideration.[51]

Thus, the Court should find that Plaintiffs' interpretation of "OCT Product" as including the four "Axsun OCT products" is the only reasonable interpretation of the ostensibly disputed meaning of "OCT Product" as it is used in the Agreement. Having found that "OCT Product" is fairly susceptible only to Plaintiffs' interpretation, it should grant summary judgment to Plaintiffs. *United Rentals, Inc.*, 937 A.2d at 830.

**B. Alternatively, the Only Admissible Extrinsic Evidence Supports Plaintiffs' Interpretation that the "Axsun OCT Products" are "OCT Products" Under the Agreement, Entitling Plaintiffs to Summary Judgment**

As the Delaware Supreme Court states:

> If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But when there is uncertainty in the meaning and application of contract language,

---

[49] *See* Volcano's Interrogatory Answers, Response Nos. 2 & 3.

[50] *See* Agreement § 13.16 (p75).

[51] *See* Dahldorf Dep. Ex. 185 (CS004954-55), 45:20-58:4.

> the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms . . . . In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.

*Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997).[52]

Plaintiffs contend that the Agreement's broad definition of "OCT Product" is not ambiguous; however, if the Court determines otherwise after first making the required finding that it is also reasonable to interpret the Agreement's plain language as excluding the four "Axsun OCT products" from "OCT Product," the Court should nevertheless grant summary judgment to Plaintiffs on this issue, because the only admissible extrinsic evidence supports Plaintiffs' interpretation.

Initially, Volcano cannot adduce any admissible extrinsic evidence of prior agreements. The Agreement is the only contract between the parties, and there are no prior agreements.[53] For the same reason, Volcano can adduce no admissible extrinsic evidence of the parties' course of dealing, because the Agreement is the only commercial transaction between the parties. Notably, in the draft agreement Volcano sent UCI, [redacted] – illustrating that Volcano knew of and expressly agreed to the more inclusively-defined term "OCT Product" in the Agreement.[54]

Nor can Volcano adduce any admissible extrinsic evidence of communications of the parties. This is because Mr. Burgess was its sole negotiator, and neither he nor Mr. Huennekens (with whom he discussed the negotiations) can recall any specific communication or anything about the negotiations for the defined term "OCT Product."[55]

---

[52] "This is true notwithstanding the presence of a routine integration clause. . . ." *Id.* at 1233 n.10.

[53] *See* Dahldorf Dep. 53:23-25.

[54] *Compare* Burgess Dep. Ex. 201 (pA-6, VOLCANO_00047006) *with* Agreement at A-13.

[55] *See* Burgess Dep. 49:19-50:3, 51:14-61:13; 65:10-66:13; Huennekens Dep. 136:16-25, 144:10-13, 159:16-19.

Plaintiff and Shareholder Representative Christopher Banas, however, recalls the negotiations over the defined term "OCT Product."[56] He specifically remembers extensive discussions with Mr. Burgess about the scope of the term "OCT Product," including at least one discussion in which he made clear to Mr. Burgess that the definition must be sufficiently expansive to include sales of component parts to be used in OCT, exactly like the four "Axsun OCT products."[57] As Mr. Banas discussed with Mr. Burgess, this was necessary to protect the Shareholders' interests, as they would be losing their ability to benefit from future sales of any products or components related to OCT because of CardioSpectra's merger with Volcano, whereas Volcano would acquire that ability.[58] This is particularly true because Volcano could have acquired other OCT companies after acquisition of CardioSpectra and could have "shelved" the CardioSpectra system in favor of other OCT systems – thus eliminating a potential loophole which had the real possibility of rendering the milestones useless unless they encompassed all OCT products, including individual components of the OCT systems.[59]

Additionally, the only admissible extrinsic evidence of trade usage unequivocally supports Plaintiffs' interpretation of "OCT Product." Axsun's own powerpoints and website descriptions even dating to well after Volcano acquired Axsun all describe its swept source lasers as "OCT products."[60] Crucially, Volcano can adduce no admissible extrinsic evidence of trade usage to the contrary.

Because the only admissible extrinsic evidence is consistent with Plaintiffs' interpretation of "OCT Product," there is no genuine issue of material fact in connection with the Court's construction of this term. The Court should therefore find that the defined term in the Agreement includes the four "Axsun OCT products," and it should enter summary judgment in favor of Plaintiffs on this issue. *Eagle Industries, Inc.*, 702 A.2d at 1232-33.

---

[56] *See* Banas Decl. ¶ 3.

[57] *See* Banas Decl. ¶¶ 3-4; *see also* Banas Dep. 139:7-21.

[58] *See* Banas Decl. ¶ 3; *see also* Banas Dep. 186:5-19.

[59] See Banas Decl. ¶ 3.

[60] *See* Huennekens Dep. Ex. 420 (p17, VOLCANO_00004703), 22:2-23:21; Kitner Decl., Ex. 14.

### C. Because "OCT Products" Includes the "Axsun OCT Products" Volcano Sold, Plaintiffs are Entitled to a Partial Summary Judgment in the Amount of $17 Million

The final issue for the Court to consider is whether Volcano's payment obligations under the milestone provisions are triggered because of its sales of more than $25 million of "OCT Products." For this inquiry, the relevant contract language for the Court to consider (in addition to the language reproduced *supra* in Part IV(A)) is:

- The definition of "Affiliate." The Agreement states: "'**Affiliate**' means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such Person."[61]
- The definition of "Person." The Agreement states: "'**Person**' means any individual, Entity or Governmental Body."[62]
- The definition of "Entity." The Agreement states: "'**Entity**' means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity."[63]
- The definition of "Parent." The Agreement states: "'**Parent**' has the meaning set forth in the introductory paragraph of this Agreement." That paragraph states (in relevant part): "**THIS AGREEMENT AND PLAN OF MERGER** (**"*Agreement*"**) is made and entered into as of December 7, 2007, by and among: **VOLCANO CORPORATION,** a Delaware corporation (**"*Parent*"**). . . ."[64]
- The definition of "Commercial Sale." The Agreement states (in relevant part): "'**Commercial Sale**' means, with respect to any OCT Products . . . the sale by Parent or its Affiliates of an OCT Product . . . for end use or consumption of

---

[61] *See* Agreement at A-2.
[62] *See* Agreement at A-14.
[63] *See* Agreement at A-8.
[64] *See* Agreement (p1).

such product in a country . . . ."[65]

- The definition of "Cumulative Cash Sales." The Agreement states (in relevant part): "'**Cumulative Cash Sales**' means revenues calculated in accordance with GAAP for OCT Products . . . from Commercial Sales. . . ."[66]

Initially, under the plain terms of the Agreement, Axsun is an "Affiliate." It and Volcano are indisputably "Entities" and are thus "Persons,"[67] and Volcano undeniably controls Axsun, as Mr. Huennekens testified:

Q. Okay. You don't deny that Axsun is a wholly-owned subsidiary of Volcano, do you?

A. No.[68]

Moreover, the introductory paragraph of the Agreement expressly states that Volcano is the "Parent."[69]

Milestone 3 requires Volcano to pay $10 million "upon the attainment of Cumulative Cash Sales totaling $10,000,000 from Commercial Sales of OCT Products. . . ."[70] Likewise, Milestone 4 requires Volcano to pay $7 million "upon the attainment of Cumulative Cash Sales totaling $10,000,000 from Commercial Sales of OCT Products. . . ."[71] The term "Commercial Sale" include sales by "Parent or its Affiliates of an OCT Product," and "Cumulative Cash Sales" essentially means revenues from such sales.[72]

---

[65] *See* Agreement at A-4. This definition includes three other qualifying events as to OCT Products: (1) sales to wholesalers or resellers, (2) leases or licenses, and (3) sales, licenses, or sublicenses by Licensees (i.e., not wholesalers or resellers). *Id.*; *see also* Agreement at A-11 (definition of "Licensee").

[66] *See* Agreement at A-7. The remainder of this definition lists three deductions from the referenced revenues, all of which are to be "stated separately on the applicable bill or invoice": (1) cash discounts or rebates actually taken, (2) refunds or credits to customers as a result of returns, and (3) transportation costs, insurance charges, and various taxes actually paid. *Id.*

[67] *See* Agreement at A-2, A-14, A-8.

[68] *See* Huennekens Dep. 144:14-16.

[69] *See* Agreement (p1).

[70] *See* Agreement § 2.5(a)(iii) (p6).

[71] *See* Agreement § 2.5(a)(iv) (p7).

[72] *See* Agreement at A-4, A-7.

Volcano does not (and cannot) dispute it has attained more than $25 million in gross revenues of the four "Axsun OCT products" before the December 31, 2013 and 2014 deadlines in Milestones 3 and 4.[73] Neither can Volcano dispute these revenues qualify as "Cumulative Cash Sales" from "Commercial Sales" if the defined term "OCT Product" in the Agreement is found to include the four "Axsun OCT products" – which would trigger Volcano's obligation to pay $17 million in milestone merger consideration under the Agreement.[74]

Accordingly, once the Court has determined that Plaintiffs are entitled to a summary judgment on their interpretation of the only disputed contractual language (the term "OCT Product"), the Court should also summarily find that Volcano's failure to pay the Shareholders $17 million in milestone merger consideration is a material breach of the Agreement, and that they have been damaged in that amount – entitling Plaintiffs to judgment as a matter of law in their favor in the amount of $17 million.

## V. CONCLUSION

There are no genuine issues of material fact for a jury to decide in connection with Plaintiffs' breach of contract claim as it relates to Milestones 3 and 4. Neither is there any reason to undermine the careful attention the parties gave to the terms and conditions of the Agreement during the course of their vigorous negotiations. The Court should order Volcano to abide by the Agreement and to pay the Shareholders what it owes after profiting from its sales of OCT Products.

Respectfully submitted,

DATED: January 21, 2014

STANLEY LAW GROUP
MATTHEW J. ZEVIN

*/s/ Matthew J. Zevin*
MATTHEW J. ZEVIN

[73] *See* Volcano's Interrogatory Answers, Response No. 3; Dahldorf Dep. 75:15-78:13; Dahldorf Rule 30(b)(6) Dep. 109:7-17, 110:13-23 & Ex. 180; Agreement §2.5(a)(iii-iv) (p6-7).

[74] *See* Agreement §2.5(a)(iii-iv).

225 Broadway, Suite 1350
San Diego, CA 92101
Telephone: (619) 235-5306
Facsimile: (815) 377-8419
e-mail: mzevin@aol.com

STANLEY LAW GROUP
MARC R. STANLEY, Texas SBN: 19046500
(*admitted pro hac vice*)
MARTIN WOODWARD, Texas SBN: 00797693
(*admitted pro hac vice*)
SCOTT A. KITNER, Texas SBN: 24065563
(*admitted pro hac vice*)
3100 Monticello Avenue, Suite 770
Dallas, TX 75205
Telephone: (214) 443-4300
Facsimile: (214) 443-0358
e-mail: marcstanley@mac.com
mwoodward@stanleylawgroup.com
skitner@stanleylawgroup.com

Attorneys for Plaintiffs, Former Shareholders of CardioSpectra, Inc.